HONORABLE ROBERT S. LASNIK

1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

8

SOPHEARY SANH,

NO. 2:20-cv-00310

9
Plaintiff,

10
v.

DECLARATION OF BRENDAN
DONCKERS IN SUPPORT OF MOTION
TO AMEND

11
12

OPPORTUNITY FINANCIAL, LLC,
APPLIED DATA FINANCE, LLC d/b/a
PERSONIFY FINANCIAL, and RISE
CREDIT SERVICE OF TEXAS, LLC d/b/a
RISE,

13
14
15

Defendants.

16
17

I, Brendan W. Donckers, declare as follows:

18
1.      I am one of the attorneys for Plaintiff in the above-captioned matter. I am

19
over the age of 18, have personal knowledge of the facts herein, and am competent to

testify.

20
2.      Attached as Exhibit 1 is a true and correct copy of the Proposed First

21
Amended Complaint in compliance with LCR 15.

22
I declare under penalty of perjury of the laws of the state of Washington that the

23
foregoing is true and correct based on my personal knowledge.

24
DATED this 25th  day of January 2021 at Seattle, Washington.

25
26
*s/Brendan W. Donckers*
Brendan W. Donckers

27

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

EXHIBIT 1

1
2
3
4
5
6
7

UNITED STATES DISTRICT~~IN THE SUPERIOR~~ COURT
WESTERN DISTRICT ~~FOR THE STATE~~ OF WASHINGTON
~~IN AND FOR THE COUNTY OF KING~~

8

SOPHEARY SANH,

NO. 2:20-cv-00310

9

        Plaintiff,

[PROPOSED]   AMENDED   CLASS

10

v.

ACTION COMPLAINT

11
12
13

~~OPPORTUNITY FINANCIAL, LLC;~~
~~APPLIED DATA FINANCE, LLC d/b/a~~
~~PERSONIFY FINANCIAL; and~~ RISE
CREDIT SERVICE OF TEXAS, LLC d/b/a
RISE and ELEVATE CREDIT, INC.~~,~~

14

        Defendants.

15
16

### I.   INTRODUCTION

17

    Plaintiff Sopheary Sanh alleges on behalf of the putative class and upon

18

information and belief as set forth herein.

19

    Defendant Elevate Credit Inc. ("Elevate") is non-bank subprime

20

lender~~Defendants Opportunity Financial, Personify Financial, and RISE engage in~~

21

~~predatory lending practices~~ that aggressively solicits ~~target~~ financially vulnerable

22

Washingtonians ~~consumers.  They are in the business of lead generation and baiting~~

23

~~consumers like Ms. Sanh~~ to enter into loans whose~~with outrageous and usurious~~

24

25
26
27

[PROPOSED] AMENDED CLASS ACTION
COMPLAINT - 1
Cause No. 2:20-cv-00310

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Page 3 of 231

interest rates can exceed 149%. *See* Exhibit A[1] Because Elevate is not. The interest
on these loans ranges between 96% and 159% of the principal loan amount.  But after
trapping a bank and subjectconsumer, the Defendants pass these loans off to
statebanks and other institutions in states with little to no usury laws, Elevate uses a
rent-a-bank scheme to originate its high interest loans. *Id*. Its scheme involves an
offshore entity, controlled by Elevate, that funds loans made in the name of FinWise
Bank, which is chartered in Utah. Elevate has a 95-96 percent ownership interest in
the loans, which it brands as RISE-FinWise loans. *Id*. Not only is Elevate's lending
scheme set up to skirt usury laws and state and federal consumer protections, its loan
funding and purchasing arm is set up . They do this in the Cayman Islandsan attempt
to avoid paying United States business taxes. *Id.*

      Elevate's high interest lending scheme is fed by its predatory marketing and
solicitation strategy. Elevate combs consumer credit reports for the financially
vulnerable and desperate. *See* Dkt. No. 39-1 Ex. 1 at 2 (RISE-branded loan solicitation
Prescreen notice). Once target borrowers are identified, Elevate sends solicitations to
the consumers home, repeatedly,Washington's strong usury protections while the
potential borrower's need is the greatest. Notably, Elevate's name is omitted from the
solicitations and documents a borrower signs. Elevate deploys its subsidiaries, brands,
and affiliates, like RISE, RISE Credit Services of Texas, and FinWise, to perpetuate its
scheme that feeds it millions if not billions of dollars.

---

[1] *See* Exhibit A attached herein (Jean Eaglesham, Anna Maria Andriotis and Coulter
Jones, *'Rent-a-Banks' Defy States' Growing Efforts to Curb High-Costs Lending*, Wall
St. J., March 12, 2020 (available online at https://www.wsj.com/articles/rent-a-banks-
defy-states-growing-efforts-to-curb-high-cost-lending-11583435510?mod
=searchresults_pos3&page=1)) (here in after referred to as the WSJ Article).

[PROPOSED] AMENDED CLASS ACTION
COMPLAINT - 2
Cause No. 2:20-cv-00310

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Page 4 of 231

Elevate coaxed Ms. Sanh into entering into a RISE-branded 149% interest rate loan. Elevate is the true lender on this loan. When Ms. Sanh learned that the loan was illegal and she had recourse, she sued the original defendant RISE Credit Services of Texas, believing this entity to be the one that solicited her. Her claims against RISE Credit Services of Texas were dismissed and Ms. Sanh subsequently obtained facts indicating that the true lender~~exploiting Washington resident.  Ms. Sanh alleges that Defendants have engaged~~ in the loan agreement she entered into, and indeed the entity responsible for marketing the product to her was the non-bank sub-prime lender Elevate.

This scheme presents a gross abuse of the public trust. It not only exploits the vulnerable for pecuniary gain, it threatens the stability of the marketplace by incentivizing dishonesty. Washington law and federal law do not allow Elevate to be the true-lender and real party in interest on the high-interest loans that were marketed and sold to individuals like Ms. Sanh. Elevate's conduct is unfair and deceptive in violation of Washington's Consumer Protection Act. It has caused injury and damages to thousands of Washington consumers. Ms. Sanh brings this action to protect herself and others like her~~practice of soliciting vulnerable consumers for loan products with outrageous interest rates and attempting to avoid Washington's usury statute~~.

## II.   PARTIES

1.      Plaintiff Sopheary Sanh is a resident of King County, Washington.

2.      Defendant Elevate Credit Inc., is a publicly traded company that does business in Washington under the brand name "RISE" for the purposes of marketing, soliciting, and originating installment loan products.

[PROPOSED] AMENDED CLASS ACTION
COMPLAINT - 3
Cause No. 2:20-cv-00310

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Page 5 of 231

2.3.    Elevate Opportunity Financial, LLC, is a foreign limited liability company doing business in King County and throughout the state of Washington.

4.    Defendant RISE Credit Services of TexasApplied Data Finance, LLC, does business in Washington under the brand name "RISE" for the purposes of marketing, soliciting, and originating installment loan products.

3.5.    RISE Credit Services of Texasas Personify Financial ("Personify"). Personify is a foreign limited liability company doing business in King County and throughout the state of Washington.

4.6.    RiseDefendant RISE Credit ServicesService of Texas, LLC, does business in Washington as RISE.  RISE is a subsidiaryforeign limited liability company doing business in King County and throughout the state of Defendant ElevateWashington.

### III.    JURISDICTION AND VENUE

7.    This matter was originally filed in the Superior Court for the State of Washington in King County.

5.8.    Venue wasis proper pursuant to RCW 4.12.025 (1) and (3) because the Defendants transactedtransact business in King County, the Defendants solicited business from King County residents, King County residents entered into an agreement in King County. , and the tort at issue was committed in King County.

6.9.    The King County SuperiorThis Court has jurisdiction over this matter pursuant to RCW 4.12.020(3) because the cause of action arose in King County and pursuant to RCW 19.86.090, which allows Washington residents to bring private right of action Consumer Protection Act claims in the superior courts of this state to enjoin unfair or deceptive business practices that affect the public interest and cause injury.

[PROPOSED] AMENDED CLASS ACTION
COMPLAINT - 4
Cause No. 2:20-cv-00310

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

10.     This matter was removed to this Court by OppLoans pursuant to 28 U.S.C. §§ 1332(d)(2), 1441, 1446 and 1453.

## IV.     FACTUAL ALLEGATIONS

### A.     Procedural History

11.     In January 2020, Ms. Sanh commenced this action in King County Superior Court by suing three entities, Applied Data Finance, LLC d/b/a/ Personify Financial ("Personify"), RISE Credit Services of Texas, LLC ("RISE") and Opportunity Financial, LLC ("OppLoans"). She alleged that these entities solicited her to enter into loans with rates substantially above Washington state's usury rate.

12.     Ms. Sanh's original Complaint alleged Washington's Consumer Protection Act ("WCPA") violations because: (1) the Defendants had transacted in usurious loans and (2) that Defendants engaged in unfair and deceptive marketing scheme to entrap borrowers in high interest loans.

13.     OppLoans and RISE each moved to dismiss Ms. Sanh's claim on May 11, 2020. Dkt. Nos. 27, 30.

14.     Both OppLoans and RISE argued that Ms. Sanh's WCPA usury claims must be dismissed under Fed. R. Civ. P. 12(B)(6) because they were preempted under the Depository Institutions Deregulation and Monetary Control Act of 1980 ("DIDA").

15.     RISE also alleged that Plaintiff had sued the wrong party and that Ms. Sanh's claims should be dismissed under Fed. R. Civ. P. 12(b)(2), because the loan she entered into was not a loan with RISE, but instead a RISE-branded loan.

[PROPOSED] AMENDED CLASS ACTION
COMPLAINT - 5
Cause No. 2:20-cv-00310

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Page 7 of 231

16.     RISE alleged that it was a subsidiary of Elevate Credit, Inc. Dkt. Nos. 14 & 43 at 4.

17.     Plaintiffs' claims were dismissed without prejudice and she was given leave to amend on January 12, 2021. Dkt. Nos. 48 and 49.

18.     After dismissal, Ms. Sanh obtained facts, through a Wall Street Journal investigative article, a Complaint filed by the Attorney General of the District of Columbia and Elevate's SEC filings, indicating that Elevate was the true-lender of her RISE-branded loan.

19.     Ms. Sanh now submits this Amended Complaint alleging Elevate, along with RISE, have violated the WCPA per se by violating Washington's usury statute, and it has violated the WCPA through unfair and deceptive lending practices involving a scheme to deceive courts, regulators, and borrowers into believing that state-chartered banks are the lenders of loans like those entered into by Ms. Sanh and others, when non-bank Defendant Elevate is in fact the true lender and real party in interest.

**B.     Defendants Elevate Credit, Inc. and RISE Credit Services of Texas**

20.     Defendant Elevate Credit, Inc. is an online lender that operates through several websites, including www.risecredit.com, www.elastic.com, and www.elevate.com. Ex. B at 1 (Complaint filed by Washington, D.C., Attorney General (DC AG Complaint)).[2]

21.     The www.risecredit.com website contains no mention of Elevate.

22.     RISE is not an independent entity, but instead an Elevate brand.

---

[2] *District of Columbia v. Elevate Credit, Inc.*, Civil Case No. ____, Superior Court of the Dist. of Columbia (Complaint dated June 5, 2020)

[PROPOSED] AMENDED CLASS ACTION
COMPLAINT - 6
Cause No. 2:20-cv-00310
**Page 8 of 231**

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

23.     Elevate boasts that from 2002 to December 31, 2019 it has $8,100,000,000 in loan originations. Ex. C [3]

24.     In Washington state, Elevate markets RISE-branded loans as RISE-FinWise loans.

25.     Elevate has the predominant economic interest in the RISE-FinWise branded loans it provides to Washingtonians. Ex. B at (DC AG Complaint).

26.     Elevate's SEC filings indicate that an Elevate entity named EF SPV, Ltd. owns 95% of RISE-FinWise loans like Ms. Sanh's. Ex. D at 25 (40 of 189).[4]

27.     EF SPV, Ltd., located in the tax haven of the Cayman Islands, is an Elevate entity for accounting purposes. Ex. A at 4 (WSJ Article).

28.     EF SPV, Ltd. entity funds the RISE branded loans in the name of FinWise. Ex. C at 41 (Elevate Annual Report).

29.     Elevate reaps a lion share of the benefit from most of the repayments on RISE-branded loans originated in Washington and bears a majority of the costs and risks for the loans. *See* Ex. A at 3 (WSJ Article).

30.     Elevate aggressively markets RISE-branded loans in Washington, despite omitting its name on the RISE-branded loan solicitations that it sends.

31.     Elevate controls, funds, and profits from the RISE-FinWise branded loan products, despite omitting its name from those documents as well.

---

[3] Elevate 2019 Annual Report (cover page 3) available online at https://s23.q4cdn.com/490591927/files/doc_financials/2020/ar/2019-annual-report.pdf
[4] Elevate Credit, Inc.'s Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for period ending September 30, 2020 available at: at https://www.sec.gov/ix?doc= /Archives/edgar/data/1651094/000165109420000051/elvt-20200930.htm.

[PROPOSED] AMENDED CLASS ACTION
COMPLAINT - 7
Cause No. 2:20-cv-00310

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

32.   RISE Credit Services of Texas, LLC, as a subsidiary and through its partnership with parent Elevate Credit, Inc., facilitates, supports, and contributes to this illegal scheme.

33.   RISE Credit Services of Texas, LLC's participation in the scheme includes, but is not limited to, hosting a website, a P.O. Box in Fort Worth, Texas, and, supporting and/or directing marketing and solicitation materials to be sent to consumers' residences in Washington.

### ~~C~~A.   **Plaintiff's Individual Factual Allegations**

~~7.~~34.   Plaintiff Sopheary Sanh is a recent college graduate with substantial federal student loans and medical debt.

~~8.~~35.   In 2015, Ms. Sanh divorced her husband leaving her financially unable to pay her bills.

~~9.~~36.   Unable to pay her debts, Ms. Sanh filed for Chapter 7 bankruptcy to discharge certain debts after her divorce and graduation from school.

~~10.~~37.   As a result of filing for bankruptcy, Ms. Sanh was ineligible to file for Chapter 7 bankruptcy again for eight years.

~~11.~~38.   In March and April of 2019, she received solicitations marketing predatory loan products~~from the Defendants~~ at her home in Seattle.

39.   ~~Some of the~~The solicitations that she received stated that they were from RISE and directed Ms. Sanh to logon to RISEcredit.com.

40.   The RISE brand identified in the solicitation is in-fact just an Elevate branding strategy.

[PROPOSED] AMENDED CLASS ACTION
COMPLAINT - 8
Cause No. 2:20-cv-00310                    **Page 10 of 231**

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

41. One RISE-branded solicitation from Elevate indicated that Ms. Sanh had been specifically targeted by RISE, stating that the "'prescreened' offer of credit is based on information in your credit report indicating that you meet certain criteria." *See* Dkt. No. 39-1, Ex. 1.

42. RISE-branded solicitations sent to Ms. Sanh contained the same return address as the address appearing on the website of Defendant RISE Credit Services of Texas, LLC,  : P.O. Box. 101808 Fort Worth, Texas 76815. *See* Dkt. No. 39-1 at Ex. 2 (Solicitation).

43. At the time of the solicitation Ms. Sanh's credit report showed that she had recently emerged from bankruptcy.

~~12.~~44. The RISE-branded solicitations from Elevate included bold language stating that Ms. Sanh was "pre-approved" or "pre-qualified" for a loan. *See id.*

45. The solicitations for the RISE branded loans represented that FinWise Bank was the originating lender, when in-fact the true-lender and real-party in interest was Elevate. *See e.g.,* Exhibit A (WSJ Article).

13. None~~For instance, one solicitation stated that since she was "pre-approved," "relief is right around the corner." The solicitation stated that the loan "is a better way to borrow, with cash in your account as soon as tomorrow."~~

~~14. Another solicitation stated that since Ms. Sanh was "pre-qualified" she could "request your money today – and receive your money within 48 hours." The solicitation further stated, "you can get your money without a trip to the bank.  It's how lending should be."~~

[PROPOSED] AMENDED CLASS ACTION
COMPLAINT - 9
Cause No. 2:20-cv-00310

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

**Page 11 of 231**

15.46. However, none of Elevate's RISE-brandedthe solicitations identified the outrageous interest rates that would be assessed to the principal loan amount or the rent-a-banks scheme underlying the loans.

16.   In fact, in one case where the concept of interest was even acknowledged, the solicitation touted the benefits of a decreasing interest rate over time.

17.   But none of the solicitations disclosed interest rates between 96.98% and 159.15%.

18.   The solicitors, however, knew that the loans they were soliciting would be tethered to interest rates as high as 96.98% and 159.15%.

19.47. The solicitors intentionally withheld information relating to the outrageous interest rates and costs that would accompany these loans.

20.   Ms. Sanh was solicited by Personify to enter into a loan agreement with First Electronic Bank.

21.   As a result of Elevate'sPersonify's solicitation, Ms. Sanh entered into a loan in which the non-bank Elevate was the true-lender and real party in interestagreement with First Electronic Bank for $3,800.

22.   The loan amount of $3,800 earned interest at 96.98 percent.

23.   Over the course of 72 payments, the loan of $3,800 will cost Ms. Sanh $11,687.64.

24.   Personify was compensated by First Electronic Bank for soliciting consumers to enter into usurious loans.

25.   Ms. Sanh was solicited by Opportunity Financial, LLC, to enter into a loan agreement with FinWise Bank.

[PROPOSED] AMENDED CLASS ACTION COMPLAINT - 10
Cause No. 2:20-cv-00310

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Page 12 of 231

26. As a result of Opportunity's solicitation, Ms. Sanh entered into a loan agreement with FinWise Bank for $3,000.

27. The loan amount of $3,000 earned interest at 159.15 percent.

28. Over the course of 19 payments, the loan of $3,000 will cost Ms. Sanh $5,239.16.

29. Opportunity was compensated by FinWise Bank for soliciting consumers to enter into usurious loans.

30. Ms. Sanh was solicited by RISE to enter into a loan agreement with FinWise Bank.

31.48. As a result of RISE's solicitation, Ms. Sanh entered into another loan agreement with FinWise Bank for $3,000.

32.49. The loan amount of $3,000 earned interest at 149.09%.

50. 149.09% is unfair.

33.51. Over the course of 48 payments, the loan of $3,000 will cost her $9,666.08.

52. Ms. Sanh received the proceeds of the RISE-branded loan and made payments on it.

53. Elevate and/or Elevate through EF SPV, Ltd., funded Ms. Sanh's loan and currently own at least 95 percent of her loan.

34. OnRISE was compensated by FinWise Bank for soliciting consumers to enter into usurious loans.

35.54. By information and belief, Elevate is the true-lender and real party in interest on the RISE-branded loan Ms. Sanh Defendants received additional

[PROPOSED] AMENDED CLASS ACTION COMPLAINT - 11
Cause No. 2:20-cv-00310

**Page 13 of 231**

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1  compensation when Washington consumers entered into.  a loan agreement with an
2  affiliated bank or partner financial institution.

3       36.   DIn total, Ms. Sanh was loaned $9,800 at a cost of $26,592.88.

4       37.   These loans were made without regard for whether they were affordable
5  or whether they could be repaid.

6       38.   Under RCW 19.52.005, it is a duty of the state to protect citizens from
7  "debts bearing burdensome interest rates" and from "oppression generally."
8
9       39.   Under RCW 19.52.020, rates of interest cannot exceed the higher of
10  either (a) twelve percent per annum or (b) four percentage points above the equivalent
11  coupon issue yield of the average bill rate for twenty-six week treasury bills.

12       40.   During the time in question, the coupon issue yield of the average bill
13  rate for twenty-six week treasury bills plus four percentage points was lower than
14  twelve percent per annum.
15
16       41.   After entering into loan agreements with First Electronic Bank and
17  FinWise, Ms. Sanh received the loan proceeds and began making payments on them.

18  **B.**   **CIVIL RULE 23 ALLEGATIONS**

19       42.55. Plaintiff brings this action on her own behalf and as a class action,
20  pursuant to  Fed. R. Civ. P.CR 23(a) and 23(b) on behalf of the following class:

21       All consumers in the State of Washington who entered intowere solicited
22       by Defendant Opportunity Financial, Defendant Personify, or Defendant
23       RISE-branded, through U.S. mail sent to the consumer's address to apply
           for a 'pre-approved' or 'pre-qualified' consumer loan without clearly
24       disclosing the high costs of such loans with an, including the potential
           interest rate that exceeded 12could exceed between 96 percent and 159
25       percent per annum or who made payments on a RISE-branded loan in
           their name between January 27, 2016 and the present date.  ·
26
27

[PROPOSED] AMENDED CLASS ACTION
COMPLAINT - 12
Cause No. 2:20-cv-00310          **Page 14 of 231**

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

43.56. The proposed class is so numerous that joinder of all members is impracticable. Although the precise number of class members is known only to Defendants, upon information and belief, there are many consumers that have been targeted and solicited for consumer loans with usurious and outrageous interest rates.

44.57. There are questions of law and fact common to the proposed class.

45.58. The principal question as to the class is whether Defendant Elevate is the true lender on usurious loans that were marketed to and entered into with Washington residents in violation of Washington's usury laws and the WCPADefendants solicited Washington consumers through U.S. mail to apply for a pre-approved or pre-qualified consumer loan without disclosing the high cost of such loans, including the potential interest rate that could exceed between 96 percent and 159 percent per annum.

46.59. Another common issue is whether the Defendant used anDefendants, through their solicitation, violated the CPA through their unfair and deceptive scheme to lure and misleadpractice of steering consumers and deceive the courts and regulators as to who the true lender of the RISE-brandedto usurious and outrageous consumer loans is.

47.60. Plaintiff's claims are typical of the claims of the proposed class, as they all arise from the same operative facts and are based on the same legal theories.

48.61. Plaintiff will fairly and adequately protect the interests of the proposed class. Plaintiff is committed to vigorously litigating this matter and has retained counsel experienced in handling class actions and claims involving unlawful business practices. Neither Plaintiff nor her counsel has any interests which might conflict with the interests of the proposed class.

[PROPOSED] AMENDED CLASS ACTION
COMPLAINT - 13
Cause No. 2:20-cv-00310

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Page 15 of 231

49.62. This action may be certified under Fed. R. Civ. P.CR 23(b)(2) because Defendant hasDefendants have acted or refused to act on grounds generally applicable to the proposed class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole. Plaintiff's claim for monetary relief is incidental to the injunctive and declaratory relief that she seeks. The damages flow directly from liability to the class as a whole on the claims forming the basis of the injunctive and declaratory relief. Moreover, computing the monetary relief is simple and relies entirely on objective facts, without the need for subjective assessments of each class member's circumstances. There is no threat of a due process violation because all damages can be objectively determined. Plaintiff's request for declaratory and injunctive relief is more than a basis for monetary relief. The relatively modest monetary relief sought by Plaintiff does not dominate her claim for declaratory and injunctive relief.

50.63. In the alternative, or in addition to certifying under Fed. R. Civ. P.CR 23(b)(2), this action may be certified as a Fed. R. Civ. P.CR 23(b)(3) class action. Certification under Fed. R. Civ. P.CR 23(b)(3) is warranted because questions of law or fact common to the class predominate over any questions affecting only individual members.

51.64. A class action is superior to other available methods for fairly and efficiently adjudicating this controversy, in that:

   a.  Members of the proposed damages class do not have an overriding interest
       in individually controlling the prosecution of separate actions;

   b.  No other litigation concerning this controversy has been commenced by or
       against members of the damages class;

[PROPOSED] AMENDED CLASS ACTION
COMPLAINT - 14
Cause No. 2:20-cv-00310                    **Page 16 of 231**

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

c.  Concentration of litigation is desirable so that all claims can be resolved in one forum; and

d.  Management of this case as a damages class action will present significantly fewer difficulties than would be presented in many individual claims challenging Defendants' unfair and deceptive practices relating~~practice of soliciting consumers~~ to the~~enter into loans with outrageous and~~ usurious interest rates on its loans.

### V.    CLASS CLAIMS AND CAUSES OF ACTION

### A.  Defendants Violated the Consumer Protection Act for Committing Unfair and Deceptive Acts in Trade or Commerce (Non *Per Se* CPA Claim)

~~52.~~65. Plaintiff re-alleges each and every allegation as set forth above.

~~53.~~66. Defendants Elevate and its subsidiary, RISE Credit Services of Texas, LLC, solicited Washington consumers to apply for pre-approved or pre-qualified RISE-branded loans without disclosing the high costs of such loans, including the potential interest rate that could exceed 149~~between 96 percent and 159~~ percent per annum.

67.    Defendants did not disclose that Elevate was the true-lender or real party in interest on the RISE-branded loans and engaged in a scheme of transacting in usurious loans against Washington law and concealing its actions by omitting its name from any and all solicitation materials, loan documents and even the RISEcredit.com website.

~~54.    Defendants have or had a pattern or practice of soliciting Washington consumers to apply for pre-approved or pre-qualified loans that were usurious and subject to outrageous interest rates.~~

[PROPOSED] AMENDED CLASS ACTION COMPLAINT - 15
Cause No. 2:20-cv-00310

**Page 17 of 231**

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

55.68. Defendants' practices constitute non per se unfair orand deceptive practices occurring in trade or commerce in violation of the Consumer Protection Act, Chapter 19.86 RCW.

56.69. Defendants' practices adversely impact the public interest and caused injury and have the capacity to injure other persons.

70.     Defendants' practices create an unfair marketplace and give it an unfair advantage in violation of the WCPA.

57.71. As a direct and proximate cause of Defendants' practices, Plaintiff and the members of the class she seeks to represent have suffered injury and damages in an amount to be proven at the time of trial.

**B. Defendants Violated the Consumer Protection Act by Entering Into andfor Transacting Usurious Contracts (*Per Se* CPA Claim)**

58.72. Plaintiff re-alleges each and every allegation as set forth above.

59.73. The CPA prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

60.74. Under RCW 19.52.020, rates of interest cannot exceed the higher of either (a) twelve percent per annum or (b) four percentage points above the equivalent coupon issue yield of the average bill rate for twenty-six week treasury bills.

61.75. Under RCW 19.52.030 contracts shall be usurious if they contain an interest rate that is greater than the rate permitted under RCW 19.52.020.

62.76. Washington's legislature has declared that "entering into or *transacting* a usurious contract" is an unfair act or practice in the conduct of commerce for the purpose of the application of the [C]onsumer [P]rotection [A]ct." RCW 19.52.036 (emphasis added).

[PROPOSED] AMENDED CLASS ACTION
COMPLAINT - 16
Cause No. 2:20-cv-00310                    **Page 18 of 231**

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

63. 77. In the four years preceding the filing of this actioncomplaint, the coupon issue yield of the average bill rate for twenty-six week treasury bills plus four percentage points was lower than twelve percent per annum.

64. 78. Defendants have a practice or patternpatter of entering into and transacting usurious RISE-brandedcontracts by soliciting Washington consumers to apply for pre-approved or pre-qualified loans that Elevate isin excess of 12 percent per annum, brokering the true-lender of contracts and supporting and the real party in interest onfacilitating consumers entering into usurious contracts.

65. 79. Defendants' practices constitute per se unfair and deceptive practices occurring in trade or commerce in violation of the Consumer Protection Act, Chapter 19.86 RCW.

66. 80. Defendants' practices adversely impact the public interest and caused injury and have the capacity to injure other persons.

67. 81. As a direct and proximate cause of Defendants' practices, Plaintiff and the members of the class she seeks to represent have suffered injury and damages in an amount to be proven at the time of trial.

**C. Unjust Enrichment**

68.    Plaintiff re-alleges each and every allegation as set forth above.

69.    An unjust enrichment claim allows aggrieved parties to recover the value of benefits that are wrongly retained by another party where fairness and justice require it.

70.    An unjust enrichment claim requires a plaintiff to establish the following elements: (1) that the plaintiff conferred a benefit on the defendant; (2) the defendant knew or appreciated the benefit; (3) that the defendant's acceptance or retention of the

[PROPOSED] AMENDED CLASS ACTION
COMPLAINT - 17
Cause No. 2:20-cv-00310

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

benefit without payment of the benefit's value would be inequitable under the circumstances.

71.     Washington consumers conferred a benefit on Defendants by accepting their solicitation to enter into usurious loan agreements that were subject to outrageous interest rates.

72.     Defendants knew and appreciated that Washington consumers were induced to enter into usurious loan agreements that were subject outrageous interest rates.

73.     Defendants were compensated for their practice of soliciting consumers to enter into usurious loan agreements that were subject to outrageous interest rates.

74.     Defendants were additionally compensated when a consumer entered into a usurious loan agreement subject to an outrageous interest rate.

75.     Defendants' acceptance and retention of compensation for soliciting consumers to enter into usurious loan agreements that were subject to outrageous interest rates without paying the value of such benefit is inequitable under the circumstances.

76.     Washington consumers are entitled to a relief and remedy for Defendants' conduct, including compensatory damages and/or disgorgement.

## VI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff Sopheary Sanh respectfully requests that the Court enter judgment as follows:

(a) Certification of the class as proposed, under Fed. R. Civ. P.CR 23, appointing

Plaintiff and her counsel to represent the class;

[PROPOSED] AMENDED CLASS ACTION
COMPLAINT - 18
Cause No. 2:20-cv-00310                    **Page 20 of 231**

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

(b) An injunction under Chapter 19.86 RCW enjoining Defendants from soliciting consumers to apply for loans with usurious and outrageous interest rates without disclosure;

(c) Judgment against Defendants for actual damages pursuant to RCW 19.86.090;

(d) Treble damages pursuant to RCW 19.86.090;

(e) Out-of-pocket and investigative expenses;

(f) An award of costs and reasonable attorneys' fees based on all applicable statutes and other grounds, including RCW 19.86.090;

(g) Pre-judgment interest on all amounts awarded as allowed by law;

(h) Post-judgment interest;

(i) A supplemental award to cover any adverse tax consequences of the judgment; and

(j) Awarding Plaintiff such further equitable, legal or additional relief as may be appropriate and just.

Dated: _____ January 27, 2020

BRESKIN JOHNSON & TOWNSEND, PLLC

By: s/ Brendan W. Donckers
    Brendan W. Donckers, WSBA #39406
    Roger M. Townsend, WSBA #25525
    1000 Second Avenue, Suite 3670
    Seattle, WA 98104
    (206) 652-8660
    bdonckers@bjtlegal.com
    rtownsend@bjtlegal.com

LEONARD LAW

By: s/ Sam Leonard
    Sam Leonard, WSBA #46498
    1001 4th Avenue, Suite 3200
    Seattle, WA 98154

[PROPOSED] AMENDED CLASS ACTION
COMPLAINT - 19
Cause No. 2:20-cv-00310

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Page 21 of 231

1

(206) 486-1176
sam@seattledebtdefense.com

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

[PROPOSED] AMENDED CLASS ACTION
COMPLAINT - 20
Cause No. 2:20-cv-00310

**Page 22 of 231**

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

EXHIBIT A

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

https://www.wsj.com/articles/rent-a-banks-defy-states-growing-efforts-to-curb-high-cost-lending-11583435510

MARKETS

# 'Rent-a-Banks' Defy States' Growing Efforts to Curb High-Cost Lending

Lenders ink deals with banks to offer loans in states with interest-rate caps, spurring calls for tighter federal regulation



California Assemblywoman Monique Limón spoke at a rally last June in Sacramento to advocate for capping interest rates for some consumer loans.
**PHOTO:** RICH PEDRONCELLI/ASSOCIATED PRESS

*By [Jean Eaglesham](#), [AnnaMaria Andriotis](#) and [Coulter Jones](#)*
March 11, 2020 5:30 am ET

California this year sought to banish high-cost lenders. OppLoans was undeterred.

A new state law this year capped interest rates—currently at about 37% a year—for some consumer loans. But OppLoans is charging 160% on a typical loan in California, according to its website, using a partnership with a Utah bank to continue selling in the state despite the new rules.

OppLoans isn't the only lender charging triple-digit rates in California. The Wall Street Journal ran 25 online searches in February within the state for loans for a financially stressed borrower. The top results included several companies pitching consumer loans with rates over 100% to borrowers browsing from California.

OppLoans and its partner FinWise Bank are in what is called a rent-a-bank partnership, which allows high-cost lenders to skirt interest-rate caps in dozens of states. Rent-a-bank arrangements are the focus of a fierce battle pitting state regulators and consumer advocates against the credit industry.

Here's how they typically work: A lender such as OppLoans helps identify borrowers to whom it wants to lend at rates above what their states permit. It makes a deal with a bank in another state, where such rates are allowed, to put up the money. Then the bank sells the lion's share of the loan to the lender or a company connected to the lender.

The companies "are intentionally finding ways to evade state law," Monique Limón, a Democratic California lawmaker who introduced the new legislation, said in an interview. She added that OppLoans and others lending above the interest-rate cap appeared to be breaking California law, and she hopes state regulators will take enforcement action.



Ms. Limón has said some lenders are intentionally seeking ways to skirt California's new law and has called for state regulators to take action.

PHOTO: RICH PEDRONCELLI/ASSOCIATED PRESS

A spokesman for Chicago-based Opportunity Financial LLC, also known as OppLoans, said the company "is not intentionally evading or breaking state law." OppLoans "provides outsourced services to...banks to help them provide loans to credit-challenged Americans," he said. FinWise Bank said in a statement it is an "active participant" in its partnerships with loan companies, and its underwriting takes into account borrowers' ability to repay the debt.

## SHARE YOUR THOUGHTS

*Should laws limiting interest rates for certain consumer loans be uniform across all U.S. states? Why or why not? Join the conversation below.*

The lenders are tapping into a large consumer population that remains shut out of bank lending. Most large banks have limited appetite to extend credit to consumers with low credit scores. Roughly 38 million U.S. consumers have subprime credit scores below 600, according to FICO.

The National Consumer Law Center, a nonprofit group, said last month it was seeing an "alarming explosion of blatant high-cost rent-a-bank schemes." In testimony to a congressional hearing on rent-a-banks, the group called the arrangements the "biggest threat in decades to states' historic power to prevent predatory lending."



WSJ | Indagare®
Take That Long-Awaited Getaway
Malibu Beach Inn
CARBON BEACH
DISCOVER MORE
Offer Code: "WSJWellness"

Under a typical rent-a-bank arrangement, the high-cost lender helps market the loan but its partner bank advances the money. The bank then sells a majority stake in the loan—90% or more—back to the high-cost lender or an affiliated entity, meaning the high-cost lender benefits from most of the repayments and bears most of the cost of loan losses. The companies say the banks are the lenders and therefore the laws that apply are those of the state where the loan was originated, not the laws of the borrower's state.

OppLoans partners with FinWise Bank, which is based in Utah where there is no interest rate cap, to sell loans in 24 states and the District of Columbia. The cap in the district is 24%, but the typical rate on a loan sold there by OppLoans and FinWise is 160%, according to OppLoans's website.

More states are adding caps on interest rates in response to a recent surge in high-interest lending. New loan-rate caps were passed in South Dakota in 2016 and in Colorado in 2018.

**Page 26 of 231**

States and lenders have been at odds over loan charges for decades. Rent-a-banks cropped up more than 15 years ago, but dwindled following a clampdown by bank regulators. After the financial crisis, some high-cost lenders instead formed partnerships with Native American tribes, which said their sovereign immunity shielded the loans from state laws. But a number of courts questioned the legality of such "rent-a-tribe" arrangements.

The new-style partnerships can involve sophisticated financial engineering. Publicly traded Elevate Credit Inc. uses a rent-a-bank model that sends loan repayments from struggling borrowers in Nebraska to a Caribbean tax haven.

Elevate's Rise loans in 18 states and D.C. are originated by FinWise, according to Elevate securities filings. The bank then sells a 96% interest in the loans to a Cayman Islands special-purpose vehicle called EF SPV Ltd., which is counted as part of Elevate for accounting purposes. This offshore company borrows to fund the loan purchases, paying a rate at end-2019 of just over 10%, compared with the 99% to 149% it collects on the typical Rise loan, the filings show.

Elevate said in a statement that it licenses technology to banks, helping them "serve the 160 million non-prime and credit invisible Americans with transparent and responsible credit options, which are far superior to predatory payday loans."

Consumer advocates and others are pressing federal banking regulators to take enforcement action against rent-a-banks, as they did in the 2000s.

"A few banks are making [state consumer] protections moot...[and] regulators haven't stopped them," said Alex Horowitz, a senior research officer at the Pew Charitable Trusts, a nonprofit organization that has studied subprime lending. "This could do real harm to millions of families' financial health."

The Federal Deposit Insurance Corporation and Office of the Comptroller of the Currency have allowed the lending to continue while they consult on rules affecting online lending. They say the proposed rules will help consumers, by clarifying the applicable laws, rather than boost rent-a-banks.

Many disagree. The proposals have drawn fire from 24 state attorneys general, 13 state treasurers, six Democratic senators—including Elizabeth Warren, who ended her

Case 2:20-cv-00310-RSL Document 51 Filed 01/25/21 Page 28 of 231

presidential campaign last week—and an array of consumer advocates.

An FDIC spokesman declined to comment. Jonathan Gould, chief counsel at the OCC, said in a statement that "nothing in the proposal alters the OCC's longstanding view that banks should avoid rent-a-charter relationships that facilitate predatory lending."

Adam Levitin, a Georgetown University law professor, acted as an expert witness for the FDIC in cases it brought against banks that had joined with high-cost lenders. He said that despite the regulators' professed concern, "they have at every step of the way acted to defend rent-a-bank arrangements and failed to take action against known rent-a-banks."

A person close to the FDIC, which regulates FinWise, said a bank in one of these arrangements would be acting illegally only if the loans breached its home state laws or were tied to unfair or deceptive practices.

Banks involved in the partnerships say the "rent-a-bank" label unfairly portrays them as passive participants, when they are actively involved in underwriting and other aspects of the loans. "We don't say, 'Here you go, you can use our charter,'" said Mike Watson, chief executive of Capital Community Bank, known as CCBank.

His Utah-based bank has a partnership with LoanMart, one of the largest car-title lenders in California. CCBank originates ChoiceCa$h title loans, secured on borrowers' cars, that are marketed by LoanMart in stores. Rates in California on these loans go up to 94%, according to the companies.

The partnerships are "a common practice that helps provide credit to consumers who would otherwise be unable to access the credit markets in their state," said Hugo Dooner, chief executive of Wheels Financial Group LLC, which does business as LoanMart.

In California, the new law, which caps interest payments on consumer loans of $2,500 to $9,999, adds to a patchwork of existing lending rules.

**Write to** Jean Eaglesham at jean.eaglesham@wsj.com, AnnaMaria Andriotis at annamaria.andriotis@wsj.com and Coulter Jones at Coulter.Jones@wsj.com

*Appeared in the March 12, 2020, print edition as '.'*

Copyright © 2021 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

EXHIBIT B

**IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**Civil Division**

| | |
|---|---|
| **DISTRICT OF COLUMBIA**<br>a municipal corporation<br>441 4th Street, N.W.<br>Washington, D.C. 20001,<br><br>                 **PLAINTIFF,**<br><br>  v.<br><br>**ELEVATE CREDIT, INC.**<br>1209 Orange Street<br>Wilmington, Delaware 19801<br><br>            **DEFENDANT**. | Case No.:<br>Judge:<br><br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR VIOLATIONS OF THE**
**CONSUMER PROTECTION PROCEDURES ACT**

The District of Columbia, by the Office of the Attorney General ("the District"), brings

this action against Elevate Credit, Inc. ("Elevate") to address violations of the District of

Columbia Consumer Protection Procedures Act ("CPPA"), D.C. Code §§ 28-3901, *et seq.* In

support of its claims, the District states as follows:

**INTRODUCTION**

1.      Elevate is on online lender that operates through several websites, including

www.risecredit.com, www.elastic.com, and www.elevate.com, to provide predatory, high-

interest, short-term loans to consumers that it describes as individuals "with little to no savings,

urgent credit needs and limited options."

2.      Its loans contain interest rates of up to 149% for its Rise loans and 251% for its

Elastic loans, both well in excess of the 24% and 6% caps in the District's usury statutes.

3.      On its website, Elevate stresses that it is "focused on developing solutions that can help customers end the cycle of debt and build a brighter tomorrow."

4.      In Elevate's 2019 10-K filing with the Securities and Exchange Commission ("10-K"), it describes its business model as "provid[ing] convenient, competitively priced financial solutions to our customers, who are not well-served by either banks or legacy non-prime lenders, by using our advanced technology platform and proprietary risk analytics."

5.      Yet rather than lifting struggling consumers out of the cycle of debt, Elevate further entrenches them by deceptively offering predatory, high-cost loans. Elevate entices vulnerable consumers with the prospect of fast cash only to saddle them with loans with usurious interest rates.

6.      As the District and the Nation enter a period of economic uncertainty borne by the unprecedented health crisis of Covid-19, it is more important than ever to safeguard District consumers from illegal, predatory online loans such as Elevate's. The District institutes this proceeding to permanently enjoin Elevate from engaging in activities that violate the CPPA; to obtain restitution for District consumers and civil penalties as permitted by statute; and to recover the District's fees and costs.

## JURISDICTION AND PARTIES

7.      This Court has jurisdiction over the subject matter of this case pursuant to D.C. Code §§ 11-921 and 28-3909.

8.      This Court has personal jurisdiction over Defendant Elevate pursuant to D.C. Code § 13-423(a). Elevate has offered, provided, serviced, and advertised loans to District residents.

9.       Plaintiff District of Columbia ("District"), a municipal corporation empowered to sue and be sued, is the local government for the territory constituting the permanent seat of the government of the United States. The District is represented by and through its chief legal officer, the Attorney General for the District of Columbia. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code § 1-301.81(a)(1). The Attorney General is specifically authorized to enforce the District's consumer protection laws, including the CPPA, pursuant to D.C. Code § 28-3909.

10.       Defendant Elevate is a Delaware corporation that has offered, provided, serviced, and advertised loans to District residents in conjunction with FinWise Bank ("FinWise"), a Utah-chartered bank, for its Rise brand, and Republic Bank & Trust Company ("Republic"), a Kentucky-chartered bank, for its Elastic brand.

## FACTUAL ALLEGATIONS

### I.    <u>Elevate Provided Illegal Loans to District Consumers</u>.

11.       Usury is as old as biblical times. To prevent preying upon society's most vulnerable, most states have enacted limits on the legal interest rates for lending. The District's usury cap for most loans in which the interest rate is expressed in the contract, is 24%. D.C. Code § 28–3301(a). The District's usury cap for loans without an express interest rate is 6%. D.C. Code § 28–3302(a).

12.       Additionally, entities that offer loans in the District at any interest rate are required to obtain a money lending license. 16 DCMR § 201.1. Elevate has never possessed a money lending license in the District of Columbia.

13.     Elevate offered and advertised loans through two different brands to District residents that far exceeded both the 6% and 24% District usury caps: Rise and Elastic.

14.     Until April 2020, Elevate marketed Rise and Elastic loans to District consumers at interest rates up to 251%.

15.     Elevate has provided at least 871 Rise loans and at least 1680 Elastic loans to District consumers.

16.     District consumers have paid or been charged millions of dollars in unlawful interest on the loans provided by Elevate.

## II.     **Elevate Markets and Owns the Rise and Elastic Products.**

17.     Elevate provides the marketing for its Rise and Elastic products.

18.     Elevate has advertised these online products through direct mail, E-mails, and via banner ads on the Internet that were either accessible to or directed at District residents.

19.     In 2019, it sent more than 62 million pre-selected credit offers to consumers nationwide.  That year, Elevate incurred $51,283,000 in direct marketing costs, and $7,381,000 in operating expenses for selling and marketing its products, which include the Rise and Elastic loans.

20.     Elevate also provides the analytics, software, and underwriting models to FinWise and Republic for the provision of the Rise and Elastic loans. It holds the intellectual property rights to its proprietary analytics, predictive underwriting models, and software systems.

21.     Elevate has either registered trademarks or has pending applications in the United States for the marks Rise and Elastic.

22.     Elevate has the predominant economic interest in the loans it provides to District consumers via FinWise and Republic.

4

III.    **Elevate Deceptively Marketed and Provided Its Rise Loans to District Consumers with Illegal Interest Rates between 99-149%.**

23.    Starting no later than the second half of 2018 until at least April 2020, Elevate has deceptively marketed and offered its Rise brand loans to District consumers at interest rates between 99% and 149%, well in excess of the District's usury cap.

A.    **Elevate Deceptively Marketed Rise Loans in the District.**

24.    Elevate's Rise brand is an installment loan that offers "fast approval for loans between $500 and $5,000." Elevate generates all of the marketing materials for Rise loans.

25.    Elevate prepares product offerings and associated marketing materials; develops and places internet, print media, radio and television advertising; designs and develops websites; and delivers all notices and disclosures to consumers.

26.    Elevate alone is responsible for all costs and expenses associated with advertising and developing promotional materials for Rise loans.

27.    In a segment of its website labeled "The truth about Rise,"[1] Elevate advertises Rise as superior to payday loans or overdraft fees, stating " . . . RISE is often a better, more responsible alternative to more expensive options like overdraft fees, payday loans, late fees and utility reconnection fees." Elevate's "The truth about Rise" website also includes the below chart that purportedly shows Rise as far less expensive than other credit options.

---

[1] https://www.risecredit.com/why-rise/ (screenshot on 5/21/20).

"The truth about Rise"

28.     In small-print footnotes, Elevate explains that it calculates the overdraft protection costs based upon a consumer borrowing $24 for three days and paying an overdraft fee of $34, which they calculate as a "loan" at 17,000% Annual Percentage Rate ("APR").

29.     However, in terms of actual cost to the consumer, overdraft fees pale next to the finance charges on a Rise loan. For example, Elevate states in its 10-K that the average loan balance for its products was $1711 in 2019. An average consumer, therefore, would need to incur more than 51 overdraft fees to exceed the finance charges for an average Rise loan.

30.     Similarly, Elevate's comparison to utility reconnection fees does not withstand scrutiny. For instance, Pepco reconnection fees in the District are $35. A consumer would have to pay more than 50 reconnection fees in 17 months to exceed the average finance charges on a Rise loan.

31.     Payday loans are illegal in the District, and thus Elevate's comparison of its products to such illegal loans is deceptive and misleading.

32.     Furthermore, Elevate does not advertise the APR for its Rise brand to consumers in its direct mail offers. Instead, the direct mail offers simply promise fast access to a pre-approved amount. The mailings indicate that the APR varies depending on a borrower's credit report, but Elevate does not provide any range for the potential APR.

33.     A consumer must complete an application for a Rise loan in order to obtain this critical information.

34.     Elevate's 10-K reflects that the APR for Rise loans is between 99% and 149% depending upon the borrower's "credit, employment and loan repayment history as well as a number of other factors."

35.     In its advertisements to potential Rise customers in the District, Elevate does not disclose that its product's interest rate far exceeds the legal usury caps in the District.

**B.     Elevate is the True Lender of its Rise Loans.**

36.     Lenders typically fund a loan, reap the profits of good loans, and take the risk of bad loans. Elevate does all three for the Rise loan.

37.     First, although Elevate, in essence rents FinWise to provide the loan, it is Elevate that directs and controls the funding of the loan.

38.     For example, Elevate funds Rise loans through its captive credit financing relationship with Victory Park Management, LLC ("VPC"). Per Elevate's 10-K, if VPC could no longer provide debt financing for Elevate, Elevate would have to secure other sources of debt financing or potentially reduce loan originations.

39.     Second, Elevate reaps most of the profits from the loan.

40.     In 2019, Elevate's revenue from the Rise brand totaled approximately $390,354,000.

41.     At all relevant times to this Complaint, Elevate EF SPV ("EF SPV") a Cayman Islands special purpose vehicle that operates for the financial benefit of Elevate, has purchased a 96% interest in the receivables for the loans, including the principal and interest due on the loans.

The 96% interest makes EF SPV the legal and equitable owner of the receivables for the loans. These receivables generate income for Elevate, which is the primary beneficiary of EF SPV.

42.     Indeed, Elevate's financial statements specifically include "revenue, losses and loans receivable related to the 96% of Rise installment loans originated by FinWise Bank and sold to EF SPV."

43.     Elevate controls the core economic performance of EF SPV and must absorb its losses.

44.     Third, Elevate takes the risk of bad loans.

45.     For example, Elevate provides credit protection to EF SPV against Rise loan losses. This credit protection places the risk of losses on Elevate.

46.     Additionally, FinWise's interests are protected in its agreement with EF SPV by a requirement that EF SPV maintain cash collateral in a FinWise account in specified amounts to secure its obligations to purchase the loans.

47.     Elevate, through ones of its subsidiaries, also acts as the servicer for the Rise loans. Its duties as a servicer include reconciling the accounts, posting payments and other credits to the accounts, and providing periodic billing statements.

IV.     **Elevate Deceptively Marketed and Offered Its Elastic Brand Loans to District Consumers with Illegal Interest Rates of 129% to 251%.**

48.     Beginning in January 2014 and continuing until at least April 2020, Elevate deceptively marketed and offered its Elastic brand loan to District consumers at interest rates between 129% and 251%, well in excess of the District's usury caps.

A.      **Elevate Deceptively Marketed Elastic Loans in the District.**

49.     Elastic is a line of credit in amounts between $500 and $4,500. As with Rise,
Elevate has engaged in a rigorous advertising campaign to attract District residents to obtain an
Elastic loan.

50.     Elevate identifies potential customers via its "websites, call centers, direct mail or
other marketing channels" that it alone operates.

51.     Elevate generates the marketing materials for the Elastic loans.

52.     It prepares product offerings and associated marketing materials; develops and
places internet, print media, radio and television advertising; designs and develops websites; and
delivers all notices and disclosures to consumers.

53.     Elevate alone is responsible for all costs and expenses associated with advertising
and developing promotional materials.

54.     Its advertisements disclose that it charges Elastic borrowers an initial advance fee
of $5 or $10 for each $100 advanced, as well as a fixed charge of 5% or 10% of the open balance
in each payment period. Elevate charges the higher rates to consumers who repay monthly
instead of bi-weekly or semi-monthly. Like a payday loan, Elevate schedules repayments to
coincide with the borrower's payday. Consumers have up to twenty payments to repay their
loans.

55.     In its direct mail solicitations Elevate pushes Elastic as a way to "avoid expensive
overdraft fees or bounced checks."

56.     Yet, in its 10-K, it explains that "if an Elastic customer makes a $2,500 draw on
the customer's line of credit and this draw required bi-weekly minimum payments of 5%

9

(equivalent to 20 bi-weekly payments), and if all minimum payments are made, the draw would earn finance charges of $1,148."

57.     Most banks charge overdraft fees of approximately $35. For Elevate's 10-K example of a $2,500 loan, that consumer would need to incur more than 32 overdraft fees to exceed the finance charges of $1,148 for such a loan.

58.     Elevate does not advertise or disclose the effective APR of its Elastic brand loans to consumers.

59.     On its website and in similar language in its agreement with consumers, Elevate claims that Elastic "does not have an interest rate like other traditional credit products. Rather, you pay a cash advance fee plus 5 or 10% for every cash advance you request depending on your billing cycle."

60.     Elevate deducts the cash advance fee from the amount that it lends so that a consumer borrowing $500 with a 5% cash advance fee, would actually receive $475.

61.     Elevate also charges a 5% or 10% fee for each billing cycle in which the consumer has a balance. Elevate describes the recurring fee as a "Carried Balance Fee."

62.     Elevate sets the cash advance fees and Carried Balance Fees at 5% or 10%, based upon whether the consumer repays every two weeks, or monthly.

63.     Its direct mail offers describe this as "easy-to-understand pricing."

64.     Although Elevate does not disclose the effective APR for Elastic to consumers, it does calculate it for itself and its investors.

65.     Elevate's 10-K states that "[f]or the year ended December 31, 2018, [Elastic's] effective APR was 129%" . . . . and that for the year ended December 31, 2013, the effective APR for Elastic was 251%.

66.     A reasonable consumer would not understand that a loan with a disclosed 5-10%
fee for each cash advance and repayment, has an effective APR of 129%.

67.     In its advertisement to potential Elastic customers in the District, Elevate does not
disclose that the interest rate on its product far exceeds the usury cap in the District.

**B.     Elevate is the True Lender of its Elastic Loans.**

68.     As with the Rise loans, Elevate reaps the profits and takes the risk of Elastic
loans.

69.     Elevate partners with Republic to provide Elastic loans. Elevate, in essence rents
Republic to originate the loans that it ultimately controls and profits from through Elevate SPV
("ESPV").

70.      For example, in its 10-K, Elevate explains that it needs a bank in order to provide
access to the Automated Clearing House ("ACH") system to deposit the loans into consumers'
accounts and to withdraw the repayments.

71.     Emphasizing that this is Elevate's product, Elevate explains when discussing
regulatory concerns that " . . . if these banks cease to provide ACH processing services or are not
allowed to do so, we would have to materially alter, or possibly discontinue, some or all of our
business if alternative ACH processors or other payment mechanisms are not available."

72.     In 2019, Elevate's revenue from the Elastic brand totaled approximately
$248,518,000.

73.     Since 2015, ESPV, a Cayman Islands special purpose vehicle that operates for the
financial benefit of Elevate, has purchased a 90% interest in the receivables for the loans,
including the principal and interest due on the loans. The 90% interests that ESPV purchases

make it the legal and equitable owner of the receivables for the loans. These receivables generate income for Elevate.

74.     Elevate controls the core economic performance of ESPV and must absorb its losses.

75.     Indeed, Elevate's financial statements include "revenue, losses and loans receivable related to the 90% of Elastic loans originated by Republic and sold to ESPV."

76.     Elevate also takes the risk of bad Elastic loans.

77.     For example, Elevate provides credit protection to ESPV against Elastic loan losses. In other words, Elevate holds the risk for loan losses.

78.     Additionally, Republic's interests are protected in its agreement with ESPV by a requirement that ESPV maintain cash collateral in a Republic account in specified amounts to secure its obligations to purchase the loans.

79.     Elevate, through ones of its subsidiaries, acts as the servicer for the Elastic loans. Its duties as a servicer include reconciling the accounts, posting payments and other credits to the accounts, and providing periodic billing statements.

**COUNT ONE**

**Misrepresentations and Omissions
in Violation of the Consumer Protection Procedures Act**

80.     The District re-alleges and incorporates by reference paragraphs 1 through 79, as if fully set forth herein. The CPPA is a remedial statute that should be broadly construed. It establishes a right to truthful information from merchants about consumer goods and services that are or would be purchased, leased or received in the District of Columbia.

12

**Page 42 of 231**

81.     Consumers obtain loans from Defendant for personal, household or family purposes and, therefore, these loans are consumer goods and services.

82.     Defendant, in the ordinary course of business, offers to sell or supply consumer goods and services and is therefore a merchant.

83.     In addition, Defendant is a merchant because it is connected with the supply-side of a consumer transaction.

84.     Merchants who violate the CPPA may be subject to restitution, damages, civil penalties, temporary or permanent injunctions, the costs of the action, and reasonable attorneys' fees. D.C. Code § 28-3909.

85.     The CPPA prohibits any person from engaging in unfair and deceptive trade practices, including by:

    a.     "represent[ing] that the person has a sponsorship, approval, status, affiliation, certification, or connection that the person does not have," D.C. Code §28-3904(b);

    b.     "misrepresent[ing] as to a material fact which has a tendency to mislead," D.C. Code §28-3904(e); and

    c.     "fail[ing] to state a material fact if such failure tends to mislead," D.C. Code §28-3904(f); and

    d.     "us[ing] innuendo or ambiguity as to a material fact, which has a tendency to mislead," D.C Code §28-3904(f-1).

86.     Defendant's representations, express or implied, that it is permitted to offer loans in the District of Columbia, when, in fact, Defendant does not possess the required money lender license allowing it to lawfully make loans to District residents, are representations that Defendant

has an approval, certification or status that it does not have and are unlawful trade practices in violation of the CPPA, D.C. Code § 28-3904(b).

87.     Defendant's representations, express or implied, including its representations that:

    a.   its offer of loans is legal in the District of Columbia, and

    b.   its loans are less expensive than incurring overdraft fees, utility reconnection fees, or taking out a payday loan,

are misrepresentations of material facts that have the tendency to mislead consumers and are unlawful trade practices in violation of the CPPA, D.C. Code § 28-3904(e).

88.     Defendant's omissions, including its failure to disclose or to adequately disclose:

    a.   that its Rise and Elastic loans contain an APR in excess of the District's usury limits,

    a.   the expected APRs or ranges of APRs for its Elastic brand, and

    b.   the APRs or range of APRs for its Rise brand,

are omissions of material facts that mislead consumers and are unlawful trade practices in violation of the CPPA, D.C. Code § 28-3904(f), or, alternatively, constitute ambiguities as to material facts that have the tendency to mislead consumers and are unlawful trade practices in violation of the CPPA, D.C. Code § 28-3904(f-1).

## COUNT TWO

### Unfair and Unconscionable Practices
### in Violation of the Consumer Protection Procedures Act

89.     The District re-alleges and incorporates by reference paragraphs 1 through 88, as if fully set forth herein.

90.     The CPPA prohibits any person from engaging in unfair trade practices. The CPPA also prohibits any person from engaging in "unconscionable" practices where the seller

14

**Page 44 of 231**

takes advantage of the "inability of the consumer reasonably to protect his interests." D.C. Code § 28-3904(r)(5).

91.     Defendant has engaged in unfair and unconscionable practices affecting District consumers, in violation of D.C. Code § 28-3904 and § 28-3904(r), by knowingly offering, providing, servicing, and marketing predatory, high-cost loans to consumers in the District of Columbia, causing substantial harm to such consumers.

92.     Defendant's conduct, including inducing consumers with false and deceptive statements to enter into predatory, high-cost loans and failing to disclose (or adequately disclose) to consumers the true costs and interest rates associated with its loans, constitute unfair trade practices that violate D.C. Code § 28-3904, and unlawful trade practices that violate D.C. Code § 28-3904(r).

## COUNT THREE

**Violations of District Usury Laws in Violation of the Consumer Protection Procedures Act**

93.     The District re-alleges and incorporates by reference paragraphs 1 through 92, as if fully set forth herein.

94.     The CPPA prohibits any person from engaging in unfair and deceptive trade practices, including by violating the District's usury laws. D.C. Code § 28-3904(ff).

95.     The District's usury limit is 24% if the loan is provided by a licensed money lender and the interest rate is expressed in the contract, and 6% if the loan is provided by a licensed money lender and the interest rate is not expressed in the contract. D.C. Code § 28–3301(a), D.C. Code § 28-3308(a), D.C. Code § 28–3302(a).

96.     Elevate has offered Rise loans in the District at APRs between 99% and 149%.

15

97.     Elevate has offered Elastic loans in the District at APRs that have varied between 129% and 251%.

98.     Elevate is subject to the District's usury laws and it has offered Rise and Elastic loans that violate the District's usury law.

99.     Elevate's offer of Rise and Elastic loans in violation of the District's usury laws are unlawful trade practices that violate D.C. Code § 28-3904(ff).

## COUNT FOUR

### Violations of the DCMR as Violations of the Consumer Protection Procedures Act

100.     The District re-alleges and incorporates by reference paragraphs 1 through 99, as if fully set forth herein.

101.     The CPPA prohibits any person from engaging in unfair and deceptive trade practices, including by violating "any provision of title 16 of the District of Columbia Municipal Regulations." D.C. Code § 28-3904(dd).

102.     Elevate has engaged in the business of loaning money in the District without obtaining a license as a money lender as required under 16 DCMR § 201.1 and 16 DCMR § 200.4.

103.     Elevate's violations of Title 16 of the District of Columbia Municipals Regulations are unlawful trade practices that violate D.C. Code § 28-3904(dd).

### PRAYER FOR RELIEF

WHEREFORE, the District of Columbia respectfully requests this Court enter a judgment in its favor and grant relief against Defendants as follows:

a)     Permanently enjoin Defendant's violations of the District of Columbia Consumer Protection Procedures Act, D.C. Code § 28–3901, *et seq.*;

16

b)      Order Defendant to pay restitution and damages pursuant to D.C. Code §§ 28–3909(a) and (b); and § 26-905;

c)      Order that the loans marketed, offered, and sold by Defendants were unconscionable at the time they were made, or to have been induced by unconscionable conduct, and are therefore unenforceable and void, pursuant to D.C. Code §§ 28-3909 and 28-3812(g)(1).

d)      Order that the loans marketed, offered, and sold by Defendants in violation of 16 DCMR § 201.1 are unenforceable and void.

e)      Order the payment of civil penalties as permitted by statute pursuant to D.C. Code § 28–3909(b);

f)      Award the District the costs of this action and reasonable attorney's fees pursuant to § 28–3909(b); and

g)      Grant such further relief as the Court deems just and proper.

## Jury Demand

The District of Columbia demands a trial by jury by the maximum number of jurors permitted by law.

Dated: June 5, 2020

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

KATHLEEN KONOPKA
Deputy Attorney General
Public Advocacy Division

_____s/_____
BENJAMIN WISEMAN (#1005442)
Director, Office of Consumer Protection

17

_____ s/ _____
WENDY J. WEINBERG (# 445460)
Senior Assistant Attorney General
Office of Consumer Protection
Office of the Attorney General
441 Fourth Street, N.W., Suite 600 South
Washington, D.C. 20001
(202) 724-1342
Wendy.Weinberg@dc.gov

DAVID BRUNFELD (#1672059)
Assistant Attorney General

Dated: June 5, 2020

18

EXHIBIT C

# We believe the New Middle Class is worth fighting for.

## E/evate

**2019 ANNUAL REPORT**

## TO OUR SHAREHOLDERS:

## Elevate delivered in 2019.

In a year of transitions, we saw record-high net income — more than double that of 2018. We also eclipsed $6.5 billion¹ in savings for our customers. No small feat. These two metrics illustrate the capability of our incredible team and their hard work in serving non-prime consumers in the US and UK.

**I couldn't be more proud of these accomplishments.**

I'm also grateful to our Board for entrusting me with the role of President and CEO on a permanent basis. With their backing, I chose to simplify and streamline several of our strategic priorities.

First, we focused on strong credit quality. A key initiative was the development and deployment of new credit models for both our products and the banks we support. Our US based brands benefited from these new models; in fact, the 2019 loan vintage is performing better than previous years as seen in our charge-offs as a percentage of originations. This is a big win. But our work isn't done. In 2020, we will continue to adopt these models in digital and partner channels. The long-term growth potential is enormous, and we are committed to investing the time and resources to get it right.

Second, we dedicated ourselves to profitability — as shown in our record net income. We were able to successfully renegotiate debt pricing, with positive results in 2019 and continuing into 2020 and beyond. Moving forward, we will continue to prioritize profitability and shareholder returns over portfolio growth.

Third, the market demand for non-prime credit continues to be vast. Together, Elevate and the banks we support don't see the immediate need to chase growth; instead, we will be taking a disciplined, focused look at profitability and credit quality first.

Finally, we remain committed to the customer experience. Whether it's directly through our products or our ongoing support services to banks, we continue to reinvent how we serve our non-prime consumers. Since 2013, we've successfully dropped our average APR by more than 50 percent— and we've seen thousands of credit scores improve. This is no accident; reducing price and delivering tools to help consumers build credit is our number one priority.

In 2020, we are focused on consumer health and wellness. I hope to share more on these initiatives later this year. Our approach may be simpler, but I firmly believe we are well positioned to continue to deliver for our shareholders and non-prime consumers — and lead our industry into the future.

Sincerely,

**Jason Harvison**
President and Chief Executive Officer



We believe non-prime Americans (we call them the New Middle Class) deserve a better shot at getting financial relief today and help them build a brighter financial future tomorrow.

Elevate brands are committed to providing the most responsible lending features to consumers— not because we have to but because it's the right thing to do.

# Who we serve

**$8.1 Billion**[2]

**in loan originations**

FLEXIBLE PAYMENT TERMS

Amado is a musician and an electrician. After reviewing an Elastic flyer he received in the mail, Amado chose to take out a line of credit to help his stepdaughter purchase a car. He likes the flexibility that the line of credit offers him. As a musician, his income can fluctuate each month, so Amado uses Elastic to help bridge the gap when needed.

**— Amado**

## ▱ Elastic

**Elastic, a bank issued line of credit, is an easy way to access the money customers need, when they need it. Elastic does not charge an interest rate like other traditional products. Rather, customers can borrow as much as they need up to their credit limit and pay a cash advance fee when requesting funds. A carried balance fee is applied for any balance outstanding.**



## ACCESS AND CONVENIENCE

Maria turned to RISE to help with medical expenses for her son. While Maria and her husband expected the tests to be expensive, the cost of the tests turned out to be closer to three or four times what they had anticipated to pay. "We had no idea they were going to be that much more expensive." They chose to take out a RISE loan to pay for the bills. She really enjoys the push payment feature that allows her to pay at a later date if needed with no penalty.

**— Maria**

### RISE

RISE is a state-licensed and bank issued online, unsecured installment loan with features such as fast approval, flexible terms, rates that go down over time, payment flexibility tools and credit bureau reporting.

Saved the customer over

## $6.5 Billion [1]

over payday loans

## 140,000

customers have seen appreciable improvements in their credit scores

## 2.4 Million [2]

customers served

## FINANCIAL WELLNESS

Donna works as an account manager at a postage meter business and she also drives for Uber to pay the bills. She applied for the Today Card to help with unexpected expenses and also utilizes it when she travels to the east coast to visit her grandchildren and says it comes in handy when they need school supplies. She chose the Today Card to improve her credit score and she wants to be more vigilant about monitoring her credit and lowering her debt. She has another goal of teaching her grandchildren how to be more financially responsible than she was at their age. "The younger generation has to be more fiscally savvy."

**— Donna**

### today

The Today Card, a credit card originated by a third-party bank, is designed to provide credit for everyday expenses for those with a near prime credit score. Features like TransUnion Vantage score monitoring are easily accessible on the Today Card app.



# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM 10-K

**(Mark One)**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2019

or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission file number 001-37680

# E/evate

## ELEVATE CREDIT, INC.
### (Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **46-4714474** |
| State or Other Jurisdiction of Incorporation or Organization | I.R.S. Employer Identification Number |

| | |
|---|---|
| **4150 International Plaza, Suite 300**<br>**Fort Worth, Texas 76109** | **76109** |
| Address of Principal Executive Offices | Zip Code |

**(817) 928-1500**
Registrant's Telephone Number, Including Area Code

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Common Shares, $0.0004 par value | ELVT | New York Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act:
None

Indicate by check mark if the Registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the Registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the Registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the Registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days.

Yes ☒                    No ☐

Indicate by check mark whether the Registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the Registrant was required to submit such files).

Yes ☒                    No ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☐                    Non-accelerated filer ☐

Accelerated filer ☒                          Smaller reporting company ☒

Emerging growth company ☒

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☒

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐    No ☒

The aggregate market value of the Registrant's common stock, par value $0.0004 per share, held by non-affiliates as of June 30, 2019 was approximately $137,459,610.

The number of shares outstanding of the Registrant's common stock, par value $0.0004 per share, as of February 12, 2020 was 43,020,373 shares.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the Registrant's Proxy Statement for the 2020 Annual Meeting of Stockholders are incorporated herein by reference in Part III of this Annual Report on Form 10-K to the extent stated herein. Such proxy statement will be filed with the Securities and Exchange Commission within 120 days of the Registrant's fiscal year ended December 31, 2019.

**TABLE OF CONTENTS**
**YEAR ENDED DECEMBER 31, 2019**
**INDEX TO FORM 10-K**

| | | |
|---|---|---|
| **Note About Forward-Looking Statements** | | 4 |
| **Part I** | | |
| **Item 1.** | Business | 6 |
| **Item 1A.** | Risk Factors | 36 |
| **Item 1B.** | Unresolved Staff Comments | 69 |
| **Item 2.** | Properties | 70 |
| **Item 3.** | Legal Proceedings | 71 |
| **Item 4.** | Mine Safety Disclosures | 72 |
| **Part II** | | |
| **Item 5.** | Market for Registrant's Common Equity, Related Shareholder Matters and Issuer Purchases of Equity Securities | 73 |
| **Item 6.** | Selected Financial Data | 74 |
| **Item 7.** | Management's Discussion and Analysis of Financial Condition and Results of Operations | 76 |
| **Item 7A.** | Quantitative and Qualitative Disclosures about Market Risk | 109 |
| **Item 8.** | Financial Statements and Supplementary Data | 111 |
| **Item 9.** | Changes in and Disagreements with Accountants on Accounting and Financial Disclosures | 157 |
| **Item 9A.** | Controls and Procedures | 158 |
| **Item 9B.** | Other Information | 159 |
| **Part III** | | |
| **Item 10.** | Directors, Executive Officers and Corporate Governance | 160 |
| **Item 11.** | Executive Compensation | 160 |
| **Item 12.** | Security Ownership of Certain Beneficial Owners and Management and Related Shareholder Matters | 160 |
| **Item 13.** | Certain Relationships and Related Transactions and Director Independence | 160 |
| **Item 14.** | Principal Accountant Fees and Services | 160 |
| **Part IV** | | |
| **Item 15.** | Exhibits, Financial Statement Schedules | 161 |
| **Item 16.** | Form 10-K Summary | 161 |
| **SIGNATURES** | | 170 |

**NOTE ABOUT FORWARD-LOOKING STATEMENTS**

This Annual Report on Form 10-K contains forward-looking statements within the meaning of Section 27A of the Securities Act of 1933, as amended (the "Securities Act"), and Section 21E of the Securities Exchange Act of 1934, as amended (the "Exchange Act") that are based on our management's beliefs and assumptions and on information currently available to our management. The forward-looking statements are contained throughout this Annual Report on Form 10-K, including in "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Risk Factors." Forward-looking statements include information concerning our strategy, future operations, future financial position, future revenues, projected expenses, margins, prospects and plans and objectives of management. Forward-looking statements include all statements that are not historical facts and can be identified by terms such as "anticipate," "believe," "could," "seek," "estimate," "expect," "intend," "may," "plan," "potential," "predict," "project," "should," "will," "would" or similar expressions and the negatives of those terms. Forward-looking statements contained in this Annual Report on Form 10-K include, but are not limited to, statements about:

- our future financial performance, including our expectations regarding our revenue, cost of revenue, growth rate of revenue, cost of borrowing, credit losses, marketing costs, net charge-offs, gross profit or gross margin, operating expenses, marketing costs, operating margins, loans outstanding, loan loss provision, credit quality, ability to generate cash flow and ability to achieve and maintain future profitability;

- the availability of debt financing, funding sources and disruptions in credit markets;

- our ability to meet anticipated cash operating expenses and capital expenditure requirements;

- anticipated trends, growth rates, seasonal fluctuations and challenges in our business and in the markets in which we operate;

- our ability to anticipate market needs and develop new and enhanced or differentiated products, services and mobile apps to meet those needs, and our ability to successfully monetize them;

- our expectations with respect to trends in our average portfolio effective annual percentage rate;

- our anticipated growth and growth strategies and our ability to effectively manage that growth;

- our anticipated expansion of relationships with strategic partners, including banks;

- customer demand for our product and our ability to rapidly grow our business in response to fluctuations in demand;

- our ability to attract potential customers and retain existing customers and our cost of customer acquisition;

- the ability of customers to repay loans;

- interest rates and origination fees on loans;

- the impact of competition in our industry and innovation by our competitors;

- our ability to attract and retain necessary qualified directors, officers and employees to expand our operations;

- our reliance on third-party service providers;

- our access to the automated clearing house system;

- the efficacy of our marketing efforts and relationships with marketing affiliates;

- our anticipated direct marketing costs and spending;

- the evolution of technology affecting our products, services and markets;

- continued innovation of our analytics platform, including releases of new credit models;

- our ability to prevent security breaches, disruption in service and comparable events that could compromise the personal and confidential information held in our data systems, reduce the attractiveness of the platform or adversely impact our ability to service loans;

- our ability to detect and filter fraudulent or incorrect information provided to us by our customers or by third parties;

- our ability to adequately protect our intellectual property;

- our compliance with applicable local, state, federal and foreign laws;

- our compliance with, and the effects on our business and results of operations from, current or future applicable regulatory developments and regulations, including developments or changes from the Consumer Financial Protection Bureau (the "CFPB") and developments or changes in state law;

- regulatory developments or scrutiny by agencies regulating our business or the businesses of our third-party partners;

- public perception of our business and industry;

- the anticipated effect on our business of litigation or regulatory proceedings to which we or our officers are a party;

- the anticipated effect on our business of natural or man-made catastrophes;

- the increased expenses and administrative workload associated with being a public company;

- failure to maintain an effective system of internal controls necessary to accurately report our financial results and prevent fraud;

- our liquidity and working capital requirements;

- the estimates and estimate methodologies used in preparing our consolidated financial statements;

- the utility of non-GAAP financial measures;

- the future trading prices of our common stock and the impact of securities analysts' reports on these prices;

- our anticipated development and release of certain products and applications and changes to certain products;

- our anticipated investing activity;

- trends anticipated to continue as our portfolio of loans matures; and

- any future repurchases under our share repurchase program, including the timing and amount of repurchases thereunder.

We caution you that the foregoing list may not contain all of the forward-looking statements made in this Annual Report on Form 10-K.

Forward-looking statements involve known and unknown risks, uncertainties and other factors that may cause our actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by the forward-looking statements. We discuss these risks in greater detail in "Risk Factors" and elsewhere in this Annual Report on Form 10-K. Given these uncertainties, you should not place undue reliance on these forward-looking statements. Also, forward-looking statements represent our management's beliefs and assumptions only as of the date of this Annual Report on Form 10-K. Except as required by law, we assume no obligation to update these forward-looking statements publicly, or to update the reasons actual results could differ materially from those anticipated in these forward-looking statements, even if new information becomes available in the future.

## PART I

**Item 1. Business**

*Unless expressly indicated or the context requires otherwise, the terms "Elevate," "company," "we," "us" and "our" used below refer to Elevate Credit, Inc. and, where appropriate, our wholly owned subsidiaries and consolidated variable interest entities, as well as the direct lending and branded product business of our predecessor, Think Finance, Inc. ("TFI"), for periods prior to our 2014 spin-off from TFI. We generally refer to loans, customers and other information and data associated with each of Rise, Elastic, Sunny and Today Card as Elevate's loans, customers, information and data, irrespective of whether Elevate originates the credit to the customer or whether such credit is originated by a third party, or originated loans by FinWise Bank, Republic Bank and Capital Community Bank, where Elevate serves as a service provider.*

## OUR COMPANY

We provide online credit solutions to consumers and banks in the United States (the "US") and the United Kingdom (the "UK") who are not well-served by traditional bank products and who are looking for better options than payday loans, title loans, pawn and storefront installment loans. Non-prime consumers—approximately 170 million people in the US and UK, typically defined as those with credit scores of less than 700—now represent a larger market than prime consumers but are difficult to underwrite and serve with traditional approaches. We're succeeding at it—and doing it responsibly—with best-in-class advanced technology and proprietary risk analytics honed by serving more than 2.4 million customers with $8.1 billion in credit. Our current online credit products, Rise, Elastic, Sunny and our recently test launched Today Card reflect our mission to provide customers with access to competitively priced credit and services while helping them build a brighter financial future with credit building and financial wellness features. We call this mission "Good Today, Better Tomorrow."

As of December 31, 2019, Rise, Elastic, Sunny and Today Card, together, have provided approximately $6.6 billion in credit to approximately 1.6 million customers. Our revenues for the year ended December 31, 2019 decreased 5% to $747.0 million from $786.7 million for the year ended December 31, 2018. Our operating income for the years ended December 31, 2019 and 2018 was $111.4 million and $94.9 million, respectively, and our total assets at December 31, 2019 and 2018 were $784 million and $753 million, respectively. We have committed funding sources to support our expected continued growth. See "Management's discussion and analysis of financial condition and results of operations—Liquidity and Capital Resources."

Along with improving operating margins, we have also reduced the effective APR of our products for our customers. For the year ended December 31, 2019, our effective APR was 122%, a drop of approximately 51% compared to the year ended December 31, 2013 when the effective APR was 251%. We estimate that, since 2013, our products have saved our customers more than $6.5 billion over what they would have paid for payday loans, based on a comparison of revenues from our combined loan portfolio and the same portfolio with an APR of 400%, which is the approximate average APR for a payday loan according to the Consumer Financial Protection Bureau ("CFPB"). As of December 31, 2019, more than 39,000 Rise customers in good standing received at least a 50% reduction in their APR. Furthermore, with help from our reporting their successful payment history to a major credit bureau, more than 140,000 of our customers have seen their credit scores improve appreciably, according to data from that credit bureau. We believe that these rate reductions and other benefits help differentiate our products in the market and reflect improvements in our underwriting and the maturing of our loan portfolios. Moreover, we believe doing business this way is the right thing to do.



Revenue and Effective APR of Combined Loan Portfolio

We believe our growth demonstrates our ability to rapidly scale our business by utilizing our advanced technology platform, proprietary risk analytics and sophisticated multi-channel marketing capabilities. The chart above details our annual total combined loans receivable, revenues and effective APR of the customer loan portfolio since 2013.

Our products in the US and the UK are:

➢ *Rise*.   A product available in 12 US states as a state-licensed installment loan product, in one state as a CSO-originated installment loan product, in two states as a line of credit product, and as an installment loan product in an additional 19 US states originated by a third-party bank;

➢ *Elastic*.   A line of credit product originated by a third-party bank and offered in 40 states in the US;

➢ *Sunny*.   An installment loan product available in the UK; and

➢ *Today Card*.   A credit card product originated by a third-party bank and in test launch in the US.

We differentiate ourselves in the following ways:

➢ *Online and mobile products that are "Good Today, Better Tomorrow."*   Our products, and those originated by banks for which we serve as service providers, are "Good Today" because they help solve our customers' immediate financial needs with competitively priced credit and a simple online application process that provides credit decisions in seconds and funds as soon as the next business day (in the US) or in minutes (in the UK). We are committed to transparent pricing with no prepayment penalties or punitive fees as well as amortizing loan balances and flexible repayment schedules that let customers design the loan repayment terms that they can afford. Our five-day risk-free guarantee provides confidence to customers that if they can find a better financial solution within that timespan, they simply repay the principal with no other fees. In addition, our products are "Better Tomorrow" because they reward successful payment history with rates on subsequent loans (installment loan products) that can decrease over time and can help customers improve their long-term financial well-being with features like credit bureau reporting, free credit monitoring (for US customers), and online financial literacy videos and tools.

➢ *Industry-leading technology and proprietary risk analytics optimized for the non-prime credit market.* We have made substantial investments in our proven technology and analytics platforms to support rapid scaling and innovation, robust regulatory compliance, and ongoing improvements in underwriting. Our proven technology platform provides for nimble testing and optimization of our user interface and underwriting strategies, highly automated loan originations, cost-effective servicing, and robust compliance oversight. Our proprietary risk analytics infrastructure utilizes a massive (approximately 80+ terabyte) Hadoop database composed of more than ten thousand potential data variables related to each of the 2.4 million customers we have served and about 8.6 million applications that we have processed. Our team of over 50 data scientists uses our proprietary technology to build and test scores and strategies across the entire underwriting process, including segmented credit scores, fraud scores, affordability scores and former customer scores. We use a variety of analytical techniques from traditional multivariate regression to machine learning and artificial intelligence to continue to enhance our underwriting accuracy while complying with applicable US and UK lending laws and regulations. As a result of our proprietary technology and risk analytics, approximately 94% of loan applications are automatically decisioned in seconds with no manual review required.

➢ *Integrated multi-channel marketing strategy.* We use a multi-channel marketing strategy to directly reach potential customers through our paid, earned and owned channels. Our marketing strategy includes coordinated direct mail programs, strategic partnerships and digital marketing. Our direct-to-consumer approach allows us to focus on higher quality, lower cost customer acquisitions and to control overall marketing costs. Our customer acquisition costs ("CAC") have remained within the range of $200 to $300 over the past five years. We continue to invest in new marketing capabilities that we believe will provide us with competitive advantages and support ongoing growth. We invest in improved customer targeting analytics and increasingly sophisticated response models to allow us to expand our marketing reach while maintaining target CAC.

Our seasoned management team has, on average, more than 12 years of online technology and financial services experience and has worked together for an average of over ten years in the non-prime consumer credit industry. Our management team has overseen the origination of $8.1 billion in credit to 2.4 million customers for the combined current and predecessor direct lending and branded products business that was contributed to Elevate in our spin-off from TFI. In addition, our management team achieved stable credit performance for our predecessor products through the last decade's financial crisis, maintaining total principal losses as a percentage of loan originations of between 17% and 20% each year from 2006 through 2011. See "—Advanced Analytics and Risk Management—History of stable credit quality through the economic downturn."

## INDUSTRY OVERVIEW

### Non-prime consumers represent the largest segment of the credit market

We provide credit to non-prime consumers, many of whom face reduced credit options and increased financial pressure due to macro-economic changes over the past few decades. We believe that this segment of the population represents a massive and underserved market of approximately 170 million consumers in the US and UK—a larger population than the market for prime credit and over half of the US adult population:

➢ According to an analysis of FICO credit score data as of 2018, nearly 42% of the US population had non-prime credit score of less than 700, representing approximately 105 million Americans adults.

➢ Approximately 22% of Americans over the age of 18, or approximately 53 million Americans, do not have a credit score at all or had credit records that were treated as "unscorable" by traditional credit scoring models used by nationwide credit reporting agencies, according to a 2015 report by Fair Isaac Corporation.

➢ According to a PwC report from 2016, it is estimated that the UK near-prime credit market consisted of approximately 10 million people.

Typical customers in both the US and UK are middle-income and have a mainstream demographic profile as illustrated below, according to a 2019 Elevate analysis of income and homeownership of customers, including self-reported customer information. This is in line with the average of the populations of the US and UK, respectively, in terms of income, educational background and rate of homeownership. We refer to them as the "New Middle Class."

|  | Rise and Elastic Customer Profile | Sunny Customer Profile |
|---|---|---|
| Average income | $52,395 for Rise $41,837 for Elastic | £21,184 |
| % Attended college | 82% | N/A |
| % Own their homes | 17.4% | 9.3% |
| Typical range of FICO score(1) | 511-623 | N/A |

(1) Range of middle quintile of Elevate US customers - 2019 Elevate data.

Customers have varying credit profiles and are more likely to be turned down for credit by many traditional bank lenders. They are risky and can be difficult to underwrite—often due to factors outside of their control. To provide insight into the different types of credit histories and financial needs facing our non-prime customers and the challenges of serving them, the following categories are illustrative:

➢ *"Prime-ish."*   Consumers with significant credit history and access to traditional credit sources who are now looking for non-bank credit. They may be over-extended on their existing credit sources and their creditworthiness may be eroding.

➢ *"Challenged."*   Consumers who have had traditional credit in the past but experienced defaults or had a history of late payments and as a result may now use alternative non-prime products such as payday, pawn and title loans.

➢ *"Invisibles."*   Consumers with no credit history or such minimal credit experience that they cannot be sufficiently scored by traditional means and as a result are often kept outside the traditional credit markets. These consumers often have limited or no credit profile and may have a high chance of potential fraud.

These categories do not correspond to specific credit score bands or precise scores or definitions for the customers included in such categories. We continue to identify additional customer categories and evolve our customer category definitions over time.

### The New Middle Class has an unmet need for credit

Due to wage stagnation over the past several decades and the continued impact of the last decade's financial crisis, the New Middle Class is characterized by a lack of savings and significant income volatility. According to a Federal Reserve survey in 2017, 40% of American adults said they could not cover an emergency expense of $400 or would cover it by selling an asset or borrowing money. In the UK, according to a 2018 study published by Zurich UK 24% of adults have no savings at all and 34% feel they would be unable to recover from financial shock. Further, the JPMorgan Chase Institute reported in a 2015 study of 100,000 US customers that 41% saw their incomes vary by more than 30% from month-to-month and noted that the bottom 80% of households by income lacked sufficient savings to cover the volatility observed in income and spending. Compounding these financial realities is the fact that average household income has generally remained flat for over a decade. As a result, our customer base often must rely on credit to fund unexpected expenses, like car and home repairs or medical emergencies.

### Non-prime credit can be less vulnerable to recessionary factors

Based on our own experiences during the last decade's financial crisis, as well as research conducted by the credit bureau TransUnion, we believe that patterns of credit charge-offs for non-prime consumers can be acyclical or counter-cyclical when compared to prime consumers in credit downturns. In a recession, banks and traditional prime credit providers often experience increases in credit charge-off rates and tighten standards which reduces access to traditional credit and pushes certain consumers out of the market for bank credit. Conversely, with advanced underwriting, lenders serving non-prime consumers are able to maintain comparatively flat charge-off rates in part because of these new customers who are unable to avail themselves of the traditional credit market. See "—Advanced Analytics and Risk Management—History of stable credit quality through the economic downturn."

**Non-prime consumers have different needs for credit**

Non-prime consumers generally have unique and immediate credit needs, which differ greatly from the typical prime consumer. Whereas prime consumers consider price most often in selecting their credit products, we believe that non-prime consumers will often consider a variety of features, including the simplicity of the application process, speed of decisioning and funding, how they will be treated if they cannot pay their loan back on time, and flexible repayment terms.

**Banks do not adequately serve the New Middle Class**

Following the last decade's financial crisis, most banks tightened their underwriting standards and increased their minimum FICO score requirements for borrowers, leaving non-prime borrowers with severely reduced access to traditional credit. Despite the improving economy, banks continue to underserve the New Middle Class. According to our analysis of master pool trust data of securitizations for the five major credit card issuers, we estimate that from 2008 to 2016 revolving credit available to US borrowers with a FICO score of less than a 660 was reduced by approximately $142 billion. This reduction has had a profound impact on non-prime consumers in the US and UK who typically have little to no savings. Often, the only credit-like product offered by banks that is available to non-prime borrowers is overdraft protection, which in essence provides credit at extremely high rates. According to a 2008 study by the FDIC, bank overdraft fees can have an effective APR of greater than 3,500%, depending upon the amount of the overdraft transaction and the length of time to bring the account positive.

**Legacy non-prime lenders are not innovative**

As a result of limited access to credit products offered by banks, the New Middle Class has historically had to rely on a variety of legacy non-prime lenders, such as storefront installment lenders, payday lenders, title lenders, pawn and rent-to-own providers that typically do not offer customers the convenience of online and mobile access. While legacy non-prime credit products may fulfill a borrower's immediate funding needs, many of these products have significant drawbacks for consumers, including a potential cycle of debt, higher interest rates, punitive fees and aggressive collection tactics. Additionally, legacy non-prime lenders do not typically report to major credit bureaus, so non-prime consumers often remain in a cycle of non-prime and rarely improve their financial options.

**Fintech startups have largely ignored the non-prime credit market**

Despite the growing and unmet need for non-prime credit, few innovative solutions tailored for non-prime consumers have come to market and achieved any meaningful scale. Where new online marketplace lenders and small business lenders have emerged to serve prime consumers, we believe that non-prime consumers still have relatively few responsible online credit options. We believe this is because underwriting non-prime consumers presents significantly greater analytical challenges than underwriting prime consumers. Unlike prime consumers, the credit profiles of non-prime consumers vary greatly and may contain significant derogatory information, yet non-prime consumers often need instant decisions with a minimum of paperwork and inconvenience. While new data and techniques can assist in improving underwriting capabilities, we believe lenders still require deep insight and extensive experience to successfully serve non-prime consumers while maintaining target loss rates. Additionally, we believe the compliance and other systems necessary to serve non-prime consumers in a manner consistent with regulatory requirements can be a barrier to entry. Having originated $8.1 billion in credit to more than 2.4 million customers, we believe we have a significant lead over new entrants.

**Consumers are embracing the internet for their personal finances**

Consumers are increasingly turning to online and mobile solutions to fulfill their personal finance needs. A 2015 study published by the CFI Group found that 88% of bank customers surveyed in the US conduct about half to all their banking online. In the UK, the Office of National Statistics found in 2018 that seven out of ten adults now bank online, doubling the percentage from ten years before. We believe this growth is an indication of borrower preferences for online and mobile financial products that are more convenient and easier to access than products provided by legacy brick-and-mortar lenders.

## OUR SOLUTIONS

Our innovative online credit solutions provide immediate relief to customers today and can help them build a brighter financial future. We call this mission "Good Today, Better Tomorrow" and it drives our product design. Elevate's current generation of credit products includes Rise, Elastic, Sunny and Today Card. See "—Our Products."

We provide more convenient, competitively priced financial solutions to our customers, who are not well-served by either banks or legacy non-prime lenders, by using our advanced technology platform and proprietary risk analytics. We also offer a number of financial wellness and consumer-friendly features such as rates that can go down over time, no punitive fees, a five-day risk-free guarantee, free online financial literacy videos and tools, credit bureau reporting and free credit monitoring (in the US) that we believe are unmatched in the non-prime lending market.

We have made substantial investments in our proven technology and analytics platforms to support rapid scaling and innovation, robust regulatory compliance, and ongoing improvements in underwriting. We have also established a research organization focused on non-prime consumers called the "Center for the New Middle Class" to raise the awareness of their unique needs. As a result, we believe we are leading a new breed of more responsible online credit providers for the New Middle Class.

Our products provide the following key benefits:

➢ *Competitive pricing with no hidden or punitive fees*.   Our US products offer rates that we believe are typically more than 50% lower than many generally available alternatives from legacy non-prime lenders, and since 2013 have saved our customers more than $5.2 billion over what they would have paid for payday loans. Our products offer rates on subsequent loans (installment loan products) that can decrease over time based on successful loan payment history. For instance, as of December 31, 2019, approximately half of Rise customers in good standing had received a rate reduction, typically after a refinance or on a subsequent loan. In addition, to help our customers facing financial hardships, we have eliminated punitive fees, including returned payment fees and late charges, among others on all products excluding our Today Card credit card, which does include some modest industry-standard fees.

➢ *Access and convenience*.   We provide convenient, easy-to-use products via online and mobile platforms. Consumers are able to apply using a mobile-optimized online application, which takes only minutes to complete from a mobile or desktop device. Credit determinations are typically made in seconds and approximately 94% of loan application decisions are fully automated with no manual review required. Funds are typically available the next-day in the US and within minutes in the UK. Consumers can elect to make payments via preapproved automated clearinghouse ("ACH") authorization or other methods such as check or debit card transfer.

➢ *Flexible payment terms and responsible lending features*.   Our customers can select a payment schedule that fits their needs with no prepayment penalties. We do not offer any "single-payment" or "balloon-payment" credit products that can lead to a cycle of debt and have been criticized by many consumer groups as well as the CFPB. To ensure that consumers fully understand the product and their alternatives, we provide extensive "Know Before You Borrow" disclosures as well as an industry-leading five-day "Risk-Free Guarantee" during which customers can rescind their loan at no cost. Consistent with our goal of being sensitive to the unique needs of non-prime consumers, we also offer flexible solutions to help customers facing issues impacting their ability to make scheduled payments. Our solutions include notifications before payment processing, extended due dates, grace periods, payment plans and special payment programs.

➢ *Financial wellness features*.   Our products include credit building and financial wellness programs, such as credit bureau reporting, free credit monitoring (in the US) and online financial literacy videos and tools. Our goal is to help our customers improve their financial options and behaviors at no additional charge. We are very proud of the fact that, with help from our reporting their successful payment history to a major credit bureau, more than 140,000 of our customers have seen an appreciable increase in their credit scores, according to data from that credit bureau.

This combination of features has resulted in extremely high customer satisfaction for our products. Internal customer satisfaction ratings were generally over 92% for all of our products during 2019.

## OUR COMPETITIVE ADVANTAGES

Using our proven technology platform and proprietary risk analytics infrastructure, we are able to offer our customers innovative credit solutions that place us as a leader among a new breed of more responsible, online non-prime lenders. We believe the following are our key competitive advantages:

➢ *Differentiated online and mobile products for non-prime consumers*.   Our product development is driven by a deep commitment to solving customers' immediate financial need for credit and helping them improve their long-term financial future. We call this mission "Good Today, Better Tomorrow." Our products are "good today" due to their convenience, cost, transparency and flexibility. Our average customer receives an interest rate that we believe is more than 50% less than that offered by many legacy non-prime lenders. In fact, since 2013 our customers have saved more than $6.5 billion over what they would have paid for payday loans based on a comparison of revenues from our combined loan portfolio and the same portfolio with an APR of 400%, which is the approximate average APR for a payday loan according to the CFPB.

Furthermore, the convenience of online and mobile access and flexible repayment options distinguish our products from many legacy non-prime credit options. However, we go even further in creating credit products that can help enable customers to have a "better tomorrow." Based on successful payment history, rates on subsequent loans (installment loan products) can decrease over time, and we provide a path to prime credit for struggling consumers by reporting to credit bureaus, providing free credit monitoring (for US products), and offering online financial literacy videos and tools to help build better financial management skills. With help from our reporting their successful payment history to a major credit bureau, more than 140,000 of our customers have seen their credit scores improve appreciably, according to data from that credit bureau.

➤ *Industry-leading risk analytics infrastructure and underwriting scores*.   Traditional approaches for underwriting credit such as FICO scores are not adequate for non-prime consumers who may have significant derogatory credit history or no credit history at all. Because continued leadership in non-prime underwriting is essential to drive growth, support continued rate reductions to customers, and manage losses, we built our proprietary risk analytics infrastructure to support the development and enhancement of our underwriting scores and strategies. Our risk analytics infrastructure utilizes a massive (approximately 80+ terabyte) Hadoop database composed of more than ten thousand potential data variables related to each of the 2.4 million customers we have served and the about 8.6 million applications that we have processed. This data is composed of variables from consumer applications and website behavior, credit bureaus, bank account transaction data, numerous other alternative third-party data providers as well as performance history for funded customers. Our team of over 50 data scientists uses our risk analytics platform to build and test scores and strategies across the entire underwriting process including segmented credit scores, fraud scores, affordability scores and former customer scores. They use a variety of analytical techniques from traditional multivariate regression to machine learning to continue to enhance our underwriting accuracy while complying with applicable US and UK lending laws and regulations. See "—Advanced Analytics and Risk Management—Segmentation strategies across the entire underwriting process." Across the portfolio of products we currently offer, we have maintained stable credit quality as evidenced by charge-off rates that are generally between 20% and 30% of the original principal loan balances. While we experience month-to-month variability in our loan losses for any variety of reasons, including due to seasonality, on an annual basis, our annual principal charge-off rates have remained consistent since the launch of our current generation of products in 2013. See "Management's discussion and analysis of financial condition and results of operations—Key Financial and Operating Metrics—Credit quality." Furthermore, our proprietary credit and fraud scoring models allow not only for the scoring of a broad range of non-prime consumers, but also across a variety of products, channels, geographies and regulatory requirements.

➤ *Innovative and flexible proven technology platform*.   Investment in our flexible and scalable technology platform has enabled us to rapidly grow and innovate new products - notably supporting the launch of our current generation of products in 2013. Our proven technology platform provides for nimble testing and optimization of our user interface and underwriting strategies, highly automated loan originations, cost-effective servicing, and robust compliance oversight. In addition, our platform is adaptable to allow us to enhance current products or launch future online products to meet evolving consumer preferences and respond to a dynamic regulatory environment. Further, our open architecture allows us to easily integrate with best-in-class third-party providers, including strategic partners, data sources and outsourced vendors.

➤ *Seasoned management team with strong industry track record*.   We have a seasoned team of senior executives with an average of more than 12 years of experience in online technology and financial services at companies such as Bank of America, MasterCard, BlackRock and Silicon Valley Bank, led by Jason Harvison, a financial services industry veteran with more than 21 years of experience, who has launched more than ten financial products. The team has overseen the origination of $8.1 billion in credit to more than 2.4 million customers for the combined current and predecessor products that were contributed to Elevate in our spin-off from TFI. Additionally, the team has a proven track record of managing defaults through the last decade's financial crisis. From 2006 to 2011, the principal charge-offs of Elevate's legacy and predecessor credit products remained comparatively flat compared to credit card charge-off rates which nearly tripled during the same period. Elevate was certified as a "Great Place To Work" in 2019 for the fourth consecutive year. We believe this reflects our commitment to build a strong and lasting company and a customer-focused corporate culture.

**OUR STRATEGY**

To achieve our goal of being the most trusted provider of financial services to the New Middle Class, we intend to execute the following strategies:

➢ *Continue to grow our brands*.   Rise, Elastic and Sunny were launched in 2013, and the Today Card was launched in 2018. Given strong consumer demand and organic growth potential, we believe that significant opportunities exist to expand these four brands within their current markets via existing marketing channels. In addition to our lending activities, we license our US brands and provide marketing and underwriting services to FDIC regulated banks. As non-prime consumers become increasingly familiar and comfortable with online and mobile financial services, we also plan to capture the new business generated as they migrate away from less convenient legacy brick-and-mortar lenders. We continue to see strong desire from banks to leverage our capabilities. In 2020, we look to continue to grow new marketing and partner channels for all brands.

➢ *Widen the credit spectrum of borrowers served with new products*.   We continue to evaluate new product and market opportunities that fit into our overall strategic objective of delivering next-generation online and mobile credit products that span the non-prime credit spectrum. Our newest product, the Today Card offers much lower rates than our other products and has helped Elevate be able to offer products across the non-prime spectrum. In addition, we are continually focused on improving our analytics to effectively underwrite and serve consumers within those segments of the non-prime credit spectrum that we do not currently reach.

➢ *Pursue additional strategic partnerships and digital marketing channels*.   Our progressive non-prime credit solutions have attracted top-tier affiliate partners including Credit Karma and Lending Tree as a way to serve customers they have acquired. We intend to continue growing our existing affiliate partnerships and will evaluate opportunities to enter into new partnerships with affiliates. We expect these partnerships to provide us with access to a broad range of potential new customers with low customer acquisition costs. In addition, we continue to expand our digital marketing efforts across our products. In 2020, we look to grow these channels at a more rapid rate.

➢ *Expand our relationship with existing customers*.   Customer acquisition costs represent one of the most significant expenses for online lenders. We will seek to expand our strong relationships with existing customers by providing qualified customers with new loans on improved terms or offering other products and services. We believe we can better serve our customers with improved products and services while, at the same time, achieving better operating leverage.

➢ *Enter new markets*.   We will explore pursuing strategic opportunities to expand into additional international and domestic markets. However, we plan to take a disciplined approach to international expansion, utilizing customized products and in-market expertise. As reflected in our approach to entering the UK market, we believe that local teams with products developed for each unique local market will ultimately be the most successful. We currently do not expect to undertake any international expansion in the near term.


**OUR PRODUCTS**

Rise, Elastic and Sunny are exclusively available through online and mobile devices. The Today Card is a credit card product, but user interfaces all happen online or through mobile device application. These products reflect the deep experience of our management team in the online non-prime lending industry and utilize leading technology and proprietary risk analytics to effectively manage profitability and optimize the customer experience.

Each of these products reflects our "Good Today, Better Tomorrow" mission and offers competitive rates and responsible lending features along with credit building and financial wellness tools. Our products have rates on subsequent loans that can decrease over time (installment loan products), no punitive fees, a five day "Risk Free Guarantee," credit bureau reporting, free credit monitoring (in the US), and online financial literacy videos and tools. The five day "Risk Free Guarantee" allows the borrower five business days to change their mind about the loan and return the principal with no fees.

Rise, Elastic, Sunny, and Today Card each follow distinct regulatory models, providing diversification across different regulatory frameworks. Rise operates under licenses from each state it serves and is additionally regulated by the CFPB; it also operates as a bank-originated credit product in an additional 19 states and is regulated by the FDIC; Elastic is a bank-originated credit product that is offered in 40 states across the US and is regulated by the FDIC and other bank regulators; Sunny is a UK credit product regulated by the Financial Conduct Authority (the "FCA"); and Today Card is a bank-originated credit card product that is offered across the US and is regulated by the FDIC and other bank regulators.



| | | | |
|---|---|---|---|
| Year launched | 2013 | 2013 | 2017 | 2018 |
| Product type | Rise - Installment | Rise - CSO | Rise - Line of credit | Rise - FinWise |
| Geographies served | 12 states | 1 state | 2 states | 19 states |
| Loan size | $300 to $5,000 | $300 to $5,000 | $500 to $5,000 | $500 to $5,000 |
| Loan term | 4-26 months | 4-19 months | N/A | 7-26 months |
| Repayment schedule | Bi-weekly, semi-monthly, or monthly | Bi-weekly, semi-monthly, or monthly | Bi-weekly, semi-monthly, or monthly | Bi-weekly, semi-monthly, or monthly |
| Prepayment penalties | None | None | None | None |
| Pricing(1) | 60% to 299% annualized.(2) | 60% to 299% annualized.(2)(3) | 60% to 299% annualized.(4) | 99% to 149% annualized. |
| Other fees | None | None | None | None |
| Combined loans receivable principal (All Rise products = $350.1 million) | $196.7 million | $20.6 million | $11.4 million | $121.4 million |
| % of Combined loans receivable principal | 30.7% | 3.2% | 1.8% | 18.9% |
| Top states as a percentage of combined loans receivable – principal | CA (9%), GA (6%) IL (4%) | TX (3%) | TN (1%), KS (1%) | FL (5%), OH (4%) MI (2%) |
| Weighted-average effective APR | 117% | 158% | 187% | 129% |
| New / former customers | New - 52.8% / Former - 47.2% | New - 34.2% / Former - 65.8% | New - 98.2% / Former - 1.8% | New - 74.8% / Former - 25.2% |

(1)   Rise interest rates may differ significantly by state. See "—Regulatory Environment—APR by geography" for a breakdown of the APR. The number shown is based on a calculation of an effective APR.

(2)   As of December 31, 2019. Some legacy customers will have rates as low as 36%.

(3)   In Texas, Rise charges a CSO fee instead of interest. See "Management's discussion and analysis of financial condition and results of operations—Key Financial and Operating Metrics—Revenues-Revenues."

(4)   Rise line of credit includes interest in addition to fees. The number shown is based on a calculation of an effective APR.

**⊏⊐ Elastic     sunny®     today**

| | Elastic | Sunny | Today |
|---|---|---|---|
| Year launched | 2013 | 2013 | 2018 |
| Product type | Line of credit | Installment | Credit card |
| Geographies served | 40 states | UK | US - nationwide |
| Loan size | $500 to $4,500 | £100 to £5,000 | $1,000 to $3,500 |
| Loan term | Up to 10 months per funding(1) | 6-14 months | N/A |
| Repayment schedule | Bi-weekly, semi-monthly, or monthly | Weekly, bi-weekly, semi-monthly, or monthly | Monthly minimum payments |
| Prepayment penalties | None | None | None |
| Pricing | Initially $5/$10 per $100 borrowed plus an average of 5%/10% of outstanding principal per billing period(2) | 10.5% to 24% monthly | 29.99% to 34.99% variable |
| Other fees | None | None | Late fees, returned payment fees, annual fee and other customary fees |
| Combined loans receivable principal | $252.6 million | $33.6 million | Test launch |
| % of Combined loans receivable principal | 39.4% | 5.2% | 0.7% |
| Top states as a percentage of combined loans receivable – principal | FL (6%), TX (4%) CA (3%) | N/A | N/A |
| Weighted-average effective APR | 98%(3) | 224% | N/A |

(1)   Elastic term is based on minimum principal payments of 10% of last draw amount per month.
(2)   Elastic pricing differs based on billing frequency.
(3)   Elastic is a fee-based product. The number shown is based on a calculation of an effective APR.

## Rise—US installment loans and lines of credit

The structure of the Rise brand varies as a result of differing state laws and federal law governing the portfolio: Rise is currently offered as an installment loan directly to consumers in 12 states ("Rise installment"), a line of credit loan product ("Rise line of credit") in two states (Kansas and Tennessee), Rise is available in Texas through a CSO program that provides consumers access to installment loans offered by a third-party lender ("Rise CSO"), and lastly as installment loans originated by FinWise Bank in 19 other states.

We utilize risk-based pricing across the portfolio to optimally serve a large percentage of non-prime customers with rates ranging from 60% to 299%. There are no origination fees, monthly fees, late fees, over-limit fees, or fees for returned payments on the product. Eligible customers may receive a rate reduction on their next loan if certain eligibility criteria are met. As of December 31, 2019, more than 50% of Rise installment customers in good standing had received a rate reduction mid-loan or after a refinance or on a subsequent loan. Approximately 55% of Rise installment customers in good standing had refinanced or taken out a subsequent loan as of December 31, 2019, with 40% of the outstanding Rise installment loan balances on that date consisting of new customer loans and 60% related to returning customer loans. The Rise installment effective APR was 117% for the year ended December 31, 2019, which we believe is more than two-thirds lower than the average effective rate of a typical payday loan, based on the CFPB's findings that the average APR for a payday loan is approximately 400%.

FinWise Bank licensed the Rise brand in the second half of 2018 and began to originate installment loans in 19 additional states. Under the terms of our agreement with FinWise Bank, we provide FinWise Bank with marketing services related to the Rise brand and license to FinWise Bank our technology platform and proprietary credit and fraud scoring models in order to originate and service Rise customers in certain states not otherwise covered by the Elevate-originated Rise brand. As the originator of the Rise loans in those states, FinWise Bank reviews and approves all marketing materials and campaigns and determines the underwriting strategies and score cutoffs used in processing applications. In addition, FinWise Bank defines all program parameters and provides full compliance oversight over all aspects of the program. Our platform supports FinWise Bank's operational and compliance activities related to the Rise program. The FinWise Bank Rise installment loan effective APR was 129% for the year ended December 31, 2019. See "Management's discussion and analysis of financial condition and results of operations—Overview" regarding the structure of EF SPV, Ltd. and how we recognize revenue associated with Rise loans originated by FinWise Bank.

The Rise line of credit product, which was launched in 2017, is available in two states under current applicable state law. Rise line of credit offers a maximum credit limit of $5,000 and charges interest based on the APR of the loan and the average balance for the period. The Rise line of credit effective APR was 187% for the year ended December 31, 2019.

**Elastic—US bank-originated lines of credit**

Elastic, currently available in 40 US states, is an online line of credit designed to be a financial safety net for non-prime consumers. It is originated by a third-party lender, Republic Bank. Elastic offers a maximum credit limit of $4,500 and charges an initial advance fee of $5 for each $100 advanced against the credit line, as well as a fixed charge of approximately 5% of open balances each payment period. Elastic's effective APR based on this was approximately 98% for the year ended December 31, 2019, more than 75% lower than the average effective rate of a typical payday loan, based on the above-mentioned findings by the CFPB. There are no origination fees, monthly fees, late fees, over-limit fees or fees for returned payments on the product. Additionally, consumers must make a 10% mandatory principal reduction each month designed to encourage the full repayment of the original loan amount in approximately 10 months or less.

Under the terms of our agreement with Republic Bank, we provide them with marketing services related to the Elastic program and license them our technology platform and proprietary credit and fraud scoring models to originate and service Elastic customers. However, as the originator of the Elastic lines of credit, Republic Bank reviews and approves all marketing materials and campaigns and determines the underwriting strategies and score cutoffs used in processing applications. In addition, Republic Bank defines all program parameters and provides full compliance oversight over all aspects of the program. Our platform supports Republic Bank's operational and compliance activities related to the Elastic program. See "Management's discussion and analysis of financial condition and results of operations—Overview" regarding the structure of Elastic and how we recognize revenue associated with Elastic loans.

**Sunny—UK installment loans**

Sunny is our online UK installment loan product, currently offering loans of up to £5,000. It has a differentiated offering based on a wider range of loan amounts, a no-fee guarantee, price promotions and more flexible repayment options than most other providers in the UK short-term lending market.

After seven years, we believe Sunny has become one of, if not the top online, high-cost short-term loan providers in the UK. In 2019, Sunny helped approximately 88,000 new customers gain access to credit, and generated revenue of $108 million.

From 2018 to 2019, we have demonstrated stability and strong performance of a Sunny branded installment product that allows customers to borrow from £2,000 to £5,000 with the maximum APR of less than 100% ("Sub 100"). We have also started to migrate a proportion of existing customers to our Sub 100 product, with early indicators showing a high level of uptake and performance.

In the fourth quarter of 2019, we introduced the first stage of our open banking platform, which allows banks to share transaction data and integrate third-party apps onto partner platforms in order to improve the way we give our customers access to credit.

**Today Card—US credit card**

Today Card, currently in test launch, is a credit card product designed to meet the spending needs of non-prime consumers by offering a prime customer experience. Today Card is originated by Capital Community Bank of Utah and is issued through Mastercard.

As our lowest APR product, Today Card allows us to serve a broader spectrum of non-prime Americans. As of December 31, 2019, we have cross-marketed Today Card to existing and former Rise customers, as well as through direct mail to new customers. It is our plan to continue to scale this product in 2020. Customer response to the Today Card continues to be strong, with extremely high response rates, customer engagement, and customer satisfaction scores.

## ADVANCED ANALYTICS AND RISK MANAGEMENT

### The non-prime lending challenge

Traditional underwriting requires manual review of physical documents and human credit decisions. This is inconvenient for customers and for lenders it is resource-intensive, time-consuming and can lead to inconsistent results. "Fintech" lenders have recently used Big Data techniques to revolutionize the offering of credit. Instant credit decisions and automated processes are increasingly the norm for innovative online lenders.

In non-prime consumer lending, however, the analytical challenges are significantly greater. Traditional credit scores like FICO are poorly correlated with risk for non-prime consumers. Whereas prime consumers have established positive credit histories with traditional credit products and very little derogatory information, non-prime consumers are more varied and difficult to underwrite since they may have significant derogatory credit history or no credit history at all. Because of the wider variety of credit backgrounds and higher credit risk, automated analytical techniques for underwriting non-prime consumers must be much more sophisticated.

We use our deep insights into non-prime consumers and extensive experience serving more than 2.4 million customers with $8.1 billion in credit to develop differentiated analytical techniques and scores to better underwrite and price credit for the New Middle Class. This approach provides for extremely high levels of automation in the underwriting process and has been proven to be effective, resulting in stable credit performance for our predecessor products through the last decade's financial crisis and continued improvements since launching the current generation of products. See "—History of stable credit quality through the economic downturn." Furthermore, we invest significant resources into the research and development of new data sources and new analytical techniques to continue to improve our capabilities.

### Proprietary risk analytics infrastructure

Unlike prime lenders who can use off-the-shelf credit scores such as FICO or build custom scores with limited data fields, we believe that successfully underwriting non-prime consumers in an online environment requires access to a much wider variety of data including not only traditional credit attributes and application information, but also website behavior, internal information, bank account information, social media information, email and phone number information, among others. Because continued leadership in non-prime underwriting is essential to drive growth, support further rate reductions to customers, and manage losses, we have made substantial investments in our risk analytics infrastructure and in the development of the latest generation of our underwriting scores and strategies. The risk analytics infrastructure utilizes a massive (approximately 80+ terabyte) Hadoop database composed of more than 10,000 potential data variables related to each of the more than 2.4 million customers we have served and the about 8.6 million applications that we have processed including performance data from our funded customers. Our team of more than 50 data scientists uses our proprietary risk analytics infrastructure to build and test scores and strategies across the entire underwriting process described below (see "—Segmentation strategies across the entire underwriting process"). Our rusk analytics infrastructure supports a variety of analytical techniques and model outputs from traditional multivariate regression to machine learning and artificial intelligence. We believe this Big Data approach and investment is foundational to our ongoing initiatives to improve underwriting and lower rates to our customers.

**Segmentation strategies across the entire underwriting process**

Based on our extensive experience and track record in the industry, we have found that FICO and other monolithic credit scores are inadequate for the non-prime market. Instead, we have used our proprietary risk analytics infrastructure to develop an array of proprietary scores and strategies using highly predictive data sources and advanced analytical techniques targeting unique customer segments and marketing channels as well as different fraud types. This analytical approach, while more complex than most prime underwriting approaches, allows us to serve an expanding set of non-prime consumer segments and marketing channels while maintaining stable credit quality and acceptable customer acquisition costs. We use this approach across the entire underwriting process for both new and former customers, as described in the following chart:

| Credit Scores | • Customized to customer segment/channel<br>• 10,000+ data inputs to credit models<br>• Traditional & machine learning techniques |  Prime-ish  Challenged  Invisibles |
|---|---|---|
| Fraud Scores | • Targeted to unique fraud types<br>• 10,000+ data inputs to fraud models<br>• Machine learning & alternative data |    |
| Affordability Assessment | • Unique to each product<br>• Multiple approaches (including debt to income, payments to income and full budgeting) |  |
| Instant Decision & Line Offer | • Approximately 94% of loan applications fully automated<br>• Lines based on direct credit and affordability tests<br>• Credit determination made in seconds |  |
| Fraud & Verifications | • Algorithmic verifications<br>• Cross-transaction fraud detection<br>• Pattern matching and link analysis |  |
| Customer Management | • Refinance & former customer scores<br>• Active line management |  |

*Segment specific credit scores*

We use our proprietary risk analytics infrastructure to build targeted credit scores for key customer segments and channels. Based on our segmentation model, we utilize highly predictive data (including nationwide credit reporting agencies ("NCRA"), non-prime bureau data, and wide-ranging alternative data sources, as well as internally collected proprietary customer credit performance history) and analytical techniques (including multivariate regression, machine learning and artificial intelligence techniques) to achieve a high level of accuracy for our scores. For instance, for "prime-ish" consumers who have access to traditional credit sources but supplement them with non-prime credit, we use NCRA data extensively in our proprietary credit and fraud scoring models. For "challenged" consumers who have derogatory NCRA credit information and, as a result, non-prime credit data is more relevant, our proprietary credit and fraud scoring models leverage data provided by non-prime credit bureau sources like Clarity and Teletrack. For "credit invisibles" with limited or no credit history, we may utilize a host of alternative data sources, such as detailed bank account data as well as the duration for which an applicant has used the same mobile phone number or used an email address. Our definitions of our customer segments and the ways they affect our credit scoring models evolve over time. We assess more than 10,000 data inputs while developing our segmented credit models.

*Targeted fraud scores*

In addition to our segment-specific credit scores, we have developed targeted fraud scores for different types of fraud. For instance, we have found that first-party fraud (when the loan applicant provides correct identity information but has no intent of repaying the loan), third-party fraud (when the applicant has stolen someone else's identity information) and bank account fraud (when the borrower intends to shut down his or her account shortly after receiving the proceeds from the loan) are fundamentally different and require unique analysis and risk management tools.

Our proprietary fraud scores are built from over 10,000 available data inputs from our risk analytics infrastructure and make extensive use of non-linear (e.g., machine learning) analytical tools and techniques. Examples of data sources that we have found to be predictive in our fraud scores include IP address information, how applicants use our website (including pages viewed), and email and bank account information as well as identity information provided by third parties.

*Affordability analysis and line offers*

Although not currently required by US federal law, we proactively assess the affordability of our products for our customers. We use multiple approaches including debt to income, payment to income and full budgeting (required by UK regulations), based on third-party and self-reported information, and continue to evaluate the effectiveness of each approach. Where applicable, we integrate real-time bank account information into our affordability scores. Our affordability assessment impacts both the decision of whether to provide the loan, as well as the maximum amount to offer. We use an enhanced affordability analysis that integrates previous payment history to underwrite current customers seeking to refinance their loan and for former customers requesting additional credit.

*Customer management*

In addition to underwriting new customers, we have built scores and strategies for underwriting customers who have paid off their initial loan and are looking for a new loan, or for customers who may want to refinance their current loan, typically for a larger amount and a lower rate. These scores and strategies reassess the customer's creditworthiness integrating their payment history on previous loans. Based on this information and revised affordability analysis, the customer is either offered a new maximum loan amount and APR or declined for additional credit.

## Fully automated, near-instant credit decisions

Credit and fraud determinations are made in seconds and approximately 94% of loan applications for all products are fully automated with no manual review required, based on our proprietary credit and fraud scoring models and affordability assessments. Once approved, the customer is provided the loan amount and relevant terms of the credit being offered. Of the approximately 6% of loan applications requiring manual review, in the US, the majority require further documentation, which can be provided via scanning, fax, email or mail. Others may have failed a fraud rule in the applicable underwriting methodology and are managed based on the rule failed, and others are reviewed to address "know your customer" and/or OFAC requirements. In the UK, of the loan applications requiring manual review, the vast majority require further verifications or other forms of identification, while the remaining portion requires further review based on fraud alerts by an industry database of fraudulent consumer activity, known as CIFAS. We provide declined customers with the reasons for the decision as per regulatory requirements.

Elevate fraud detection agents manually review a limited number of applicants based on the results of the fraud scores and any discrepancies in the application data they provide (such as identity information prior to the funding of the loan). Fraud detection specialists generate and review intraday reports to identify cross-application fraud risk and use such reports to flag additional loan applications requiring review. Elevate fraud detection agents use sophisticated link analysis of application information to identify potentially fraudulent activity and pursue additional investigation if they suspect fraud.

**History of stable credit quality through the economic downturn**

We bring extensive experience in managing defaults through the most recent financial crisis. Including products that preceded our current generation of credit products, we have provided $8.1 billion in credit to 2.4 million non-prime consumers since 2002. As the following chart indicates, our management team delivered stable credit quality for our predecessor products through the last decade's financial crisis. The chart below also presents the levels of volatility experienced by the US credit card industry over the same period.

# Total principal charge-offs as a percentage of originations (%)[1]



(1)   Elevate legacy predecessor credit product from 2006-2011. Includes losses related to credit and fraud.
(2)   Years presented pre-date the spin-off. For recent cumulative loss rates by vintage, see "Management's discussion and analysis of financial condition and
       results of operations—Key Financial and Operating Metrics—Credit quality."
(3)   Credit card information based on Federal Reserve data.

Additionally, research conducted by the credit bureau TransUnion indicates that non-prime personal loan portfolios show significantly less volatility due to recessionary factors than portfolios with higher credit quality customers. As shown in the following chart, according to TransUnion data, non-prime portfolios demonstrated approximately half of the charge-off rate volatility of Prime, Prime-Plus and Super Prime portfolios during the Great Recession between 2006 and 2011. We believe this indicates that patterns of credit charge-offs for non-prime consumers can be acyclical or counter-cyclical when compared to prime consumers in credit downturns. In a recession, banks and traditional prime credit providers often experience increases in credit charge-off rates and tighten standards, which reduces access to traditional credit and pushes certain consumers out of the market for bank credit. Conversely, with advanced underwriting, lenders serving non-prime consumers are able to maintain comparatively flat charge-off rates, in part, because of these new customers who are unable to avail themselves of the traditional credit market.

## Personal loan delinquency volatility through the Great Recession 2006-2017 [1]

### (standard deviation divided by the tier's average delinquency)



(1)  TransUnion data on 90-day delinquency rates of balances for different Vantage Score bands from the first quarter of 2005 through the first quarter of 2017. Volatility is calculated by dividing the standard deviation of Vantage Score bands from the first quarter of 2006 to the first quarter of 2017 by the average during the same period per TransUnion. Super prime includes those with credit scores ranging from 781 to 850, Prime plus from 721 to 780, Prime from 661 to 720, Near prime from 601 to 660 and Non-prime from 300 to 600.

### Commitment to research and development

We have built a team of over 300 employees in our Risk Management and Technology department, over 50 of which work specifically in risk analytics and work with data on a daily basis. Our Advanced Analytics team is primarily focused on analysis of new (typically non-traditional) data sources and analytical techniques. We believe our commitment to research and development in risk analytics results in consistently improving capabilities, which give us an on-going competitive advantage in the market by allowing us to scale our business while providing savings back to our customers in the form of lower rates.

**OUR SALES AND MARKETING CAPABILITIES**

**Multi-channel approach to customer acquisition**

Online providers of non-prime credit often rely on third-party lead generators for customer acquisition, which we believe limits growth and provides challenges to achieving cost and quality targets. In contrast, we rely on a multi-channel marketing mix, which supports improved CAC, faster growth and heightened brand awareness. This approach allows us to gradually expand investments to grow prospects, while thoughtfully balancing the investment split within channels. We monitor each channel, and how each contributes to a user's path to conversion. The following chart shows the percentage of total customers attributable to each marketing channel for the year ended December 31, 2019.



Our multi-channel approach is demonstrated by the following:

➢ Direct mail: More than 62 million pre-selected credit offers mailed during the year ended December 31, 2019;

➢ TV and mass media: Both brand and direct response-oriented campaigns launched for Sunny;

➢ Strategic partnerships: Multiple partnerships with large customer aggregators to drive traffic; and

➢ Digital marketing campaigns: Search engine optimization, content marketing, social media, paid search, digital advertising and email marketing.

**Analytically-driven channel optimization**

Each new marketing channel we introduce requires extensive testing and optimization before it can be scaled cost-effectively and requires significant on-going analytical support. For instance, we spent several years developing, testing, and optimizing our response and credit models for preapproved direct mail campaigns to achieve an acceptable CAC for this channel. As a result, direct mail is now our largest and most profitable marketing capability, and we continue to identify new analytical approaches that help expand the addressable market through the direct mail channel.

Over the last few years, we've built a successful digital acquisition strategy and found the right baseline tactics to drive strong conversions. We continuously test within our digital channels and have a pipeline of new testing opportunities to help identify strong performers. In order to scale up support, we are focusing on testing tactics which help drive consumer awareness and engagement through search, digital advertising and social media. We anticipate expanding growth in all of our digital marketing channels based on improved customer targeting analytics and increasingly sophisticated response models that allow us to enhance our marketing reach while maintaining our target CAC. Our dedicated channel management teams continually monitor and manage campaign effectiveness. We believe our investment in developing multiple customer acquisition channels provides a significant competitive advantage over other online non-prime lenders who rely primarily on lead generators.

### Multi-channel management

In addition to optimizing the performance of each channel, we are increasingly optimizing our marketing mix to improve marketing impact and enhance brand-building. We have found that coordinating the timing of individual channel campaigns and leveraging creative across channels can accelerate growth at lower costs.

Through a multi-channel marketing approach, Sunny remains one of the most well-known brands in the sector. Sunny is now number one in active short-term loan brand awareness and we have benefited commercially from several competitors exiting the market. In addition, investment in digital marketing channels has continued to deliver dividends in both brand visibility and commercial efficiency. In the last year, Sunny drove marketing efficiency with a record-low CAC (33% decrease year-over-year).

### Strategic partner development

Rather than utilizing lead generators who are often accused of deceptive practices, we have focused on developing relationships through large strategic partnerships with trusted brands. Our strategic partners refer prospects from their site to our product website. Because the customer completes the loan application on our website, rather than on a lead generator's site, we control the messaging received by the customer about our products. This method allows us to better control application quality, customer experience and CAC. Aligning with strategic partners that share our values and commitment to the customer helps us fulfill our mission of providing better products to the New Middle Class.

We expect our relationships with strategic partners to continue to expand over time, and we will evaluate opportunities to enter into new partnerships. We also have the ability to make targeted offers with discounted rates to strategic partners who have been shown to deliver higher quality applicants.

### Customer relationship optimization

Our sales and marketing efforts are not only focused on acquiring new customers. We focus on strong customer engagement, providing added value and developing a mutually beneficial relationship with current and former customers. If customers or former customers need additional liquidity, we strive to be the top of their consideration set.

Based on rigorous creditworthiness and affordability analysis, we typically offer increased credit lines to former customers—often at lower rates. Also, subject to our usage caps, we may offer current customers the ability to refinance loans to receive additional funds (in the US). We use both email and text messaging campaigns to reach customers with additional credit offers. Because there is no additional CAC for originating those additional loans, these transactions are highly profitable and can support offering a lower APR for consumers.

**History of strong growth in new customer acquisition volumes at or below target CAC**

As a result of our unique marketing capabilities discussed above, we have shown significant growth in annual new customer acquisition volumes while managing our customer acquisition costs within or below our target level of $250 to $300.



## Customer Acquisition
## (Volumes + CAC)

## OUR TECHNOLOGY PLATFORM AND INFORMATION SECURITY

Underlying our innovative customer centric product offerings, loan processing and multitude of servicing features is our flexible proven technology platform. Loan originations, advanced proprietary underwriting and decisioning, loan management and loan servicing are all supported by our scalable and flexible technology platform built with modern cloud-based architecture principles. Our continuous technological innovations to our platform position us to respond quickly to new market opportunities, customer feedback, market trends and regulatory changes. Inherent to our technology platform is support and monitoring for compliant applications, loan processing and business controls. In addition, because we collect and store extensive amounts of consumer information, we have invested in and are committed to best practice levels of information security.

### Flexible and scalable proven technology platform

Our proven technology platform integrates the best available third-party products and capabilities under our proprietary architecture. This has allowed us to rapidly launch new products, modify product functionality and ensure regulatory compliance.

Our proven technology platform includes proprietary architecture and messaging that facilitates high-availability, scalability and flexibility for changing product features. It supports open-end (lines of credit) products, closed-end (installment loans) and credit cards, and is easily configurable for new pricing and term structures, whether in response to regulatory changes or competitive opportunities. Currently, our technology platform supports our US products, Rise and Elastic, as well as loan origination functionality for the Today Card. Servicing functions for our Today Card utilize technology and experience from Total Systems Services, a global payment solution provider ("TSYS"), to store data and interface with customers.

The core functionality of Elevate's technology platform is illustrated below.

# Technology Platform



### Mobile-first approach to user interface development

Currently, approximately two-thirds of our customer interactions come from mobile rather than desktop devices. The customer-facing portions of our products for both desktop and mobile interfaces are designed with a focus on user-friendly design and cross-platform mobility.

### Cloud-hosted applications

Leveraging cloud technology for our customer-facing web applications, we are able to support rapid enhancements and optimizations to product user experiences. Our front-end technology approach enables different user application flows for different customers depending on what channel they came to our site and will dynamically change the user interface data capture based on credit assessment. Our marketing and user experience teams can rapidly test new application flows on small percentages of inbound traffic to determine the impact of such changes on loan conversion, underwriting accuracy, and customer satisfaction prior to full deployment.

**Sophisticated decision engine**

Our sophisticated analytics approach requires us to manage numerous credit and fraud scores and strategies for each of our products, customer segments and marketing channels. In addition, because of our commitment to innovation and research and development, we are regularly conducting testing of new scores, data providers and analytical techniques. This requires an extremely flexible yet compliant decision engine. Our decision engine is a key component of our technology platform and allows our Risk Management team to rapidly implement tests that control and measure the performance of new scores, data providers and analytical techniques against the existing best versions of each. In particular, the decision engine can rapidly integrate with new data providers and test a randomly selected percentage of application traffic with new scores and track their performance against existing scores.

All aspects of our underwriting process are controlled through components of our technology platform, from the credit and fraud scores to the various product affordability assessments, to the instant decisioning and credit assignment process and even including the fraud and verifications activities performed by fraud agents. In this manner we have enhanced automation and have instituted tight controls over the entire decisioning process.

**Best practice approach to information security and system reliability**

Because we store extensive amounts of public and non-public customer personally identifiable information ("PII"), we take our obligations to protect that information and avoid data breaches very seriously. PII in Elevate's technology platform is encrypted, and we conduct regular audits of our security protocols via third-party intrusion detection, vulnerability scans and penetration testing. These activities are supplemented with real-time monitoring and alerting for potential intrusions.

We have fully redundant data centers in place to support all critical business functions. Disaster recovery and business continuity plans and tests have been completed, which help to ensure our ability to recover in the event of a disaster or other unforeseen event.

**COMPETITIVE OVERVIEW**

The competition in our market is composed of both legacy brick-and-mortar and online credit providers. We compete with providers that offer products in the following categories:

➢ Non-prime installment loans

➢ Non-prime credit cards

➢ Pawn loans

➢ Payday loans

➢ Title loans

➢ Rent to own

In addition, bank overdrafts often function as an expensive form of emergency credit. According to a 2008 study by the FDIC, bank overdraft fees can have an effective APR greater than 3,500%, depending upon the amount of the overdraft transaction and length of time to bring the account positive.

Most legacy non-prime lenders still operate primarily out of legacy brick-and-mortar locations and require extensive documentation and face-to-face interactions. With online and mobile-only products, Elevate eliminates the potential need for our customers to drive across town and stand in line to apply for credit. In fact, with our products, the credit determination is made in seconds and approximately 94% of loan applications are fully automated with no manual review required.

There are few providers attempting to deliver lower-cost, online non-prime credit products similar to ours. Although there are a number of technology-enabled financial services companies that target prime and near-prime customers, including LendingClub, Prosper and Avant, there are only a limited number of comparable online competitors in the non-prime lending space, such as OppLoans and NetCredit in the US. We expect more entrants in this space as this market continues to develop. We also believe that it would require significant time and expense for other companies to build technological and analytical platforms similar to ours, which is geared towards serving non-prime consumers. While other lenders may use proprietary or off-the-shelf lending platforms to support their online lending operations, these typically are focused on specific product types, and this makes such platforms inflexible for the kind of product innovation that we have pursued. We are not aware of any off-the-shelf products that support the variety of non-prime products such as those supported by our proven technology platform and proprietary risk analytics infrastructure. Although technology generally can be reverse-engineered over time, we believe our proven and proprietary technology and analytics platforms provide a competitive advantage due to our lead time based on our long history of serving non-prime consumers with multiple credit products.

The online non-prime credit market in the US is extremely fragmented and most lenders source customers from lead generation companies, resulting in low brand recognition. Unlike these competitors, we have made a significant investment in establishing a direct-to-consumer, integrated multi-channel marketing capability using direct mail, TV, search engine marketing, search engine optimization, and digital campaigns, which we believe creates a unique opportunity for Rise and Elastic to become dominant and trusted brands in this space.

In the UK, high-cost, short-term credit ("HCSTC") products are established but highly regulated and scrutinized by consumer affairs champions, advocacy groups, government and media. In 2015, the Financial Conduct Authority ("FCA") undertook an industry review and introduced a set of regulations including a price cap to ensure borrowers will never have to pay back more than double what they originally borrowed. As a result, the number of HCSTC providers shrunk as many exited the market. In July 2017, the FCA reviewed the price-cap and concluded that the regulations have delivered "substantial benefit to consumers." Despite these positive regulatory changes, there has been a rise in affordability complaints to the Financial Ombudsman Services ("FOS") in 2018 and 2019. Under these circumstances, several competitors have left the market including Wonga, QuickQuid and WageDay Advance. Sunny works closely with the FCA and the FOS to ensure our stringent creditworthiness and affordability checks are meeting the regulator's requirements. The introduction of open banking means we will be able to improve the efficiency of income verification and better assess the customer's financial situation and needs, providing a significant advantage to Sunny.

## REGULATORY ENVIRONMENT

The online consumer loan products we currently originate or support are subject to a range of laws, regulations and standards that address consumer lending, banking, credit services, consumer protections and reporting, information sharing, marketing, debt collection, data protection, state licensing and interest rate and term limitations, among other things.

All products are subject to supervision, regulation and / or enforcement by numerous regulatory bodies—from state regulators and attorneys general, federal regulators, like the CFPB, the FTC and in some cases the FDIC, and the FCA in the UK. Consistent with regulatory expectations, we have an extensive compliance program and internal controls.

For a discussion of the risks related to our regulatory environment, see "Risk factors—Other Risks Related to Compliance and Regulation."

### US regulation

### *State and local regulation and licensing applicable to products originated by Elevate or CSOs*

We offer our Rise installment and line of credit products directly to customers. In Texas, our CSO lending partners originate Rise installment loans. The US Rise loans we and our CSO partners originate are regulated under a variety of enabling state statutes. The scope of state regulation, including permissible interest rates, fees and terms, varies from state to state. Some states require specific disclosures, mandate or prohibit certain terms and limit the maximum interest rate and fees that may be charged. Where licensing or registration is required, we and our lending partners are subject to extensive state rules, licensing and examination. Failure to comply with these requirements may result in, among other things, refunds of excess charges, monetary penalties, revocation of required licenses, voiding of loans and other administrative enforcement actions. These Rise loans are available in the following 15 states: Alabama, Delaware, Georgia, Idaho, Illinois, Kansas, Mississippi, Missouri, New Mexico, North Dakota, South Carolina, Tennessee, Texas, Utah and Wisconsin. In these states, Rise may also be subject to additional municipal regulations and ordinances related to, for example, certain non-bank loan products and debt collection.

The scope of municipal regulations and ordinances vary. Several state regulators have publicly expressed their intent to increase supervision and enforcement of consumer protection laws against supervised entities. State consumer protection laws also apply to Rise installment loans. In many states, legislators and attorneys general could increase their focus or enforcement of these consumer protection statutes. If this were to occur, it could result in additional regulatory oversight and enforcement on our business.

### *US state and federal regulation*

Our US products are subject to a variety of state and federal laws, including but not limited to the following:

*Truth in Lending Act.*   All of the US products we originate or support are subject to the federal Truth in Lending Act ("TILA") and its underlying regulations known as Regulation Z. TILA and Regulation Z require creditors to deliver disclosures to borrowers during the life cycle of a loan—certain advertisements, at application, at account opening or at consummation and for open-end credit products, such as Elastic, Rise and Today Card, periodically, and for certain post-consummation events (e.g., refinancings, change in terms for open-end credit).

The disclosure rules differ depending upon whether the product is an open-end credit or closed-end credit. Under the appropriate disclosure rules, the originating creditor is required to provide borrowers with key information about the loan, including, for open-end credit, the annual percentage rate (if applicable), applicable finance charges, transaction and penalty fees, and, for closed-end loans, the annual percentage rate, the finance charge, the amount financed, the total of payments, the number and amount of payments and payment due dates.

Regulation Z and TILA also provide consumers with substantive consumer protections. Specifically, pursuant to Regulation Z and TILA, loan products are subject to special rules for calculating annual percentage rates, advertising, and for open-end credit, rules for resolving billing errors.

*Fair Credit Reporting Act.*   We are also subject to the Fair Credit Reporting Act (the "FCRA") and similar state laws, as both a user of consumer reports and a furnisher of consumer credit information to credit reporting agencies. The FCRA and similar state laws regulate the use of consumer reports and reporting of information to credit reporting agencies. Specifically, the FCRA establishes requirements that apply to the use of "consumer reports" and similar data, including certain notifications to consumers, including when an adverse action, such as a loan declination, is based on information contained in a consumer report.

We only obtain and use consumer reports subject to the permissible purpose requirements under the FCRA. The FCRA permits us to share our experience information, information obtained from credit reporting agencies, and other customer information with affiliates. We comply with notice and opt out requirements for prescreen solicitations and for certain information sharing under the FCRA. We also have implemented an identity theft prevention program to fulfill the requirements of the Red Flags Regulations and Guidelines issued under the Fair and Accurate Credit Transactions Act (the "FACT Act").

In meeting our duties to furnish consumer credit information to consumer reporting agencies, we:

➢   furnish consumer credit information pursuant to the METRO 2 guidelines;

➢   establish and maintain procedures regarding the accuracy and integrity of the consumer credit information we report; and

➢   establish and maintain procedures to conduct timely investigations of customer disputes (received directly from customers or through credit reporting agencies) regarding the consumer credit information we report to the consumer reporting agencies.

*Equal Credit Opportunity Act.*   The federal Equal Credit Opportunity Act (the "ECOA") generally prohibit creditors from discriminating against applicants on the basis of race, color, sex, age (provided the individual is of legal age to enter into a contract), religion, national origin, marital status, the fact that all or part of the applicant's income derives from any public assistance program or the fact that the applicant has in good faith exercised any right under the federal Consumer Credit Protection Act. Regulation B, which implements ECOA, restricts creditors from requesting certain types of information from loan applicants and from using advertising or making statements that would discourage, on a prohibited basis, a reasonable person from making or pursuing an application.

In the underwriting of loans offered through our online platform, and with respect to all aspects of the credit transaction, including any servicing of loans and other credit, we, our lending partners and marketing affiliates must comply with applicable provisions prohibiting discouragement and discrimination.

ECOA also requires creditors to provide consumers with timely notices of adverse action taken on credit applications or counteroffers. A prospective borrower applying for a loan but denied credit or offered a counteroffer is provided with an adverse action notice.

*FTC Act and Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010.*   Both the FTC and CFPB regulate advertising, marketing of and practices related to financial products and services. The FTC is charged with preventing unfair or deceptive acts or practices and false or misleading advertisements, and the CFPB is charged with preventing unfair, deceptive, or abusive acts and practices. All marketing materials related to our products must also comply with the advertising requirements set forth in TILA.

*Military Lending Act.*   The Military Lending Act ("MLA") restricts, among other things, the interest rate and other terms that can be offered to active military personnel and their dependents on most types of consumer credit. The MLA caps the interest rate that may be offered to a covered borrower to a 36% military annual percentage rate ("MAPR"), which includes certain fees such as application fees, participation fees and fees for add-on products. The MLA also requires certain disclosures and prohibits certain terms, such as mandatory arbitration if a dispute arises concerning the consumer credit product.

The MLA covers Elastic, Rise and the Today Card and restricts our, or our bank partners', ability to offer our products to military personnel and their dependents. Failure to comply with the MLA may limit our ability to collect principal, interest, and fees from borrowers and may result in civil and criminal liability that could harm our business.

*The Servicemembers Civil Relief Act.*   The federal Servicemembers Civil Relief Act ("SCRA") and similar state laws apply to certain loans made to certain members of the US military, reservists and members of the National Guard and certain dependents. The SCRA limits the interest rate a creditor may charge or certain collection actions a creditor may take on certain loans while a servicemember is on military duty. We maintain policies and procedures to comply with SCRA.

*The Electronic Signatures in Global and National Commerce Act.*   The federal Electronic Signatures in Global and National Commerce Act ("E-SIGN") and similar state laws, particularly the Uniform Electronic Transactions Act ("UETA") authorize the creation of legally binding and enforceable agreements utilizing electronic records and signatures. E-SIGN and UETA require businesses that use electronic records or signatures in consumer transactions and provide required disclosures to consumers electronically, to obtain the consumer's consent to receive information electronically. When a borrower is provided electronic disclosures, we obtain his or her consent to transact business electronically, to receive electronic disclosures and maintain electronic records in compliance with E-SIGN and UETA requirements. We also follow similar state e-signature rules mandating that certain disclosures be made, and certain steps be followed, in order to obtain and authenticate e-signatures.

*Electronic Fund Transfer Act.*   The Electronic Fund Transfer Act of 1978 ("EFTA") protects consumers engaging in electronic fund transfers, including preauthorized transactions and recurring transactions. The EFTA is implemented through Regulation E. Borrowers of our products often choose to repay by electronic fund transfers and, accordingly, a written authorization, signed or similarly authenticated, may be required in connection with auto-pay features. Restrictions on how consumers choose to pay or how lenders comply with electronic fund transfers could impact our current business processes.

To the extent a borrower repays his or her payment obligation through electronic fund transfers, the EFTA and Regulation E apply. EFTA and Regulation E contain restrictions, requires disclosures and provides consumers certain rights relating to electronic fund transfers.

*Fair Debt Collection Practices Act.*   The federal Fair Debt Collection Practices Act (the "FDCPA") provides guidelines and limitations on the conduct of third-party debt collectors and debt buyers when collecting consumer debt. While the FDCPA generally does not apply to first-party creditors collecting their own debts or to servicers when collecting debts that were current when servicing began, we use the FDCPA as a guideline for all collections. We require all vendors and third parties that provide collection services on our behalf to comply with the FDCPA to the extent applicable. We also comply with state and local laws that apply to creditors and provide guidance and limitations similar to the FDCPA.

*Unfair, Deceptive, Abusive Acts and Practices.*   The Dodd-Frank Act prohibits "unfair, deceptive or abusive" acts or practices ("UDAAPs"). Through enforcement actions, the CFPB has found UDAAP conduct in most phases in the life cycle of a loan, including the marketing, collecting and reporting of loans. UDAAPs could involve omissions or misrepresentations of important information to consumers or practices that take advantages of vulnerable consumers, such as elderly or low-income consumers. All products and services provided by Elevate and its vendors in the US are subject to the UDAAP prohibition. There are also various state laws that govern unfair and deceptive acts and practices with which we must comply.

*Gramm-Leach-Bliley Act.*    We are also subject to various federal and state laws and regulations relating to privacy and security of consumers' nonpublic personal information. Under these laws, including the federal Gramm-Leach-Bliley Act ("GLBA") and Regulation P promulgated thereunder, we must disclose our privacy policy and practices, including those policies relating to the sharing of nonpublic personal information with third parties. We may also be required to provide an opt-out to certain sharing. The GLBA and other laws also require us to safeguard personal information. The FTC regulates the safeguarding requirements of the GBLA for non-bank lenders through its Safeguard Rules.

*Anti-money laundering and economic sanctions*.    We and the originating lenders that we work with are also subject to certain provisions of the USA PATRIOT Act and the Bank Secrecy Act under which we must maintain an anti-money laundering compliance program covering certain of our business activities. In addition, the Office of Foreign Assets Control prohibits us from engaging in financial transactions with specially designated nationals.

*Anticorruption*.    We are also subject to the US Foreign Corrupt Practices Act (the "FCPA") which generally prohibits companies and their agents or intermediaries from making improper payments to foreign officials for the purpose of obtaining or keeping business and/or other benefits.

*Telemarketing Sales Rule.*    We are also subject to the Telemarketing and Consumer Fraud and Abuse Prevention Act, the FTC's Telemarketing Sales Rule promulgated pursuant to such Act, and similar state laws. The Telemarketing Sales Rule prohibits deceptive and abusive telemarketing acts or practices, such as calling before 8 a.m. or after 9 p.m., and requires telemarketers and sellers to make certain disclosures to consumers in every outbound call. Telemarketers are also required to comply with a company specific do-not-call framework, as well as with state and federal do-not-call registries. We have implemented policies and procedures reasonably designed to comply with the Telemarketing Sales Rule.

*CAN-SPAM Act*.    We are subject to the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 and the FTC's rules promulgated pursuant to such Act (together, "CAN-SPAM Act"), which establish requirements for certain "commercial messages" and "transactional or relationship messages." For example, the CAN-SPAM Act prohibits the sending of messages that contain false, deceptive or misleading information. It also gives recipients the right to stop receiving commercial messages. We have implemented policies and procedures reasonably designed to comply with the CAN-SPAM Act.

*Telephone Consumer Protection Act*.    We are also subject to the Telephone Consumer Protection Act and its implementing regulations (together, the "TCPA") and the regulations of the FCC. The TCPA regulates the delivery of live and prerecorded telemarketing calls, non-marketing calls to cell phones through the use of an automated telephone dialing system, fax advertisements, and text messages. For example, under the TCPA, it is unlawful to make many of these types of communications without the prior consent of the recipient. The TCPA also established a federal do-not-call registry, with the Telemarketing Sales Rule, as noted above. We maintain policies and procedures reasonably designed to comply with the TCPA.

*CARD Act.*    The Today Card is subject to the Credit Card Accountability Responsibility and Disclosure ("CARD") Act that establishes fair and transparent practices relating to credit cards. The CARD Act, among other things, provides protections for consumers such as limiting interest rate hikes, banning the issuance of credit cards to anyone less than 21 years of age without an adult co-signer, limiting over-limit, late and account-opening fees, and requiring transparent disclosures related to minimum payments.

*Fair Credit Billing Act* - The Fair Credit Billing Act ("FCBA") protects consumers from prejudicial or unfair billing practices in open-ended lines of credit and credit cards. It lays out consumers' rights to dispute credit card issuers' charges and addresses consumer redress for common billing errors.

### Consumer Financial Protection Bureau

The CFPB regulates consumer financial products and services, including consumer loans that we offer. The CFPB has regulatory, supervisory and enforcement powers over certain providers of consumer financial products and services.

The CFPB released its final "Payday, Vehicle Title, and Certain High-Cost Lending Rule" ("2017 Rule") on October 5, 2017 which would require us to provide customers notice at least three days before a payment withdrawal attempt, as well as obtain new ACH authorization from a customer following two failed ACH attempts, among other requirements. The 2017 Rule became effective on January 16, 2018; the compliance date for the 2017 Rule was August 19, 2019. On February 6, 2019, the CFPB issued proposed revisions to the 2017 Rule ("2019 Proposed Revisions"). The 2019 Proposed Revisions leave in place requirements and limitations on attempts to withdraw payments from consumers' checking, savings or prepaid accounts for payments. The mandatory compliance deadline for the 2019 Proposed Revisions was August 19, 2019; however, language in the 2019 Proposed Revisions suggests that the CFPB may be receptive to informal requests to revisit the payment provisions requirements.

In a separate CFPB proposal, the CFPB announced it was seeking a 15-month delay in the 2017 Rule's August 19, 2019 compliance date to November 19, 2020, that would apply only to proposed rescinded ability-to-pay provisions. According to the most recent semi-annual regulatory agenda, the CFPB expects to take final action with respect to this proposal in April 2020. On May 7, 2019, the CFPB issued its outline of proposals under consideration for the regulation of debt collection by third-party debt collectors. An extended Notice Period to provide comments to the rule ended in September 2019; the CFPB has not issued a final rule on debt collection by third-party debt collectors and expects to engage in further testing of consumer disclosures related to time-barred debt disclosures. However, if a final rule is promulgated, we will take the necessary steps to ensure that our management and oversight of third-party debt collectors is consistent with the final rule. We also expect the CFPB to continue with its rulemaking regarding the Supervision of Larger Participants in Installment Loan and Vehicle Title Loan Markets, which will enable the CFPB to examine and supervise those markets.

We do not currently know the full extent of the final rules the CFPB will ultimately adopt, and thus, the final rule's impact on our activities is uncertain, however the final rules will likely impose limitations on certain loans and services we offer, and our conduct with respect to such loans and services. We believe that the new rules will ultimately reduce potential consumer harm and allow responsible lenders to continue to serve the large and growing need for non-prime credit. As noted above, Republic Bank, FinWise Bank, and Capital Community Bank are supervised and examined by the FDIC. Furthermore, it is not clear whether and to what extent the FDIC, the CFPB, or both will have supervisory authority over Elevate, as a service provider to these banks. However, banks may have third-party vendor management requirements pursuant to the FDIC's Third-Party Guidance for Managing Third-Party Risk that impose obligations on us with respect to our business.

The Trump Administration has issued numerous executive orders aimed at reducing regulations. It is unclear whether these apply to the CFPB. Further, the CFPB is currently overseen by Director Kathy Kraninger who has made organizational changes to the CFPB, is reviewing all operations of the CFPB and has issued or anticipates issuing Requests for Information (RFIs) on the following topics: CIDs, Use of Administrative Adjudications, Enforcement, Supervision, External Engagement, Complaint Reporting, Rulemaking Processes, Bureau Rules Not Under §1022(d) Assessment, Inherited Rules, Guidance and Implementation Support, Consumer Education and Consumer Inquiries. It is unclear what impact, if any, the findings or outcomes of the RFIs will have on the oversight of our business.

### Federal Trade Commission

The Federal Trade Commission ("FTC") enforces the safeguarding requirements of the GLBA against non-banks pursuant its authority to enforce Section 5 of the Federal Trade Commission Act, which prohibits unfair or deceptive acts or practices. In addition, the FTC has a history of pursuing enforcement actions against non-bank lenders and online lead generators for alleged unfair or deceptive acts or practices in connection with the marketing or servicing of consumer credit products and services. Like the CFPB, the FTC may issue fines and corrective orders that could require us to make revisions to our existing business models. The FTC has jurisdiction over Elevate and its business practices.

### Foreign regulation

### United Kingdom

In the UK, we are subject to regulation by the FCA and must comply with the FCA's rules and guidance set forth in the FCA Handbook, the Financial Services and Markets Act 2000 (the "FSMA"), the Consumer Credit Act of 1974, as amended (the "CCA") and secondary legislation passed under the FSMA and the CCA, among other rules and regulations.

*UK regulation and authorization.*    Our Sunny product is covered by the extensive regulatory regime promulgated under the FSMA and CCA. The regulatory regime requires firms undertaking consumer credit regulatory activities to be FCA authorized. Regulated businesses must hold FCA authorizations, pay annual fees, follow prescriptive rules on advertising, include minimum and prescribed disclosures within pre-contract, loan and post-contract arrears documentation, regularly report customer complaints information, and maintain robust systems and controls in relation to the conduct of regulated business, including when engaging third-party suppliers.

The UK regime includes an obligation to self-report breaches of the applicable laws and regulations, and the FCA has the power to order regulated firms to pay fines, undertake changes to business models, implement customer remediation programs compensating customers for historic breaches and, among various other enforcement powers, limit or revoke regulatory authorizations. Failure to comply with the technical requirements of CCA and underlying regulations can, among other penalties, render loan agreements unenforceable without a court order or preclude the charging of interest for the period of non-compliance. The courts also have wide powers to determine that a relationship between a lender and customers is unfair and impose equitable remedies in such circumstances.

The FCA dictates that customer complaints are to be addressed promptly and fairly within our industry. Certain disputes are managed through the Financial Ombudsman Service (hereinafter "FOS"). If a business and a customer can't resolve a complaint themselves, the FOS can become involved to advocate on behalf of the customer.

*Equality Act.*    The Equality Act 2010 prohibits unlawful direct and indirect discrimination and harassment of applicants and customers when conducting lending services on the basis of nine protected characteristics: age; disability; gender reassignment; marriage and civil partnership; pregnancy and maternity; race; religion or belief; sex; and sexual orientation. These requirements apply to the advertising, underwriting and enforcing of Sunny loans and the handling of complaints regarding Sunny loans.

*Marketing laws.*    Marketing in all mediums, including television, radio and online, is subject to the detailed advertising rules for the consumer credit industry contained in part 3 of the FCA's CONC rulebook as well as the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005. In particular, all advertisements must be clear, fair and not misleading and include representative cost information and illustrations where particular advertising jargon is included in the material. Certain marketing expressions are also prohibited. We are also subject to the Privacy and Electronic Communications (EC Directive) Regulations 2003, which impose rules on the use of unsolicited marketing and the monitoring of devices.

The Advertising Standards Authority (the "ASA") has also published specific codes for broadcast and non-broadcast advertising to which we must also adhere. Both the FCA and the ASA tightly monitor consumer credit advertising and regularly conduct industry audits of compliance standards. The ASA maintains a complaints framework and investigates legal, regulatory and code breaches raised by both consumers and competitors and publishes public adjudications, which can require firms to amend or completely remove advertisements. Misleading marketing can also constitute a criminal offense under the Consumer Protection from Unfair Trading Regulations 2008 and result in fines from the FCA.

*Debt collection practices.*    The CCA sets out a formulaic procedure for customers in arrears, applicable when levying default fees and when taking any other steps in relation to default. Firms are required to issue statutory notices in a prescribed format within specific time frames and include self-help information sheets. Failure to comply has severe consequences, including restricting lender rights to enforce relevant loan agreements, charge interest or any levy applicable default fees. The FCA also expects firms that have failed to comply with these requirements to proactively undertake extensive remediation activities, issuing refunds to customers where appropriate, including in cases where customers have not raised a complaint directly. A number of leading banking groups in the UK have undertaken such remediation activities.

Part 7 of the FCA's CONC rulebook also sets out detailed rules and guidance for dealing with customers in arrears or default when pursuing recovery. The rules prohibit threatening, aggressive and harassing debt collection communications and practices, impose obligations to treat customers in arrears with forbearance and govern conduct when interacting with debt management firms engaged to resolve over-indebtedness. There are also specific rules on the use of continuous payment authorities as a repayment method that limit the number of repayment attempts that can be initiated by lenders.

*Privacy laws.*    In the UK, we remain subject to the requirements of the EU General Data Protection Regulation ("GDPR") during the post-Brexit transition period under the EU Withdrawal Agreement. Subsequently, we will be subject to UK data protection legislation that we expect to remain comparable to GDPR. The GDPR has imposed a variety of obligations on businesses, including, for example, the appointment of a data protection officer in some circumstances, self-reporting of personal data breaches, obtaining express consent for data processing in some circumstances, and providing a variety of rights to individuals whose personal data is processed, including the "right to be forgotten," by having records containing such individual's personal data erased. Penalties for non-compliance under the GDPR are up to 4% of annual global turnover (a.k.a. total revenues) for the preceding year or £20 Million (whichever is greater). The UK is expected to transpose the protections of the GDPR into UK law after the end of the Brexit transition period, which is expected to end on December 31, 2020.

In the UK, Regulation (EU) No 910/2014 on electronic identification and trust services for electronic transactions in the internal market ("eIDAS"), came into force on July 1, 2016. eIDAS repealed and replaced the e-Signatures Directive (1999/93/EC) and is directly applicable in all EU Member States, including the UK as it was a member of the EU when eIDAS entered into force. At the same time, the UK also introduced the Electronic Identification and Trust Services for Electronic Transactions Regulations 2016 to, amongst other things, repeal the previous UK e-signature legislation. eIDAS is technology neutral and defines three types of electronic signature (Qualified Electronic Signature (QES), Advanced Electronic Signature (AES) and Simple Electronic Signature (SES)). Article 25(1) of eIDAS provides that an electronic signature shall not be denied legal effect and admissibility as evidence in legal proceedings solely on the grounds that it is in an electronic form or does not meet the requirements of a QES. Articles 25(2) and (3) of eIDAS give a QES the same legal effect as a handwritten signature, and ensure that a QES recognized in one EU Member State is also recognized in other EU Member States.

The Electronic Identification and Trust Services for Electronic Transactions (Amendment etc.) (EU Exit) Regulations 2019 entered into force when the UK left the EU on January 31, 2020. This ensures that the provisions under eIDAS are maintained in UK domestic law when eIDAS ceases to apply in the UK at the end of the Brexit transition period.

There are also strict rules on the instigation of electronic communications such as email, text message and telephone calls under the Privacy and Electronic Communications (EC Directive) Regulations 2003 ("PECR"), which generally impose consent rules regarding unsolicited direct marketing, as well as the monitoring of devices. During the transition period, the GDPR, PECR and other European Union laws will continue to apply within the UK. When the transition period ends, the UK will implement the Data Protection, Privacy and Electronic Communications (Amendments etc.) (EU Exit) Regulations 2019, which transpose the protections of the GDPR and PECR under UK law. The UK is expected to continue the protections of the GDPR and PECR for the transfer of personal data into and out of the UK.

We are subject to laws limiting the transfer of personal data from the European Economic Area to non-European Economic Area countries or territories. With respect to Brexit, no immediate steps are necessary in terms of data transfers between the EU and the UK because the GDPR continues to apply in the UK during the transition period. We are keeping track of the adequacy assessments that will take place between the EU and the UK. If necessary, we will take all necessary steps to implement an appropriate data transfer mechanism to facilitate GDPR-compliant transfers of personal data between the UK and the EU.

*Anti-money laundering.*    We are subject to the Proceeds of Crime Act 2002 and the Money Laundering Regulations 2007, which require the implementation of strict procedures for our business activities. The UK regime includes self-reporting suspicious activities, the appointment of a designated anti-money laundering officer with overall responsibility for the compliance of the business and employees. The legislation also includes several criminal offenses and can result in personal criminal liability.

*Anti-bribery and corruption.*    UK firms are subject to the Bribery Act 2010, which introduces a number of individual offenses relating to giving and receiving bribes and dealings with foreign public officials. Commercial organizations can be prosecuted for failure to implement adequate procedures to record, report and prevent bribery.

*Modern Slavery Act 2018.*    UK firms are required to publish an annual statement if they have an annual turnover above a threshold. The statement must confirm the steps taken to ensure that slavery and human trafficking are not taking place in the business or in any supply chain.

*APR by geography*

The table below presents the maximum APR allowed by state for states in which Rise is offered through state licenses or through CSO lenders. Sunny is subject to a 24% monthly APR limit, which is nationwide in the UK. Elastic is a fee-based product without a periodic rate that requires the disclosure of an APR. The Today Card's variable APR ranges from 29.99% to 34.99% and also has certain additional fees that may be charged, including late fees, returned payment fees, an annual fee and other customary fees.

| State | Maximum APR allowed by state | Maximum APR Rise charges |
|---|---|---|
| Alabama | * | 295% |
| Delaware | * | 299% |
| Georgia(1) | 60% | 60% |
| Idaho | * | 299% |
| Illinois | 99% | 99% |
| Kansas(2) | * | 299% |
| Mississippi | * | 290% |
| Missouri | * | 299% |
| New Mexico | 175% | 175% |
| North Dakota | * | 299% |
| South Carolina | * | 299% |
| Tennessee(2) | See note (3) | 275% |
| Texas | * | 299% |
| Utah | * | 299% |
| Wisconsin | * | 299% |

(1)    APR must be less than 60% under applicable state law.

(2)    In Tennessee and Kansas, Rise is a line of credit and the maximum APR noted above is actually the periodic interest and fees allowable by statute.

(3)    Tennessee has a statutory maximum APR allowed equal to periodic interest of 24% per year (this only applies to periodic interest and not fees) plus a daily fee of 0.7% of the average daily principal balance in any billing cycle.


## EMPLOYEES

We are committed to building and nurturing a distinctive corporate culture of innovation, excellence, collaboration and integrity. Our key company values based on how we expect ourselves to serve our customers, owners and each other are:

➢   *Think Big*.   We have always been an innovator in our industry. Ideas, both big and small, are our competitive advantage. We share a responsibility to think out of the box, challenge the status quo and embrace change.

➢   *Raise the Bar*.   Excellence is not a skill. It is a habit—the gradual result of always striving to do better. As a company and as individuals we push ourselves to build on success, learn from failure and get better every day.

➢   *Win Together*.   Our goals are too big to achieve as individuals. Collaboration is not a by-product of our work, it is the primary focus. It is also more fun.

➢   *Do the Right Thing*.   Doing the right thing is not optional. We hold each other to the highest standards and earn our reputation every day.


Our values are reinforced in all aspects of our employees' relationship with our company, including during the recruiting process, quarterly check-ins and annual reviews, and play a large role in the promotion process. In addition, each quarter, employees who best exemplify these values are nominated for "Smart Awards" and are selected and recognized at all-company Town Hall meetings.

Elevate has been certified as a "Great Place to Work" from 2016 to 2019 based on a comparison of our employees' survey responses to responses of hundreds of other companies. We believe this reflects our commitment to build a strong and lasting company and corporate culture.

As of December 31, 2019, we had 695 full-time employees, including 260 in technology, 66 in risk management, 86 in loan operations and customer support, 27 in marketing and business development, 143 related to our UK operations and 113 in general and administrative functions. We also outsource certain functions, such as collections and customer service to increase efficiencies and scalability. We use an internal quality team to review and improve third-party performance.

## OUR INTELLECTUAL PROPERTY

Protecting our rights to our intellectual property is critical, as it enhances our ability to offer distinctive services and products to our customers, which differentiates us from our competitors. We rely on a combination of trademark laws and trade secret protections in the US and other jurisdictions, as well as confidentiality procedures and contractual provisions, to protect the intellectual property rights related to our proprietary analytics, predictive underwriting models and software systems. We have either registered trademarks and/or pending applications in the US for the marks Elevate, Rise, Elastic, Sunny and Today Card. We also own European Community trademark registrations for the Sunny and Elastic marks. Our trademarks are materially important to us and we anticipate maintaining them and renewing them.

## OUR HISTORY

We were created through the spin-off of the direct lending and branded product businesses of TFI, which was founded in 2001. Prior to the spin-off transaction, TFI had two discrete lines of business: (1) a direct lender and branded product provider to non-prime consumers; and (2) a licensor of its technology platform to third-party lenders. In order to allow each of these separate lines of business to focus on its relative strategic and operational strengths and future business plans, the board of directors of TFI decided to spin off its direct lending and branded products business into a separate company.

We were incorporated in Delaware on January 31, 2014 as a subsidiary of TFI, and we had no material assets or activities as a separate corporate entity until the spin-off occurred. On May 1, 2014, TFI contributed the assets and liabilities associated with its direct lending and branded products business to us and distributed its interest in our Company to its stockholders, but retained the assets and liabilities associated with its licensed technology platform line of business. TFI's retained business line entails providing marketing services to third-party lenders and licensing TFI's technology platform to these lenders for marketing and licensing fees. TFI previously conducted its direct lending business through various legal entity subsidiaries, which were contributed to us in the spin-off transaction.

On April 11, 2017, we closed an initial public offering ("IPO") of 12,400,000 shares of our common stock at a price of $6.50 per share to the public. In connection with the closing, the underwriters exercised their option to purchase in full for an additional 1,860,000 shares. On April 6, 2017, our stock began trading on the New York Stock Exchange ("NYSE") under the symbol "ELVT."

## AVAILABLE INFORMATION

Our website address is www.elevate.com, and our investor relations website is located at http://elevate.com/investors. Information on our website is not incorporated by reference herein. We file annual, quarterly and special reports, proxy statements and other information with the Securities and Exchange Commission (the "SEC"). These filings are also available on the SEC's website at www.sec.gov. You also may read and copy reports and other information filed by us at the office of the NYSE at 20 Broad Street, New York, New York 10005.

We make our Annual Reports on Form 10-K, our Quarterly Reports on Form 10-Q, our Current Reports on Form 8-K, and all amendments to these reports, available free of charge on our corporate website as soon as reasonably practicable after such reports are filed with, or furnished to, the SEC. In addition, our Corporate Governance Guidelines, Code of Business Conduct and Ethics Policy, Related Party Transaction Policy, and charters of the Audit Committee, Compensation Committee, Nominating and Corporate Governance Committee and Risk Committee are available on our website. We will provide reasonable quantities of electronic or paper copies of filings free of charge upon request. In addition, we will provide a copy of the above referenced charters to stockholders upon request.

**Item 1A. Risk Factors**

*Investing in our common stock involves a high degree of risk. You should carefully consider the following risks and all other information contained in this Annual Report on Form 10-K, including our consolidated financial statements and the related notes, before investing in our common stock. The risks and uncertainties described below are not the only ones we face but include the most significant factors currently known by us that make investing in our securities speculative or risky. Additional risks and uncertainties that we are unaware of, or that we currently believe are not material, also may become important factors that affect us. If any of the following risks materialize, our business, financial condition and results of operations could be materially harmed. In that case, the trading price of our common stock could decline, and you may lose some or all of your investment.*

## RISKS RELATED TO OUR BUSINESS AND INDUSTRY

### We operate in an industry that is rapidly evolving, and we may be unsuccessful in response to these changes.

Although our management team has many years of experience in the non-prime lending industry, we operate in an evolving industry that may not develop as expected. Assessing the future prospects of our business is challenging in light of both known and unknown risks and difficulties we may encounter. Growth prospects in non-prime lending can be affected by a wide variety of factors including:

- Competition from other online and traditional lenders and credit card providers;

- Regulatory limitations that impact the non-prime lending products we can offer and the markets we can serve;

- An evolving regulatory and legislative landscape;

- Access to important marketing channels such as:

    - Direct mail and electronic offers;

    - TV and mass media;

    - Direct marketing, including search engine marketing; and

    - Strategic partnerships with affiliates;

- Changes in consumer behavior;

- Access to adequate financing;

- Increasingly sophisticated fraudulent borrowing and online theft;

- Challenges with new products and new markets;

- Dependence on our proprietary technology infrastructure and security systems;

- Dependence on our personnel and certain third parties with whom we do business;

- Risk to our business if our systems are hacked or otherwise compromised;

- Evolving industry standards;

- Recruiting and retention of qualified personnel necessary to operate our business; and

- Fluctuations in the credit markets and demand for credit.

We may not be able to successfully address these factors, which could negatively impact our growth, harm our business and cause our operating results to be worse than expected.

**Our most recent annual revenue declined from the prior year and we may not be able to grow in the future**.

Our revenues decreased to $747.0 million for the year ended December 31, 2019 from $786.7 million for the year ended December 31, 2018. Our revenue growth rate has fluctuated over the past few years and it is possible that, in the future, even if our revenues continue to increase, our rate of revenue growth could decline, either because of external factors affecting the growth of our business or because we are not able to scale effectively as we grow. If we cannot manage our growth effectively, it could have a material adverse effect on our business, prospects, results of operations, financial condition or cash flows.

**We have a history of losses and may not maintain or achieve consistent profitability in the future.**

We incurred net income (losses) of $32.2 million, $12.5 million and $(6.9) million for the years ended December 31, 2019, 2018 and 2017, respectively. As of December 31, 2019, we had an accumulated deficit of $34.3 million. We will need to generate and sustain increased revenues in future periods in order to become and remain profitable, and, even if we do, we may not be able to maintain or increase our level of profitability.

As we grow, we expect to continue to expend substantial financial and other resources on:

- personnel, including significant increases to the total compensation we pay our employees as we grow our employee headcount;

- marketing, including expenses relating to increased direct marketing efforts;

- product development, including the continued development of our proprietary scoring methodology;

- funding costs to support loan growth;

- office space, as we increase the space we need for our growing employee base; and

- general administration, including legal, accounting and other compliance expenses related to being a public company.

These expenditures are expected to increase and may adversely affect our ability to achieve and sustain profitability as we grow. In addition, we record our provision for loan losses as an expense to account for the possibility that some loans may not be repaid in full. We expect the aggregate amount of loan loss provision to grow as we increase the number and total amount of loans we make to new customers.

Our efforts to grow our business may be more costly than we expect, and we may not be able to increase our revenues enough to offset our higher operating expenses. We may incur losses in the future for a number of reasons, including the other risks described in this "Risk Factors" section, unforeseen expenses, difficulties, complications and delays and other unknown events. If we are unable to achieve and sustain profitability, the market price of our common stock may significantly decrease.

**The consumer lending industry continues to be subject to new laws and regulations in many jurisdictions that could restrict the consumer lending products and services we offer, impose additional compliance costs on us, render our current operations unprofitable or even prohibit our current operations.**

Both state and federal governments in the US and regulatory bodies in the UK may seek to impose new laws, direct contractual arrangements with us, regulatory restrictions or licensing requirements that affect the products or services we offer, the terms on which we may offer them, and the disclosure, compliance and reporting obligations we must fulfill in connection with our lending business. They may also interpret or enforce existing requirements in new ways that could restrict our ability to continue our current methods of operation or to expand operations, impose significant additional compliance costs and may have a negative effect on our business, prospects, results of operations, financial condition or cash flows. In some cases, these measures could even directly prohibit some or all of our current business activities in certain jurisdictions, or render them unprofitable or impractical to continue. For example, on October 25, 2019, the Company's UK subsidiary, ECI, entered into an agreement with the FCA that prohibits us from making payments greater than £1.0 million outside of the normal course of business without obtaining prior approval from the FCA. The Company believes this agreement will not have a material impact on ECI's ability to continue to serve its customers and meet its obligations.

In recent years, consumer loans, and in particular the category commonly referred to as "payday loans," have come under increased regulatory scrutiny that has resulted in increasingly restrictive regulations and legislation that makes offering consumer loans in certain states in the US or the UK less profitable or unattractive. On October 5, 2017 the CFPB issued a final rule covering loans that require consumers to repay all or most of the debt at once, including payday loans, auto title loans, deposit advance products, longer-term loans with balloon payments and any loan with an annual percentage rate over 36% that includes authorization for the lender to access the borrower's checking or prepaid account (the "2017 Rule"). Since that time, the 2017 Rule has been amended. See "—The CFPB issued proposed revisions to the 2017 Rule affecting the consumer lending industry, and these or subsequent new rules and regulations, if they are finalized, may impact our US consumer lending business" for more information.

We also expect that further new laws and regulations will be promulgated in the UK that could impact our business operations. See "—The UK has imposed, and continues to impose, increased regulation of the high-cost short-term credit industry with the stated expectation that some firms will exit the market" for additional information.

In order to serve our non-prime customers profitably we need to sufficiently price the risk of the transaction into the annual percentage rate ("APR") of our loans. If individual states or the US federal government or regulators in the UK impose rate caps lower than those at which we can operate our current business profitably or otherwise impose stricter limits on non-prime lending, we would need to exit such states or dramatically reduce our rate of growth by limiting our products to customers with higher creditworthiness. On April 30, 2019, Senator Dick Durbin reintroduced a bill that would create a national interest rate cap of 36% on consumer loans. S. 1230 "Protecting Consumers from Unreasonable Credit Rates Act of 2019" is co-sponsored by Senators Jeff Merkley, Sheldon Whitehouse, and Richard Blumenthal. Previous versions have been proposed in 2009, 2013, 2015 and 2017, but the bill has never made it to the House or Senate floor. The current bill is still pending in the Senate. In November 2019, Rep. Jesús "Chuy" García and Rep. Glenn Grothman introduced H.R. 5050, the Veterans and Consumers Fair Credit Act (VCFCA). This bill would create a national rate cap of 36% on all consumer loans from all lenders. Senators Jeff Merkley, Jack Reed, Sherrod Brown and Chris Van Hollen introduced a companion bill in the Senate at the same time. It is anticipated that the House Financial Services Committee will hold hearings and a potential mark-up of H.R. 5050 during calendar year 2020.

On January 1, 2020, California lending law changed to impose a rate cap of 36% plus the Federal Funds Rate set by the Federal Reserve Board for all consumer-purpose installment loans, including personal loans, car loans, and auto title loans, as well as open-end lines of credit made under its California Financing where the amount of credit is $2,500 or more but less than $10,000. Rise loans originated by Elevate are impacted by this law.

Furthermore, legislative or regulatory actions may be influenced by negative perceptions of us and our industry, even if such negative perceptions are inaccurate, attributable to conduct by third parties not affiliated with us (such as other industry members) or attributable to matters not specific to our industry.

Any of these or other legislative or regulatory actions that affect our consumer loan business at the national, state, international and local level could, if enacted or interpreted differently, have a material adverse effect on our business, prospects, results of operations, financial condition or cash flows and prohibit or directly or indirectly impair our ability to continue current operations.

**Regulators and payment processors are scrutinizing certain online lenders' access to the Automated Clearing House system to disburse and collect loan proceeds and repayments, and any interruption or limitation on our ability to access this critical system would materially adversely affect our business.**

When making loans in the US, we typically use the Automated Clearing House ("ACH") system to deposit loan proceeds into our customers' bank accounts. This includes loans that we originate as well as Elastic loans originated by Republic Bank & Trust Company ("Republic Bank"), Rise loans made through the credit services organization ("CSO") programs and Rise loans originated by FinWise Bank ("FinWise"). These products also depend on the ACH system to collect amounts due by withdrawing funds from customers' bank accounts when the customer has provided authorization to do so. ACH transactions are processed by banks, and if these banks cease to provide ACH processing services or are not allowed to do so, we would have to materially alter, or possibly discontinue, some or all of our business if alternative ACH processors or other payment mechanisms are not available.

It has been reported that actions, referred to as Operation Choke Point, by the US Department of Justice (the "Justice Department") the Federal Deposit Insurance Corporation (the "FDIC") and certain state regulators appear to be intended to discourage banks and ACH payment processors from providing access to the ACH system for certain lenders that they believe are operating illegally, cutting off their access to the ACH system to either debit or credit customer accounts (or both).

In the past, this heightened regulatory scrutiny by the Justice Department, the FDIC and other regulators has caused some banks and ACH payment processors to cease doing business with consumer lenders who are operating legally, without regard to whether those lenders are complying with applicable laws, simply to avoid the risk of heightened scrutiny or even litigation. These actions have reduced the number of banks and payment processors who provide ACH payment processing services and could conceivably make it increasingly difficult to find banking partners and payment processors in the future and/or lead to significantly increased costs for these services. If we are unable to maintain access to needed services on favorable terms, we would have to materially alter, or possibly discontinue, some or all of our business if alternative processors are not available. In response to Operation Choke Point, H.R. 2706 was introduced in the House to halt future similar actions. The bill passed out of the House on December 11, 2017 but did not progress. H.R. 189 was introduced in the House on January 3, 2019 to address Operation Choke Point. It is unknown if this newly reintroduced legislation will progress further. On May 22, 2019, the FDIC issued a letter in connection with litigation acknowledging that certain of its "employees acted in a manner inconsistent with FDIC policies with respect to payday lenders" in what has been generically described as "Operation Choke Point," and that this conduct created misperceptions about the FDIC's policies. Regulatory threats, undue pressure, coercion, and intimidation designed to restrict access to financial services for lawful businesses have no place at the FDIC."

If we lost access to the ACH system because our payment processor was unable or unwilling to access the ACH system on our behalf, we would experience a significant reduction in customer loan payments. Although we would notify consumers that they would need to make their loan payments via physical check, debit card or other method of payment a large number of customers would likely go into default because they are expecting automated payment processing. Similarly, if regulatory changes limited our access to the ACH system or reduced the number of times ACH transactions could be re-presented, we would experience higher losses.

**If the information provided by customers or other third parties to us is incomplete, incorrect or fraudulent, we may misjudge a customer's qualification to receive a loan, and any inability to effectively identify, manage, monitor and mitigate fraud risk on a large scale could cause us to incur substantial losses, and our operating results, brand and reputation could be harmed.**

For the loans we originate through Rise and Sunny, our growth is largely predicated on effective loan underwriting resulting in acceptable customer profitability. This is equally important for the Rise loans in Texas and the Rise loans and Elastic lines of credit originated by unaffiliated third parties. See "Management's discussion and analysis of financial condition and results of operations—Components of Our Results of Operations—Revenues." Lending decisions by such originating lenders are made using our proprietary credit and fraud scoring models, which we license to them. Lending decisions are based partly on information provided by loan applicants and partly on information provided by consumer reporting agencies, such as TransUnion, Experian or Equifax and other third-party data providers. Data provided by third-party sources is a significant component of the decision methodology, and this data may contain inaccuracies. To the extent that applicants provide inaccurate or unverifiable information or data from third-party providers is incomplete or inaccurate, the credit score delivered by our proprietary scoring methodology may not accurately reflect the associated risk. Additionally, a credit score assigned to a borrower may not reflect that borrower's actual creditworthiness because the credit score may be based on outdated, incomplete or inaccurate consumer reporting data, and we do not verify the information obtained from the borrower's credit report. Additionally, there is a risk that, following the date of the credit report that we obtain and review, a borrower may have:

- become past due in the payment of an outstanding obligation;

- defaulted on a pre-existing debt obligation;

- taken on additional debt; or

- sustained other adverse financial events.

Our resources, technologies and fraud prevention tools, which are used to originate loans or lines of credit, as applicable, under Rise, Sunny, Elastic and Today Card, may be insufficient to accurately detect and prevent fraud. Inaccurate analysis of credit data that could result from false loan application information could harm our reputation, business and operating results.

In addition, our proprietary credit and fraud scoring models use identity and fraud checks analyzing data provided by external databases to authenticate each customer's identity. The level of our fraud charge-offs and results of operations could be materially adversely affected if fraudulent activity were to significantly increase. Online lenders are particularly subject to fraud because of the lack of face-to-face interactions and document review. If applicants assume false identities to defraud the Company or consumers simply have no intent to repay the money they have borrowed, the related portfolio of loans will exhibit higher loan losses. We have in the past and may in the future incur substantial losses and our business operations could be disrupted if we or the originating lenders are unable to effectively identify, manage, monitor and mitigate fraud risk using our proprietary credit and fraud scoring models.

Since fraud is often perpetrated by increasingly sophisticated individuals and "rings" of criminals, it is important for us to continue to update and improve the fraud detection and prevention capabilities of our proprietary credit and fraud scoring models. If these efforts are unsuccessful then credit quality and customer profitability will erode. If credit and/or fraud losses increased significantly due to inadequacies in underwriting or new fraud trends, new customer originations may need to be reduced until credit and fraud losses returned to target levels, and business could contract.

It may be difficult or impossible to recoup funds underlying loans made in connection with inaccurate statements, omissions of fact or fraud. Loan losses are currently the largest cost as a percentage of revenues across each of Rise, Sunny, Elastic, and Today Card. If credit or fraud losses were to rise, this would significantly reduce our profitability. High profile fraudulent activity could also lead to regulatory intervention, negatively impact our operating results, brand and reputation and require us, and the originating lenders, to take steps to reduce fraud risk, which could increase our costs.

Any of the above risks could have a material adverse effect on our business, prospects, results of operations, financial condition or cash flows.

**Because of the non-prime nature of our customers, we have historically experienced a high rate of net charge-offs as a percentage of revenues, and our ability to price appropriately in response to this and other factors is essential. We rely on our proprietary credit and fraud scoring models in the forecasting of loss rates. If we are unable to effectively forecast loss rates, it may negatively impact our operating results.**

Our net charge-offs as a percentage of revenues for the years ended December 31, 2019 and 2018 were 50% and 52%, respectively. Because of the non-prime nature of our customers, it is essential that our products are appropriately priced, taking this and all other relevant factors into account. In making a decision whether to extend credit to prospective customers, and the terms on which we or the originating lenders are willing to provide credit, including the price, we and the originating lenders rely heavily on our proprietary credit and fraud scoring models, which comprise an empirically derived suite of statistical models built using third-party data, data from customers and our credit experience gained through monitoring the performance of customers over time. Our proprietary credit and fraud scoring models are based on previous historical experience. Typically, however, our models will become less effective over time and need to be rebuilt regularly to perform optimally. This is particularly true in the context of our preapproved direct mail campaigns. If we are unable to rebuild our proprietary credit and fraud scoring models, or if they do not perform up to target standards the products will experience increasing defaults or higher customer acquisition costs. In addition, any upgrades or planned improvements to our technology and credit models may not be implemented on the timeline that we expect or may not drive improvements in credit quality for our products as anticipated, which may have a material adverse effect on our business, prospects, results of operations, financial condition or cash flows.

If our proprietary credit and fraud scoring models fail to adequately predict the creditworthiness of customers, or if they fail to assess prospective customers' financial ability to repay their loans, or any or all of the other components of the credit decision process described herein fails, higher than forecasted losses may result. Furthermore, if we are unable to access the third-party data used in our proprietary credit and fraud scoring models, or access to such data is limited, the ability to accurately evaluate potential customers using our proprietary credit and fraud scoring models will be compromised. As a result, we may be unable to effectively predict probable credit losses inherent in the resulting loan portfolio, and we, and the originating lender, may consequently experience higher defaults or customer acquisition costs, which could have a material adverse effect on our business, prospects, results of operations, financial condition or cash flows.

Additionally, if we make errors in the development and validation of any of the models or tools used to underwrite loans, such loans may result in higher delinquencies and losses. Moreover, if future performance of customer loans differs from past experience, which experience has informed the development of our proprietary credit and fraud scoring models, delinquency rates and losses could increase.

If our proprietary credit and fraud scoring models were unable to effectively price credit to the risk of the customer, lower margins would result. Either our losses would be higher than anticipated due to "underpricing" products or customers may refuse to accept the loan if products are perceived as "overpriced." Additionally, an inability to effectively forecast loss rates could also inhibit our ability to borrow from our debt facilities, which could further hinder our growth and have a material adverse effect on our business, prospects, results of operations, financial condition or cash flows.

**We depend in part on debt financing to finance most of the loans we originate. Our business could be adversely affected by a lack of sufficient debt financing at acceptable prices or disruptions in the credit markets, which could reduce our access to credit.**

We depend in part on debt financing to support the growth of our originated portfolios, Rise and Sunny. However, we cannot guarantee that financing will continue to be available beyond the current maturity date of our debt facilities, on reasonable terms or at all. Presently our debt financing for Rise and Sunny primarily comes from a single source, Victory Park Management, LLC ("VPC"), an affiliate of Victory Park Capital. If VPC became unwilling or unable to provide debt financing to us at prices acceptable to us, we would need to secure additional debt financing or potentially reduce loan originations. The availability of these financing sources depends on many factors, some of which are outside of our control.

We may also experience the occurrence of events of default or breaches of financial or performance covenants under our debt agreements, which are currently secured by all our assets. Any such occurrence or breach could result in the reduction or termination of our access to institutional funding or increase our cost of funding. Certain of these covenants are tied to our customer default rates, which may be significantly affected by factors, such as economic downturns or general economic conditions beyond our control and beyond the control of individual customers. In particular, loss rates on customer loans may increase due to factors such as prevailing interest rates, the rate of unemployment, the level of consumer and business confidence, commercial real estate values, the value of the US dollar, energy prices, changes in consumer and business spending, the number of personal bankruptcies, disruptions in the credit markets and other factors. Increases in the cost of capital would reduce our net profit margins.

The loan portfolio for Elastic, which is originated by a third-party lender, gets funding as a result of the purchase of a participation interest in the loans it originates from Elastic SPV, Ltd. ("Elastic SPV"), a Cayman Islands entity that purchases such participations. Elastic SPV has a loan facility with VPC for its funding, for which we provide credit support, and we have entered into a credit default protection agreement with Elastic SPV that provides protection for loan losses. Similarly, the loan portfolio for the Rise loans originated by FinWise gets funding as a result of the purchase of a participation interest in the loans it originates from EF SPV, Ltd. ("EF SPV"), a Cayman Islands entity that purchases such participations. EF SPV has a loan facility with VPC for its funding, for which we provide credit support, and we have entered into a credit default protection agreement with EF SPV that provides protection for loan losses. Any voluntary or involuntary halt to this existing program could result in the originating lender halting further loan originations until an additional financing partner could be identified.

In the event of a sudden or unexpected shortage of funds in the banking system, we cannot be sure that we will be able to maintain necessary levels of funding without incurring high funding costs, a reduction in the term of funding instruments or the liquidation of certain assets. If our cost of borrowing goes up, our net interest expense could increase, and if we were to be unable to arrange new or alternative methods of financing on favorable terms, we may have to curtail our origination of loans or recommend that the originating lenders curtail their origination of credit, all of which could have a material adverse effect on our business, prospects, results of operations, financial condition or cash flows.

The interest rates we charge to our customers and pay to our lenders could each be affected by a variety of factors, including access to capital based on our business performance and the volume of loans we make to our customers. These interest rates may also be affected by a change over time in the mix of the types of products we sell to our customers and a shift among our channels of customer acquisition. Our VPC funding facilities are variable rate in nature and tied to a base rate of the greater of the 3-month LIBOR rate, the five-year LIBOR swap rate or 1% at the borrowing date. Thus, any increase in the 3-month LIBOR rate could result in an increase in our net interest expense. Effective February 1, 2019, certain of the funding facilities were amended. The amended facilities included reductions to the interest rates paid on our debt in addition to other changes. Interest rate changes may also adversely affect our business forecasts and expectations and are highly sensitive to many macroeconomic factors beyond our control, such as inflation, recession, the state of the credit markets, changes in market interest rates, global economic disruptions, unemployment and the fiscal and monetary policies of the federal government and its agencies. Regulatory or legislative changes may reduce our ability to charge our current rates in all states and products. Also, competitive threats may cause us to reduce our rates. This would reduce profit margins unless there was a commensurate reduction in losses. Any material reduction in our interest rate spread could have a material adverse effect on our business, prospects, results of operations, financial condition or cash flows. In the event that the spread between the rate at which we lend to our customers and the rate at which we borrow from our lenders decreases, our financial results and operating performance will be harmed.

In the future, we may seek to access the debt capital markets to obtain capital to finance growth. However, our future access to the debt capital markets could be restricted due to a variety of factors, including a deterioration of our earnings, cash flows, balance sheet quality, or overall business or industry prospects, adverse regulatory changes, a disruption to or deterioration in the state of the capital markets or a negative bias toward our industry by market participants. Disruptions and volatility in the capital markets could also cause banks and other credit providers to restrict availability of new credit. Due to the negative bias toward our industry, commercial banks and other lenders have restricted access to available credit to participants in our industry, and we may have more limited access to commercial bank lending than other businesses. Our ability to obtain additional financing in the future will depend in part upon prevailing capital market conditions, and a potential disruption in the capital markets may adversely affect our efforts to arrange additional financing on terms that are satisfactory to us, if at all. If adequate funds are not available, or are not available on acceptable terms, we may not have sufficient liquidity to fund our operations, make future investments, take advantage of acquisitions or other opportunities, or respond to competitive challenges and this, in turn, could adversely affect our ability to advance our strategic plans. Additionally, if the capital and credit markets experience volatility, and the availability of funds is limited, third parties with whom we do business may incur increased costs or business disruption and this could adversely affect our business relationships with such third parties, which could have a material adverse effect on our business, prospects, results of operations, financial condition or cash flows.

**Any decrease in our access to preapproved marketing lists from credit bureaus or other developments impacting our use of direct mail marketing could adversely affect our ability to grow our business.**

We market Rise and Sunny and provide marketing services to the originating lender in connection with Elastic, Today Card, and Rise bank-originated loans. Direct mailings and electronic offers of preapproved loans and Today Cards to potential loan customers comprise significant marketing channels for both the loans we originate and credit card product we offer, as well as those loans originated by third-party lenders. We estimate that approximately 65% and 92% of new Rise and Elastic loan customers, respectively, in the year ended December 31, 2019 obtained loans as a result of receiving such preapproved offers. The Today Card, which expanded its test launch in November 2018, is expected to expand its direct mailing activities in the future. Our marketing techniques identify candidates for preapproved loan or credit card mailings in part through the use of preapproved marketing lists purchased from credit bureaus. If access to such preapproved marketing lists were lost or limited due to regulatory changes prohibiting credit bureaus from sharing such information or for other reasons, our growth could be significantly adversely affected. If the cost of obtaining such lists increases significantly, it could substantially increase customer acquisition costs and decrease profitability.

Similarly, federal or state regulators or legislators could limit access to these preapproved marketing lists with the same effect.

In addition, preapproved direct mailings may become a less effective marketing tool due to over-penetration of direct mailing-lists. Any of these developments could have a material adverse effect on our business, prospects, results of operations, financial condition or cash flows.

**We rely in part on relationships with marketing affiliates to identify potential customers for our loans. These relationships are generally non-exclusive and subject to termination, and the growth of our customer base could be adversely affected if any of our marketing affiliate relationships are terminated or the number of referrals we receive from marketing affiliates is reduced.**

We rely on strategic marketing affiliate relationships with certain companies for referrals of some of the customers to whom we issue loans, and our growth depends in part on the growth of these referrals. In the year ended December 31, 2019, loans issued to Rise, Elastic and Sunny customers referred to us by our strategic partners constituted 17%, 7% and 4% of total respective new customer loans. Many of our marketing affiliate relationships do not contain exclusivity provisions that would prevent such marketing affiliates from providing customer referrals to competing companies. In addition, the agreements governing these partnerships, generally, contain termination provisions, including provisions that in certain circumstances would allow our partners to terminate if convenient, that, if exercised, would terminate our relationship with these partners. These agreements also contain no requirement that a marketing affiliate refer us any minimum number of customers. There can be no assurance that these marketing affiliates will not terminate our relationship with them or continue referring business to us in the future, and a termination of any of these relationships or reduction in customer referrals to us could have a material adverse effect on our business, prospects, results of operations, financial condition or cash flows.

**Our success and future growth depend significantly on our successful marketing efforts, and if such efforts are not successful, our business and financial results may be harmed.**

We intend to continue to dedicate significant resources to marketing efforts. Our ability to attract qualified borrowers depends in large part on the success of these marketing efforts and the success of the marketing channels we use to promote our products. Our marketing channels include social media and the press, online affiliations, search engine optimization, search engine marketing, offline partnerships, preapproved direct mailings and television advertising. If any of our current marketing channels become less effective, if we are unable to continue to use any of these channels, if the cost of using these channels were to significantly increase or if we are not successful in generating new channels, we may not be able to attract new borrowers in a cost-effective manner or convert potential borrowers into active borrowers. If we are unable to recover our marketing costs through increases in website traffic and in the number of loans made by visitors to product websites, or if we discontinue our broad marketing campaigns, it could have a material adverse effect on our business, prospects, results of operations, financial condition or cash flows.

**We are dependent on third parties to support several key aspects of our business, and the failure of such parties to continue to provide services to us in the current manner and at the current rates would adversely affect our revenues and results of operations.**

The Elastic line of credit product, which is originated by a third-party lender and contributed approximately 33% of our revenues for the year ended December 31, 2019, and the portions of the Rise installment loan product that we offer through CSO programs, which contributed approximately 6% of our revenues for the year ended December 31, 2019, and the Rise loans originated by a third-party lender, which contributed approximately 14% of our revenues for the year ended December 31, 2019, depend in part on the willingness and ability of unaffiliated third-party lenders to make loans to customers. Additionally, as described above, our business, including our Elastic loans and Rise loans made through the CSO programs and Rise loans originated by a third-party lender, depends on the ACH system, and ACH transactions are processed by third-party banks. See "—Regulators and payment processors are scrutinizing certain online lenders' access to the Automated Clearing House system to disburse and collect loan proceeds and repayments, and any interruption or limitation on our ability to access this critical system would materially adversely affect our business." We also utilize many other third parties to provide services to facilitate lending, loan underwriting, payment processing, customer service, collections and recoveries, as well as to support and maintain certain of our communication systems and information systems, and we may need to expand our relationships with third parties, or develop relationships with new third parties, to support any new product offerings that we may pursue.

The loss of the relationship with any of these third-party lenders and service providers, an inability to replace them or develop new relationships, or the failure of any of these third parties to provide its products or services, to maintain its quality and consistency or to have the ability to provide its products and services, could disrupt our operations, cause us to terminate product offerings or delay or discontinue new product offerings, result in lost customers and substantially decrease the revenues and earnings of our business. Our revenues and earnings could also be adversely affected if any of those third-party providers make material changes to the products or services that we rely on or increase the price of their products or services.

Elevate uses third parties for the majority of its collections and recovery activities. If those parties were unable or unwilling to provide those services for Elevate products, we would experience higher defaults until those functions could be outsourced to an alternative service provider or until we could bring those functions in-house and adequately staff and train internally.

Any of these events could result in a loss of revenues and could have a material adverse effect on our business, prospects, results of operations, financial condition or cash flows.

**The profitability of our bank-originated products could be adversely affected by policy or pricing decisions made by the originating lenders.**

We do not originate and do not ultimately control the pricing or functionality of Elastic lines of credit originated by Republic Bank, Rise loans originated by FinWise Bank ("FinWise") and the Today Card originated by Capital Community Bank ("CCB") (collectively the "Bank-Originated Products" and the "Bank Partners" or the "Banks"). Generally, a "Bank" is an entity that is chartered under federal or state law to accept deposits and/or make loans. Each Bank Partner has licensed our technology and underwriting services and makes all key decisions regarding the marketing, underwriting, product features and pricing. We generate revenues from these products through marketing and technology licensing fees paid by the Bank Partners, and through credit default protection agreements with certain Bank Partners. If the Bank Partners were to change their pricing, underwriting or marketing of the Bank-Originated Products in a way that decreases revenues or increases losses, then the profitability of each loan, line of credit or credit card issued could be reduced. Although this would not reduce the revenues that we receive for marketing and technology licensing services, it would reduce the revenues that we receive from our credit default protection agreements with the Bank Partners.

Any of the above changes could have a material adverse effect on our business, prospects, results of operations, financial condition or cash flows.

**Our ability to continue to provide Bank-Originated Products could be adversely affected by a degradation in our relationships with our Bank Partners.**

The structure of the Bank-Originated Products exposes us to risks associated with being reliant on the Bank Partners as the originating lenders and credit card issuers. If our relationships with the Banks were to degrade, or if any of the Banks were to terminate the various agreements associated with the Bank Products, we may not be able to find another suitable originating lender or credit card issuer and new arrangements, if any, may result in significantly increased costs to us. Any inability to find another originating lender or credit card issuer would adversely affect our ability to continue to provide the Bank-Originated Products which in turn could have a material adverse effect on our business, prospects, results of operations, financial condition or cash flows.

**Decreased demand for non-prime loans as a result of increased savings or income could result in a loss of revenues or decline in profitability if we are unable to successfully adapt to such changes.**

The demand for non-prime loan products in the markets we serve could decline due to a variety of factors, such as regulatory restrictions that reduce customer access to particular products, the availability of competing or alternative products or changes in customers' financial conditions, particularly increases in income or savings. For instance, an increase in state or federal minimum wage requirements, or a decrease in individual income tax rates, could decrease demand for non-prime loans. Additionally, a change in focus from borrowing to saving (such as has happened in some countries) would reduce demand. Should we fail to adapt to a significant change in our customers' demand for, or access to, our products, our revenues could decrease significantly. Even if we make adaptations or introduce new products to fulfill customer demand, customers may resist or may reject products whose adaptations make them less attractive or less available. Such decreased demand could have a material adverse effect on our business, prospects, results of operations, financial condition or cash flows.

**A decline in economic conditions could result in decreased demand for our loans or cause our customers' default rates to increase, harming our operating results.**

Uncertainty and negative trends in general economic conditions in the US and abroad, including significant tightening of credit markets and a general decline in the value of real property, historically have created a difficult environment for companies in the lending industry. Many factors, including factors that are beyond our control, may impact our consolidated results of operations or financial condition or affect our borrowers' willingness or capacity to make payments on their loans. These factors include: unemployment levels, housing markets, rising living expenses, energy costs and interest rates, as well as major medical expenses, divorce or death that affect our borrowers. If the US or UK economies experience a downturn, or if we become affected by other events beyond our control, we may experience a significant reduction in revenues, earnings and cash flows, difficulties accessing capital and a deterioration in the value of our investments.

We are also monitoring developments related to the decision by the UK government to leave the European Union (often referred to as "Brexit"), which could have significant implications for our UK business. In March 2017, the UK began the official process to leave the European Union. The UK formally exited the European Union on January 31, 2020. The instability surrounding Brexit and Brexit itself could lead to economic and legal uncertainty, including significant volatility in global stock markets and currency exchange rates, as well as new and uncertain laws, regulations and licensing requirements for the Company as the UK determines which EU laws to replace or replicate. For example, see "—The use of personal data in credit underwriting is highly regulated" below. Any of these effects of Brexit, among others, could adversely affect our operating results.

Credit quality is driven by the ability and willingness of customers to make their loan payments. If customers face rising unemployment or reduced wages, defaults may increase. Similarly, if customers experience rising living expenses (for instance due to rising gas, energy, or food costs) they may be unable to make loan payments. An economic slowdown could also result in a decreased number of loans being made to customers due to higher unemployment or an increase in loan defaults in our loan products. The underwriting standards used for our products may need to be tightened in response to such conditions, which could reduce loan balances, and collecting defaulted loans could become more difficult, which could lead to an increase in loan losses. If a customer defaults on a loan, the loan enters a collections process where, including as a result of contractual agreements with the originating lenders, our systems and collections teams initiate contact with the customer for payments owed. If a loan is subsequently charged off, the loan is generally sold to a third-party collection agency and the resulting proceeds from such sales comprise only a small fraction of the remaining amount payable on the loan.

There can be no assurance that economic conditions will remain favorable for our business or that demand for loans or default rates by customers will remain at current levels. Reduced demand for loans would negatively impact our growth and revenues, while increased default rates by customers may inhibit our access to capital, hinder the growth of the loan portfolio attributable to our products and negatively impact our profitability. Either such result could have a material adverse effect on our business, prospects, results of operations, financial condition or cash flows.

**We are operating in a highly competitive environment and face increasing competition from a variety of traditional and new lending institutions, including other online lending companies. This competition could adversely affect our business, prospects, results of operations, financial condition or cash flows.**

We have many competitors. Our principal competitors are consumer loan companies, CSOs, online lenders, credit card companies, consumer finance companies, pawnshops and other financial institutions that offer similar financial services. Other financial institutions or other businesses that do not now offer products or services directed toward our traditional customer base could begin doing so. Significant increases in the number and size of competitors for our business could result in a decrease in the number of loans that we fund, resulting in lower levels of revenues and earnings in these categories. Many of these competitors are larger than us, have significantly more resources and greater brand recognition than we do, and may be able to attract customers more effectively than we do.

Competitors of our business may operate, or begin to operate, under business models less focused on legal and regulatory compliance, which could put us at a competitive disadvantage. Additionally, negative perceptions about these models could cause legislators or regulators to pursue additional industry restrictions that could affect the business model under which we operate. To the extent that these models gain acceptance among consumers, small businesses and investors or face less onerous regulatory restrictions than we do, we may be unable to replicate their business practices or otherwise compete with them effectively, which could cause demand for the products we currently offer to decline substantially.

When new competitors seek to enter one of our markets, or when existing market participants seek to increase their market share, they sometimes undercut the pricing and/or credit terms prevalent in that market, which could adversely affect our market share or ability to exploit new market opportunities. Elevate products compete at least partly based on rate comparison with other credit products used by non-prime consumers. However, non-prime consumers by definition have a higher propensity for default and as a result need to be charged higher rates of interest to generate adequate profit margins. If existing competitors significantly reduced their rates or lower-priced competitors enter the market and offer credit to customers at lower rates, the pricing and credit terms we or the originating lenders offer could deteriorate if we or the originating lenders act to meet these competitive challenges. Any such action may result in lower customer acquisition volumes and higher costs per new customer.

We may be unable to compete successfully against any or all of our current or future competitors. As a result, our products could lose market share and our revenues could decline, thereby affecting our ability to generate sufficient cash flow to service our indebtedness and fund our operations. Any such changes in our competition could have a material adverse effect on our business, prospects, results of operations, financial condition or cash flows.

**Customer complaints or negative public perception of our business could result in a decline in our customer growth and our business could suffer.**

Our reputation is very important to attracting new customers to our platform as well as securing repeat lending to existing customers. While we believe that we have a good reputation and that we provide customers with a superior experience, there can be no assurance that we will be able to continue to maintain a good relationship with customers or avoid negative publicity.

In recent years, consumer advocacy groups and some media reports have advocated governmental action to prohibit or place severe restrictions on non-bank consumer loans and bank originated loans for the nonprime consumer. Such consumer advocacy groups and media reports generally focus on the annual percentage rate for this type of consumer loan, which is compared unfavorably to the interest typically charged by banks to consumers with top-tier credit histories. The finance charges assessed by us, the originating lenders and others in the industry can attract media publicity about the industry and be perceived as controversial. If the negative characterization of the types of loans we offer, including those originated through third-party lenders, becomes increasingly accepted by consumers, demand for any or all of our consumer loan products could significantly decrease, which could materially affect our business, prospects, results of operations, financial condition or cash flows. Additionally, if the negative characterization of these types of loans is accepted by legislators and regulators, we could become subject to more restrictive laws and regulations applicable to consumer loan products that could have a material adverse effect on our business, prospects, results of operations, financial condition or cash flows.

Third parties may also seek to take advantage of unique regulations applicable to consumer loan products to drive up complaints and the cost of doing business in our industry. From the third quarter of 2018, the Company's UK business began to receive an increased number of customer complaints initiated by claims management companies ("CMCs") and others related to the affordability assessment of certain loans. If the Company's evidence supports the affordability assessment and the Company rejects the claim, the customer has the right to take the complaint to the Financial Ombudsman Service ("FOS") for further adjudication. We have incurred significant costs in the form of FOS administrative fees associated with each individual complaint submitted to FOS, operational costs necessary to manage the large volume of complaints, and payments we are required to make to customers to resolve these complaints. We believe that many of the increased claims against us are without merit and reflect the use of abusive and deceptive tactics by the CMCs. On April 1, 2019, the Financial Conduct Authority (the "FCA") took over responsibility for supervision and authorization of a high percentage of CMCs (those regulated by the Solicitor's Regulation Authority, which account for the minority of CMCs, will not be automatically impacted). In addition to the CMCs issuing claims, some law firms are also issuing claims on behalf of claimants. If we experience an increased volume of complaints due to the activities of the CMCs and law firms representing claimants and continue incurring significant costs to resolve such complaints, such costs could have a material adverse effect on our business, results of operations, financial condition and cash flows. A significant number of consumer complaints could also trigger enhanced regulatory scrutiny by the FCA.

Separately, the FCA asked all industry participants to review their lending practices to ensure that such companies are using an appropriate affordability and creditworthiness analysis. Our UK business provided the requested information to the FCA. The FCA recently reported back to us and asked our UK business to tighten certain aspects of its income verification and expenditure processes. We are working with the FCA to ensure the changes we make address all matters raised by the FCA.

**Our business depends on the uninterrupted operation of our systems and business functions, including our information technology and other business systems, as well as the ability of such systems to support compliance with applicable legal and regulatory requirements.**

Our business is highly dependent upon customers' ability to access our website and the ability of our employees and those of the originating lenders, as well as third-party service providers, to perform, in an efficient and uninterrupted fashion, necessary business functions, such as internet support, call center activities and processing and servicing of loans. Problems with the technology platform running our systems, or a shut-down of or inability to access the facilities in which our internet operations and other technology infrastructure are based, such as a power outage, a failure of one or more of our information technology, telecommunications or other systems, cyber-attacks on, or sustained or repeated disruptions of, such systems could significantly impair our ability to perform such functions on a timely basis and could result in a deterioration of our ability to underwrite, approve and process loans, provide customer service, perform collections activities, or perform other necessary business functions. Any such interruption could reduce new customer acquisition and negatively impact growth, which would have a material adverse effect on our business, prospects, results of operations, financial condition or cash flows.

In addition, our systems and those of third parties on whom we rely must consistently be capable of compliance with applicable legal and regulatory requirements and timely modification to comply with new or amended requirements. Any systems problems going forward could have a material adverse effect on our business, prospects, results of operations, financial condition or cash flows.

**We are subject to cybersecurity risks and security breaches and may incur increasing costs in an effort to minimize those risks and to respond to cyber incidents, and we may experience harm to our reputation and liability exposure from security breaches.**

Our business involves the storage and transmission of consumers' proprietary information, and security breaches could expose us to a risk of loss or misuse of this information, litigation and potential liability. We are entirely dependent on the secure operation of our websites and systems as well as the operation of the internet generally. While we have incurred no material cyber-attacks or security breaches to date, a number of other companies have disclosed cyber-attacks and security breaches, some of which have involved intentional attacks. Attacks may be targeted at us, our customers, or both. Although we devote significant resources to maintain and regularly upgrade our systems and processes that are designed to protect the security of our computer systems, software, networks and other technology assets and the confidentiality, integrity and availability of information belonging to us and our customers, our security measures may not provide absolute security.

Despite our efforts to ensure the integrity of our systems, it is possible that we may not be able to anticipate or to implement effective preventive measures against all security breaches of these types, especially because the techniques used change frequently or are not recognized until launched, and because cyber-attacks can originate from a wide variety of sources, including third parties outside the Company such as persons who are involved with organized crime or associated with external service providers or who may be linked to terrorist organizations or hostile foreign governments. These risks may increase in the future as we continue to increase our mobile and other internet-based product offerings and expand our internal usage of web-based products and applications or expand into new countries. If an actual or perceived breach of security occurs, customer and/or supplier perception of the effectiveness of our security measures could be harmed and could result in the loss of customers, suppliers or both. Actual or anticipated attacks and risks may cause us to incur increasing costs, including costs to deploy additional personnel and protection technologies, train employees, and engage third-party experts and consultants.

A successful penetration or circumvention of the security of our systems could cause serious negative consequences, including significant disruption of our operations, misappropriation of our confidential information or that of our customers, or damage to our computers or systems or those of our customers and counterparties, and could result in violations of applicable privacy and other laws, financial loss to us or to our customers, loss of confidence in our security measures, customer dissatisfaction, significant litigation exposure, and harm to our reputation, all of which could have a material adverse effect on us. In addition, our applicants provide personal information, including bank account information when applying for loans. We rely on encryption and authentication technology licensed from third parties to provide the security and authentication to effectively secure transmission of confidential information, including customer bank account and other personal information. Advances in computer capabilities, new discoveries in the field of cryptography or other developments may result in the technology used by us to protect transaction data being breached or compromised. Data breaches can also occur as a result of non-technical issues.

Our servers are also vulnerable to computer viruses, physical or electronic break-ins, and similar disruptions, including "denial-of-service" type attacks. We may need to expend significant resources to protect against security breaches or to address problems caused by breaches. Security breaches, including any breach of our systems or by persons with whom we have commercial relationships that result in the unauthorized release of consumers' personal information, could damage our reputation and expose us to a risk of loss or litigation and possible liability. In addition, many of the third parties who provide products, services or support to us could also experience any of the above cyber risks or security breaches, which could impact our customers and our business and could result in a loss of customers, suppliers or revenues.

In addition, federal and some state regulators are considering promulgating rules and standards to address cybersecurity risks and many US states and the UK have already enacted laws requiring companies to notify individuals of data security breaches involving their personal data. These mandatory disclosures regarding a security breach are costly to implement and may lead to widespread negative publicity, which may cause customers to lose confidence in the effectiveness of our data security measures.

Any of these events could have a material adverse effect on our business, prospects, results of operations, financial condition or cash flows.

**Our ability to collect payment on loans and maintain accurate accounts may be adversely affected by computer viruses, physical or electronic break-ins, technical errors and similar disruptions.**

The automated nature of our platform may make it an attractive target for hacking and potentially vulnerable to computer viruses, physical or electronic break-ins and similar disruptions. Despite efforts to ensure the integrity of our platform, it is possible that we may not be able to anticipate or to implement effective preventive measures against all security breaches of these types, in which case there would be an increased risk of fraud or identity theft, and we may experience losses on, or delays in the collection of amounts owed on, a fraudulently induced loan. In addition, the software that we have developed to use in our daily operations is highly complex and may contain undetected technical errors that could cause our computer systems to fail. Because each loan made involves our proprietary credit and fraud scoring models, and over 94% of loan applications are fully automated with no manual review required, any failure of our computer systems involving our proprietary credit and fraud scoring models and any technical or other errors contained in the software pertaining to our proprietary credit and fraud scoring models could compromise the ability to accurately evaluate potential customers, which would negatively impact our results of operations. Furthermore, any failure of our computer systems could cause an interruption in operations and result in disruptions in, or reductions in the amount of, collections from the loans we made to customers. If any of these risks were to materialize, it could have a material adverse effect on our business, prospects, results of operations, financial condition or cash flows.

**Our platform and internal systems rely on software that is highly technical, and if it contains undetected errors, our business could be adversely affected.**

Our platform and internal systems rely on software that is highly technical and complex. In addition, our platform and internal systems depend on the ability of such software to store, retrieve, process and manage immense amounts of data. The software on which we rely has contained, and may now or in the future contain, undetected errors or bugs. Some errors may only be discovered after the code has been released for external or internal use. Errors or other design defects within the software on which we rely may result in a negative experience for borrowers, delay introductions of new features or enhancements, result in errors or compromise our ability to protect borrower data or our intellectual property. Any errors, bugs or defects discovered in the software on which we rely could result in harm to our reputation, loss of borrowers, loss of revenues or liability for damages, any of which could have a material adverse effect on our business, prospects, results of operations, financial condition or cash flows.

**To date, we have derived our revenues from a limited number of products and markets. Our efforts to expand our market reach and product portfolio may not succeed or may put pressure on our margins.**

We frequently explore paths to expand our market reach and product portfolio. For example, we have launched or are in the process of launching other non-prime products like bank-originated installment loans and credit cards through FinWise and the Today Card, a bank-originated credit card. In the future, we may elect to pursue new products, channels, or markets. However, there is always risk that these new products, channels, or markets will be unprofitable, will increase costs, decrease margins, or take longer to generate target margins than anticipated. Additional costs could include those related to the need to hire more staff, invest in technology, develop and support new third-party partnerships or other costs which would increase operating expenses. In particular, growth may require additional technology staff, analysts in risk management, compliance personnel and customer support and collections staff. Although the Company outsources most of its customer support and collections staff, additional volumes would lead to increased costs in these areas.

When new customers are acquired, from an accounting point of view, we must recognize marketing costs and loan origination and data costs, and we incur a provision for loan losses. We use the same accounting treatment for new customers acquired through the Bank-Originated Products, such as loan participations that are purchased from the originating lender by a third party, which we protect from loan losses pursuant to a credit default protection arrangement. Due to these marketing costs, loan origination and data costs, and provision for loan losses, new customer acquisition does not typically yield positive margins for at least six months. As a result, rapid growth tends to compress margins in the near-term until growth rates slow down.

In the states in which we originate Rise under a state-license, the rates and terms vary based on specific state laws. In states with lower maximum rates, we have more stringent credit criteria and generally lower initial customer profitability due to higher customer acquisition costs and higher losses as a percentage of revenues. While these states can have significant growth potential, they typically deliver lower profit margins. In states in which FinWise originates Rise installment loans, loan participations are purchased from FinWise by a third party, which we protect from loan losses pursuant to a credit default protection arrangement. As a result, Rise loans originated through our third-party partnerships have the same pattern of variable profit margins depending on state laws and which states are offering the most growth potential.

We may elect to pursue aggressive growth over margin expansion in order to increase market share and long-term revenue opportunities.

There also can be no guarantee that we will be successful with respect to any new product initiatives or any further expansion beyond the US and the UK, if we decide to attempt such expansion, which may inhibit the growth of our business and have a material adverse effect on our business, prospects, results of operations, financial condition or cash flows.

**Our allowance for loan losses is determined based upon both objective and subjective factors and may not be adequate to absorb loan losses. If we experience rising credit or fraud losses, our results of operations would be adversely affected.**

We face the risk that customers will fail to repay their loans in full. We reserve for such losses by establishing an allowance for loan losses, the increase of which results in a charge to our earnings as a provision for loan losses. We have established a methodology designed to determine the adequacy of our allowance for loan losses. While this evaluation process uses historical and other objective information, the classification of loans and the forecasts and establishment of loan losses are also dependent on our subjective assessment based upon our experience and judgment. Actual losses are difficult to forecast, especially if such losses stem from factors beyond our historical experience. As a result, there can be no assurance that our allowance for loan losses will be sufficient to absorb losses or prevent a material adverse effect on our business, financial condition and results of operations. Losses are the largest cost as a percentage of revenues across all of our products.

Fraud and customers not being able to repay their loans are both significant drivers of loss rates. If we experienced rising credit or fraud losses this would significantly reduce our earnings and profit margins and could have a material adverse effect on our business, prospects, results of operations, financial condition or cash flows.

In June 2016, the Financial Accounting Standards Board (the "FASB") issued Accounting Standards Update No. 2016-13, *Financial Instruments—Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments* ("ASU 2016-13"). ASU 2016-13 is intended to replace the incurred loss impairment methodology in current US GAAP with a methodology that reflects expected credit losses and requires consideration of a broader range of reasonable and supportable information to inform credit loss estimates to improve the quality of information available to financial statement users about expected credit losses on financial instruments and other commitments to extend credit held by a reporting entity at each reporting date. For public entities, ASU 2016-13 is effective for fiscal years beginning after December 15, 2019, including interim periods within those fiscal years. In November 2019, the FASB issued ASU No. 2019-10, *Financial Instruments - Credit Losses (Topic 326), Derivatives and Hedging (Topic 815), and Leases (Topic 842): Effective Dates ("ASU 2019-10").* The purpose of this amendment is to create a two-tier rollout of major updates, staggering the effective dates between larger public companies and all other entities. This granted certain classes of companies, including Smaller Reporting Companies ("SRCs"), additional time to implement major FASB standards, including ASU 2016-13. Larger public companies will still have an effective date for fiscal years beginning after December 15, 2019, including interim periods within those fiscal years. All other entities are permitted to defer adoption of ASU 2016-13, and its related amendments, until fiscal periods beginning after December 15, 2022. Under the current SEC definitions, the Company meets the definition of an SRC as of the ASU 2019-10 issuance date and is adopting the deferral period for ASU 2016-13.

The new methodology for determining the allowance for loan losses, once adopted by the Company, will extend the time frame covered by the estimate of credit losses by including forward-looking information, such as "reasonable and supportable" forecasts in the assessment of the collectability of loans. As a result, rather than just looking at historical performances of loans to determine allowance for loan losses, we will have to consider future losses as well. Further, the new standard will drive a change in the accounting treatment in that the new expected lifetime losses of loans will be recognized at the time a loan is made rather than over the lifetime of the loans. We anticipate that adoption of this new methodology may have a material impact on our financial statements due to the timing differences caused by the change. We also expect that the internal financial controls processes in place for the Company's loan loss reserve process will be impacted. In addition, if we fail to accurately forecast the collectability of our loans under this new methodology and we reserve inadequate allowance amounts, we could be required to absorb such additional losses, which could have a material adverse effect on our business, prospects, results of operations, financial condition or cash flows.

### Increased customer acquisition costs and/or data costs would reduce our margins.

Although losses are our largest cost, if customer acquisition costs or other servicing costs increased this would reduce our profit margins. Marketing costs would be negatively affected by increased competition or stricter credit standards that would reduce customer fund rates. We could also experience increased marketing costs due to higher fees from credit bureaus for preapproved direct mail lists, search engines for search engine marketing, or fees for affiliates, and these increased costs would reduce our profit margins. Other costs, such as legal costs, may increase as we pursue various company strategic initiatives, which could further reduce our profit margins.

We purchase significant amounts of data to facilitate our proprietary credit and fraud scoring models. If there was an increase in the cost of data, or if the Company elected to purchase from new data providers, there would be a reduction in our profit margins.

Any such reduction in our profit margins could result in a material adverse effect on our business, prospects, results of operations, financial condition or cash flows.

### Our success is dependent, in part, upon our officers and key employees, and if we are not able to attract and retain qualified officers and key employees, or if one of our officers or key employees is temporarily unable to fully contribute to our operations, our business could be materially adversely affected.

Our success depends, in part, on our officers, which comprise a relatively small group of individuals. Many members of the senior management team have significant industry experience, and we believe that our senior management would be difficult to replace, if necessary. Because the market for qualified individuals is highly competitive, we may not be able to attract and retain qualified officers or candidates. In addition, increasing regulations on, and negative publicity about, the consumer financial services industry could affect our ability to attract and retain qualified officers.

Our future success also depends on our continuing ability to attract, develop, motivate and retain highly qualified and skilled employees. Qualified individuals are in high demand, and we may incur significant costs to attract and retain them. The loss of any of our senior management or key employees could materially adversely affect our ability to execute our business plan and strategy, and we may not be able to find adequate replacements on a timely basis, or at all. We cannot ensure that we will be able retain the services of any members of our senior management or other key employees. Our officers and key employees may terminate their employment relationship with us at any time, and their knowledge of our business and industry would be extremely difficult to replace. While all key employees have signed non-disclosure, non-solicitation and non-compete agreements, they may still elect to leave the Company or even retire any time. Loss of key employees could result in delays to critical initiatives and the loss of certain capabilities and poorly documented intellectual property.

If we do not succeed in attracting and retaining our officers and key employees, our business could be materially and adversely affected.

**Our US loan business is seasonal in nature, which causes our revenues and earnings to fluctuate.**

Our US loan business is affected by fluctuating demand for the products and services we offer and fluctuating collection rates throughout the year. Demand for our consumer loan products in the US has historically been highest in the third and fourth quarters of each year, corresponding to the holiday season, and lowest in the first quarter of each year, corresponding to our customers' receipt of income tax refunds. This results in significant increases and decreases in portfolio size and profit margins from quarter to quarter. In particular, we typically experience a reduction in our credit portfolios and an increase in profit margins in the first quarter of the year. When we experience higher growth in the second quarter through fourth quarters, portfolio balances tend to grow and profit margins are compressed. Our cost of sales for the non-prime loan products we offer in the US, which represents our provision for loan losses, is lowest as a percentage of revenues in the first quarter of each year, corresponding to our customers' receipt of income tax refunds, and increases as a percentage of revenues for the remainder of each year. This seasonality requires us to manage our cash flows over the course of the year. If our revenues or collections were to fall substantially below what we would normally expect during certain periods, our ability to service debt and meet our other liquidity requirements may be adversely affected, which could have a material adverse effect on our business, prospects, results of operations, financial condition or cash flows. Any unexpected change to the growth in the second half of the year or delay of our customers' receipt of income tax refunds could change our typical seasonal product demand pattern and impact our profit margins and our annual cash flow management plans, which could have a material adverse effect on our financial condition and results of operations.

**If internet search engine providers change their methodologies for organic rankings or paid search results, or our organic rankings or paid search results decline for other reasons, our new customer growth or volume from returning customers could decline.**

Our new customer acquisition marketing and our returning customer relationship management is partly dependent on search engines such as Google, Bing and Yahoo! to direct a significant amount of traffic to our desktop and mobile websites via organic ranking and paid search advertising. We bid on certain keywords from search engines as well as use their algorithms to place our listings ahead of other lenders.

Our paid search activities may not continue to produce the desired results. Internet search engines often revise their methodologies. The volume of customers we receive through organic ranking and paid search could be adversely affected by any such changes in methodologies or policies by search engine providers, by:

• decreasing our organic rankings or paid search results;

• creating difficulty for our customers in using our web and mobile sites;

• producing more successful organic rankings, paid search results or tactical execution efforts for our competitors than for us; and

• resulting in higher costs for acquiring new or returning customers.

In addition, search engines could implement policies that restrict the ability of companies such as us to advertise their services and products, which could prevent us from appearing in a favorable location or any location in the organic rankings or paid search results when certain search terms are used by the consumer. Our online marketing efforts are also susceptible to actions by third parties that negatively impact our search results such as spam link attacks, which are often referred to as "black hat" tactics. Our sites have experienced meaningful fluctuations in organic rankings and paid search results in the past, and we anticipate similar fluctuations in the future. Any reduction in the number of consumers directed to our web and mobile sites could harm our business and operating results.

Finally, our competitors' paid search, pay per click or search engine marketing activities may result in their sites receiving higher paid search results than ours and significantly increasing the cost of such advertising for us. We have little to no control over these potential changes in policy and methodologies relating to search engine results, and any of the changes described above could have a material adverse effect on our business, prospects, results of operations, financial condition or cash flows.

**Failure to keep up with the rapid technological changes in financial services and e-commerce, or changes in the uses and regulation of the internet could harm our business.**

The financial services industry is undergoing rapid technological changes, with frequent introductions of new technology-driven products and services. The effective use of technology increases efficiency and enables financial and lending institutions to better serve customers and reduce costs. Our future success will depend, in part, upon our ability to address the needs of our customers by using technology to provide products and services that will satisfy customer demands for convenience, as well as to create additional efficiencies in our operations. We may not be able to effectively implement new technology-driven products and services as quickly as some of our competitors or be successful in marketing these products and services to our customers. Failure to successfully keep pace with technological change affecting the financial services industry could harm our ability to compete with our competitors.

Additionally, the business of providing products and services such as ours over the internet is dynamic and relatively new. We must keep pace with rapid technological change, consumer use habits, internet security risks, risks of system failure or inadequacy, and governmental regulation and taxation, and each of these factors could adversely impact our business. In addition, concerns about fraud, computer security and privacy and/or other problems may discourage additional consumers from adopting or continuing to use the internet as a medium of commerce. Also, to expand our customer base, we may elect to appeal to and acquire consumers who prove to be less profitable than our previous customers, and as a result we may be unable to gain efficiencies in our operating costs, including our cost of acquiring new customers, and our business could be adversely impacted.

Any such failure to adapt to changes could have a material adverse effect on our business, prospects, results of operations, financial condition or cash flows.

**Our ability to conduct our business and demand for our loans could be disrupted by natural or man-made catastrophes.**

Catastrophes, such as fires, hurricanes and tornadoes, floods, earthquakes, or other natural disasters, terrorist attacks, computer viruses and telecommunications failures, could adversely affect our ability to market, originate or service loans. Natural disasters and acts of terrorism, war, civil unrest, violence or human error could also cause disruptions to our business or the economy as a whole, which could negatively affect customers' demand for our loans. Despite any precautions we may take, system interruptions and delays could occur if there is a natural disaster that affects our offices or one of the data center facilities we lease. As we rely heavily on our servers, computer and communications systems and the internet to conduct our business and provide high-quality customer service, such disruptions could harm our ability to market our products, accept and underwrite applications, provide customer service and undertake collections activities and cause lengthy delays which could harm our business, results of operations and financial condition. We have implemented a disaster recovery program that allows us to move production to a backup data center in the event of a catastrophe. Although this program is functional, we do not currently serve network traffic equally from each backup data center and are not able to switch instantly to our backup center in the event of failure of the main server site. If our primary data center shuts down, there will be a period of time that our loan products or services, or certain of such loan products or services, will remain inaccessible to our users or our users may experience severe issues accessing such loan products and services. Our business interruption insurance may not be sufficient to compensate us for losses that may result from interruptions in our service as a result of system failures.

Any of these events could also cause consumer confidence to decrease in one or more of the markets we serve, which could result in a decreased number of loans being made to customers. As a result of these issues, any of these occurrences could have a material adverse effect on our business, prospects, results of operations, financial condition or cash flows.

**We may be unable to protect our proprietary technology and analytics or keep up with that of our competitors.**

The success of our business depends to a significant degree upon the protection of our proprietary technology, including our proprietary credit and fraud scoring models, which we use for pricing loans. We seek to protect our intellectual property with non-disclosure agreements and through standard measures to protect trade secrets. However, we may be unable to deter misappropriation of our proprietary information, detect unauthorized use or take appropriate steps to enforce our intellectual property rights. If competitors learn our trade secrets (especially with regard to marketing and risk management capabilities) it could be difficult to successfully prosecute to recover damages. A third party may attempt to reverse engineer or otherwise obtain and use our proprietary technology without our consent. The pursuit of a claim against a third party for infringement of our intellectual property could be costly, and there can be no guarantee that any such efforts would be successful. Our failure to protect our software and other proprietary intellectual property rights or to develop technologies that are as good as our competitors could put us at a disadvantage relative to our competitors. Any such failures could have a material adverse effect on our business, prospects, results of operations, financial condition or cash flows.

**We are subject to intellectual property disputes from time to time, and such disputes may be costly to defend and could harm our business and operating results.**

We have faced and may continue to face allegations that we have infringed the trademarks, copyrights, patents or other intellectual property rights of third parties, including from our competitors or non-practicing entities. Patent and other intellectual property litigation may be protracted and expensive, and the results are difficult to predict and may require us to stop offering certain products or product features, acquire licenses, which may not be available at a commercially reasonable price or at all, or modify such products, product features, processes or websites while we develop non-infringing substitutes.

In addition, we use open source software in our technology platform and plan to use open source software in the future. From time to time, we may face claims from parties claiming ownership of, or demanding release of, the source code, potentially including our valuable proprietary code, or derivative works that were developed using such software, or otherwise seeking to enforce the terms of the applicable open source license. These claims could also result in litigation, require us to purchase a costly license or require us to devote additional research and development resources to change our platform, any of which could have a material adverse effect on our business, prospects, results of operations, financial condition or cash flows.

**Current and future litigation or settlements or regulatory proceedings could cause management distraction, harm our reputation and have a material adverse effect on our business, prospects, results of operations, financial condition or cash flows.**

We, our officers and certain of our subsidiaries have been and may become subject to lawsuits that could cause us to incur substantial expenditures, generate adverse publicity and could significantly impair our business, force us to cease doing business in one or more jurisdictions or cause us to cease offering or alter one or more products.

We have been and may also become subject to litigation in the future and a future adverse ruling in or a settlement of any such litigation against us, our executive officers or another lender, could result in significant legal fees that could become material, could harm our reputation, create obligations, forego collection of the principal amount of loans, pay treble or other multiple damages, pay monetary penalties and/or modify or terminate our operations in particular jurisdictions. On January 9, 2020, the District of Columbia's Attorney General, Karl A. Racine, issued a subpoena to Elevate alleging that Elevate may have violated the District of Columbia's Consumer Protection Procedures Act in connection with loans issued by banks in the District of Columbia.  The documents requested are related to the FinWise and Republic Bank originated loans in the District of Columbia.  Elevate has engaged counsel and initiated discussions with the Attorney General's office and is working to address any potential issues and provide certain documents as requested.  Elevate disagrees that it has violated the above referenced law and it intends to vigorously defend its position. In addition, on January 27, 2020, Rise Credit Service of Texas, LLC d/b/a Rise, Opportunity Financial, LLC and Applied Data Finance, LLC d/b/a Personify Financial were sued in a class action lawsuit in Washington state.  The Plaintiff in the case claims that Rise and others are engaged in "predatory lending practices that target financially vulnerable consumers" and have violated Washington's Consumer Protection Act by engaging in unfair or deceptive practices.

While no TFI related litigation has been filed directly against Elevate, we can provide no assurances that there will not be any future TFI related litigation filed against the Company. In October 2019, Elevate entered into tolling agreements with the TFI Creditors' Committee and class claimants in regard to any potential future claims against Elevate. These tolling agreements have been extended, and we may enter into additional extensions of the tolling agreements in the future. In December 2019, the TFI bankruptcy plan was confirmed, and any claims from the TFI Creditors' Committee were assigned to the Think Finance Litigation Trust ("TFLT"). On February 20, 2020, Elevate and the TFLT will commence mediation in an attempt to resolve, prior to any litigation being filed, any potential claims that the TFLT may have against Elevate including, among other things, whether or not the spin-off of Elevate from TFI was a fraudulent conveyance. While Elevate can provide no assurances as to the potential outcome of such mediation process, in the event that there is a settlement and Elevate is unable to pay any amount resulting from such settlement, it could have a material adverse effect on Elevate's financial condition, or, if there is no settlement and Elevate is deemed to ultimately be liable in this matter, Elevate could be obligated to file for bankruptcy. Elevate can provide no assurances as to how long the mediation process may take, or the outcome of such mediation. In addition, if the mediation is unsuccessful, Elevate anticipates that the TFLT will pursue its claims in litigation against Elevate. For more information please see "The Think Finance Litigation Trust in the TFI bankruptcy, as well as third parties, may seek to hold us responsible for liabilities of TFI due to the Spin-Off." Because no claims have been filed against Elevate, no reasonable estimate of possible loss, if any, can be made at this time. We believe any future claims are without merit, and we intend to defend ourselves vigorously.

Defense of any lawsuit, even if successful, could require substantial time and attention of our management and could require the expenditure of significant amounts for legal fees and other related costs. In addition, a lawsuit or the mediation process with the TFLT, could cause investors to sell our stock based on concerns about potential adverse outcomes, whether unfounded or not, which could negatively impact our share price. We and others are also subject to regulatory proceedings, and we could suffer losses as a result of interpretations of applicable laws, rules and regulations in those regulatory proceedings, even if we are not a party to those proceedings. Any of these events could have a material adverse effect on our business, prospects, results of operations, financial condition or cash flows.

**We may be unable to use some or all of our net operating loss carryforwards, which could materially and adversely affect our reported financial condition and results of operations.**

At December 31, 2019, we had a UK net operating loss carryforward ("NOL") of $57.2 million available to offset future taxable income due to prior period losses. This NOL can be carried forward indefinitely. At December 31, 2018, we had a NOL from US operations of approximately $42.0 million. We expect that our results from operations in 2019 will fully utilize this NOL carryforward. At December 31, 2019, the remaining US NOL was immaterial. If not utilized, the US NOL will begin to expire in 2034. If we do not generate sufficient taxable income, we may not be able to utilize a material portion of our NOLs, even if we achieve profitability. If we are limited in our ability to use our NOLs in future years in which we have taxable income, we will pay more taxes than if we were able to fully utilize our NOLs. This could materially and adversely affect our results of operations.

Under Section 382 of the Internal Revenue Code of 1986, as amended (the "Code"), our ability to utilize the NOL or other tax attributes, such as research tax credits, in any taxable year may be limited if we experience an "ownership change." A Section 382 "ownership change" generally occurs if one or more stockholders or groups of stockholders, who own at least 5% of our stock, increase their ownership by more than 50 percentage points over their lowest ownership percentage within a rolling three-year period. Similar rules may apply under state tax laws. We have not completed a Section 382 analysis through December 31, 2019. If we have previously had, or have in the future, one or more Section 382 "ownership changes," including in connection with our IPO, we may not be able to utilize a material portion of our NOL.

**RISKS RELATED TO OUR ASSOCIATION WITH TFI**

**The Think Finance Litigation Trust in the TFI bankruptcy, as well as third parties, may seek to hold us responsible for liabilities of TFI due to the Spin-Off.**

In connection with our separation from TFI, TFI has generally agreed to retain all liabilities that did not historically arise from our business. Third parties may seek to hold us responsible for TFI's retained liabilities, including third-party claims arising from TFI's business and retained assets. Under the separation and distribution agreement, we are responsible for the debts, liabilities and other obligations related to the business or businesses that we own and operate. Under our agreements with TFI, TFI has agreed to indemnify us for claims and losses relating to its retained liabilities. However, if any of those liabilities are significant and we are ultimately held liable for such liabilities, we cannot assure you that we will be able to recover the full amount of our losses from TFI. As an example, Elevate is a potential defendant in litigation that may be brought on behalf of the debtors' estates in the TFI bankruptcy.

Although no such claims have been brought directly against Elevate to date, in October 2019, Elevate entered into tolling agreements with TFI Creditors' Committee and class claimants in regard to any potential future claims against Elevate. These tolling agreements have been extended, and we may enter into additional extensions of the tolling agreements in the future. In December 2019, the TFI bankruptcy plan was confirmed, and any claims from the TFI Creditors' Committee were assigned to the TFLT. In addition, on February 20, 2020, Elevate and the TFLT will commence mediation in an attempt to resolve, prior to any litigation being filed, any potential claims that the TFLT may have against Elevate including, among other things, whether or not the spin-off of Elevate from TFI was a fraudulent conveyance. In the event the mediation is unsuccessful, Elevate anticipates that the TFLT will pursue its claims in litigation against Elevate. As discussed below, in the event of litigation, to the extent that Elevate is not successful, it could be required to pay money in an amount equal to the difference between the consideration received by TFI in the spin-off and the fair market value of Elevate at the time of the spin-off. While Elevate can provide no assurances as to whether there will be a settlement, or a judgment against Elevate, or what the terms of any such settlement or judgment could be, in the event that Elevate is unable to pay any amount resulting from such settlement or judgment, it could have a material adverse effect on the Company's financial condition, and Elevate could be obligated to file for bankruptcy. At this time, because no claims have been filed against Elevate, no reasonable estimate of possible loss, if any, can be made at this time. We believe any future claims are without merit, and we intend to defend ourselves vigorously.

Although we do not anticipate liability for any obligations not expressly assumed by us pursuant to the separation and distribution agreement, it is possible that we could be required to assume responsibility for certain obligations retained by TFI should TFI fail to pay or perform its retained obligations.

In addition, the spin-off could be challenged under various state and federal fraudulent conveyance laws. An unpaid creditor or an entity vested with the power of such creditor (such as the TFLT in the TFI bankruptcy could claim that the distribution left TFI insolvent or with unreasonably small capital or that TFI intended or believed it would incur debts beyond its ability to pay such debts as they mature and that TFI did not receive fair consideration or reasonably equivalent value in the spin-off. The measure of insolvency for purposes of such fraudulent conveyance laws will vary depending on which jurisdiction's law is applied. Generally, however, an entity would be considered insolvent if either the fair saleable value of its assets is less than the amount of its liabilities (including the probable amount of contingent liabilities), or it is unlikely to be able to pay its liabilities as they become due. If it were determined that the spin-off constituted a fraudulent conveyance, then the spin-off could be deemed void and there could be a number of different remedies imposed against Elevate, including without limitation, the requirement that Elevate has to pay money damages in an amount equal to the difference between the consideration received by TFI in the spin-off and the fair market value of Elevate at the time of the spin-off. While Elevate can provide no assurances as to whether there will be a settlement, or a judgment against Elevate, or what the terms of any such settlement or judgment could be, in the event that Elevate is unable to pay any amount resulting from such settlement or judgment, it could have a material adverse effect on the Company's financial condition, or, if there is no settlement and Elevate is deemed to ultimately be held liable in this matter, Elevate could be obligated to file for bankruptcy. In addition, in negotiations with the TFLT in the TFI bankruptcy, Elevate may be obligated to book a reserve for potential settlement amounts that it considers as an estimate of possible loss. Any such reserve could materially impact Elevate's financial condition. Elevate can provide no assurances as to how long the mediation process may take, or the outcome of such mediation.

**The CFPB has authority to investigate and issue Civil Investigative Demands to consumer lending businesses and may issue fines or corrective orders.**

The CFPB has authority to investigate and issue Civil Investigative Demands ("CIDs") to consumer lending businesses, including us. In June 2012, prior to the spin-off, and after the spin-off, TFI received CIDs from the CFPB. The purpose of the CIDs purportedly was to determine whether TFI engaged in unlawful acts or practices relating to the advertising, marketing, provision, or collection of small-dollar loan products, in violation of parts of the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act"), the Truth in Lending Act, the Electronic Funds Transfer Act, the Gramm-Leach-Bliley Act, or any other federal consumer financial law and to determine whether CFPB action to obtain legal or equitable relief would be in the public interest. On November 15, 2017, the CFPB sued TFI alleging it engaged in unfair, deceptive, or abusive acts or practices. The CFPB and TFI have settled all claims and have received final court approval in the United States Bankruptcy Court for the Northern District of Texas. While TFI's business is distinct from our business, we cannot predict the final outcome of this litigation or to what extent any obligations arising out of such final outcome will be applicable to our Company, business or officers, if at all.

**OTHER RISKS RELATED TO COMPLIANCE AND REGULATION**

**We, our marketing affiliates, our third-party service providers and our Bank Partners are subject to complex federal, state and local lending and consumer protection laws, and if we fail to comply with applicable laws, regulations, rules and guidance, our business could be adversely affected.**

We, our marketing affiliates, our third-party service providers and our Bank Partners must comply with US federal, state and local regulatory regimes, including those applicable to consumer credit transactions. Certain US federal and state laws generally regulate interest rates and other charges and require certain disclosures. In particular, we may be subject to laws such as:

- local regulations and ordinances that impose requirements or restrictions related to certain loan product offerings and collection practices;

- state laws and regulations that impose requirements related to loan or credit service disclosures and terms, credit discrimination, credit reporting, debt servicing and collection;

- the Truth in Lending Act and Regulation Z promulgated thereunder, and similar state laws, which require certain disclosures to borrowers regarding the terms and conditions of their loans and credit transactions and other substantive consumer protections with respect to credit cards, such as an assessment of a borrower's ability to repay obligations and penalty fee limitations;

- Section 5 of the Federal Trade Commission Act, which prohibits unfair and deceptive acts or practices in or affecting commerce, Section 1031 of the Dodd-Frank Act, which prohibits unfair, deceptive or abusive acts or practices in connection with any consumer financial product or service, and similar state laws that prohibit unfair and deceptive acts or practices;

- the Equal Credit Opportunity Act and Regulation B promulgated thereunder and state non-discrimination laws, which generally prohibit creditors from discriminating against credit applicants on the basis of race, color, sex, age, religion, national origin, marital status, the fact that all or part of the applicant's income derives from any public assistance program or the fact that the applicant has in good faith exercised any right under the federal Consumer Credit Protection Act;

- the Fair Credit Reporting Act (the "FCRA") as amended by the Fair and Accurate Credit Transactions Act, and similar state laws, which promote the accuracy, fairness and privacy of information in the files of consumer reporting agencies;

- the Fair Debt Collection Practices Act (the "FDCPA") and similar state and local debt collection laws, which provide guidelines and limitations on the conduct of third-party debt collectors and creditors in connection with the collection of consumer debts;

- the Gramm-Leach-Bliley Act and Regulation P promulgated thereunder and similar state privacy laws, which include limitations on financial institutions' disclosure of nonpublic personal information about a consumer to nonaffiliated third parties, in certain circumstances require financial institutions to limit the use and further disclosure of nonpublic personal information by nonaffiliated third parties to whom they disclose such information and require financial institutions to disclose certain privacy policies and practices with respect to information sharing with affiliated and nonaffiliated entities as well as to safeguard personal customer information, and other privacy laws and regulations;

- the Bankruptcy Code and similar state insolvency laws, which limit the extent to which creditors may seek to enforce debts against parties who have filed for bankruptcy protection;

- the Servicemembers Civil Relief Act and similar state laws, which allow military members and certain dependents to suspend or postpone certain civil obligations, as well as limit applicable rates, so that the military member can devote his or her full attention to military duties;

- the Military Lending Act and Department of Defense rules, which limit the interest rate and fees that may be charged to military members and their dependents, requires certain disclosures and prohibits certain mandatory clauses among other restrictions;

- the Electronic Fund Transfer Act and Regulation E promulgated thereunder, which provide disclosure requirements, guidelines and restrictions on the electronic transfer of funds from consumers' asset accounts;

- the Electronic Signatures in Global and National Commerce Act and similar state laws, particularly the Uniform Electronic Transactions Act, which authorize the creation of legally binding and enforceable agreements utilizing electronic records and signatures and, with consumer consent, permits required disclosures to be provided electronically;

- the Bank Secrecy Act, which relates to compliance with anti-money laundering, customer due diligence and record-keeping policies and procedures; and

- the Telephone Consumer Protection Act (the "TCPA") and the regulations of the Federal Communications Commission (the "FCC"), which regulations include limitations on telemarketing calls, auto-dialed calls, prerecorded calls, text messages and unsolicited faxes.

While it is our intention to always be in compliance with these laws, it is possible that we may currently be, or at some time have been, inadvertently out of compliance with some or any such laws. Further, all applicable laws are subject to evolving regulatory and judicial interpretations, which further complicate real-time compliance. Lastly, compliance with these laws is costly, time-consuming and limits our operational flexibility.

Failure to comply with these laws and regulatory requirements applicable to our business may, among other things, limit our or a collection agency's ability to collect all or part of the principal of or interest on loans. As a result, we may not be able to collect on unpaid principal or interest. In addition, non-compliance could subject us to damages, revocation of required licenses, class action lawsuits, administrative enforcement actions, rescission rights held by investors in securities offerings and civil and criminal liability, which may harm our business and may result in borrowers rescinding their loans.

Where applicable, we seek to comply with state installment, CSO, servicing and similar statutes. In all jurisdictions with licensing or other requirements that we believe may be applicable to us, we comply with the relevant requirements by acquiring the necessary licenses or authorization and submitting appropriate registrations in connection therewith. Nevertheless, if we are found to not have complied with applicable laws, we could lose one or more of our licenses or authorizations or face other sanctions or penalties or be required to obtain other licenses or authorizations in such jurisdiction, which may have an adverse effect on our ability to perform our servicing obligations or make products or services available to borrowers in particular states, which may harm our business.

Our products currently have usage caps and limitations on lending based on internally developed "responsible lending guidelines." If those policies become more restrictive due to legislative or regulatory changes at either the local, state, US federal, or UK regulatory level these products would experience declining revenues per customer. In some cases, legislative or regulatory changes at the local, state, US federal or UK regulatory level, like the new law in Ohio targeting small-dollar lending practices, may require us to discontinue offering certain of our products in certain jurisdictions.

**The CFPB may have examination authority over our US consumer lending business that could have a significant impact on our US business.**

In July 2010, the US Congress passed the Dodd-Frank Act. Title X of the Dodd-Frank Act created the CFPB, which regulates US consumer financial products and services, and gave it regulatory, supervisory and enforcement powers over certain providers of consumer financial products and services, including authority to examine such providers.

The CFPB is currently considering rules to define larger participants in markets for consumer installment loans for purposes of supervision. Once this rule and corresponding examination rules are established, we anticipate the CFPB will examine us. The CFPB's examination authority permits CFPB examiners to inspect the books and records of providers and ask questions about their business practices. The examination procedures include specific modules for examining marketing activities, loan application and origination activities, payment processing activities and sustained use by consumers, collections, accounts in default, consumer reporting activities and third-party relationships. As a result of these examinations, we could be required to change our products, our services or our practices, whether as a result of another party being examined or as a result of an examination of us, or we could be subject to monetary penalties, which could reduce profit margins for the company or otherwise materially adversely affect us.

Furthermore, the CFPB's practices and procedures regarding civil investigations, examination, enforcement and other matters relevant to us and other CFPB-regulated entities are subject to further development and change. Where the CFPB holds powers previously assigned to other regulators or may interpret laws previously interpreted by other regulators, the CFPB may not continue to apply such powers or interpret relevant concepts consistent with previous regulators' practice. This may adversely affect our ability to anticipate the CFPB's expectations or interpretations in our interaction with the CFPB.

The CFPB also has broad authority to prohibit unfair, deceptive and abusive acts and practices and to investigate and penalize financial institutions that violate this prohibition. In addition to having the authority to obtain monetary penalties for violations of applicable federal consumer financial laws (including the CFPB's own rules), the CFPB can require remediation of practices, pursue administrative proceedings or litigation and obtain cease and desist orders (which can include orders for restitution or rescission of contracts, as well as other kinds of affirmative relief). Also, where a company is believed to have violated Title X of the Dodd-Frank Act or CFPB regulations implemented thereunder, the Dodd-Frank Act empowers state attorneys general and state regulators to bring civil actions to remedy such violations after consulting with the CFPB. If the CFPB or one or more state attorneys general or state regulators believe that we have violated any of the applicable laws or regulations, they could exercise their enforcement powers in ways that could have a material adverse effect on our business, prospects, results of operations, financial condition or cash flows.

Many states, including California, Massachusetts, Maryland and New York, have taken steps to actively enforce consumer protection laws, including through the creation of so-called "mini-CFPBs."

**The CFPB issued proposed revisions to the 2017 Rule affecting the consumer lending industry, and these or subsequent new rules and regulations, if they are finalized, may impact our US consumer lending business.**

The CFPB released its final "Payday, Vehicle Title, and Certain High-Cost Lending Rule" (the "2017 Rule") on October 5, 2017, covering certain short-term and longer-term loans with an APR of 36% or higher and have a "leveraged payment mechanism" such as an ACH payment plan. On February 6, 2019, the CFPB issued proposed revisions to the 2017 Rule (the "2019 Proposed Revisions"). The 2019 Proposed Revisions leave in place requirements and limitations on attempts to withdraw payments from consumers' checking, savings or prepaid accounts. Among other requirements, the payment provisions prohibit lenders that have had two consecutive attempts to collect money from a consumers' account returned for insufficient funds from making any further attempts to collect from the account unless the consumers have provided new authorizations for additional payment transfers. Additionally, the payment provisions require us to give consumers at least three business days' advance notice before attempting payment withdrawals. The mandatory compliance deadline for the payment provisions of the 2017 Rule was August 19, 2019. Language in the 2019 Proposed Revisions suggest that the CFPB may be receptive to informal requests to revisit such payment provisions requirements. There are also recordkeeping requirements and compliance plan requirements in the 2019 Proposed Rule that will apply to us. On June 7, 2019, the CFPB announced a 15-month delay in the rule's August 19, 2019 compliance date to November 19, 2020 that applies only to the proposed rescission of the ability-to-pay provisions. Relatedly, the Community Financial Services Association of America ("CFSA") sued the CFPB in April 2018 over the Payday, Vehicle Title, and Certain High-Cost Lending Rule. As a result, the court suspended the Bureau's August 19, 2019 implementation of the 2019 Proposed Revisions pending further order of the court. On August 6, 2019 the court issued an order that leaves the compliance date stay in effect. The CFPB plans to finalize the 2019 Proposed Revisions in the first or second quarter of 2020. To the extent that the 2019 Proposed Revisions, or subsequent new rules and regulations proposed by the CFPB, are finalized, the results of operations of our US consumer lending business could be adversely affected.

**The FDIC has issued examination guidance affecting our unaffiliated third-party lenders and these or subsequent new rules and regulations could have a significant impact on our products originated by unaffiliated third-party lenders.**

The Bank-Originated Products are offered by Elevate's unaffiliated third-party lenders using technology, underwriting and marketing services provided by Elevate. The unaffiliated third-party lenders are supervised and examined by both the states that charter them and the FDIC. If the FDIC or a state supervisory body considers any aspect of the products originated by unaffiliated third-party lenders to be inconsistent with its guidance, the unaffiliated third-party lenders may be required to alter the product.

On July 29, 2016, the board of directors of the FDIC released examination guidance relating to third-party lending as part of a package of materials designed to "improve the transparency and clarity of the FDIC's supervisory policies and practices" and consumer compliance measures that FDIC-supervised institutions should follow when lending through a business relationship with a third party. The proposed guidance, if finalized, would apply to all FDIC-supervised institutions that engage in third-party lending programs, including certain Bank Products.

The proposed guidance elaborates on previously issued agency guidance on managing third-party risks and specifically addresses third-party lending arrangements where an FDIC-supervised institution relies on a third party to perform a significant aspect of the lending process. The types of relationships that would be covered by the guidance include (but are not limited to) relationships for originating loans on behalf of, through or jointly with third parties, or using platforms developed by third parties. If adopted as proposed, the guidance would result in increased supervisory attention of institutions that engage in significant lending activities through third parties, including at least one examination every 12 months, as well as supervisory expectations for a third-party lending risk management program and third-party lending policies that contain certain minimum requirements, such as self-imposed limits as a percentage of total capital for each third-party lending relationship and for the overall loan program, relative to origination volumes, credit exposures (including pipeline risk), growth, loan types, and acceptable credit quality. Comments on the guidance were due October 27, 2016. While the guidance has never formally been adopted, it is our understanding that the FDIC has relied upon it in its examination of third-party lending arrangements.

On June 5, 2018, Jelena McWilliams was sworn in as the Chair of the FDIC. At this time, it is unclear what impact the incoming Chair will have on the FDIC's third-party lending policies governing the Bank Products.

### The UK has imposed, and continues to impose, increased regulation of the high-cost short-term credit industry with the stated expectation that some firms will exit the market.

During the years ended December 31, 2019 and 2018, our UK operations represented 14% and 16%, respectively, of our consolidated total revenues. In the UK, we are subject to regulation by the FCA pursuant to the Financial Services and Markets Act 2000 (the "FSMA"), the Consumer Credit Act 1974, as amended (the "CCA"), and secondary legislation passed under such statutes, among other rules and regulations including the FCA Handbook, which collectively serve to transpose the obligations under the European Consumer Credit Directive into UK law.

The FSMA gives the FCA the power to authorize, supervise, examine, bring enforcement actions and impose fines and disciplinary sanctions against providers of consumer credit, as well as to make rules for the regulation of consumer credit. The Consumer Credit Sourcebook (the "CONC") incorporates prescriptive regulations for consumer loans such as those that we offer, including mandatory affordability checks on borrowers, limiting the number of refinances, or "rollovers," to two, restricting how lenders can advertise, banning advertisements that the FCA deems misleading, and introducing a limit of two unsuccessful attempts on the use of continuous payment authority ("CPA") (which provides a creditor the ability to directly debit a customer's account for payment using their bank card details when authorized by the customer to do so) to pay off a loan. The UK also has strict regulations regarding advertising (including websites) and the presentation, form and content of loan agreements, including statutory warnings, the layout of prescribed financial information, as well as in relation to defaulted loans and collections activities. The changes that we have implemented or any changes we may be required to implement in the future as a result of such legislative and regulatory activities could have a material adverse effect on our UK business.

In the period since the FCA acquired responsibility for the regulation of consumer credit in the UK in place of the Office of Fair Trading (the "OFT") in April 2014, there have been a large number of new regulations affecting our UK product offerings. These include the introduction of a rate cap, a prohibition on certain types of line of credit products, the establishment of a price comparison website, and restrictions on payment processing activities, among other changes. The rate cap imposes a maximum interest rate of 0.8% per day and maximum late payment fee of £15; the total amount charged for the loan, including all default charges, must not exceed 100% of the capital sum originally borrowed. This rule translates to a maximum rate of £24 for every £100 borrowed for a 30-day period, or 0.8% per day. The maximum fees that can be earned on the loan (through interest, default fees, and late interest) ensure that a consumer cannot pay back more than twice the amount of principal borrowed.

In July 2017, the FCA announced that it had reviewed the impact of the 0.8% per day price cap and concluded that the current price cap will be left in place. The FCA will review the price cap again in 2020. Further, the FCA found that regulation of high-cost short-term credit, including the price cap, has led to substantial benefits to consumers. The FCA validated concerns about specific products and segments of the high-cost credit market, including unarranged overdrafts and long-term use of high-cost credit and the rent-to-own, home-collected credit and catalog credit markets. In May 2018, the FCA published the outcome of its high-cost credit review and proposed changes to its regulations of overdrafts, the rent-to-own market, home-collected credit, catalogue credit and store cards.

No recommendations were made concerning the high-cost short-term credit loan market. Separately, the FCA has asked companies to review their lending practices regarding repeat borrowing to ensure such lending practices reflect decisions made by the Financial Ombudsman Service. Our UK business has undertaken this exercise and has invited the FCA to discuss its findings. While we believe that our UK business has implemented lending practices for repeat borrowing that are compliant with regulatory requirements, if the FCA were to impose a cap on a number of times a consumer of our Sunny product can borrow from us, this could have a material adverse effect on our business, prospects, results of operations, financial condition and cash flows.

During 2019 and 2018, our UK business received an increased number of customer complaints initiated by claims management companies ("CMCs") related to the affordability assessment of certain loans. If our evidence supports the affordability assessment and we reject the claim, the customer has the right to take the complaint to the Financial Ombudsman Service for further adjudication. The CMCs' campaign against the high cost lending industry increased significantly during the third and fourth quarters of 2018 and continued through 2019 resulting in a significant increase in affordability claims against all companies in the industry during this period. We believe that many of the increased claims are without merit and reflect the use of abusive and deceptive tactics by the CMCs. The FCA began regulating the CMCs in April 2019 in order to ensure that the methods used by the CMCs are in the best interests of the consumer and the industry. As of December 31, 2019, we accrued approximately $2.3 million for the claims received that were determined to be probable and reasonably estimable based on the Company's historical loss rates related to these claims. The outcomes of the adjudication of these claims may differ from the Company's estimates, and as a result, our estimates may change in the near term and the effect of any such change could be material to the financial statements. We continue to monitor the matters for further developments that could affect the amount of the accrued liability recognized.

Separately, the FCA asked all industry participants to review their lending practices to ensure that such companies are using an appropriate affordability and creditworthiness analysis. Our UK business provided the requested information to the FCA. The FCA recently reported back to us and asked our UK business to tighten certain aspects of its income verification and expenditure processes. We are working with the FCA to ensure the changes we make address all matters raised by the FCA.

In February 2016, the FCA issued full authorization to Elevate for our UK business. Similar to US federal and state regulatory regimes, the FCA has the power to revoke, suspend or impose conditions upon our authorization to conduct a consumer credit business if it determines we are out of compliance with applicable UK laws, high-cost short-term rules or other legal requirements ensuring fair treatment of consumers. If the FCA adopts rules that significantly restrict the conduct of our business, any such rules could have a material adverse effect on our business, prospects, results of operations, financial condition or cash flows or could make the continuance of all or part of our UK business impractical or unprofitable. Any new rules adopted by the FCA could also result in significant compliance costs.

On October 25, 2019, the Company's UK subsidiary, ECI, entered into an agreement with the FCA that prohibits us from making any payments greater than £1.0 million outside of the normal course of business without obtaining prior approval from the FCA. The Company believes this agreement will not have a material impact on ECI's ability to continue to serve its customers and meet its obligations.

**Our advertising and marketing materials and disclosures have been and continue to be subject to regulatory scrutiny, particularly in the UK.**

In the jurisdictions where we operate, our advertising and marketing activities and disclosures are subject to regulation under various industry standards, consumer protection laws, and other applicable laws and regulations. Consistent with the consumer lending industry as a whole (see "—The consumer lending industry continues to be subjected to new laws and regulations in many jurisdictions that could restrict the consumer lending products and services we offer, impose additional compliance costs on us, render our current operations unprofitable or even prohibit our current operations" above), our advertising and marketing materials have come under increased scrutiny. In the UK, for example, consumer credit firms are subject to the financial promotion regime set out in the FSMA (Financial Promotion) Order 2005 and specific rules in the CONC, part 3, such as the inclusion of a risk warning on all advertising materials. The FCA has also decided to adopt certain elements of industry codes as FCA rules on a case by case basis. Our advertising and marketing materials in the UK are subject to review and regulation both by the FCA and the Advertising Standards Authority. We have in some cases been required to withdraw, amend or add disclosures to such materials, or have done so voluntarily in response to inquiries or complaints. Going forward, there can be no guarantee that we will be able to advertise and market our business in the UK or elsewhere in a manner we consider effective. Any inability to do so could have a material adverse effect on our business, prospects, results of operations, financial condition or cash flows.

**The regulatory landscape in which we operate is continually changing due to new CFPB rules, regulations and interpretations, as well as various legal actions that have been brought against others in marketplace lending, including several lawsuits that have sought to re-characterize certain loans made by federally insured banks as loans made by third parties. If litigation on similar theories were brought against us when we work with a federally insured bank that makes loans, rather than making loans ourselves and were such an action to be successful, we could be subject to state usury limits and/or state licensing requirements, in addition to the state consumer protection laws to which we are already subject, in a greater number of states, loans in such states could be deemed void and unenforceable, and we could be subject to substantial penalties in connection with such loans.**

The case law involving whether an originating lender, on the one hand, or third-parties, on the other hand, are the "true lenders" of a loan is still developing and courts have come to different conclusions and applied different analyses. The determination of whether a third-party service provider is the "true lender" is significant because third-parties risk having the loans they service becoming subject to a consumer's state usury limits. A number of federal courts that have opined on the "true lender" issue have looked to who is the lender identified on the borrower's loan documents. A number of state courts and at least one federal district court have considered a number of other factors when analyzing whether the originating lender or a third party is the "true lender," including looking to the economics of the transaction to determine, among other things, who has the predominant economic interest in the loan being made. If we were re-characterized as a "true lender" with respect to Elastic, or Rise of Texas or FinWise states, loans could be deemed to be void and unenforceable in some states, the right to collect finance charges could be affected, and we could be subject to fines and penalties from state and federal regulatory agencies as well as claims by borrowers, including class actions by private plaintiffs. Even if we were not required to change our business practices to comply with applicable state laws and regulations or cease doing business in some states, we could be required to register or obtain lending licenses or other regulatory approvals that could impose a substantial cost on us. If Republic Bank, FinWise Bank or the CSO lenders in Texas were subject to such a lawsuit, they may elect to terminate their relationship with us voluntarily or at the direction of their regulators, and if they lost the lawsuit, they could be forced to modify or terminate the programs.

On August 13, 2018, the California Supreme Court in *Eduardo De La Torre, et al. v. CashCall, Inc.*, held that interest rates on consumer loans of $2,500 or more could be found unconscionable under section 22302 of the California Financial Code, despite not being subject to certain statutory interest rate caps and that such a finding requires a full unconscionability analysis, which is fact-intensive.  The California Supreme Court did not hold that any particular loan or loans were unconscionable. In its opinion, the California Supreme Court noted that the unconscionability determination is not an easy one, that high interest rates may indeed be justified for higher risk borrowers. As a result of the California Supreme Court's ruling, the case was remanded to the Northern District of California. The Judge for the Northern District of California dismissed the case, on the basis that the unconscionability analysis and class action determination are matters of state law for evaluation by a state court.

On August 31, 2016, the United States District Court for the Central District of California ruled in *CFPB v. CashCall, Inc. et. al.* that CashCall was the "true lender" and consequently was engaged in deceptive practices by servicing and collecting on payday loans in certain states where the interest rate on the loans exceeded the state usury limit and/or where CashCall was not a licensed lender. The CashCall case is related to a tribally related lending program. In reaching its decision, the court adopted a "totality of the circumstances" test to determine which party to the transaction had the "predominant economic interest" in the transaction. Given the fact-intensive nature of a "totality of the circumstances" assessment, the particular and varied details of marketplace lending and other bank partner programs may lead to different outcomes to those reached in CashCall, even in those jurisdictions where courts adopt the "totality of the circumstances" approach. Notably, CashCall did not address the federal preemption of state law under the National Bank Act or any other federal statute. Although CashCall is appealing the decision in the Ninth Circuit, on January 26, 2018, the District Court ordered CashCall to pay approximately $10.2 million in civil money penalties, but no consumer restitution.  In issuing the judgment, which was significantly less than the $280 million the CFPB sought in penalties and consumer restitution, the Court found that CashCall had not knowingly or recklessly violated consumer protection laws, and that the CFPB had not demonstrated that consumer restitution was an appropriate remedy.

On September 20, 2016, in *Beechum v. Navient Solutions, Inc.*, the United States District Court for the Central District of California dismissed a class action suit alleging usurious interest rates on private student loans in violation of California law. In doing so, the court rejected the plaintiff's arguments that the defendants were the de facto "true lenders" of loans made by a national bank under a bank partnership arrangement with a non-bank partner. Consistent with the controlling judicial authority for challenges to the applicability of statutory or constitutional exemptions to California's usury prohibition, the court determined that "it must look solely to the face of the transaction" in determining whether an exemption applies and did not apply the "totality of the circumstances" test.

In addition to true lender challenges, a question regarding the applicability of state usury rates may arise when a loan is sold from a bank to a non-bank entity. In *Madden v. Midland Funding, LLC*, the Court of Appeals for the Second Circuit held that the federal preemption of state usury laws did not extend to the purchaser of a loan issued by a national bank. In its brief urging the US Supreme Court to deny certiorari, the US Solicitor General, joined by the Office of the Comptroller of the Currency ("OCC"), noted that the Second Circuit (Connecticut, New York and Vermont) analysis was incorrect. On remand, the United States District Court for the Southern District of New York concluded on February 27, 2017 that New York's state usury law, not Delaware's state usury law, was applicable and that the plaintiff's claims under the FDCPA and state unfair and deceptive acts and practices could proceed. To that end, the court granted Madden's motion for class certification. At this time, it is unknown whether Madden will be applied outside of the defaulted debt context in which it arose; however, recently two class actions, *Cohen v Capital One Funding, LLC, et al* and *Chase Card Funding, LLC, et al*, have relied on *Madden* to challenge the interest rate charged once debt was sold to securitization trusts. The facts in *CashCall*, *Navient* and *Madden* are not directly applicable to our business, as we do not engage in practices similar to those at issue in *CashCall, Navient* or *Madden*, and we do not purchase whole loans or engage in business in states within the Second Circuit. However, to the extent that either the holdings in *CashCall* or *Madden* were broadened to cover circumstances applicable to our business, or if other litigation on related theories were brought against us and were successful, or we were otherwise found to be the "true lender," we could become subject to state usury limits and state licensing laws, in addition to the state consumer protection laws to which we are already subject, in a greater number of states, loans in such states could be deemed void and unenforceable, and we could be subject to substantial penalties in connection with such loans.

In response to the uncertainty *Madden* created as to the validity of interest rates of bank-originated loans sold in the secondary market, in November 2019, the OCC and the FDIC took action to reaffirm the "valid when made" doctrine by issuing a notice of proposed rulemaking to clarify that when a bank sells, assigns, or otherwise transfers a loan, the interest permissible prior to the transfer would continue to be permissible following the transfer. The 60-day comment periods ended January 21, 2020 and February 4, 2020, respectively, and it is anticipated that the agencies will issue final rules soon. The FDIC issued a similar proposed rule to reaffirm the "valid when made" doctrine and its comment period ended on February 4, 2020.

Relatedly, the OCC and FDIC have signaled they are working on a rule to remove uncertainty surrounding the "true lender" theory-which involves a claim by a borrower or regulator that the supposed "true lender" of a loan funded by a bank is a non-bank service provider of the bank, rather than the bank itself. This controversial theory poses a growing threat to banks' ability to enter into contractual partnerships with nonbank service providers to extend responsible credit products that are far superior to payday loans. Such a theory threatens to undermine the long-established lending powers of national and state chartered banks and the validity of their originated loans and could cause substantial disruption to the financial system upon which all Americans rely. As a result, the agencies are looking to provide clarity for banks and their non-bank service providers.

Lastly, the OCC and FDIC are also working on a proposed "Small Dollar Rule" which will facilitate greater financial inclusion and give guidance for banks that make "small dollar" loans to non-prime consumers. The guidance could impact the products or interest rates that unaffiliated third-party banks originate utilizing the Elevate's lending platforms.

California's Governor Gavin Newsom recently proposed a new law, the California Consumer Financial Protection Law (CCFPL), that would rename the Department of Business Oversight to be the Department of Financial Protection and Innovation and also empower the Department to extend state oversight to financial services providers not currently subject to state supervision but also facilitate innovation.

In 2017, the Colorado Attorney General recently filed complaints in state court against marketplace lenders Marlette Funding LLC and Avant of Colorado LLC on behalf of the administrator of Colorado's Uniform Consumer Credit Code (UCCC), alleging violations of the UCCC based on "true lender" and loan assignment cases with respect to lending programs sponsored by WebBank and Cross River Bank, respectively. The complaints allege that the non-bank service providers, Marlette Funding LLC and Avant of Colorado LLC - rather than WebBank and Cross River Bank, are the "true lenders," and therefore subject to Colorado usury limits. Efforts by Avant and Marlette Funding to remove the cases to federal court and efforts by Cross River Bank and WebBank seeking declaratory judgments against the administrator of Colorado's UCCC failed (although both Cross River Bank and WebBank filed appeals with the Tenth Circuit). At this time, it is unknown what the outcome of these cases will be and whether any conclusions of law would be applied outside Colorado. However, recently in November 2018, the administrator of Colorado's UCCC amended its complaints against Avant and Marlette Funding to add additional parties (the securitization trusts that acquired the loans originated under the bank partnerships Avant and Marlette Funding have with Cross River Bank and WebBank) alleging violations of Colorado's UCCC related to the finance charges and fees received by the securitization trusts. Another marketplace lender, Kabbage, Inc. and its bank, Celtic Bank, were sued in Massachusetts federal court in 2017, with the defendant alleging that Kabbage, not Celtic Bank, is the "true lender." Kabbage, Inc. was successful in compelling arbitration in that case. In October 2019, Kabbage was sued in the Southern District of New York by several small businesses alleging violations of state usury laws (California, Massachusetts, Colorado, New York) and racketeering and conspiracy under federal RICO statutes. It also includes claims for violations of various state laws other than usury laws, including the California Financing Law Code (CFLC).

The plaintiffs in that case also make a UDAP claim under Massachusetts law in which they allege that Kabbage's loan agreements were "contracts of adhesion" that included "unconscionable and unfair provisions" such as provisions that required the plaintiffs to waive the right to a jury trial, waive the right to participate in a class action, and waive the right to seek legal redress in their home state. It is expected that the Kabbage will again seek to compel arbitration in this most recent lawsuit.

In the last few months, we have seen increased activity by some state regulatory authorities seeking to understand the services we provide to our Bank Partners. We cannot predict the final outcome of these inquiries or to what extent any obligations arising out of such final outcome will be applicable to our Company, business or officers, if at all. It is possible that some state regulators could conclude that we are subject to state laws, including licensing or registration in connection with services we provide to our Bank Partners.

In September 2019, the FDIC and the OCC jointly submitted an amicus brief to the U.S. District Court for the District of Colorado in support of the appellee debt buyer, urging the district court to uphold the bank's rights to enforce that debt to the debt buyer, including the bank's right to charge interest as authorized under the laws of its home state. The brief includes related discussions of (i) the rights of federally regulated banks to "export" their home states' interest rates by charging those rates to borrowers nationwide, first with respect to national banks under section 85 of the National Bank Act and then with respect to state banks under section 27 of the Federal Deposit Insurance Act and (ii) federal preemption of state usury laws. The portion of the brief that discusses rate exportation strongly reaffirms the OCC and the FDIC's complete accord that section 27 and section 85 should be mirror images of each other. At the conclusion of their brief, the agencies ask the district court to affirm the bankruptcy court's decision on the basis that affirmation would "preserve the banks' longstanding ability to engage in loan sales, would reaffirm the traditional protections that such loan sales have received under the law, would ensure the proper functioning of the credit markets, and would promote safety and soundness in the banking sector by supporting loan sales and securitizations, which are used to manage capital and liquidity positions."

**We use third-party collection agencies to assist us with debt collection. Their failure to comply with applicable debt collection regulations could subject us to fines and other liabilities, which could harm our reputation and business.**

The FDCPA regulates persons who regularly collect or attempt to collect, directly or indirectly, consumer debts owed or asserted to be owed to another person. Many states impose additional requirements on debt collection communications, and some of those requirements may be more stringent than the federal requirements. Moreover, regulations governing debt collection are subject to changing interpretations that differ from jurisdiction to jurisdiction. We use third-party collections agencies to collect on debts incurred by consumers of our credit products. Regulatory changes could make it more difficult for collections agencies to effectively collect on the loans we originate.

Non-US jurisdictions also regulate debt collection. For example, in the UK, due to new rules under the CONC we have made adjustments to some of our business practices, including our collections processes, which could possibly result in lower collections on loans made by us and has resulted in a decrease in the number of new customers that we are able to approve. In addition, the concerns expressed to us by the OFT and the FCA relate in part to debt collection. We could be subject to fines, written orders or other penalties if we, or parties working on our behalf, are determined to have violated the FDCPA, the CONC or analogous state or international laws, which could have a material adverse effect on our reputation, business, prospects, results of operations, financial condition or cash flows.

**Our business is subject to complex and evolving US and international laws and regulations regarding privacy, data protection, and other matters. Many of these laws and regulations are subject to change and uncertain interpretation, and could result in claims, changes to our business practices, monetary penalties, increased cost of operations, or declines in user growth or engagement, or otherwise harm our business.**

We receive, transmit and store a large volume of personally identifiable information and other sensitive data from customers and potential customers. Our business is subject to a variety of laws and regulations in the US and the UK that involve user privacy issues, data protection, advertising, marketing, disclosures, distribution, electronic contracts and other communications, consumer protection and online payment services. The introduction of new products or expansion of our activities in certain jurisdictions may subject us to additional laws and regulations. In addition, international data protection, privacy, and other laws and regulations can be more restrictive than those in the US. US federal and state and international laws and regulations, which can be enforced by private parties or government entities, are constantly evolving and can be subject to significant change.

A number of proposals have recently been implemented or are pending before federal, state, and international legislative and regulatory bodies that could impose obligations in areas such as privacy. For example, the European Union's new General Data Protection Regulation (the "GDPR") was implemented in the UK in May 2018, and the California Consumer Privacy Act (the "CCPA") came into effect on January 1, 2020. The GDPR is more prescriptive than the prior EU regime and has imposed new obligations on businesses, including the requirement to appoint a data protection officer in some circumstances, self-report personal data breaches, obtain express consent to data processing in certain circumstances and provide more enhanced rights to individuals whose personal data they process, including the "right to be forgotten," by having records containing their personal data erased, subject to certain exceptions. Penalties for non-compliance with the GDPR are significant, with a maximum fine calculated as the higher of €20 million or 4% of global turnover for the preceding year. Similar to the GDPR, the CCPA broadly defines personal information and provides California consumers increased privacy rights and protections. California Attorney General ("AG") Xavier Becerra issued draft regulations on October 11, 2019 to guide covered businesses' implementation of the CCPA. The regulations address several CCPA provisions that explicitly call for the AG's input, as well as others that have been the subject of confusion, criticism, or discussion.

In addition, the 4th European Union's anti-money laundering directive (2015/849/EC) came into effect in June 2017 and requires changes to customer due diligence assessments and greater focus on a risk-based approach.

Some countries are also considering or have enacted legislation requiring local storage and processing of data that, if applicable to the markets in which we operate, would increase the cost and complexity of delivering our services. These existing and proposed laws and regulations can be costly to comply with and can delay or impede the development of new products, the expansion into new markets, result in negative publicity, increase our operating costs, require significant management time and attention, and subject us to inquiries or investigations, claims or other liabilities, including demands that we modify or cease existing business practices or pay fines, penalties or other damages.

It is difficult to assess the likelihood of the enactment of any future legislation or the impact that such rules and regulations could have on our business. We are operating on the basis, confirmed by the UK government and the FCA, that the decision of the UK to leave the European Union will not affect the implementation of the new European Union directives on data protection and anti-money laundering as outlined above.

**The use of personal data in credit underwriting is highly regulated.**

In the US, the FCRA regulates the collection, dissemination and use of consumer information, including consumer credit information. Compliance with the FCRA and related laws and regulations concerning consumer reports has recently been under regulatory scrutiny. The FCRA requires us to provide a Notice of Adverse Action to a loan applicant when we deny an application for credit, which, among other things, informs the applicant of the action taken regarding the credit application and the specific reasons for the denial of credit. The FCRA also requires us to promptly update any credit information reported to a consumer reporting agency about a consumer and to allow a process by which consumers may inquire about credit information furnished by us to a consumer reporting agency. Historically, the FTC has played a key role in the implementation, oversight, enforcement and interpretation of the FCRA. Pursuant to the Dodd-Frank Act, the CFPB has primary supervisory, regulatory and enforcement authority of FCRA issues. Although the FTC also retains its enforcement role regarding the FCRA, it shares that role in many respects with the CFPB. The CFPB has taken a more active approach than the FTC, including with respect to regulation, enforcement and supervision of the FCRA. Changes in the regulation, enforcement or supervision of the FCRA may materially affect our business if new regulations or interpretations by the CFPB or the FTC require us to materially alter the manner in which we use personal data in our credit underwriting.

On May 28, 2018, our UK business became subject to the GDPR, and in January 2020, our California business became subject to the CCPA. As described above in "-Our business is subject to complex and evolving US and international laws and regulations regarding privacy, data protection, and other matters. Many of these laws and regulations are subject to change and uncertain interpretation, and could result in claims, changes to our business practices, monetary penalties, increased cost of operations, or declines in user growth or engagement or otherwise harm our business," the CCPA broadly defines personal information and provides California consumers increased privacy rights and protections, and the GDPR is more prescriptive than the prior regime and includes new obligations on businesses, including the requirement to appoint a data protection officer, self-report breaches, obtain express consent to data processing and provide more rights to individuals whose data they process, including the "right to be forgotten," by having their records erased. Penalties for non-compliance with the GDPR are significant with a maximum fine calculated as the higher of €20 million or 4% of global turnover for the preceding year. There are also strict rules on the use of credit reference data under the CCA regulations and the CONC. We are also subject to laws limiting the transfer of personal data from the European Economic Area to non-European Economic Area countries or territories.

There are also strict rules on the instigation of electronic communications such as email, text message and telephone calls under the Privacy and Electronic Communications (EC Directive) Regulations 2003 ("PECR"), which generally prohibit unsolicited direct marketing by electronic means without express consent, as well as the monitoring of devices. The UK left the European Union on January 31, 2020. During the transition period agreed between the UK and the European Union, which is expected to end on December 31, 2020, the GDPR, PECR and other European Union laws will continue to apply within the UK. When the transition period ends, the UK will implement the Data Protection, Privacy and Electronic Communications (Amendments etc) (EU Exit) Regulations 2019, which transpose the protections of the GDPR and PECR under UK law. The UK is expected to continue the protections of the GDPR and PECR for the transfer of personal data into and out of the UK. We expect to comply with any changes to the framework for the transfer of personal data into and out of the UK but can provide no assurances as to whether such regulation will be more or less burdensome than the GDPR, PECR and other European Union regulations, and we may incur significant costs in transitioning to any new regulatory model. Furthermore, compliance with any new or developing privacy laws in the US, including the CCPA or other state or federal laws that may be enacted in the future, may require significant resources and could have a material adverse impact on our business and results of operations.

The oversight of the FCRA by both the CFPB and the FTC and any related investigation or enforcement activities or our failure to comply with the Data Protection Act ("DPA"), GDPR, PECR and any supplementary data protection legislation may have a material adverse impact on our business, including our operations, our mode and manner of conducting business and our financial results.

**Judicial decisions or amendments to the Federal Arbitration Act could render the arbitration agreements we use illegal or unenforceable.**

We include arbitration provisions in our consumer loan agreements. These provisions are designed to allow us to resolve any customer disputes through individual arbitration rather than in court and explicitly provide that all arbitrations will be conducted on an individual and not on a class basis. Thus, our arbitration agreements, if enforced, have the effect of shielding us from class action liability. Our arbitration agreements do not generally have any impact on regulatory enforcement proceedings. We take the position that the arbitration provisions in our consumer loan agreements, including class action waivers, are valid and enforceable; however, the enforceability of arbitration provisions is often challenged in court. If those challenges are successful, our arbitration and class action waiver provisions could be unenforceable, which could subject us to additional litigation, including additional class action litigation.

Any judicial decisions, legislation or other rules or regulations that impair our ability to enter into and enforce consumer arbitration agreements and class action waivers could significantly increase our exposure to class action litigation as well as litigation in plaintiff-friendly jurisdictions, which would be costly and could have a material adverse effect on our business, prospects, results of operations, financial condition or cash flows.

**We use marketing affiliates to assist us and the originating lender in obtaining new customers, and if such marketing affiliates do not comply with an increasing number of applicable laws and regulations, or if our ability to use such marketing affiliates is otherwise impaired, it could adversely affect our business.**

We depend in part on marketing affiliates as a source of new customers for us and, with respect to the Bank Products, for the originating lender and credit card issuer. Our marketing affiliates place our advertisements on their websites that direct potential customers to our websites. As a result, the success of our business depends in part on the willingness and ability of marketing affiliates to provide us customer referrals at acceptable prices.

If regulatory oversight of marketing affiliates relationships is increased, through the implementation of new laws or regulations or the interpretation of existing laws or regulations, our ability to use marketing affiliates could be restricted or eliminated.

Marketing affiliates' failure to comply with applicable laws or regulations, or any changes in laws or regulations applicable to marketing affiliates relationships or changes in the interpretation or implementation of such laws or regulations, could have an adverse effect on our business and could increase negative perceptions of our business and industry. Additionally, the use of marketing affiliates could subject us to additional regulatory cost and expense. If our ability to use marketing affiliates were to be impaired, our business, prospects, results of operations, financial condition or cash flows could be materially adversely affected.

**RISKS RELATED TO THE SECURITIES MARKETS AND OWNERSHIP OF OUR COMMON STOCK**

**The price of our common stock may be volatile, and the value of your investment could decline.**

Technology stocks have historically experienced high levels of volatility. The trading price of our common stock may fluctuate substantially depending on many factors, some of which are beyond our control and may not be related to our operating performance. These fluctuations could cause you to lose all or part of your investment in our common stock. Factors that could cause fluctuations in the trading price of our common stock include the following:

- announcements of new products, services or technologies, relationships with strategic partners or acquisitions or changes in the timing of such anticipated events; of the termination of, or material changes to, material agreements; or of other events by us or our competitors;

- changes in economic conditions;

- changes in prevailing interest rates;

- price and volume fluctuations in the overall stock market from time to time;

- significant volatility in the market price and trading volume of technology companies in general and of companies in the financial services industry;

- fluctuations in the trading volume of our shares or the size of our public float;

- actual or anticipated changes in our operating results or fluctuations in our operating results;

- quarterly fluctuations in demand for our loans;

- whether our operating results meet the expectations of securities analysts or investors;

- actual or anticipated changes in the expectations of investors or securities analysts;

- regulatory developments in the US, foreign countries or both and our ability to comply with applicable regulations;

- material litigation, including class action lawsuits;

- major catastrophic events;

- sales of large blocks of our stock;

- entry into, modification of or termination of a material agreement; or

- departures of key personnel or directors.


In addition, if the market for technology and financial services stocks or the stock market in general experiences loss of investor confidence, the trading price of our common stock could decline for reasons unrelated to our business, operating results or financial condition. The trading price of our common stock might also decline in reaction to events that affect other companies in our industry even if these events do not directly affect us. In the past, following periods of volatility in the market price of a company's securities, securities class action litigation has often been brought against that company. If our stock price is volatile, we may become the target of securities litigation. Securities litigation could result in substantial costs and divert our management's attention and resources from our business. This could have a material adverse effect on our business, operating results and financial condition.

**Sales of substantial amounts of our common stock in the public markets, or the perception that they might occur, could reduce the price that our common stock might otherwise attain and may dilute your voting power and your ownership interest in us.**

Sales of a substantial number of shares of our common stock in the public market, or the perception that these sales could occur, could adversely affect the market price of our common stock and may make it more difficult for you to sell your common stock at a time and price that you deem appropriate.

We may issue our shares of common stock or securities convertible into our common stock from time to time in connection with a financing, acquisition, investments or otherwise. Any such issuance could result in substantial dilution to our existing stockholders and cause the trading price of our common stock to decline.

**The requirements of being a public company may strain our resources, divert management's attention and affect our ability to attract and retain qualified board members.**

As a public company, we are subject to the reporting requirements of the Exchange Act, the NYSE listing standards and other applicable securities rules and regulations. Compliance with these rules and regulations increases our legal and financial compliance costs, makes some activities more difficult, time-consuming or costly, and increases demand on our systems and resources, particularly after we are no longer an "emerging growth company" as defined in the Jumpstart Our Business Startups Act (the "JOBS Act"). Among other things, the Exchange Act requires that we file annual, quarterly and current reports with respect to our business and operating results and maintain effective disclosure controls and procedures and internal control over financial reporting. In order to maintain and, if required, improve our disclosure controls and procedures and internal control over financial reporting to meet this standard, significant resources and management oversight may be required. As a result, management's attention may be diverted from other business concerns, which could harm our business and operating results.

In addition, changing laws, regulations and standards relating to corporate governance and public disclosure are creating uncertainty for public companies, increasing legal and financial compliance costs and making some activities more time consuming. These laws, regulations and standards are subject to varying interpretations, in many cases due to their lack of specificity, and, as a result, their application in practice may evolve over time as new guidance is provided by regulatory and governing bodies. This could result in continuing uncertainty regarding compliance matters and higher costs necessitated by ongoing revisions to disclosure and governance practices. We intend to invest resources to comply with evolving laws, regulations and standards, and this investment may result in increased general and administrative expense and a diversion of management's time and attention from revenues-generating activities to compliance activities. If our efforts to comply with new laws, regulations and standards differ from the activities intended by regulatory or governing bodies, regulatory authorities may initiate legal proceedings against us and our business may be harmed.

However, for so long as we remain an "emerging growth company" as defined in the JOBS Act, we may take advantage of certain exemptions from various requirements that are applicable to public companies that are not "emerging growth companies," including not being required to comply with the independent auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act, reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements, and exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and stockholder approval of any golden parachute payments not previously approved. We may take advantage of these exemptions until we are no longer an "emerging growth company." As a result, our stockholders may not have access to certain information they deem important.

We will cease to be an "emerging growth company" upon the earliest of: (i) the first fiscal year following the fifth anniversary of the completion of our IPO, (ii) the first fiscal year after our annual gross revenues are $1.07 billion or more, (iii) the date on which we have, during the previous three-year period, issued more than $1 billion in non-convertible debt securities, and (iv) as of the end of any fiscal year in which the market value of our common stock held by non-affiliates exceeded $700 million as of the end of the second quarter of that fiscal year.

We cannot predict if investors will find our securities less attractive because we will rely on these exemptions. If some investors find our securities less attractive as a result, there may be a less active trading market for securities and our stock price may be more volatile.

**If securities or industry analysts do not publish research or reports about our business or publish inaccurate or unfavorable research reports about our business, our share price and trading volume could decline.**

The trading market for our common stock, to some extent, depends on the research and reports that securities or industry analysts publish about us or our business. We do not have any control over these analysts. If one or more of the analysts who cover us should downgrade our shares or change their opinion of our shares, our share price would likely decline. If one or more of these analysts should cease coverage of our company or fail to regularly publish reports on us, we could lose visibility in the financial markets, which could cause our share price or trading volume to decline.

**We do not intend to pay dividends for the foreseeable future.**

We have never declared or paid any dividends on our common stock. We intend to retain any earnings to finance the operation and expansion of our business, and we do not anticipate paying any cash dividends in the future. In addition, pursuant to our financing agreement, we are prohibited from paying cash dividends without the prior consent of VPC, and we may be further restricted in the future by debt or other agreements we enter into. As a result, you may only receive a return on your investment in our common stock if the market price of our common stock increases.

**Anti-takeover provisions in our charter documents and Delaware law may delay or prevent an acquisition of our company.**

Our amended and restated certificate of incorporation and amended and restated bylaws contain provisions that may have the effect of delaying or preventing a change in control of us or changes in our management. The provisions, among other things:

- establish a classified Board of Directors so that not all members of our Board of Directors are elected at one time;

- permit only our Board of Directors to establish the number of directors and fill vacancies on the Board;

- provide that directors may only be removed "for cause" and only with the approval of two-thirds of our stockholders;

- require two-thirds approval to amend some provisions in our restated certificate of incorporation and restated bylaws;

- authorize the issuance of "blank check" preferred stock that our Board of Directors could use to implement a stockholder rights plan, or a "poison pill;"

- eliminate the ability of our stockholders to call special meetings of stockholders;

- prohibit stockholder action by written consent, which will require that all stockholder actions must be taken at a stockholder meeting;

- do not provide for cumulative voting; and

- establish advance notice requirements for nominations for election to our Board of Directors or for proposing matters that can be acted upon by stockholders at annual stockholder meetings.

These provisions, alone or together, could delay or prevent hostile takeovers and changes in control or changes in our management.

In addition, because we are incorporated in Delaware, we are governed by the provisions of Section 203 of the Delaware General Corporation Law (the "DGCL") which limits the ability of stockholders owning in excess of 15% of our outstanding voting stock to merge or combine with us in certain circumstances.

Any provision of our amended and restated certificate of incorporation or amended and restated bylaws or Delaware law that has the effect of delaying or deterring a change in control could limit the opportunity for our stockholders to receive a premium for their shares of our common stock and could also affect the price that some investors are willing to pay for our common stock.

**Our amended and restated certificate of incorporation designates the Court of Chancery of the State of Delaware as the exclusive forum for certain litigation that may be initiated by our stockholders, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us.**

Our amended and restated certificate of incorporation provides that the Court of Chancery of the State of Delaware is the sole and exclusive forum for (i) any derivative action or proceeding brought on our behalf, (ii) any action asserting a claim of breach of a fiduciary duty owed to us or our stockholders by any of our directors, officers, employees or agents, (iii) any action asserting a claim against us arising under the DGCL or (iv) any action asserting a claim against us that is governed by the internal affairs doctrine. This choice of forum provision does not preclude or contract the scope of exclusive federal or concurrent jurisdiction for any actions brought under the Securities Act or the Exchange Act. Accordingly, our exclusive forum provision will not relieve us of our duties to comply with the federal securities laws and the rules and regulations thereunder, and our stockholders will not be deemed to have waived our compliance with these laws, rules and regulations. The choice of forum provision in our amended and restated certificate of incorporation may limit our stockholders' ability to obtain a favorable judicial forum for disputes with us.

**If we fail to maintain an effective system of disclosure controls and procedures and internal control over financial reporting, we may not be able to accurately report our financial results or prevent fraud.**

Ensuring that we have adequate disclosure controls and procedures, including internal controls over financial reporting, in place so that we can produce accurate financial statements on a timely basis is costly and time-consuming and needs to be reevaluated frequently. We are required to comply with Section 404 of the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act") and related rules and regulations. Pursuant to Section 404, our management is required to report on, and, if we cease to be an emerging growth company, our independent registered public accounting firm will have to attest to the effectiveness of, our internal control over financial reporting. Our management may conclude that our internal controls over financial reporting are not effective if we fail to cure any identified material weakness or otherwise.

Moreover, even if our management concludes that our internal controls over financial reporting are effective, our independent registered public accounting firm may conclude that our internal controls over financial reporting are not effective. In the future, our independent registered public accounting firm may not be satisfied with our internal controls over financial reporting or the level at which our controls are documented, designed, operated or reviewed, or it may interpret the relevant requirements differently from us. In addition, during the course of the evaluation, documentation and testing of our internal controls over financial reporting, we may identify deficiencies that we may not be able to remediate in time to meet the deadline imposed by the SEC for compliance with the requirements of Section 404 of the Sarbanes-Oxley Act. Any such deficiencies may also subject us to adverse regulatory consequences. If we fail to achieve and maintain the adequacy of our internal controls over financial reporting, as these standards may be modified, supplemented or amended from time to time, we may be unable to report our financial information on a timely basis, may not be able to conclude on an ongoing basis that we have effective internal control over financial reporting in accordance with the Sarbanes-Oxley Act, and may suffer adverse regulatory consequences or violations of listing standards. Any of the above could also result in a negative reaction in the financial markets due to a loss of investor confidence in the reliability of our financial statements.

**Item 1B. Unresolved Staff Comments**

None.

**Item 2. Properties**

The Company leases its corporate headquarters in Fort Worth, Texas pursuant to a lease that expires September 30, 2023 and covers 94,979 square feet. We also lease approximately 59,360 square feet of office space in Addison, Texas pursuant to a lease that expires June 30, 2026.

**Item 3. Legal Proceedings**

In addition to the matters discussed below, in the ordinary course of business, from time to time, we have been and may be named as a defendant in various legal proceedings arising in connection with our business activities, including affordability claims related to the Sunny product. We may also be involved, from time to time, in reviews, investigations and proceedings (both formal and informal) by governmental agencies regarding our business (collectively, "regulatory matters"). We contest liability and/or the amount of damages as appropriate in each such pending matter. We do not anticipate that the ultimate liability, if any, arising out of any such pending matter will have a material effect on our financial condition, results of operations or cash flows.

**TFI Settlement with CFPB**

In June 2012, prior to the spin-off from TFI, and in February 2016, after the spin-off, TFI received Civil Investigative Demands from the CFPB. The purpose of the Civil Investigative Demands was to determine whether small-dollar online lenders or other unnamed persons engaged in unlawful acts or practices relating to the advertising, marketing, provision, or collection of small-dollar loan products, in violation of Section 1036 of the Dodd-Frank Wall Street Reform and Consumer Protection Act, the Electronic Funds Transfer Act, the Gramm-Leach-Bliley Act, or any other federal consumer financial law and to determine whether CFPB action to obtain legal or equitable relief would be in the public interest. Further, on November 15, 2017 the CFPB sued TFI alleging it deceived consumers into paying debts that were not valid and that it collected loan payments that consumers did not owe. The CFPB and TFI have agreed to settle all claims and executed a settlement agreement that was filed with the United States District Court for the District of Montana and is part of a larger resolution of the bankruptcy proceeding in the United States Bankruptcy Court for the Northern District of Texas involving TFI. While TFI's business is distinct from our business, we cannot predict the final outcome of the Civil Investigative Demands or to what extent any obligations arising out of such final outcome will be applicable to our company or business, if at all.

**Other Matters**

While no TFI related litigation has been filed directly against Elevate, we can provide no assurances that there will not be any future TFI related litigation filed against the Company. In October 2019, Elevate entered into tolling agreements with the TFI Creditors' Committee and class claimants in regard to any potential future claims against Elevate. These tolling agreements have been extended, and we may enter into additional extensions of the tolling agreements in the future. In December 2019, the TFI bankruptcy plan was confirmed, and any claims from the TFI Creditors' Committee were assigned to the Think Finance Litigation Trust ("TFLT"). On February 20, 2020, Elevate and the TFLT will commence mediation in an attempt to resolve, prior to any litigation being filed, any potential claims that the TFLT may have against Elevate including, among other things, whether or not the spin-off of Elevate from TFI was a fraudulent conveyance. While Elevate can provide no assurances as to the potential outcome of such mediation process, in the event that there is a settlement and Elevate is unable to pay any amount resulting from such settlement, it could have a material adverse effect on Elevate's financial condition, or, if there is no settlement and Elevate is deemed to ultimately be liable in this matter, Elevate could be obligated to file for bankruptcy. Elevate can provide no assurances as to how long the mediation process may take, or the outcome of such mediation. In addition, if the mediation is unsuccessful, Elevate anticipates that the TFLT will pursue its claims in litigation against Elevate. For more information please see "The Think Finance Litigation Trust in the TFI bankruptcy, as well as third parties, may seek to hold us responsible for liabilities of TFI due to the Spin-Off." Because no claims have been filed against Elevate, no reasonable estimate of possible loss, if any, can be made at this time. We believe any future claims are without merit, and we intend to defend ourselves vigorously.

On January 9, 2020, the District of Columbia's Attorney General, Karl A. Racine, issued a subpoena to Elevate alleging that Elevate may have violated the District of Columbia's Consumer Protection Procedures Act in connection with loans issued by banks in the District of Columbia.  The documents requested are related to the FinWise and Republic Bank originated loans in the District of Columbia.  Elevate has engaged counsel and initiated discussions with the Attorney General's office and is working to address any potential issues and provide certain documents as requested.  Elevate disagrees that it has violated the above referenced law and it intends to vigorously defend its position.

In addition, on January 27, 2020, Rise Credit Service of Texas, LLC d/b/a Rise, Opportunity Financial, LLC and Applied Data Finance, LLC d/b/a Personify Financial were sued in a class action lawsuit in Washington state.  The Plaintiff in the case claims that Rise and others are engaged in "predatory lending practices that target financially vulnerable consumers" and have violated Washington's Consumer Protection Act by engaging in unfair or deceptive practices. Elevate disagrees that it has violated the above referenced law and it intends to vigorously defend its position.

**Item 4. Mine Safety Disclosures**

Not applicable.

## PART II

**Item 5. Market for Registrant's Common Equity, Related Shareholder Matters and Issuer Purchases of Equity Securities**

### Principal Market

Our common stock began trading on the New York Stock Exchange ("NYSE") under the symbol "ELVT" on April 6, 2017.

### Stockholders

There were 51 stockholders of record of Elevate common stock as of February 12, 2020.

### Dividends

We have never declared or paid cash dividends on our common stock. We currently intend to retain all available funds and any future earnings for use in the operation of our business and do not anticipate paying any dividends on our common stock in the foreseeable future. In addition, pursuant to our financing agreement, we are prohibited from paying cash dividends without the prior consent of VPC. Any future determination to declare dividends will be made at the discretion of our Board of Directors and will depend on our financial condition, operating results, capital requirements, general business conditions and other factors that our Board of Directors may deem relevant.

### Issuer Purchases of Equity Securities

On July 25, 2019, the Company's Board of Directors authorized a share repurchase program providing for the repurchase of up to $10 million of our common stock through July 31, 2024. In January 2020, the Company's Board of Directors authorized a $20 million increase to the Company's existing common stock repurchase program providing for the repurchase of up to $30 million of the Company's common stock through July 31, 2024. The prior authorization totaled $5 million for both fiscal years 2019 and 2020. The Company purchased $3.3 million of common shares under its $5 million authorization during the second half of 2019. The share repurchase program, as amended, provides that up to a maximum aggregate amount of $25 million shares may be repurchased in any given fiscal year. Repurchases will be made in accordance with applicable securities laws from time-to-time in the open market and/or in privately negotiated transactions at our discretion, subject to market conditions and other factors. The share repurchase plan does not require the purchase of any minimum number of shares and may be implemented, modified, suspended or discontinued in whole or in part at any time without further notice. All repurchased shares may potentially be withheld for the vesting of RSUs.

The following table provides information about our common stock repurchases during the quarter ended December 31, 2019.

| Period | Total number of shares purchased | | Average price paid per share (1) | Total number of shares purchased as part of the publicly announced program | Approximate dollar value of shares that may yet be purchased under the program (1) | |
|---|---|---|---|---|---|---|
| October 1, 2019 to October 31, 2019 ............. | — | $ | — | — | $ | 9,565,938 |
| November 1, 2019 to November 30, 2019 | 146,058 | $ | 4.12 | 146,058 | $ | 8,964,273 |
| December 1, 2019 to December 31, 2019 ...... | 531,482 | $ | 4.34 | 531,482 | $ | 6,655,716 |
| Total........................................................ | 677,540 | $ | 4.27 | 677,540 | | |

(1) Includes fees and commissions associated with the shares repurchased.

**Item 6. Selected Financial Data**

The selected consolidated financial data presented below has been derived from our audited consolidated financial statements. This information should be read in conjunction with "Management's discussion and analysis of financial condition and results of operations" and our audited consolidated financial statements and related notes thereto. Our historical results are not necessarily indicative of the results that may be expected in any future period.

| Consolidated statements of operations data (dollars in thousands, except share and per share amounts) | For the years ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2019 | 2018 | 2017 | 2016 | 2015 |
| Revenues | $ 746,962 | $ 786,682 | $ 673,132 | $ 580,441 | $ 434,006 |
| Cost of sales: | | | | | |
| Provision for loan losses | 364,241 | 411,979 | 357,574 | 317,821 | 232,650 |
| Direct marketing costs | 51,283 | 77,605 | 72,222 | 65,190 | 61,032 |
| Other cost of sales | 28,846 | 26,359 | 20,536 | 17,433 | 15,197 |
| Total cost of sales | 444,370 | 515,943 | 450,332 | 400,444 | 308,879 |
| Gross profit | 302,592 | 270,739 | 222,800 | 179,997 | 125,127 |
| Operating expenses: | | | | | |
| Compensation and benefits | 103,070 | 94,382 | 81,969 | 65,657 | 60,568 |
| Professional services | 36,715 | 35,864 | 32,848 | 30,659 | 25,134 |
| Selling and marketing | 7,381 | 9,435 | 8,353 | 9,684 | 7,567 |
| Occupancy and equipment | 20,712 | 17,547 | 13,895 | 11,475 | 9,690 |
| Depreciation and amortization | 17,380 | 12,988 | 10,272 | 10,906 | 8,898 |
| Other | 5,911 | 5,649 | 4,600 | 3,812 | 4,303 |
| Total operating expenses | 191,169 | 175,865 | 151,937 | 132,193 | 116,160 |
| Operating income | 111,423 | 94,874 | 70,863 | 47,804 | 8,967 |
| Other income (expense): | | | | | |
| Net interest expense | (66,646) | (79,198) | (73,043) | (64,277) | (36,674) |
| Foreign currency transaction gain (loss) | 334 | (1,409) | 2,900 | (8,809) | (2,385) |
| Non-operating income (loss) | (681) | (350) | 2,295 | (43) | 5,523 |
| Total other expense | (66,993) | (80,957) | (67,848) | (73,129) | (33,536) |
| Income (loss) before taxes | 44,430 | 13,917 | 3,015 | (25,325) | (24,569) |
| Income tax expense (benefit) | 12,247 | 1,408 | 9,931 | (2,952) | (4,658) |
| Net income (loss) | $ 32,183 | $ 12,509 | $ (6,916) | $ (22,373) | $ (19,911) |
| Basic income (loss) per share | $ 0.73 | $ 0.29 | $ (0.20) | $ (1.74) | $ (1.59) |
| Diluted income (loss) per share | $ 0.73 | $ 0.28 | $ (0.20) | $ (1.74) | $ (1.59) |
| Basic weighted-average shares outstanding | 43,805,845 | 42,791,061 | 33,911,520 | 12,894,262 | 12,525,847 |
| Diluted weighted-average shares outstanding | 44,338,205 | 44,299,304 | 33,911,520 | 12,894,262 | 12,525,847 |
| | | | | | |
| Adjustments to arrive at Adjusted EBITDA: | | | | | |
| Net income (loss) | $ 32,183 | $ 12,509 | $ (6,916) | $ (22,373) | $ (19,911) |
| Net interest expense | 66,646 | 79,198 | 73,043 | 64,277 | 36,674 |
| Share-based compensation | 9,940 | 8,233 | 6,318 | 1,707 | 847 |
| Foreign currency transaction (gain) loss | (334) | 1,409 | (2,900) | 8,809 | 2,385 |
| Depreciation and amortization | 17,380 | 12,988 | 10,272 | 10,906 | 8,898 |
| Non-operating (income) loss | 681 | 350 | (2,295) | 43 | (5,523) |
| Income tax expense (benefit) | 12,247 | 1,408 | 9,931 | (2,952) | (4,658) |
| Adjusted EBITDA(1) | $ 138,743 | $ 116,095 | $ 87,453 | $ 60,417 | $ 18,712 |

| Other financial and operational data (dollars in thousands, except as noted) | As of and for the years ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2019 | 2018 | 2017 | 2016 | 2015 |
| Free cash flow(2)............................................. | $ 58,466 | $ 15,460 | $ 16,741 | $ 19,930 | $ (29,054) |
| Number of new customer loans..................... | 247,706 | 316,483 | 305,186 | 277,637 | 238,238 |
| Ending number of combined loans outstanding ................................................. | 374,484 | 398,604 | 361,972 | 289,193 | 222,723 |
| Customer acquisition costs (in dollars) ......... | $ 207 | $ 245 | $ 237 | $ 235 | $ 256 |
| Net charge-offs(3).......................................... | $ 371,458 | $ 409,160 | $ 347,010 | $ 299,700 | $ 214,795 |
| Additional provision for loan losses(3) ......... | (7,217) | 2,819 | 10,564 | 18,121 | 17,855 |
| Provision for loan losses................................ | $ 364,241 | $ 411,979 | $ 357,574 | $ 317,821 | $ 232,650 |
| Past due combined loans receivable – principal as a percentage of combined loans receivable – principal(4)............................... | 10% | 11% | 10% | 12% | 12% |
| Net charge-offs as a percentage of revenues . | 50% | 52% | 52% | 52% | 49% |
| Total provision for loan losses as a percentage of revenues ................................. | 49% | 52% | 53% | 55% | 54% |
| Combined loan loss reserve(5) ...................... | $ 89,075 | $ 96,052 | $ 93,789 | $ 82,376 | $ 65,784 |
| Combined loan loss reserve as a percentage of combined loans receivable(5) ................... | 13% | 14% | 14% | 16% | 17% |
| Effective APR of combined loan portfolio.... | 122% | 129% | 131% | 146% | 173% |
| Ending combined loans receivable – principal(4) ..................................................... | $ 640,779 | $ 648,538 | $ 618,375 | $ 481,210 | $ 356,069 |

(1)   Adjusted EBITDA is not a financial measure prepared in accordance with accounting principles generally accepted in the United States ("US GAAP"). Adjusted EBITDA represents our net income (loss), adjusted to exclude: net interest expense primarily associated with notes payable under the VPC Facility, EF SPV Facility and ESPV Facility used to fund or grow receivables; share-based compensation; foreign currency gains and losses associated with our UK operations; depreciation and amortization expense on fixed assets and intangible assets; non-operating income and losses associated with fair value adjustments or dispositions; and income taxes. See "Management's discussion and analysis of financial condition and results of operations—Non-GAAP Financial Measures" for more information and for a reconciliation of Adjusted EBITDA to Net income (loss), the most directly comparable financial measure calculated in accordance with US GAAP.

(2)   Free cash flow is not a financial measure prepared in accordance with US GAAP. Free cash flow represents our net cash from operating activities adjusted for the net charge-offs—combined principal loans and capital expenditures incurred during the period. See "Management's discussion and analysis of financial condition and results of operations—Non-GAAP Financial Measures" for more information and a reconciliation of free cash flow to Net cash provided by operating activities.

(3)   Net charge-offs and additional provision for loan losses are not a financial measure prepared in accordance with US GAAP. Net charge-offs include the amount of principal and accrued interest on loans that are more than 60 days past due, or sooner if we receive notice that the loan will not be collected, such as a bankruptcy notice or identified fraud, offset by any recoveries. Additional provision for loan losses is the amount of provision for loan losses needed for a particular period to adjust the combined loan loss reserve to the appropriate level in accordance with our underlying loan loss reserve methodology. See "Management's discussion and analysis of financial condition and results of operations—Non-GAAP Financial Measures" for more information and for a reconciliation to Provision for loan losses, the most directly comparable financial measure calculated in accordance with US GAAP.

(4)   Combined loans receivable is defined as loans owned by the Company and consolidated VIEs plus loans originated and owned by third-party lenders pursuant to our CSO programs. See "Management's discussion and analysis of financial condition and results of operations—Non-GAAP Financial Measures" for more information and for a reconciliation of Combined loans receivable to Loans receivable, net, the most directly comparable financial measure calculated in accordance with US GAAP.

(5)   Combined loan loss reserve is defined as the loan loss reserve for loans owned by the Company and consolidated VIEs plus the loan loss reserve for loans originated and owned by third-party lenders and guaranteed by the Company. See "Management's discussion and analysis of financial condition and results of operations—Non-GAAP Financial Measures" for more information and for a reconciliation of Combined loan loss reserve to loan loss reserve, the most directly comparable financial measure calculated in accordance with US GAAP.

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations**

*You should read the following discussion and analysis of our financial condition and results of operations together with our consolidated financial statements and the related notes and other financial information included elsewhere in this Annual Report on Form 10-K. Some of the information contained in this discussion and analysis, including information with respect to our plans and strategy for our business, includes forward-looking statements that involve risks and uncertainties. You should review the "Risk Factors" and "Note About Forward-Looking Statements" sections of this Annual Report on Form 10-K for a discussion of important factors that could cause actual results to differ materially from the results described in or implied by the forward-looking statements contained in the following discussion and analysis. We generally refer to loans, customers and other information and data associated with each of Rise, Elastic, Sunny and Today Card as Elevate's loans, customers, information and data, irrespective of whether Elevate directly originates the credit to the customer or whether such credit is originated by a third party.*


## OVERVIEW

We provide online credit solutions to consumers in the US and the UK who are not well-served by traditional bank products and who are looking for better options than payday loans, title loans, pawn and storefront installment loans. Non-prime consumers now represent a larger market than prime consumers but are risky to underwrite and serve with traditional approaches. We're succeeding at it - and doing it responsibly - with best-in-class advanced technology and proprietary risk analytics honed by serving more than 2.4 million customers with $8.1 billion in credit. Our current online credit products, Rise, Elastic and Sunny, and our recently test launched Today Card reflect our mission to provide customers with access to competitively priced credit and services while helping them build a brighter financial future with credit building and financial wellness features. We call this mission "Good Today, Better Tomorrow."

We earn revenues on the Rise and Sunny installment loans, on the Rise and Elastic lines of credit and on the Today Card credit card product. Our revenue primarily consists of finance charges and line of credit fees. Finance charges are driven by our average loan balances outstanding and by the average annual percentage rate ("APR") associated with those outstanding loan balances. We calculate our average loan balances by taking a simple daily average of the ending loan balances outstanding for each period. Line of credit fees are recognized when they are assessed and recorded to revenue over the life of the loan. We present certain key metrics and other information on a "combined" basis to reflect information related to loans originated by us and by our bank partners, Republic Bank, FinWise Bank and Capital Community Bank, as well as loans originated by third-party lenders pursuant to CSO programs, which loans originated through CSO programs are not recorded on our balance sheets in accordance with US GAAP. See "—Key Financial and Operating Metrics" and "—Non-GAAP Financial Measures."

We use our working capital, funds provided by third-party lenders pursuant to CSO programs and our credit facility with Victory Park Management, LLC ("VPC" and the "VPC Facility") to fund the loans we make to our Rise and Sunny customers and provide working capital. Since originally entering into the VPC Facility, it has been amended several times to increase the maximum total borrowing amount available from the original amount of $250 million to approximately $500 million at December 31, 2019. See "—Liquidity and Capital Resources—Debt facilities."

Beginning in the fourth quarter of 2018, the Company also licenses its Rise installment loan brand to a third-party lender, FinWise Bank, which originates Rise installment loans in 19 states. FinWise Bank initially provides all of the funding and retains a percentage of the balances of all of the loans originated and sells the remaining loan participation in those Rise installment loans to a third-party SPV, EF SPV, Ltd. ("EF SPV"). Prior to August 1, 2019, FinWise Bank retained 5% of the balances and sold a 95% participation to EF SPV. On August 1, 2019, EF SPV purchased an additional 1% participation in the outstanding portfolio with the participation percentage revised going forward to 96%. These loan participation purchases are funded through a separate financing facility (the "EF SPV Facility"), effective February 1, 2019, and through cash flows from operations generated by EF SPV. The EF SPV Facility has a maximum total borrowing amount available of $150 million. We do not own EF SPV, but we have a credit default protection agreement with EF SPV whereby we provide credit protection to the investors in EF SPV against Rise loan losses in return for a credit premium. Elevate is required to consolidate EF SPV as a variable interest entity under GAAP and the consolidated financial statements include revenue, losses and loans receivable related to the 96% of the Rise installment loans originated by FinWise Bank and sold to EF SPV.

The Elastic line of credit product is originated by a third-party lender, Republic Bank, which initially provides all of the funding for that product. Republic Bank retains 10% of the balances of all loans originated and sells a 90% loan participation in the Elastic lines of credit. An SPV structure was implemented such that the loan participations are sold by Republic Bank to Elastic SPV, Ltd. ("Elastic SPV") and Elastic SPV receives its funding from VPC in a separate financing facility (the "ESPV Facility"), which was finalized on July 13, 2015. We do not own Elastic SPV but we have a credit default protection agreement with Elastic SPV whereby we provide credit protection to the investors in Elastic SPV against Elastic loan losses in return for a credit premium. Per the terms of this agreement, under US GAAP, the Company is the primary beneficiary of Elastic SPV and is required to consolidate the financial results of Elastic SPV as a variable interest entity ("VIE") in its consolidated financial results.

The ESPV Facility has also been amended several times and the original commitment amount of $50 million has grown to $350 million as of December 31, 2019. See "—Liquidity and Capital Resources—Debt facilities."

Our management assesses our financial performance and future strategic goals through key metrics based primarily on the following three themes:

- *Revenue growth*.   Key metrics related to revenue growth that we monitor by product include the ending and average combined loan balances outstanding, the effective APR of our product loan portfolios, the total dollar value of loans originated, the number of new customer loans made, the ending number of customer loans outstanding and the related customer acquisition costs ("CAC") associated with each new customer loan made. We include CAC as a key metric when analyzing revenue growth (rather than as a key metric within margin expansion).

- *Stable credit quality*.   Since the time they were managing our legacy US products, our management team has maintained stable credit quality across the loan portfolio they were managing. Additionally, in the periods covered in this Management's Discussion and Analysis of Financial Condition and Results of Operations, we have improved our credit quality. The credit quality metrics we monitor include net charge-offs as a percentage of revenues, the combined loan loss reserve as a percentage of outstanding combined loans, total provision for loan losses as a percentage of revenues and the percentage of past due combined loans receivable – principal.

- *Margin expansion*.   We expect that our operating margins will continue to expand over the near term as we lower our direct marketing costs and efficiently manage our operating expenses while continuing to improve our credit quality. Over the next several years, as we continue to scale our loan portfolio, we anticipate that our direct marketing costs primarily associated with new customer acquisitions will decline to approximately 10% of revenues and our operating expenses will decline to approximately 20% of revenues. We aim to manage our business to achieve a long-term operating margin of 20%, and do not expect our operating margin to increase beyond that level, as we intend to pass on any improvements over our targeted margins to our customers in the form of lower APRs. We believe this is a critical component of our responsible lending platform and over time will also help us continue to attract new customers and retain existing customers.

## KEY FINANCIAL AND OPERATING METRICS

As discussed above, we regularly monitor a number of metrics in order to measure our current performance and project our future performance. These metrics aid us in developing and refining our growth strategies and in making strategic decisions.

Certain of our metrics are non-GAAP financial measures. We believe that such metrics are useful in period-to-period comparisons of our core business. However, non-GAAP financial measures are not an alternative to any measure of financial performance calculated and presented in accordance with US GAAP. See "—Non-GAAP Financial Measures" for a reconciliation of our non-GAAP measures to US GAAP.

**Revenues**

| Revenue metrics (dollars in thousands, except as noted) | As of and for the years ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | | 2019 | | 2018 | | 2017 |
| Revenues................................................................... | $ | 746,962 | $ | 786,682 | $ | 673,132 |
| Period-over-period revenue increase/(decrease) ......... | | (5)% | | 17% | | 16% |
| Ending combined loans receivable – principal(1) ....... | | 640,779 | | 648,538 | | 618,375 |
| Average combined loans receivable – principal(1)(2)... | | 609,596 | | 607,743 | | 506,928 |
| Total combined loans originated – principal ............... | | 1,386,768 | | 1,498,351 | | 1,318,338 |
| Average customer loan balance (in dollars)(3)............. | | 1,711 | | 1,627 | | 1,708 |
| Number of new customer loans .................................. | | 247,706 | | 316,483 | | 305,186 |
| Ending number of combined loans outstanding ........... | | 374,484 | | 398,604 | | 361,972 |
| Customer acquisition costs (in dollars) ...................... | $ | 207 | $ | 245 | $ | 237 |
| Effective APR of combined loan portfolio.................. | | 122 % | | 129% | | 131% |

(1) Combined loans receivable is defined as loans owned by the Company and consolidated VIEs plus loans originated and owned by third-party lenders pursuant to our CSO programs. See "—Non-GAAP financial measures" for more information and for a reconciliation of combined loans receivable to Loans receivable, net, the most directly comparable financial measure calculated in accordance with US GAAP.

(2) Average combined loans receivable – principal is calculated using an average of daily principal balances.

(3) Average customer loan balance is a weighted average of all three products and is calculated for each product by dividing the ending combined loans receivable – principal by the number of loans outstanding at period end (excluding Today Card as balances are immaterial).

*Revenues.*   Our revenues are composed of Rise finance charges, Rise CSO fees (which are fees we receive from customers who obtain a loan through the CSO program for the credit services, including the loan guaranty, we provide), finance charges on Sunny installment loans and revenues earned on the Rise and Elastic lines of credit. Finance charge and fee revenues from the Today Card credit card product, which expanded its test launch in November 2018, were immaterial. See "—Components of our Results of Operations—Revenues."

*Ending and average combined loans receivable – principal.*   We calculate the average combined loans receivable – principal by taking a simple daily average of the ending combined loans receivable – principal for each period. Key metrics that drive the ending and average combined loans receivable – principal include the amount of loans originated in a period and the average customer loan balance. All loan balance metrics include only the 90% participation in the related Elastic line of credit advances (we exclude the 10% held by Republic Bank) and the 96% participation in FinWise Bank originated Rise installment loans, but include the full loan balances on CSO loans, which are not presented on our Consolidated Balance Sheet.

*Total combined loans originated – principal.*   The amount of loans originated in a period is driven primarily by loans to new customers as well as new loans to prior customers, including refinancings of existing loans to customers in good standing.

*Average customer loan balance and effective APR of combined loan portfolio.*   The average loan amount and its related APR are based on the product and the underlying credit quality of the customer. Generally, better credit quality customers are offered higher loan amounts at lower APRs. Additionally, new customers have more potential risk of loss than prior or existing customers due to lack of payment history and the potential for fraud. As a result, newer customers typically will have lower loan amounts and higher APRs to compensate for that additional risk of loss. The effective APR is calculated based on the actual amount of finance charges generated from a customer loan divided by the average outstanding balance for the loan and can be lower than the stated APR on the loan due to waived finance charges and other reasons. For example, a Rise customer may receive a $2,000 installment loan with a term of 24 months and a stated rate of 180%. In this example, the customer's monthly installment loan payment would be $310.86. As the customer can prepay the loan balance at any time with no additional fees or early payment penalty, the customer pays the loan in full in month eight. The customer's loan earns interest of $2,337.81 over the eight-month period and has an average outstanding balance of $1,948.17. The effective APR for this loan is 180% over the eight-month period calculated as follows:

$$\frac{(\$2,337.81 \text{ interest earned} / \$1,948.17 \text{ average balance outstanding})}{8 \text{ months}} \times 12 \text{ months per year} = 180\%$$

In addition, as an example for Elastic, if a customer makes a $2,500 draw on the customer's line of credit and this draw required bi-weekly minimum payments of 5% (equivalent to 20 bi-weekly payments), and if all minimum payments are made, the draw would earn finance charges of $1,148. The effective APR for the line of credit in this example is 109% over the payment period and is calculated as follows:

$$\frac{(\$1,148.00 \text{ fees earned} / \$1,369.05 \text{ average balance outstanding})}{20 \text{ payments}} \times 26 \text{ bi-weekly periods per year} = 109\%$$

The actual total revenue we realize on a loan portfolio is also impacted by the amount of prepayments and charged-off customer loans in the portfolio. For a single loan, on average, we typically expect to realize approximately 60% of the revenues that we would otherwise realize if the loan were to fully amortize at the stated APR. From the Rise example above, if we waived $400 of interest for this customer, the effective APR for this loan would decrease to 149%.

*Number of new customer loans.*   We define a new customer loan as the first loan made to a customer for each of our products (so a customer receiving a Rise installment loan and then at a later date taking their first cash advance on an Elastic line of credit would be counted twice). The number of new customer loans is subject to seasonal fluctuations. New customer acquisition is typically slowest during the first six months of each calendar year, primarily in the first quarter, compared to the latter half of the year, as our existing and prospective US customers usually receive tax refunds during this period and, thus, have less of a need for loans from us. Further, many US customers will use their tax refunds to prepay all or a portion of their loan balance during this period, so our overall loan portfolio typically decreases during the first quarter of the calendar year. Overall loan portfolio growth and the number of new customer loans tends to accelerate during the summer months (typically June and July), at the beginning of the school year (typically late August to early September) and during the winter holidays (typically late November to early December).

*Customer acquisition costs.*   A key expense metric we monitor related to loan growth is our CAC. This metric is the amount of direct marketing costs incurred during a period divided by the number of new customer loans originated during that same period. New loans to former customers are not included in our calculation of CAC (except to the extent they receive a loan through a different product) as we believe we incur no material direct marketing costs to make additional loans to a prior customer through the same product.

The following tables summarize the changes in customer loans by product for the years ended December 31, 2019, 2018 and 2017.

| | Year ended December 31, 2019 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Rise (US) | Elastic (US)(1) | Total Domestic | Sunny (UK) | Total |
| Beginning number of combined loans outstanding | 142,758 | 166,397 | 309,155 | 89,449 | 398,604 |
| New customer loans originated | 108,813 | 50,912 | 159,725 | 87,981 | 247,706 |
| Former customer loans originated | 80,624 | 62 | 80,686 | — | 80,686 |
| Attrition | (179,760) | (67,847) | (247,607) | (104,905) | (352,512) |
| Ending number of combined loans outstanding | 152,435 | 149,524 | 301,959 | 72,525 | 374,484 |
| Customer acquisition cost | $ 248 | $ 226 | $ 241 | $ 145 | $ 207 |
| Average customer loan balance | $ 2,297 | $ 1,719 | $ 2,011 | $ 464 | $ 1,711 |

| | Year ended December 31, 2018 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Rise (US) | Elastic (US)(1) | Total Domestic | Sunny (UK) | Total |
| Beginning number of combined loans outstanding | 140,790 | 140,672 | 281,462 | 80,510 | 361,972 |
| New customer loans originated | 111,860 | 99,820 | 211,680 | 104,803 | 316,483 |
| Former customer loans originated | 86,278 | 746 | 87,024 | — | 87,024 |
| Attrition | (196,170) | (74,841) | (271,011) | (95,864) | (366,875) |
| Ending number of combined loans outstanding | 142,758 | 166,397 | 309,155 | 89,449 | 398,604 |
| Customer acquisition cost | $ 275 | $ 240 | $ 259 | $ 218 | $ 245 |
| Average customer loan balance | $ 2,167 | $ 1,746 | $ 1,940 | $ 544 | $ 1,627 |

(1)        Includes immaterial balances related to the Today Card, which expanded its test launch in November 2018.

**Page 132 of 231**

| | Rise (US) | Elastic (US) | Total Domestic | Sunny (UK) | Total |
|---|---|---|---|---|---|
| | | | Year Ended December 31, 2017 | | |
| Beginning number of combined loans outstanding | 121,996 | 89,153 | 211,149 | 78,044 | 289,193 |
| New customer loans originated | 116,030 | 110,145 | 226,175 | 79,011 | 305,186 |
| Former customer loans originated | 71,109 | — | 71,109 | — | 71,109 |
| Attrition | (168,345) | (58,626) | (226,971) | (76,545) | (303,516) |
| Ending number of combined loans outstanding | 140,790 | 140,672 | 281,462 | 80,510 | 361,972 |
| Customer acquisition cost | $ 281 | $ 182 | $ 233 | $ 249 | $ 237 |
| Average customer loan balance | $ 2,276 | $ 1,784 | $ 2,030 | $ 584 | $ 1,708 |

*Recent trends.*   Our revenues for the year ended December 31, 2019 totaled $747.0 million, a decrease of 5% versus the prior year period. This decrease in revenues primarily resulted from a decrease in our effective APR on the combined loans receivable - principal balance as the APR declined to 122% during the year ended December 31, 2019 from 129% during the comparable prior year period. This decrease in the average APR resulted primarily from our Rise product as the average APR of a new Rise loan originated by a FinWise Bank customer is 130%, which is lower than our typical state-licensed Rise customer but with a better credit profile. In addition, we have experienced slower new customer loan growth as we funded 247,706 new customer loans for the year ended December 31, 2019, a decrease of 22% from the prior year. As we disclosed in our 2018 Annual Report on Form 10-K, we chose to moderate our new customer growth in 2019 as we deployed and refined our new credit models during the second and third quarters of 2019.

Our CAC was significantly lower for the year ended December 31, 2019 as compared to prior year and was below the lower end of our targeted range of $250 to $300. This decrease was attributable to all three products. The Rise and Elastic CAC decreased due to more efficient marketing spend. The Sunny CAC also decreased for the year ended December 31, 2019 from $218 to $145 due to more efficient marketing spend coupled with diminished competition in the UK market. We believe our CAC in future quarters will remain within or below our target range of $250 to $300 as we continue to optimize the efficiency of our marketing channels and benefit from continued less competition in the UK market.

**Credit quality**

| | As of and for the years ended December 31, | | |
|---|---|---|---|
| Credit quality metrics (dollars in thousands) | 2019 | 2018 | 2017 |
| Net charge-offs(1) | $ 371,458 | $ 409,160 | $ 347,010 |
| Additional provision for loan losses(1) | (7,217) | 2,819 | 10,564 |
| Provision for loan losses | $ 364,241 | $ 411,979 | $ 357,574 |
| Past due combined loans receivable – principal as a percentage of combined loans receivable – principal(2) | 10% | 11% | 10% |
| Net charge-offs as a percentage of revenues(1) | 50% | 52% | 52% |
| Total provision for loan losses as a percentage of revenues | 49% | 52% | 53% |
| Combined loan loss reserve(3) | $ 89,075 | $ 96,052 | $ 93,789 |
| Combined loan loss reserve as a percentage of combined loans receivable(3) | 13% | 14% | 14% |

---

(1)  Net charge-offs and additional provision for loan losses are not financial measures prepared in accordance with US GAAP. Net charge-offs include the amount of principal and accrued interest on loans that are more than 60 days past due, or sooner if we receive notice that the loan will not be collected, such as a bankruptcy notice or identified fraud, offset by any recoveries. Additional provision for loan losses is the amount of provision for loan losses needed for a particular period to adjust the combined loan loss reserve to the appropriate level in accordance with our underlying loan loss reserve methodology. See "—Non-GAAP Financial Measures" for more information and for a reconciliation to Provision for loan losses, the most directly comparable financial measure calculated in accordance with US GAAP.

(2)  Combined loans receivable is defined as loans owned by the Company and consolidated VIEs plus loans originated and owned by third-party lenders. See "—Non-GAAP Financial Measures" for more information and for a reconciliation of Combined loans receivable to Loans receivable, net, the most directly comparable financial measure calculated in accordance with US GAAP.

(3)  Combined loan loss reserve is defined as the loan loss reserve for loans originated and owned by the Company and consolidated VIEs plus the loan loss reserve for loans owned by third-party lenders and guaranteed by the Company. See "—Non-GAAP Financial Measures" for more information and for a reconciliation of Combined loan loss reserve to allowance for loan losses, the most directly comparable financial measure calculated in accordance with US GAAP.

| Net principal charge-offs as a percentage of average combined loans receivable - principal (1) (2) (3) | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| 2019 | 13% | 11% | 11% | 12% |
| 2018 | 13% | 12% | 13% | 14% |
| 2017 | 15% | 14% | 12% | 13% |

(1)   Net principal charge-offs is comprised of gross principal charge-offs less recoveries.

(2)   Average combined loans receivable - principal is calculated using an average of daily combined loans receivable - principal balances during each quarter.

(3)   Combined loans receivable is defined as loans owned by the Company and consolidated VIEs plus loans originated and owned by third-party lenders pursuant to our CSO programs. See "—Non-GAAP Financial Measures" for more information and for a reconciliation of combined loans receivable to Loans receivable, net, the most directly comparable financial measure calculated in accordance with US GAAP.

In reviewing the credit quality of our loan portfolio, we break out our total provision for loan losses that is presented on our statement of operations under US GAAP into two separate items—net charge-offs and additional provision for loan losses. Net charge-offs are indicative of the credit quality of our underlying portfolio, while additional provision for loan losses is subject to more fluctuation based on loan portfolio growth, recent credit quality trends and the effect of normal seasonality on our business. The additional provision for loan losses is the amount needed to adjust the combined loan loss reserve to the appropriate amount at the end of each month based on our loan loss reserve methodology.

*Net charge-offs.*   Net charge-offs comprise gross charge-offs offset by recoveries on prior charge-offs. Gross charge-offs include the amount of principal and accrued interest on loans that are more than 60 days past due, or sooner if we receive notice that the loan will not be collected, such as a bankruptcy notice or identified fraud. Any payments received on loans that have been charged off are recorded as recoveries and reduce total gross charge-offs. Recoveries are typically less than 10% of the amount charged off, and thus, we do not view recoveries as a key credit quality metric.

Net charge-offs as a percentage of revenues can vary based on several factors, such as whether or not we experience significant growth or lower the APR of our products. Additionally, although a more seasoned portfolio will typically result in lower net charge-offs as a percentage of revenues, we do not intend to drive down this ratio significantly below our historical ratios and would instead seek to offer our existing products to a broader new customer base to drive additional revenues.

Net charge-offs as a percentage of average combined loans receivable-principal allow us to determine credit quality and evaluate loss experience trends across our loan portfolio.

*Additional provision for loan losses.*   Additional provision for loan losses is the amount of provision for loan losses needed for a particular period to adjust the combined loan loss reserve to the appropriate level in accordance with our underlying loan loss reserve methodology.

Additional provision for loan losses relates to an increase in future inherent losses in the loan portfolio as determined by our loan loss reserve methodology. This increase could be due to a combination of factors such as an increase in the size of the loan portfolio or a worsening of credit quality or increase in past due loans. It is also possible for the additional provision for loan losses for a period to be a negative amount, which would reduce the amount of the combined loan loss reserve needed (due to a decrease in the loan portfolio or improvement in credit quality). The amount of additional provision for loan losses is seasonal in nature, mirroring the seasonality of our new customer acquisition and overall loan portfolio growth, as discussed above. The combined loan loss reserve typically decreases during the first quarter or first half of the calendar year due to a decrease in the loan portfolio from year end. Then, as the rate of growth for the loan portfolio starts to increase during the second half of the year, additional provision for loan losses is typically needed to increase the reserve for future losses associated with the loan growth. Because of this, our provision for loan losses can vary significantly throughout the year without a significant change in the credit quality of our portfolio.

The following provides an example of the application of our loan loss reserve methodology and the break out of the provision for loan losses between the portion associated with replenishing the reserve due to net charge-offs and the amount related to the additional provision for loan losses. If the beginning combined loan loss reserve were $25 million, and we incurred $10 million of net charge-offs during the period and the ending combined loan loss reserve needed to be $30 million according to our loan loss reserve methodology, our total provision for loan losses would be $15 million, comprising $10 million in net charge-offs (provision needed to replenish the combined loan loss reserve) plus $5 million of additional provision related to an increase in future inherent losses in the loan portfolio identified by our loan loss reserve methodology.

**Example (dollars in thousands)**

| | | |
|---|---:|---:|
| Beginning combined loan loss reserve | $ | 25,000 |
| Less: Net charge-offs | | (10,000) |
| Provision for loan losses: | | |
|     Provision for net charge-offs | 10,000 | |
|     Additional provision for loan losses | 5,000 | |
| Total provision for loan losses | | 15,000 |
| Ending combined loan loss reserve balance | $ | 30,000 |

*Loan loss reserve methodology.*   Our loan loss reserve methodology is calculated separately for each product and, in the case of Rise loans originated under the state lending model (including CSO program loans), is calculated separately based on the state in which each customer resides to account for varying state license requirements that affect the amount of the loan offered, repayment terms and other factors. For each product, loss factors are calculated based on the delinquency status of customer loan balances: current, 1 to 30 days past due or 31 to 60 days past due. These loss factors for loans in each delinquency status are based on average historical loss rates by product (or state) associated with each of these three delinquency categories. Hence, another key credit quality metric we monitor is the percentage of past due combined loans receivable – principal, as an increase in past due loans will cause an increase in our combined loan loss reserve and related additional provision for loan losses to increase the reserve. For customers that are not past due, we further stratify these loans into loss rates by payment number, as a new customer that is about to make a first loan payment has a significantly higher risk of loss than a customer who has successfully made ten payments on an existing loan with us. Based on this methodology, during the past three years we have seen our combined loan loss reserve as a percentage of combined loans receivable fluctuate between approximately 13% and 17% depending on the overall mix of new, former and past due customer loans.

*Recent trends.*   Total loan loss provision for the year ended December 31, 2019 was 49% of revenues, which was within our targeted range of 45% to 55%, and lower than the 52% in the prior year period. For the year ended December 31, 2019, net charge-offs as a percentage of revenues totaled 50%, compared to 52% in the prior year period. We expect total loan loss provision as a percentage of revenues to continue to remain within our targeted range due to ongoing maturation of the loan portfolio and continued improvements in our underwriting models and processes.

The combined loan loss reserve as a percentage of combined loans receivable totaled 13% and 14% as of December 31, 2019 and December 31, 2018, respectively, reflecting improvements in our credit quality in each product portfolio. Past due loan balances at December 31, 2019 were 10% of total combined loans receivable - principal, down from 11% from a year ago.

Additionally, we also look at principal loan charge-offs (including both credit and fraud losses) by vintage as a percentage of combined loans originated - principal. As the below table shows, our cumulative principal loan charge-offs through December 31, 2019 for each annual vintage since the 2013 vintage are generally under 30% and continue to generally trend at or slightly below our 25% to 30% targeted range. In the beginning of 2019, we implemented new fraud tools that have helped lower fraud losses. Additionally, we rolled out our next generation of credit models during the second quarter of 2019 and continued refining the models during the third quarter of 2019. The preliminary data on the 2019 vintage is that it is performing better than both 2017 and 2018 vintages.

## Cumulative loss rates by loan vintage[1]



Months since origination

2013 — 2014 — 2015 — 2016 — 2017 — 2018 — YTD DEC 2019 - - - YTD DEC 2018

1. The 2019 vintage is not yet fully mature from a loss perspective.

**Margins**

| Margin metrics (dollars in thousands) | Twelve Months Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | | 2019 | | 2018 | | 2017 |
| Revenues | $ | 746,962 | $ | 786,682 | $ | 673,132 |
| Net charge-offs(1) | | (371,458) | | (409,160) | | (347,010) |
| Additional provision for loan losses(1) | | 7,217 | | (2,819) | | (10,564) |
| Direct marketing costs | | (51,283) | | (77,605) | | (72,222) |
| Other cost of sales | | (28,846) | | (26,359) | | (20,536) |
| Gross profit | | 302,592 | | 270,739 | | 222,800 |
| Operating expenses | | (191,169) | | (175,865) | | (151,937) |
| Operating income | $ | 111,423 | $ | 94,874 | $ | 70,863 |
| As a percentage of revenues: | | | | | | |
| Net charge-offs | | 50% | | 52% | | 52% |
| Additional provision for loan losses | | (1) | | — | | 2 |
| Direct marketing costs | | 7 | | 10 | | 11 |
| Other cost of sales | | 4 | | 3 | | 3 |
| Gross margin | | 41 | | 34 | | 33 |
| Operating expenses | | 26 | | 22 | | 23 |
| Operating margin | | 15% | | 12% | | 11% |

(1)   Non-GAAP measure. See "—Non-GAAP Financial Measures—Net charge-offs and additional provision for loan losses."

Gross margin is calculated as revenues minus cost of sales, or gross profit, expressed as a percentage of revenues, and operating margin is calculated as operating income expressed as a percentage of revenues. We expect our margins to continue to increase as we continue to scale our business while maintaining stable credit quality. We allocate all marketing spend only to new customer loans. As our loan portfolio continues to mature with more customer loans that are from repeat customers, we will be generating revenue from those repeat customer loans without incurring any related marketing expense. As a result, we expect marketing expense as a percentage of revenue to continue to decline over time resulting in an increased gross profit margin. Additionally, being an online fintech company, we believe that as we continue to scale our business, we will generate operating efficiencies and our operating expense as a percentage of revenues will decline resulting in an increased operating margin.

*Recent operating margin trends*.   For the year ended December 31, 2019, our operating margin was 15%, which was an improvement from 12% in the prior year period. This increase was largely due to a higher gross margin driven by lower direct marketing costs and an overall lower loan loss provision due to improved credit quality in the loan portfolio.

Direct marketing costs for the year ended December 31, 2019 decreased to 7% of revenue from 10% in the prior year period. This decrease is due to the measured new customer growth we targeted as we focused on deploying our new credit models during the second quarter of 2019 and refining our credit models during the third quarter of 2019. The lower marketing spend, coupled with improved marketing efficiencies, resulted in a CAC of $207 for the year ended December 31, 2019, which is below the low end of our targeted range of $250 to $300 and lower than the CAC of $245 for the prior year. We expect CAC to continue to be within or below our targeted range of $250 to $300 as we continue to optimize the efficiency of our marketing channels for our Rise and Elastic products, and benefit from decreased competition in the UK, although we may see some quarterly volatility in CAC.

## NON-GAAP FINANCIAL MEASURES

We believe that the inclusion of the following non-GAAP financial measures in this Annual Report on Form 10-K can provide a useful measure for period-to-period comparisons of our core business, provide transparency and useful information to investors and others in understanding and evaluating our operating results, and enable investors to better compare our operating performance with the operating performance of our competitors. Management uses these non-GAAP financial measures frequently in its decision-making because they provide supplemental information that facilitates internal comparisons to the historical operating performance of prior periods and give an additional indication of the Company's core operating performance. However, non-GAAP financial measures are not a measure calculated in accordance with US generally accepted accounting principles, or US GAAP, and should not be considered an alternative to any measures of financial performance calculated and presented in accordance with US GAAP. Other companies may calculate these non-GAAP financial measures differently than we do.

### Adjusted EBITDA and Adjusted EBITDA Margin

Adjusted EBITDA represents our net income (loss), adjusted to exclude:

- Net interest expense primarily associated with notes payable under the VPC Facility, EF SPV Facility and ESPV Facility used to fund the loan portfolios;

- Share-based compensation;

- Foreign currency gains and losses associated with our UK operations;

- Depreciation and amortization expense on fixed assets and intangible assets;

- Gains and losses from fair value adjustments or dispositions included in non-operating income (loss); and

- Income taxes.

Adjusted EBITDA margin is Adjusted EBITDA divided by revenue.

Management believes that Adjusted EBITDA and Adjusted EBITDA margin are useful supplemental measures to assist management and investors in analyzing the operating performance of the business and provide greater transparency into the results of operations of our core business.

Adjusted EBITDA and Adjusted EBITDA margin should not be considered as alternatives to net income (loss) or any other performance measure derived in accordance with US GAAP. Our use of Adjusted EBITDA and Adjusted EBITDA margin has limitations as an analytical tool, and you should not consider it in isolation or as a substitute for analysis of our results as reported under US GAAP. Some of these limitations are:

- Although depreciation and amortization are non-cash charges, the assets being depreciated and amortized may have to be replaced in the future, and Adjusted EBITDA does not reflect expected cash capital expenditure requirements for such replacements or for new capital assets;

- Adjusted EBITDA does not reflect changes in, or cash requirements for, our working capital needs; and

- Adjusted EBITDA does not reflect interest associated with notes payable used for funding the loan portfolios, for other corporate purposes or tax payments that may represent a reduction in cash available to us.

The following table presents a reconciliation of net income (loss) to Adjusted EBITDA and Adjusted EBITDA margin for each of the periods indicated:

| (Dollars in thousands) | Twelve Months Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2019 | | 2018 | | 2017 | |
| Net income (loss) | $ | 32,183 | $ | 12,509 | $ | (6,916) |
| Adjustments: | | | | | | |
| Net interest expense | | 66,646 | | 79,198 | | 73,043 |
| Share-based compensation | | 9,940 | | 8,233 | | 6,318 |
| Foreign currency transaction (gain) loss | | (334) | | 1,409 | | (2,900) |
| Depreciation and amortization | | 17,380 | | 12,988 | | 10,272 |
| Non-operating (income) loss | | 681 | | 350 | | (2,295) |
| Income tax expense | | 12,247 | | 1,408 | | 9,931 |
| Adjusted EBITDA | $ | 138,743 | $ | 116,095 | $ | 87,453 |
| Adjusted EBITDA margin | | 19% | | 15% | | 13% |

**Free cash flow**

Free cash flow ("FCF") represents our net cash provided by operating activities, adjusted to include:

- Net charge-offs – combined principal loans; and

- Capital expenditures.

The following table presents a reconciliation of net cash provided by operating activities to FCF for each of the periods indicated:

| (Dollars in thousands) | Twelve Months Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2019 | | 2018 | | 2017 | |
| Net cash provided by operating activities(1) | $ | 370,344 | $ | 362,276 | $ | 308,688 |
| Adjustments: | | | | | | |
| Net charge-offs – combined principal loans | | (287,188) | | (319,326) | | (275,192) |
| Capital expenditures | | (24,690) | | (27,490) | | (16,755) |
| FCF | $ | 58,466 | $ | 15,460 | $ | 16,741 |

_____

(1)  Net cash provided by operating activities includes net charge-offs – combined finance charges.

**Net charge-offs and additional provision for loan losses**

We break out our total provision for loan losses into two separate items—first, the amount related to net charge-offs, and second, the additional provision for loan losses needed to adjust the combined loan loss reserve to the appropriate amount at the end of each month based on our loan loss provision methodology. We believe this presentation provides more detail related to the components of our total provision for loan losses when analyzing the gross margin of our business.

_Net charge-offs._   Net charge-offs comprise gross charge-offs offset by recoveries on prior charge-offs. Gross charge-offs include the amount of principal and accrued interest on loans that are more than 60 days past due, or sooner if we receive notice that the loan will not be collected, such as a bankruptcy notice or identified fraud. Any payments received on loans that have been charged off are recorded as recoveries and reduce total gross charge-offs.

*Additional provision for loan losses.*   Additional provision for loan losses is the amount of provision for loan losses needed for a particular period to adjust the combined loan loss reserve to the appropriate level in accordance with our underlying loan loss reserve methodology.

| (Dollars in thousands) | Twelve Months Ended December 31, | | |
|---|---|---|---|
| | 2019 | 2018 | 2017 |
| Net charge-offs | $ 371,458 | $ 409,160 | $ 347,010 |
| Additional provision for loan losses | (7,217) | 2,819 | 10,564 |
| Provision for loan losses | $ 364,241 | $ 411,979 | $ 357,574 |

**Combined loan information**

The Elastic line of credit product is originated by a third-party lender, Republic Bank, which initially provides all of the funding for that product. Republic Bank retains 10% of the balances of all of the loans originated and sells a 90% loan participation in the Elastic lines of credit to a third-party SPV, Elastic SPV, Ltd. Elevate is required to consolidate Elastic SPV, Ltd. as a variable interest entity under US GAAP and the consolidated financial statements include revenue, losses and loans receivable related to the 90% of Elastic lines of credit originated by Republic Bank and sold to Elastic SPV.

Beginning in the fourth quarter of 2018, the Company also licenses its Rise installment loan brand to a third-party lender, FinWise Bank, which originates Rise installment loans in 19 states. Prior to August 1, 2019, FinWise Bank retained 5% of the balances of all originated loans and sold a 95% loan participation in those Rise installment loans to a third-party SPV, EF SPV. On August 1, 2019, EF SPV purchased an additional 1% participation in the outstanding portfolio with the participation percentage revised going forward to 96%. Elevate is required to consolidate EF SPV as a VIE under US GAAP and the consolidated financial statements include revenue, losses and loans receivable related to the 96% of Rise installment loans originated by FinWise Bank and sold to EF SPV.

The information presented in the tables below on a combined basis are non-GAAP measures based on a combined portfolio of loans, which includes the total amount of outstanding loans receivable that we own and that are on our balance sheets plus outstanding loans receivable originated and owned by third parties that we guarantee pursuant to CSO programs in which we participate. See "—Basis of Presentation and Critical Accounting Policies—Allowance and liability for estimated losses on consumer loans" and "—Basis of Presentation and Critical Accounting Policies—Liability for estimated losses on credit service organization loans."

We believe these non-GAAP measures provide investors with important information needed to evaluate the magnitude of potential loan losses and the opportunity for revenue performance of the combined loan portfolio on an aggregate basis. We also believe that the comparison of the combined amounts from period to period is more meaningful than comparing only the amounts reflected on our balance sheets since both revenues and cost of sales as reflected in our financial statements are impacted by the aggregate amount of loans we own and those CSO loans we guarantee.

Our use of total combined loans and fees receivable has limitations as an analytical tool, and you should not consider it in isolation or as a substitute for analysis of our results as reported under US GAAP. Some of these limitations are:

• Rise CSO loans are originated and owned by a third-party lender and

• Rise CSO loans are funded by a third-party lender and are not part of the VPC Facility.

As of each of the period ends indicated, the following table presents a reconciliation of:

• Loans receivable, net, Company owned (which reconciles to our Consolidated Balance Sheets included elsewhere in this Annual Report on Form 10-K);

• Loans receivable, net, guaranteed by the Company (as disclosed in Note 3 of our consolidated financial statements included elsewhere in this Annual Report on Form 10-K);

• Combined loans receivable (which we use as a non-GAAP measure); and

• Combined loan loss reserve (which we use as a non-GAAP measure).

| (Dollars in thousands) | 2017 December 31 | 2018 March 31 | June 30 | September 30 | December 31 | 2019 March 31 | June 30 | September 30 | December 31 |
|---|---|---|---|---|---|---|---|---|---|
| **Company Owned Loans:** | | | | | | | | | |
| Loans receivable – principal, current, company owned | $ 514,147 | $ 471,996 | $ 493,908 | $ 525,717 | $ 543,405 | $ 491,208 | $ 523,785 | $ 543,565 | $ 559,169 |
| Loans receivable – principal, past due, company owned | 61,856 | 60,876 | 58,949 | 69,934 | 68,251 | 55,286 | 55,711 | 65,824 | 63,413 |
| Loans receivable – principal, total, company owned | 576,003 | 532,872 | 552,857 | 595,651 | 611,656 | 546,494 | 579,496 | 609,389 | 622,582 |
| Loans receivable – finance charges, company owned | 36,562 | 31,181 | 31,519 | 36,747 | 41,646 | 32,491 | 31,805 | 35,702 | 38,091 |
| Loans receivable – company owned | 612,565 | 564,053 | 584,376 | 632,398 | 653,302 | 578,985 | 611,301 | 645,091 | 660,673 |
| Allowance for loan losses on loans receivable, company owned | (87,946) | (80,497) | (76,575) | (89,422) | (91,608) | (76,457) | (75,896) | (89,667) | (86,996) |
| Loans receivable, net, company owned | $ 524,619 | $ 483,556 | $ 507,801 | $ 542,976 | $ 561,694 | $ 502,528 | $ 535,405 | $ 555,424 | $ 573,677 |
| **Third-Party Loans Guaranteed by the Company:** | | | | | | | | | |
| Loans receivable – principal, current, guaranteed by company | $ 41,220 | $ 33,469 | $ 35,114 | $ 36,649 | $ 35,529 | $ 27,941 | $ 21,099 | $ 18,633 | $ 17,474 |
| Loans receivable – principal, past due, guaranteed by company | 1,152 | 1,123 | 1,494 | 1,661 | 1,353 | 696 | 596 | 697 | 723 |
| Loans receivable – principal, total, guaranteed by company(1) | 42,372 | 34,592 | 36,608 | 38,310 | 36,882 | 28,637 | 21,695 | 19,330 | 18,197 |
| Loans receivable – finance charges, guaranteed by company(2) | 3,093 | 2,612 | 2,777 | 3,103 | 2,944 | 2,164 | 1,676 | 1,553 | 1,395 |
| Loans receivable – guaranteed by company | 45,465 | 37,204 | 39,385 | 41,413 | 39,826 | 30,801 | 23,371 | 20,883 | 19,592 |
| Liability for losses on loans receivable, guaranteed by company | (5,843) | (3,749) | (3,956) | (4,510) | (4,444) | (3,242) | (1,983) | (1,972) | (2,079) |
| Loans receivable, net, guaranteed by company(3) | $ 39,622 | $ 33,455 | $ 35,429 | $ 36,903 | $ 35,382 | $ 27,559 | $ 21,388 | $ 18,911 | $ 17,513 |
| **Combined Loans Receivable(3):** | | | | | | | | | |
| Combined loans receivable – principal, current | $ 555,367 | $ 505,465 | $ 529,022 | $ 562,366 | $ 578,934 | $ 519,149 | $ 544,884 | $ 562,198 | $ 576,643 |
| Combined loans receivable – principal, past due | 63,008 | 61,999 | 60,443 | 71,595 | 69,604 | 55,982 | 56,307 | 66,521 | 64,136 |
| Combined loans receivable – principal | 618,375 | 567,464 | 589,465 | 633,961 | 648,538 | 575,131 | 601,191 | 628,719 | 640,779 |
| Combined loans receivable – finance charges | 39,655 | 33,793 | 34,296 | 39,850 | 44,590 | 34,655 | 33,481 | 37,255 | 39,486 |
| Combined loans receivable | $ 658,030 | $ 601,257 | $ 623,761 | $ 673,811 | $ 693,128 | $ 609,786 | $ 634,672 | $ 665,974 | $ 680,265 |

**Combined Loan Loss Reserve(3):**

| (Dollars in thousands) | 2017 December 31 | 2018 March 31 | June 30 | September 30 | December 31 | 2019 March 31 | June 30 | September 30 | December 31 |
|---|---|---|---|---|---|---|---|---|---|
| Allowance for loan losses on loans receivable, company owned | $ (87,946) | $ (80,497) | $ (76,575) | $ (89,422) | $ (91,608) | $ (76,457) | $ (75,896) | $ (89,667) | $ (86,996) |
| Liability for losses on loans receivable, guaranteed by company | (5,843) | (3,749) | (3,956) | (4,510) | (4,444) | (3,242) | (1,983) | (1,972) | (2,079) |
| Combined loan loss reserve | $ (93,789) | $ (84,246) | $ (80,531) | $ (93,932) | $ (96,052) | $ (79,699) | $ (77,879) | $ (91,639) | $ (89,075) |
| Combined loans receivable — principal, past due(3) | $ 63,008 | $ 61,999 | $ 60,443 | $ 71,595 | $ 69,604 | $ 55,982 | $ 56,307 | $ 66,521 | $ 64,136 |
| Combined loans receivable — principal(3) | 618,375 | 567,464 | 589,465 | 633,961 | 648,538 | 575,131 | 601,191 | 628,719 | 640,779 |
| Percentage past due | 10% | 11% | 10% | 11% | 11% | 10% | 9% | 11% | 10% |
| Combined loan loss reserve as a percentage of combined loans receivable(3)(4) | 14% | 14% | 13% | 14% | 14% | 13% | 12% | 14% | 13% |
| Allowance for loan losses as a percentage of loans receivable — company owned | 14% | 14% | 13% | 14% | 14% | 13% | 12% | 14% | 13% |

(1) Represents loans originated by third-party lenders through the CSO programs, which are not included in our financial statements.
(2) Represents finance charges earned by third-party lenders through the CSO programs, which are not included in our financial statements.
(3) Non-GAAP measure.
(4) Combined loan loss reserve as a percentage of combined loans receivable is determined using period-end balances.

**COMPONENTS OF OUR RESULTS OF OPERATIONS**

### Revenues

Our revenues are composed of Rise finance charges and CSO fees (inclusive of finance charges attributable to the participation in Rise installment loans originated by FinWise Bank), finance charges on Sunny installment loans, cash advance fees attributable to the participation in Elastic lines of credit that we consolidate and marketing and licensing fees received from third-party lenders related to the Rise, Rise CSO and Elastic products. See "—Overview" above for further information on the structure of Elastic. Finance charge and fee revenues related to the test launch of the Today Card credit card product were immaterial.

### Cost of sales

*Provision for loan losses*.   Provision for loan losses consists of amounts charged against income during the period related to net charge-offs and the additional provision for loan losses needed to adjust the loan loss reserve to the appropriate amount at the end of each month based on our loan loss methodology.

*Direct marketing costs*.   Direct marketing costs consist of online marketing costs such as sponsored search and advertising on social networking sites, and other marketing costs such as purchased television and radio air time and direct mail print advertising. In addition, direct marketing cost includes affiliate costs paid to marketers in exchange for referrals of potential customers. All direct marketing costs are expensed as incurred.

*Other cost of sales*.   Other cost of sales includes data verification costs associated with the underwriting of potential customers, automated clearing house ("ACH") transaction costs associated with customer loan funding and payments, and settlement expense associated with UK affordability claims.

### Operating expenses

Operating expenses consist of compensation and benefits, professional services, selling and marketing, occupancy and equipment, depreciation and amortization as well as other miscellaneous expenses.

*Compensation and benefits*.   Salaries and personnel-related costs, including benefits, bonuses and share-based compensation expense, comprise a majority of our operating expenses and these costs are driven by our number of employees.

*Professional services*.   These operating expenses include costs associated with legal, accounting and auditing, recruiting and outsourced customer support and collections.

*Selling and marketing*.   Selling and marketing costs include costs associated with the use of agencies that perform creative services and monitor and measure the performance of the various marketing channels. Selling and marketing costs also include the production costs associated with media advertisements that are expensed as incurred over the licensing or production period. These expenses do not include direct marketing costs incurred to acquire customers, which comprises CAC.

*Occupancy and equipment*.   Occupancy and equipment includes rent expense on our leased facilities, as well as telephony and web hosting expenses.

*Depreciation and amortization*.   We capitalize all acquisitions of property and equipment of $500 or greater as well as certain software development costs. Costs incurred in the preliminary stages of software development are expensed. Costs incurred thereafter, including external direct costs of materials and services as well as payroll and payroll-related costs, are capitalized. Post-development costs are expensed. Depreciation is computed using the straight-line method over the estimated useful lives of the depreciable assets.

**Other income (expense)**

*Net interest expense.*   Net interest expense primarily includes the interest expense associated with the VPC Facility that funds the Rise and Sunny installment loans, the interest expense associated with the EF SPV Facility that funds Rise installment loans originated by FinWise Bank and the interest expense associated with the ESPV Facility related to the Elastic lines of credit and related Elastic SPV entity. For the year ended December 31, 2019, net interest expense included amortization on the ESPV amendment fee and the prepayment penalty associated with the early repayment of a portion of the 4th Tranche Note. For the year ended December 31, 2018, amortization of the costs of and realized gains from the interest rate caps on the VPC and ESPV Facility are included within net interest expense. For the year ended December 31, 2017, net interest expense also included amortization of the debt discount for the Convertible Term Notes.

*Foreign currency transaction gain (loss).*   We incur foreign currency transaction gains and losses related to activities associated with our UK entity, Elevate Credit International, Ltd., primarily with regard to the VPC Facility used to fund Sunny installment loans.

*Non-operating income (loss).*   Non-operating income primarily includes gains and losses on adjustments to the fair value of derivatives not designated as cash flow hedges and losses from dispositions of capitalized software and other property and equipment.

## RESULTS OF OPERATIONS

This section of this Form 10-K generally discusses 2019 and 2018 items and year-to-year comparisons between 2019 and 2018. Discussions of 2017 items and year-to-year comparisons between 2018 and 2017 that are not included in this Form 10-K can be found in "Management's Discussion and Analysis of Financial Condition and Results of Operations" in Part II, Item 7 of the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2018.

The following table sets forth our consolidated statements of operations data for each of the periods indicated:

| Consolidated statements of operations data (dollars in thousands) | Years ended December 31, | | |
|---|---|---|---|
| | 2019 | 2018 | 2017 |
| Revenues | $ 746,962 | $ 786,682 | $ 673,132 |
| Cost of sales: | | | |
| Provision for loan losses | 364,241 | 411,979 | 357,574 |
| Direct marketing costs | 51,283 | 77,605 | 72,222 |
| Other cost of sales | 28,846 | 26,359 | 20,536 |
| Total cost of sales | 444,370 | 515,943 | 450,332 |
| Gross profit | 302,592 | 270,739 | 222,800 |
| Operating expenses: | | | |
| Compensation and benefits | 103,070 | 94,382 | 81,969 |
| Professional services | 36,715 | 35,864 | 32,848 |
| Selling and marketing | 7,381 | 9,435 | 8,353 |
| Occupancy and equipment | 20,712 | 17,547 | 13,895 |
| Depreciation and amortization | 17,380 | 12,988 | 10,272 |
| Other | 5,911 | 5,649 | 4,600 |
| Total operating expenses | 191,169 | 175,865 | 151,937 |
| Operating income | 111,423 | 94,874 | 70,863 |
| Other income (expense): | | | |
| Net interest expense | (66,646) | (79,198) | (73,043) |
| Foreign currency transaction gain (loss) | 334 | (1,409) | 2,900 |
| Non-operating income (loss) | (681) | (350) | 2,295 |
| Total other expense | (66,993) | (80,957) | (67,848) |
| Income before taxes | 44,430 | 13,917 | 3,015 |
| Income tax expense | 12,247 | 1,408 | 9,931 |
| Net income (loss) | $ 32,183 | $ 12,509 | $ (6,916) |

| As a percentage of revenues | Years ended December 31, | | |
|---|---|---|---|
| | 2019 | 2018 | 2017 |
| Cost of sales: | | | |
| Provision for loan losses | 49% | 52% | 53 % |
| Direct marketing costs | 7 | 10 | 11 |
| Other cost of sales | 4 | 3 | 3 |
| Total cost of sales | 59 | 66 | 67 |
| Gross profit | 41 | 34 | 33 |
| Operating expenses: | | | |
| Compensation and benefits | 14 | 12 | 12 |
| Professional services | 5 | 5 | 5 |
| Selling and marketing | 1 | 1 | 1 |
| Occupancy and equipment | 3 | 2 | 2 |
| Depreciation and amortization | 2 | 2 | 2 |
| Other | 1 | 1 | 1 |
| Total operating expenses | 26 | 22 | 23 |
| Operating income | 15 | 12 | 11 |
| Other income (expense): | | | |
| Net interest expense | (9) | (10) | (11) |
| Foreign currency transaction gain (loss) | — | — | — |
| Non-operating income (loss) | — | — | — |
| Total other expense | (9) | (10) | (10) |
| Income before taxes | 6 | 2 | — |
| Income tax expense | 2 | — | 1 |
| Net income (loss) | 4% | 2% | (1)% |

**Comparison of the years ended December 31, 2019 and 2018**

*Revenues*

| (Dollars in thousands) | Years ended December 31, | | | | Period-to-period change | |
|---|---|---|---|---|---|---|
| | 2019 | | 2018 | | | |
| | Amount | Percentage of revenues | Amount | Percentage of revenues | Amount | Percentage |
| Finance charges | $ 744,690 | 100% | $ 782,473 | 99% | $ (37,783) | (5)% |
| Other | 2,272 | — | 4,209 | 1 | (1,937) | (46) |
| Revenues | $ 746,962 | 100% | $ 786,682 | 100% | $ (39,720) | (5)% |

Revenues decreased by $39.7 million, or 5%, from $786.7 million for the year ended December 31, 2018 to $747.0 million for the year ended December 31, 2019. This decrease in revenue was primarily due to a decline in the effective APR of the combined loans receivable, partially offset by an increase in our average combined loans receivable - principal balance, as illustrated in the tables below. The decrease in Other revenues is due to a decrease in marketing and licensing fees related to the Rise CSO programs as our CSO partners stopped originating Rise CSO loans in Ohio in April 2019 due to a state law change.

The tables below break out this change in revenue (including CSO fees and cash advance fees) by product:

| (Dollars in thousands) | Rise (US)(1) | Elastic (US)(2) | Total Domestic | Sunny (UK) | Total |
|---|---|---|---|---|---|
| | **Year ended December 31, 2019** | | | | |
| Average combined loans receivable – principal(3) | $ 306,785 | $ 254,549 | $ 561,334 | $ 48,262 | $ 609,596 |
| Effective APR | 127% | 97% | 113% | 224% | 122% |
| Finance charges | $ 389,372 | $ 247,397 | $ 636,769 | $ 107,921 | $ 744,690 |
| Other | 982 | 1,121 | 2,103 | 169 | 2,272 |
| Total revenue | $ 390,354 | $ 248,518 | $ 638,872 | $ 108,090 | $ 746,962 |

| (Dollars in thousands) | Rise (US)(1) | Elastic (US)(2) | Total Domestic | Sunny (UK) | Total |
|---|---|---|---|---|---|
| | **Year ended December 31, 2018** | | | | |
| Average combined loans receivable – principal(3) | $ 293,413 | $ 262,537 | $ 555,950 | $ 51,793 | $ 607,743 |
| Effective APR | 138% | 97% | 119% | 237% | 129% |
| Finance charges | $ 405,224 | $ 254,561 | $ 659,785 | $ 122,688 | $ 782,473 |
| Other | 2,187 | 1,745 | 3,932 | 277 | 4,209 |
| Total revenue | $ 407,411 | $ 256,306 | $ 663,717 | $ 122,965 | $ 786,682 |

(1) Includes loans originated by third-party lenders through the CSO programs, which are not included in the Company's consolidated financial statements.

(2) Includes immaterial balances related to the Today Card, which expanded its test launch in November 2018.

(3) Average combined loans receivable – principal is calculated using daily combined loans receivable - principal balances. Combined loans receivable is defined as loans owned by the Company and consolidated VIEs plus loans originated and owned by third-party lenders pursuant to our CSO programs. See "—Non-GAAP Financial Measures" for more information and for a reconciliation of combined loans receivable to Loans receivable, net, the most directly comparable financial measure calculated in accordance with US GAAP.

Our average APR declined from 129% for the year ended December 31, 2018 to 122% for the year ended December 31, 2019. This resulted in a $42.5 million decrease in finance charges on a year-over-year basis, primarily in our Rise product. The average APR of a new Rise loan originated for a FinWise Bank customer is 130%, which is lower than our typical state-licensed Rise customer but with a better credit profile. While this has impacted top-line revenue growth, the related decrease in net charge-offs due to the better customer credit profile has resulted in an increase in gross profits.

*Cost of sales*

| (Dollars in thousands) | Years ended December 31, | | | | Period-to-period change | |
|---|---|---|---|---|---|---|
| | 2019 | | 2018 | | | |
| | Amount | Percentage of revenues | Amount | Percentage of revenues | Amount | Percentage |
| Cost of sales: | | | | | | |
| Provision for loan losses | $ 364,241 | 49% | $ 411,979 | 52% | $ (47,738) | (12)% |
| Direct marketing costs | 51,283 | 7 | 77,605 | 10 | (26,322) | (34) |
| Other cost of sales | 28,846 | 4 | 26,359 | 3 | 2,487 | 9 |
| Total cost of sales | $ 444,370 | 59% | $ 515,943 | 66% | $ (71,573) | (14)% |

*Provision for loan losses.*   Provision for loan losses decreased by $47.7 million, or 12%, from $412.0 million for the year ended December 31, 2018 to $364.2 million for the year ended December 31, 2019 primarily due to a $37.7 million decrease in net charge-offs and a decrease of $10.0 million in the additional provision for loan losses resulting from improved credit quality.

The tables below break out these changes by loan product:

| (Dollars in thousands) | Year ended December 31, 2019 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Rise (US) | Elastic (US) (1) | Total Domestic | Sunny (UK) | Total |
| Combined loan loss reserve(2): | | | | | |
| Beginning balance | $ 50,597 | $ 36,050 | $ 86,647 | $ 9,405 | $ 96,052 |
| Net charge-offs | (205,577) | (124,740) | (330,317) | (41,141) | (371,458) |
| Provision for loan losses | 207,079 | 118,583 | 325,662 | 38,579 | 364,241 |
| Effect of foreign currency | — | — | — | 240 | 240 |
| Ending balance | $ 52,099 | $ 29,893 | $ 81,992 | $ 7,083 | $ 89,075 |
| Combined loans receivable(2)(3) | $ 373,676 | $ 267,903 | $ 641,579 | $ 38,686 | $ 680,265 |
| Combined loan loss reserve as a percentage of ending combined loans receivable | 14% | 11% | 13% | 18% | 13% |
| Net charge-offs as a percentage of revenues | 53% | 50% | 52% | 38% | 50% |
| Provision for loan losses as a percentage of revenues | 53% | 48% | 51% | 36% | 49% |

| (Dollars in thousands) | Year ended December 31, 2018 | | | | |
| --- | --- | --- | --- | --- | --- |
| | Rise (US) | Elastic (US) (1) | Total Domestic | Sunny (UK) | Total |
| Combined loan loss reserve(2): | | | | | |
| Beginning balance | $ 55,867 | $ 28,870 | $ 84,737 | $ 9,052 | $ 93,789 |
| Net charge-offs | (228,569) | (131,719) | (360,288) | (48,872) | (409,160) |
| Provision for loan losses | 223,299 | 138,899 | 362,198 | 49,781 | 411,979 |
| Effect of foreign currency | — | — | — | (556) | (556) |
| Ending balance | $ 50,597 | $ 36,050 | $ 86,647 | $ 9,405 | $ 96,052 |
| Combined loans receivable(2)(3) | $ 333,001 | $ 303,418 | $ 636,419 | $ 56,709 | $ 693,128 |
| Combined loan loss reserve as a percentage of ending combined loans receivable | 15% | 12% | 14% | 17% | 14% |
| Net charge-offs as a percentage of revenues | 56% | 51% | 54% | 40% | 52% |
| Provision for loan losses as a percentage of revenues | 55% | 54% | 55% | 40% | 52% |

(1)   Includes immaterial balances related to the Today Card, which expanded its test launch in November 2018.
(2)   Not a financial measure prepared in accordance with US GAAP. See "—Non-GAAP Financial Measures" for more information and for a reconciliation to the most directly comparable financial measure calculated in accordance with US GAAP.
(3)   Includes loans originated by third-party lenders through the CSO programs, which are not included in our financial statements.

Net charge-offs decreased $37.7 million for the year ended December 31, 2019 compared to the year ended December 31, 2018, due to improved credit quality, with the primary decrease attributed to the Rise product and in particular the FinWise Bank customer, which has a better credit profile than the state-licensed Rise customer. Net charge-offs as a percentage of revenues for the year ended December 31, 2019 was 50%, a decrease from 52% for the comparable period in 2018. Provision for loan losses for the year ended December 31, 2019 totaled 49% of revenues, lower than 52% for the year ended December 31, 2018.

*Direct marketing costs.*   Direct marketing costs decreased by $26.3 million, or 34%, from $77.6 million for the year ended December 31, 2018 to $51.3 million for the year ended December 31, 2019. The decrease was due to slower new customer growth as we focused on deploying our new credit models during 2019. For the year ended December 31, 2019, the number of new customers acquired decreased to 247,706 compared to 316,483 during the year ended December 31, 2018. For the years ended December 31, 2019 and 2018, our CAC was $207 and $245, respectively. We expect our CAC to continue to be lower than, or within, our targeted range of $250 to $300 as we continue to optimize the efficiency of our marketing channels for our Rise and Elastic products and benefit from decreased competition in the UK, although we may see some quarterly volatility in CAC.

*Other cost of sales.*   Other cost of sales increased by $2.5 million, or 9%, from $26.4 million for the year ended December 31, 2018 to $28.8 million for the year ended December 31, 2019 due to increased affordability claim settlement expense related to the Sunny UK product, partially offset by decreased data verification costs incurred from the lower new customer loan volume across all products.

### Operating expenses

| (Dollars in thousands) | Years ended December 31, | | | | Period-to-period change | |
|---|---|---|---|---|---|---|
| | 2019 | | 2018 | | | |
| | Amount | Percentage of revenues | Amount | Percentage of revenues | Amount | Percentage |
| Operating expenses: | | | | | | |
| Compensation and benefits | $ 103,070 | 14% | $ 94,382 | 12% | $ 8,688 | 9% |
| Professional services | 36,715 | 5 | 35,864 | 5 | 851 | 2 |
| Selling and marketing | 7,381 | 1 | 9,435 | 1 | (2,054) | (22) |
| Occupancy and equipment | 20,712 | 3 | 17,547 | 2 | 3,165 | 18 |
| Depreciation and amortization | 17,380 | 2 | 12,988 | 2 | 4,392 | 34 |
| Other | 5,911 | 1 | 5,649 | 1 | 262 | 5 |
| Total operating expenses | $ 191,169 | 26% | $ 175,865 | 22% | $ 15,304 | 9% |

*Compensation and benefits.*   Compensation and benefits increased by $8.7 million, or 9%, from $94.4 million for the year ended December 31, 2018 to $103.1 million for the year ended December 31, 2019 primarily due to an increase in the number of employees and severance payments related to the resignation of our CEO in July 2019.

*Professional services.*   Professional services increased by $0.9 million, or 2%, from $35.9 million for the year ended December 31, 2018 to $36.7 million for the year ended December 31, 2019 primarily due to increased legal expenses related to various regulatory matters and outsourced servicing expense, partially offset by decreased contractor and consulting expenses.

*Selling and marketing.*   Selling and marketing decreased by $2.1 million, or 22%, from $9.4 million for the year ended December 31, 2018 to $7.4 million for the year ended December 31, 2019 primarily due to decreased marketing agency fees.

*Occupancy and equipment.*   Occupancy and equipment increased by $3.2 million, or 18%, from $17.5 million for the year ended December 31, 2018 to $20.7 million for the year ended December 31, 2019 primarily due to increased web hosting expense, increased software licenses, and increased rent expense needed to support a greater number of employees.

*Depreciation and amortization.*   Depreciation and amortization increased by $4.4 million, or 34%, from $13.0 million for the year ended December 31, 2018 to $17.4 million for the year ended December 31, 2019 primarily due to increased purchases of property and equipment, including depreciation on internally developed software.

*Net interest expense*

| (Dollars in thousands) | Years ended December 31, | | | | Period-to-period change | |
| | 2019 | | 2018 | | | |
| | Amount | Percentage of revenues | Amount | Percentage of revenues | Amount | Percentage |
|---|---|---|---|---|---|---|
| Net interest expense.................. | $ 66,646 | 9% | $ 79,198 | 10% | $ (12,552) | (16)% |

Net interest expense decreased $12.6 million, or 16%, during the year ended December 31, 2019 versus the year ended December 31, 2018. Our average effective cost of funds on our notes payable outstanding decreased to 12.1% from 14.8% on an unadjusted basis for the years ended December 31, 2019 and 2018. This lower cost of funds led to a decrease in interest expense of $14.3 million, which was partially offset by additional interest expense of approximately $1.8 million due to a higher average debt balance in 2019. For the year ended December 31, 2018, we had an average balance of $534.9 million in notes payable outstanding under our debt facilities, which increased to $549.4 million on average for fiscal year 2019. In addition, we incurred an $850 thousand prepayment penalty during the second quarter of 2019 for the early repayment on the 4th Tranche Term Note that is included in net interest expense.

The following table shows the effective cost of funds of each debt facility for the period:

| (Dollars in thousands) | Years ended December 31, | |
| | 2019 | 2018 |
|---|---|---|
| **VPC Facility** | | |
| Average facility balance during the period ........................................................ | $ 251.875 | $ 311.505 |
| Net interest expense ........................................................................................... | 29,335 | 45,381 |
| Less: prepayment penalty associated with the early repayment on the 4th Tranche Term Note ........................................................................... | (850) | — |
| Net interest expense, as adjusted........................................................................ | $ 28,485 | $ 45,381 |
| Effective cost of funds ....................................................................................... | 11.7% | 14.6% |
| Effective cost of funds, as adjusted.................................................................... | 11.3% | 14.6% |
| **EF SPV Facility** | | |
| Average facility balance during the period ........................................................ | $ 70.518 | $ — |
| Net interest expense ........................................................................................... | 7,350 | — |
| Cost of funds ...................................................................................................... | 10.4% | —% |
| **ESPV Facility** | | |
| Average facility balance during the period ........................................................ | $ 227,044 | $ 223,370 |
| Net interest expense ........................................................................................... | 29,961 | 33,817 |
| Cost of funds ...................................................................................................... | 13.2% | 15.1% |

In January 2018, the Company entered into interest rate caps, which cap 3-month LIBOR at 1.75%, to mitigate the floating interest rate risk on $240 million of the US Term Notes included in the VPC Facility and on $216 million of the ESPV Facility. The interest rate caps matured on February 1, 2019. Additionally, effective February 1, 2019, the VPC Facility and ESPV Facility were amended and a third new facility, the EF SPV Facility, was also created. The amended facilities included reductions to the interest rates paid on our debt in addition to other changes. The reduction in interest rates was effective February 1, 2019 for the VPC Facility and the EF SPV Facility. The reduction in interest rates for the ESPV Facility was effective July 1, 2019. All existing debt outstanding under these facilities (excluding the 4th Tranche Term Note of $18.1 million under the VPC Facility) had an effective cost of funds of approximately 10.3% at December 31, 2019. Per the terms of the February 1, 2019 amendments, the Company qualifies for a 25 bps rate reduction on all three facilities effective January 1, 2020. This reduction does not apply to the 4th Tranche Term Note. See "-Liquidity and Capital Resources-Debt facilities" for more information.

*Foreign currency transaction gain (loss)*

During the year ended December 31, 2019, we realized a $0.3 million gain in foreign currency remeasurement primarily related to a portion of the debt facility that our UK entity, Elevate Credit International, Ltd., has with a third-party lender, VPC, which is denominated in US dollars. The foreign currency remeasurement loss for the year ended December 31, 2018 was $1.4 million.

*Non-operating income (expense)*

During the year ended December 31, 2018, we recognized $0.4 million in non-operating expenses related to certain impairments and losses on disposals of fixed assets. During the year ended December 31, 2019, we recognized $0.7 million in non-operating losses related to the write-off of an internally developed software project.

*Income tax expense*

| | Years ended December 31, | | | | Period-to-period change | |
| | 2019 | | 2018 | | | |
| (Dollars in thousands) | Amount | Percentage of revenues | Amount | Percentage of revenues | Amount | Percentage |
|---|---|---|---|---|---|---|
| Income tax expense................. | $      12,247 | 2% | $      1,408 | —% | $      10,839 | 770% |

Our income tax expense increased $10.8 million, or 770%, from $1.4 million for the year ended December 31, 2018 to $12.2 million for the year ended December 31, 2019. Our consolidated effective tax rates for the years ended December 31, 2019 and 2018 were 27.6% and 10.1%, respectively. Our effective tax rates are different from the standard corporate federal income tax rate of 21% in the US primarily due to our permanent non-deductible items, corporate state tax obligations in the states where we have lending activities, and the impact of the GILTI provision of the Tax Cuts and Jobs Act enacted in 2017. The Company's US cash effective tax rate was approximately 2% for 2019. Our UK operations have a full valuation allowance provided due to the lack of sufficient objective evidence regarding the realizability of this asset due to the regulatory uncertainty in the UK. Therefore, no UK tax benefit has been recognized in the financial statements for the years ended December 31, 2019 and 2018.

*Net income*

| | Years ended December 31, | | | | Period-to-period change | |
| | 2019 | | 2018 | | | |
| (Dollars in thousands) | Amount | Percentage of revenues | Amount | Percentage of revenues | Amount | Percentage |
|---|---|---|---|---|---|---|
| Net income.......................... | $      32,183 | 4% | $      12,509 | 2% | $      19,674 | (157)% |

Our net income increased $19.7 million, or 157%, from $12.5 million for the year ended December 31, 2018 to $32.2 million for the year ended December 31, 2019, due to improved gross profit and lower interest expense offset by higher income tax expense.

**LIQUIDITY AND CAPITAL RESOURCES**

We principally rely on our working capital, funds from third-party lenders under the CSO programs, and our credit facility with VPC to fund the loans we make to our customers.

On July 25, 2019, the Company's Board of Directors authorized a share repurchase program providing for the repurchase of up to $10 million of our common stock through July 31, 2024. In January 2020, the Company's Board of Directors authorized a $20 million increase to the Company's existing common stock repurchase program providing for the repurchase of up to $30 million of the Company's common stock through July 31, 2024. The prior authorization totaled $5 million for both fiscal years 2019 and 2020. The Company purchased $3.3 million of common shares under its $5 million authorization during the second half of 2019. The amended share repurchase program provides that up to a maximum aggregate amount of $25 million shares (inclusive of the previous maximum aggregate amount of $5 million) may be repurchased in any given fiscal year. Repurchases will be made in accordance with applicable securities laws from time-to-time in the open market and/or in privately negotiated transactions at our discretion, subject to market conditions and other factors. The share repurchase program does not require the purchase of any minimum number of shares and may be implemented, modified, suspended or discontinued in whole or in part at any time without further notice. Any repurchased shares will be available for use in connection with equity plans and for other corporate purposes. During the year ended December 31, 2019, 768,910 shares were repurchased at a total cost of $3.3 million inclusive of any transactional fees or commissions.

## Debt Facilities

**VPC Facility**

*VPC Facility Term Notes*

On January 30, 2014, we entered into the VPC Facility in order to fund our Rise and Sunny products and provide working capital. The VPC Facility has been amended several times, with the most recent amendment effective February 1, 2019, to increase the maximum total borrowing amount available and other terms of the VPC Facility.

The VPC Facility provided the following term notes as of December 31, 2019:

- A maximum borrowing amount of $350 million used to fund the Rise loan portfolio ("US Term Note"). Prior to the February 1, 2019 amendment, the interest rate paid on this facility was a base rate (defined as the 3-month LIBOR, with a 1% floor) plus 11%. This resulted in a blended interest rate paid of 12.79% on debt outstanding under this facility as of December 31, 2018. The Company entered into an interest rate cap on January 1, 2018 to mitigate the floating interest rate risk on the aggregate $240 million outstanding as of December 31, 2017. This cap matured in February 2019. Upon the February 1, 2019 amendment date, the interest rate of the debt outstanding as of the amendment date was fixed through the January 1, 2024 maturity date at 10.23% (base rate of 2.73% plus 7.5%). All future borrowings under this facility will bear an interest rate at a base rate (defined as the greater of 3-month LIBOR, the five-year LIBOR swap rate or 1%) plus 7.5% at the borrowing date. The weighted-average base rate on the outstanding balance at December 31, 2019 was 2.73% and the overall rate was 10.23%.

- A maximum borrowing amount of $132 million used to fund the UK Sunny loan portfolio ("UK Term Note"). Prior to the February 1, 2019 amendment, the interest rate paid on this facility was a base rate (defined as the 3-month LIBOR rate) plus 14%. This resulted in a blended interest rate paid of 16.74% on debt outstanding under this facility as of December 31, 2018. Upon the February 1, 2019 amendment date, the interest rate on the debt outstanding as of the amendment date was fixed through the January 1, 2024 maturity date at 10.23% (base rate of 2.73% plus 7.5%). All future borrowings under this facility will bear an interest rate at a base rate (defined as the greater of 3-month LIBOR, the five-year LIBOR swap rate or 1%) plus 7.5% at the borrowing date. The weighted-average base rate on the outstanding balance at December 31, 2019 was 2.73% and the overall interest rate was 10.23%.

- A maximum borrowing amount of $18 million used to fund working capital, and prior to February 1, 2019, at a base rate (defined as the 3-month LIBOR, with a 1% floor) plus 13% ("4th Tranche Term Note"). Upon the February 1, 2019 amendment date, the interest rate was fixed through the February 1, 2021 maturity date at a base rate of 2.73% plus 13%. The interest rate at December 31, 2019 and 2018 was 15.73% and 15.74%, respectively. There was no change in the interest rate spread on this facility upon the February 1, 2019 amendment.

- A revolving feature which provides the option to pay down up to 20% of the outstanding balance, excluding the 4th Tranche Term note, once per year during the first quarter. Amounts paid down may be drawn again at a later date prior to maturity.

There are no principal payments due or scheduled under the VPC Facility until the respective maturity dates of the US Term Note, the UK Term Note and the 4th Tranche Term Note. The 4th Tranche Term Note matures on February 1, 2021, although we expect to repay this early during the first half of 2020 out of our free cash flow. The US Term Note and the UK Term Note mature on January 1, 2024.

All of our assets are pledged as collateral to secure the VPC Facility. The agreement contains customary financial covenants, including minimum cash and excess spread requirements, maximum roll rate and charge-off rate levels, maximum loan-to-value ratios and a minimum book value of equity requirement. We were in compliance with all covenants as of December 31, 2019.

Our Convertible Term Notes were converted into the 4th Tranche Term Notes on January 30, 2018 per the terms of the VPC Facility. Additionally, the maturity of the Convertible Term Notes (due to their conversion to 4th Tranche Term Notes) was extended to February 1, 2021 and the debt discount on the Convertible Term Notes was fully amortized. Finally, the exit premium under the Convertible Term Notes of $2.0 million was due and paid on January 30, 2018. See Note 7—Notes Payable of our consolidated financial statements for additional information.

***EF SPV Facility***

*EF SPV Term Note*

The EF SPV Facility has a maximum borrowing amount of $150 million used to purchase loan participations from a third-party lender. Prior to execution of the agreement with VPC effective February 1, 2019, EF SPV was a borrower on the US Term Note under the VPC Facility and the interest rate paid on this facility was a base rate (defined as 3-month LIBOR, with a 1% floor) plus 11%. Upon the February 1, 2019 amendment date, $43 million was re-allocated into the EF SPV Facility and the interest rate on the debt outstanding as of the amendment date was fixed through the January 1, 2024 maturity date at 10.23% (base rate of 2.73% plus 7.5%). All future borrowings under this facility will bear an interest rate at a base rate (defined as the greater of 3-month LIBOR, the five-year LIBOR swap rate or 1%) plus 7.5% at the borrowing date. The weighted-average base rate on the outstanding balance at December 31, 2019 was 2.49% and the overall interest rate was 9.99%. The EF SPV Term Note has a revolving feature with the option to pay down up to 20% of the outstanding balance once per year during the first quarter. Amounts paid down may be drawn again at a later date prior to maturity.

The EF SPV Term Note matures on January 1, 2024. There are no principal payments due or scheduled until the maturity date. All assets of the Company and EF SPV are pledged as collateral to secure the EF SPV Facility. The EF SPV Facility contains certain covenants for the Company such as minimum cash requirements and a minimum book value of equity requirement. There are also certain covenants for the product portfolio underlying the facility including, among other things, excess spread requirements, maximum roll rate and charge-off rate levels, and maximum loan-to-value ratios. The Company was in compliance with all covenants related to the EF SPV Facility as of December 31, 2019.

***ESPV Facility***

*ESPV Facility Term Note*

Elastic SPV receives its funding from VPC in the ESPV Facility, which was finalized on July 13, 2015. The ESPV Facility has a maximum borrowing amount of $350 million used to purchase loan participations from a third-party lender. Prior to the February 1, 2019 amendment, the interest rate paid on this facility was a base rate (defined as the greater of the 3-month LIBOR rate or 1% per annum) plus 13% for the outstanding balance up to $50 million, plus 12% for the outstanding balance greater than $50 million up to $100 million, plus 13.5% for any amounts greater than $100 million up to $150 million, and plus 12.75% for borrowing amounts greater than $150 million. This resulted in a blended interest rate paid of 14.65% on the debt outstanding under this facility at December 31, 2018. Upon the February 1, 2019 amendment date, the interest rate on the debt outstanding as of the amendment date was fixed at 15.48% (base rate of 2.73% plus 12.75%). Effective July 1, 2019, the interest rate on the debt outstanding as of the amendment date was set at 10.23% (base rate of 2.73% plus 7.5%). All future borrowings under this facility after July 1, 2019 will bear an interest rate at a base rate (defined as the greater of 3-month LIBOR, the five-year LIBOR swap rate or 1%) plus 7.5% at the borrowing date. The weighted-average base rate on the outstanding balance at December 31, 2019 was 2.72% and the overall interest rate was 10.22%. The Company entered into an interest rate cap on January 11, 2018 to mitigate the floating rate interest risk on an aggregate $216 million then outstanding. This cap matured in February 2019. The ESPV Term Note has a revolving feature providing the option to pay down up to 20% of the outstanding balance once per year during the first quarter. Amounts paid down may be drawn again at a later date prior to maturity.

The ESPV Term Note matures on January 1, 2024. There are no principal payments due or scheduled until the maturity date. All assets of the Company and ESPV are pledged as collateral to secure the ESPV Facility. The ESPV Facility contains certain covenants for the Company such as minimum cash requirements and a minimum book value of equity requirement. There are also certain covenants for the product portfolio underlying the facility including, among other things, excess spread requirements, maximum roll rate and charge-off levels, and maximum loan-to-value ratios. The Company was in compliance with all covenants related to the ESPV Facility as of December 31, 2019 and 2018.

*Outstanding Notes Payable*

The outstanding balance of notes payable as of December 31, 2019 and 2018 are as follows:

| (Dollars in thousands) | 2019 | | 2018 |
|---|---|---|---|
| US Term Note bearing interest at the base rate + 7.5% (2019) and + 11% (2018) | $ 182,000 | $ | 250,000 |
| UK Term Note bearing interest at the base rate + 7.5% (2019) and + 14% (2018) | 29,635 | | 39,196 |
| 4th Tranche Term Note bearing interest at the base rate + 13% | 18,050 | | 35,050 |
| EF SPV Term Note bearing interest at the base rate + 7.5% | 102,000 | | — |
| ESPV Term Note bearing interest at the base rate + 7.5% (2019) and + 12-13.5% (2018) | 226,000 | | 239,000 |
| Total | $ 557,685 | $ | 563,246 |

The change in the facility balances includes the following:
- US Term Note - $43 million re-allocation to new EF SPV facility and pay down of $25 million in the first quarter of 2019 under the revolver component of the facility;
- UK Term Note - $10 million repayment in the fourth quarter of 2019;
- 4th Tranche Term Note - $17 million early repayment in the second quarter of 2019;
- EF SPV Term note -$43 million re-allocation from US Term Note in the first quarter of 2019 and additional draws of $59 million during the year ended December 31, 2019; and
- ESPV Term Note - Paydown of $18 million in the first quarter of 2019 under the revolver component of the facility and an additional draw of $5 million in the third quarter of 2019.

Per the terms of the February 1, 2019 amendments, the Company qualifies for a 25 bps rate reduction on all three facilities effective January 1, 2020. This reduction does not apply to the 4th Tranche Term Note.

The Company paid a $2.4 million amendment fee on the ESPV Facility during the first quarter of 2019 that is included in deferred debt issuance costs and will be amortized into interest expense over the remaining life of the facility (through January 1, 2024). Additionally, the Company incurred an $850 thousand prepayment penalty during the second quarter of 2019 for the early repayment on the 4th Tranche Term Note that is included in interest expense.

The following table presents the future debt maturities, including debt issuance costs, as of December 31, 2019:

| Year (dollars in thousands) | December 31, 2019 |
|---|---|
| 2020 | — |
| 2021 | 18,050 |
| 2022 | — |
| 2023 | — |
| 2024 | 539,635 |
| Total | $ 557,685 |

**Cash and cash equivalents, restricted cash, loans (net of allowance for loan losses), and cash flows**

The following table summarizes our cash and cash equivalents, restricted cash, loans receivable, net and cash flows for the periods indicated:

| (Dollars in thousands) | As of and for the years ended December 31, | | |
| --- | --- | --- | --- |
| | 2019 | 2018 | 2017 |
| Cash and cash equivalents | $ 88,913 | $ 58,313 | 41,142 |
| Restricted cash | 2,294 | 2,591 | 1,595 |
| Loans receivable, net | 573,677 | 561,694 | 524,619 |
| Cash provided by (used in): | | | |
| Operating activities | 370,344 | 362,276 | 308,688 |
| Investing activities | (327,521) | (391,818) | (424,441) |
| Financing activities | (12,920) | 47,842 | 102,695 |

Our cash and cash equivalents at December 31, 2019 were held primarily for working capital purposes. We may, from time to time, use excess cash and cash equivalents to fund our lending activities, paydown debt or repurchase stock. We do not enter into investments for trading or speculative purposes. Our policy is to invest any cash in excess of our immediate working capital requirements in investments designed to preserve the principal balance and provide liquidity. Accordingly, our excess cash is invested primarily in demand deposit accounts that are currently providing only a minimal return.

### *Net cash provided by operating activities*

We generated $370.3 million in cash from our operating activities for the year ended December 31, 2019, primarily from revenues derived from our loan portfolio. This was up $8.1 million from the $362.3 million of cash provided by operating activities during the year ended December 31, 2018. This increase was the result of the expansion of our gross margin, which contributed to the $19.7 million increase in our net income for the year ended December 31, 2019 compared to the same prior year period.

### *Net cash used in investing activities*

For the years ended December 31, 2019, 2018 and 2017, cash used in investing activities was $327.5 million, $391.8 million and $424.4 million, respectively. The decrease for the year ended December 31, 2019 was primarily due to a decrease in net loans issued to customers. The following table summarizes cash used in investing activities for the periods indicated:

| (Dollars in thousands) | For the years ended December 31, | | |
| --- | --- | --- | --- |
| | 2019 | 2018 | 2017 |
| Cash used in investing activities | | | |
| Net loans issued to consumers, less repayments | $ (296,970) | $ (357,935) | $ (402,006) |
| Participation premium paid | (5,861) | (6,393) | (5,680) |
| Purchases of property and equipment | (24,690) | (27,490) | (16,755) |
| | $ (327,521) | $ (391,818) | $ (424,441) |

*Net cash provided by financing activities*

Cash flows from financing activities primarily include cash received from issuing notes payable, payments on notes payable, and activity related to stock awards. For the years ended December 31, 2019, 2018 and 2017, cash provided by financing activities was $12.9 million, $47.8 million and $102.7 million, respectively. The following table summarizes cash provided by (used in) financing activities for the periods indicated:

| | For the years ended December 31, | | |
|---|---|---|---|
| (Dollars in thousands) | 2019 | 2018 | 2017 |
| Cash provided by (used in) financing activities | | | |
| Proceeds from issuance of Notes payable, net.......... | $ 61,394 | $ 49,624 | $ 102,772 |
| Payments on Notes payable ................................... | (70,000) | — | (84,950) |
| Debt prepayment penalties paid | (850) | — | — |
| Cash paid for interest rate caps ............................... | — | (1,367) | — |
| Settlement of derivative liability | — | (2,010) | — |
| Common stock repurchased................................... | (3,344) | — | — |
| Proceeds from issuance of stock, net | (120) | 1,595 | 84,894 |
| Other activities................................................. | — | — | (21) |
| | $ (12,920) | $ 47,842 | $ 102,695 |

The decrease in cash provided by financing activities for the year ended December 31, 2019 versus the comparable period of 2018 was due primarily to payments made on notes payable made during 2019.

**Free Cash Flow**

In addition to the above, we also review FCF when analyzing our cash flows from operations. We calculate free cash flow as cash flows from operating activities, adjusted for the principal loan net charge-offs and capital expenditures incurred during the period. While this is a non-GAAP measure, we believe it provides a useful presentation of cash flows derived from our core operating activities.

| | For the years ended December 31, | | |
|---|---|---|---|
| (Dollars in thousands) | 2019 | 2018 | 2017 |
| Net cash provided by operating activities .............. | $ 370,344 | $ 362,276 | $ 308,688 |
| Adjustments: | | | |
| Net charge-offs – combined principal loans .......... | (287,188) | (319,326) | (275,192) |
| Capital expenditures................................. | (24,690) | (27,490) | (16,755) |
| FCF ........................................................ | $ 58,466 | $ 15,460 | $ 16,741 |

Our FCF was $58.5 million for the year ended December 31, 2019 compared to $15.5 million for the prior year. The increase in our FCF was the result of the increase in cash provided by operations and a decrease in net-charge-offs - combined principal loans and capital expenditures during the year ended December 31, 2019.

**Operating and capital expenditure requirements**

We believe that our existing cash balances, together with the available borrowing capacity under our VPC Facility and ESPV Facility, will be sufficient to meet our anticipated cash operating expense and capital expenditure requirements through at least the next 12 months. If our loan growth exceeds our expectations, our available cash balances may be insufficient to satisfy our liquidity requirements, and we may seek additional equity or debt financing. This additional capital may not be available on reasonable terms, or at all.

## CONTRACTUAL OBLIGATIONS

Our principal commitments consist of obligations under our debt facilities and operating lease obligations. The following table summarizes our contractual obligations as of December 31, 2019.

| | | Payment due by period as of December 31, 2019 | | | |
|---|---|---|---|---|---|
| (Dollars in thousands) | Total | Less than 1 year | 1-3 years | 3-5 years | More than 5 years |
| Contractual obligations: | | | | | |
| Long-term debt obligations .............. | $ 557,685 | $ — | $ 18,050 | $ 539,635 | $ — |
| Operating lease obligations ............. | 18,436 | 3,760 | 7,860 | 4,924 | 1,892 |
| Total contractual obligations .................. | $ 576,121 | $ 3,760 | $ 25,910 | $ 544,559 | $ 1,892 |

## OFF-BALANCE SHEET ARRANGEMENTS

We provide services in connection with installment loans originated by independent third-party lenders ("CSO lenders") whereby we act as a credit service organization/credit access business on behalf of consumers in accordance with applicable state laws through our "CSO program." The CSO program includes arranging loans with CSO lenders, assisting in the loan application, documentation and servicing processes. Under the CSO program, we guarantee the repayment of a customer's loan to the CSO lenders as part of the credit services we provide to the customer. A customer who obtains a loan through the CSO program pays us a fee for the credit services, including the guaranty, and enters into a contract with the CSO lenders governing the credit services arrangement. We estimate a liability for losses associated with the guaranty provided to the CSO lenders using assumptions and methodologies similar to the allowance for loan losses, which we recognize for our consumer loans.

## RECENT REGULATORY DEVELOPMENTS

During the year ended December 31, 2018, our UK business began to receive an increased number of customer complaints initiated by claims management companies ("CMCs") related to the affordability assessment of certain loans. If our evidence supports the affordability assessment and we reject the claim, the customer has the right to take the complaint to the Financial Ombudsman Service for further adjudication. The CMCs' campaign against the high cost lending industry increased significantly during the third and fourth quarters of 2018 and continued during 2019 resulting in a significant increase in affordability claims against all companies in the industry during this period. We believe that many of the increased claims are without merit and reflect the use of abusive and deceptive tactics by the CMCs. The Financial Conduct Authority ("FCA"), a regulator in the UK financial services industry, began regulating the CMCs in April 2019 in order to ensure that the methods used by the CMCs are in the best interests of the consumer and the industry. As of December 31, 2019, we accrued approximately $2.3 million for the claims received that were determined to be probable and reasonably estimable based on the Company's historical loss rates related to these claims. The outcomes of the adjudication of these claims may differ from the Company's estimates, and as a result, our estimates may change in the near term and the effect of any such change could be material to the financial statements. We continue to monitor the matters for further developments that could affect the amount of the accrued liability recognized.

Separately, the FCA asked all industry participants to review their lending practices to ensure that such companies are using an appropriate affordability and creditworthiness analysis. Our UK business provided the requested information to the FCA. The FCA recently reported back to us and asked our UK business to tighten certain aspects of its income verification and expenditure processes. We are working with the FCA to ensure the changes we make address all matters raised by the FCA.

On October 25, 2019, the Company's UK subsidiary, ECI, entered into an agreement with the Financial Conduct Authority ("FCA") (the "Agreement") to not make any payments greater than £1.0 million outside of the normal course of business without obtaining prior approval from the FCA. The Company believes this Agreement will not have a material impact on ECI's ability to continue to serve its customers and meet its obligations.

On May 7, 2019, the Consumer Financial Protection Bureau (the "CFPB") proposed amendments to Regulation F, which implements the FDCPA. The Bureau's proposal would, among other things, address communications in connection with debt collection; interpret and apply prohibitions on harassment or abuse, false or misleading representations, and unfair practices in debt collection; and clarify requirements for certain consumer-facing debt collection disclosures. The public comment period on the proposed amendments closed on September 18, 2019. Once a final rule is promulgated, we will take the necessary steps to ensure that the third-party debt collectors we work with are compliant with the final rule.

On October 10, 2019, AB 539 was signed by the Governor and chaptered by the California Secretary of State. Among other things, AB 539 imposes an interest rate cap on all consumer loans made by Consumer Finance Lenders licensees between $2,500 and $10,000 of 36% plus the Federal Funds Rate. Effective January 1, 2020, Rise will no longer originate state-licensed loans under the California Consumer Finance Lenders Law.

California Attorney General Xavier Becerra has issued draft regulations to guide covered businesses' implementation of the California Consumer Privacy Act ("CCPA") which became operative on January 1, 2020. The CCPA imposes obligations on the handling of consumers' personal information by businesses, including required disclosures to consumers; consumer access and deletion rights, consumers' right to opt-out of the sale of personal information; and a private right of action relating to a failure to maintain reasonable security procedures and practices leading to a security breach, as defined by the CCPA. The CCPA does not apply to information that is covered by the GLBA or California's Financial Information Privacy Act, or to personal consumer report information that is processed pursuant to the Fair Credit Reporting Act ("FCRA"). While it is too early to know its full impact, implementation of the CCPA and its related requirements could increase costs or otherwise adversely affect our business in the California market.

Another California bill, AB 1202, was signed into law on October 11, 2019 and came into effect January 1, 2020. This new law requires "data brokers" that collect and sell personal information of consumers with whom they do not have a direct relationship and that are not exempted under the FCRP or the GLBA to register with the California Attorney General's office.


## BASIS OF PRESENTATION AND CRITICAL ACCOUNTING POLICIES

### Revenue recognition

We recognize consumer loan fees as revenues for each of the loan products we offer. Revenues on the Consolidated Statements of Operations include: finance charges, lines of credit fees, fees for services provided through CSO programs ("CSO fees"), and interest, as well as any other fees or charges permitted by applicable laws and pursuant to the agreement with the borrower. We also record revenues related to the sale of customer applications to unrelated third parties. These applications are sold with the customer's consent in the event that we or our CSO lenders are unable to offer the customer a loan. Revenue is recognized at the time of the sale. Other revenues also include marketing and licensing fees received from the originating lender related to the Elastic product and Rise bank-originated loans and from CSO fees related to the Rise product. Revenues related to these fees are recognized when the service is performed.

We accrue finance charges on installment loans on a constant yield basis over their terms. We accrue and defer fixed charges such as CSO fees and lines of credit fees when they are assessed and recognize them to earnings as they are earned over the life of the loan. We accrue interest on credit cards based on the amount of the loan outstanding and their contractual interest rate. Credit card membership fees are amortized to revenue over the card membership period. Other credit card fees, such as late payment fees and returned payment fees, are accrued when assessed. We do not accrue finance charges and other fees on installment loans or lines of credit for which payment is greater than 60 days past due. Credit card interest charges are recognized based on the contractual provisions of the underlying arrangements and are not accrued for which payment is greater than 90 days past due. Installment loans and lines of credit are considered past due if a grace period has not been requested and a scheduled payment is not paid on its due date. Credit cards have a grace period of 25 days. Payments received on past due loans are applied against the loan and accrued interest balance to bring the loan current. Payments are generally first applied to accrued fees and interest, and then to the principal loan balance.

Our business is affected by seasonality, which can cause significant changes in portfolio size and profit margins from quarter to quarter. Although this seasonality does not impact our policies for revenue recognition, it does generally impact our results of operations by potentially causing an increase in its profit margins in the first quarter of the year and decreased margins in the second through fourth quarters.

### Allowance and liability for estimated losses on consumer loans

We have adopted Financial Accounting Standards Board ("FASB") guidance for disclosures about the credit quality of financing receivables and the allowance for loan losses ("allowance"). We maintain an allowance for loan losses for loans and interest receivable for loans not classified as TDRs at a level estimated to be adequate to absorb credit losses inherent in the outstanding loans receivable. We primarily utilize historical loss rates by product, stratified by delinquency ranges, to determine the allowance, but we also consider recent collection and delinquency trends, as well as macro-economic conditions that may affect portfolio losses. Additionally, due to the uncertainty of economic conditions and cash flow resources of our customers, the estimate of the allowance for loan losses is subject to change in the near-term and could significantly impact the consolidated financial statements. If a loan is deemed to be uncollectible before it is fully reserved, it is charged-off at that time.

For loans classified as TDRs, impairment is typically measured based on the present value of the expected future cash flows discounted at the original effective interest rate. As permitted by the SEC, we have elected to not adopt the Current Expected Credit Losses ("CECL") model which would require a broader range of reasonable and supportable information to inform credit loss estimates. See "- Recently Issued Accounting Pronouncements And JOBS Act Election" for more information.

We classify loans as either current or past due. An installment loan or line of credit customer in good standing may request a 16-day grace period when or before a payment becomes due and, if granted, the loan is considered current during the grace period. Credit card customers have a 25-day grace period for each payment. Installment loans and lines of credit are considered past due if a grace period has not been requested and a scheduled payment is not paid on its due date. Credit cards are considered past due if the grace period has passed and the scheduled payment has not been made. Increases in the allowance are created by recording a Provision for loan losses in the Consolidated Statements of Operations. Installment loans and lines of credit are charged off, which reduces the allowance, when they are over 60 days past due or earlier if deemed uncollectible. Credit cards are charged off, which reduces the allowance, when they are over 120 days past due or earlier if deemed uncollectible. Recoveries on losses previously charged to the allowance are credited to the allowance when collected.

**Liability for estimated losses on credit service organization loans**

Under the CSO program, we guarantee the repayment of a customer's loan to the CSO lenders as part of the credit services we provide to the customer. A customer who obtains a loan through the CSO program pays us a fee for the credit services, including the guaranty, and enters into a contract with the CSO lenders governing the credit services arrangement. We estimate a liability for losses associated with the guaranty provided to the CSO lenders using assumptions and methodologies similar to the allowance for loan losses, which we recognize for our consumer loans.

**Goodwill**

Goodwill represents the excess of the purchase price over the fair value of the net tangible and identifiable intangible assets acquired in each business combination. We perform an impairment review of goodwill and intangible assets with an indefinite life annually at October 1 and between annual tests if we determine that an event has occurred or circumstances changed in a way that would more likely than not reduce the fair value of a reporting unit below its carrying amount. Such a determination may be based on our consideration of macro-economic and other factors and trends, such as current and projected financial performance, interest rates and access to capital. We completed our annual test and determined that there was no evidence of impairment of goodwill or indefinite lived intangible assets. No events or circumstances occurred between October 1 and December 31, 2019 that would more likely than not reduce the fair value of the reporting units below the carrying amount.

Our impairment evaluation of goodwill is based on comparing the fair value of the respective reporting unit to its carrying value. The fair value of the reporting unit is determined based on a weighted average of the income and market approaches. The income approach establishes fair value based on estimated future cash flows of the reporting unit, discounted by an estimated weighted-average cost of capital developed using the capital asset pricing model, which reflects the overall level of inherent risk of the reporting unit. The income approach uses our projections of financial performance for a six- to nine-year period and includes assumptions about future revenue growth rates, operating margins and terminal values. The market approach establishes fair value by applying cash flow multiples to the respective reporting unit's operating performance. The multiples are derived from other publicly traded companies that are similar but not identical from an operational and economic standpoint.

We completed our 2019 annual test and determined that there was no evidence of impairment of goodwill for the two reporting units that have goodwill. Although no goodwill impairment was noted, there can be no assurances that future goodwill impairments will not occur.

**Internal-use software development costs**

We capitalize certain costs related to software developed for internal-use, primarily associated with the ongoing development and enhancement of our technology platform. Costs incurred in the preliminary development and post-development stages are expensed. These costs are amortized on a straight-line basis over the estimated useful life of the related asset, generally three years.

**Income taxes**

Income taxes are accounted for under the asset and liability method. Deferred tax assets and liabilities are recognized for the future tax consequences and benefits attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss and tax credit carryforwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. Valuation allowances are established when necessary to reduce deferred tax assets to the amounts that are more likely than not to be realized.

Relative to uncertain tax positions, we accrue for losses we believe are probable and can be reasonably estimated. The amount recognized is subject to estimate and management judgment with respect to the likely outcome of each uncertain tax position. The amount that is ultimately sustained for an individual uncertain tax position or for all uncertain tax positions in the aggregate could differ from the amount recognized. If the amounts recorded are not realized or if penalties and interest are incurred, we have elected to record all amounts within income tax expense.

We have no recorded liabilities for US uncertain tax positions at December 31, 2019 and 2018. Tax periods from fiscal years 2014 to 2018 remain open and subject to examination for US federal and state tax purposes. As we had no operations nor had filed US federal tax returns prior to May 1, 2014, there are no other US federal or state tax years subject to examination.

For UK taxes, tax periods from fiscal years 2010 to 2019 remain open and subject to examination. We had an uncertain tax position at December 31, 2017 that was resolved and released during the year ended December 31, 2018. There are no additional UK uncertain tax positions at December 31, 2019.

On December 22, 2017, the Tax Cuts and Jobs Act (the "Act", or "Tax Reform") was enacted into law. The Act contains several changes to the US federal tax law including a reduction to the US federal corporate tax rate from 35% to 21%, an acceleration of the expensing of certain business assets, a reduction to the amount of executive pay that could qualify as a tax deduction, and the addition of a repatriation tax on any accumulated offshore earnings and profit.

We recognized a one-time $12.5 million charge as of December 31, 2017 due to the impact of the Tax Reform. This one-time charge was primarily the result of US GAAP requiring remeasurement of all US deferred income tax assets and liabilities for temporary differences from the previous tax rate of 35% to the new corporate tax rate of 21%.

The Tax Reform also included a new "Mandatory Repatriation" that required a one-time tax on shareholders of Specific Foreign Corporations ("SFCs"). The one-time tax was imposed using the Subpart F rules to require US shareholders to include in income the pro rata share of their SFC's previously untaxed accumulated post 1986 deferred foreign income. Our SFC, ECI, had an accumulated earnings and profit ("E&P") deficit at December 31, 2017, and therefore, we had no US impact from the new mandatory repatriation law.

Additionally, tax reform included a new anti-deferral provision, similar to the subpart F provision, requiring a US shareholder of Controlled Foreign Corporation's ("CFC") to include in income annually its pro rata share of a CFC's "global intangible low-taxed income" ("GILTI"). Our SFC, ECI, qualifies as a CFC, and as such, requires a GILTI inclusion in the applicable tax year. ECI has a US tax year end of November 30. We have elected to treat GILTI as a period cost, and therefore, will recognize those taxes as expenses in the period incurred.

**Share-Based Compensation**

In accordance with applicable accounting standards, all share-based payments, consisting of stock options, and restricted stock units ("RSUs") issued to employees are measured based on the grant-date fair value of the awards and recognized as compensation expense on a straight-line basis over the period during which the recipient is required to perform services in exchange for the award (the requisite service period). Starting July 2017, we also have an employee stock purchase plan ("ESPP"). The determination of fair value of share-based payment awards and ESPP purchase rights on the date of grant using option-pricing models is affected by our stock price as well as assumptions regarding a number of highly complex and subjective variables. These variables include, but are not limited to, the expected stock price volatility over the term of the awards, actual and projected employee stock option exercise activity, risk-free interest rate, expected dividends and expected term. We use the Black-Scholes-Merton Option Pricing Model to estimate the grant-date fair value of stock options. We also use an equity valuation model to estimate the grant-date fair value of RSUs. Additionally, the recognition of share-based compensation expense requires an estimation of the number of awards that will ultimately vest and the number of awards that will ultimately be forfeited.

**Derivative Financial Instruments**

On January 11, 2018, we and ESPV each entered into one interest rate cap transaction with a counterparty to mitigate the floating rate interest risk on a portion of the debt underlying the Rise and Elastic portfolios, respectively, which matured on February 1, 2019. See Note 7—Notes Payable of our consolidated financial statements for additional information. The interest rate caps were designated as cash flow hedges against expected future cash flows attributable to future interest payments on debt facilities held by each entity. We initially reported the gains or losses related to the hedges as a component of Accumulated other comprehensive income in the Consolidated Balance Sheets in the period incurred and subsequently reclassified the interest rate caps' gains or losses to interest expense when the hedged expenses were recorded. We excluded the change in the time value of the interest rate caps in its assessment of their hedge effectiveness. We present the cash flows from cash flow hedges in the same category in the Consolidated Statements of Cash Flows as the category for the cash flows from the hedged items. The interest rate caps do not contain any credit risk related contingent features. Our hedging program is not designed for trading or speculative purposes.

Our derivative financial instruments also included bifurcated embedded derivatives that were identified within the Convertible Term Notes recorded as assets or liabilities initially at fair value, and the changes in fair value at the end of each quarterly reporting period are included in earnings. Upon repayment of a portion of the Convertible Term Notes, approximately $2.0 million was released from the debt discount where the derivative was recorded into Interest expense. In January 2018, the Convertible Term Notes matured and became a portion of the 4th Tranche Term Note. Therefore, there is no bifurcated embedded derivatives as of December 31, 2019.

## RECENTLY ISSUED ACCOUNTING PRONOUNCEMENTS AND JOBS ACT ELECTION

Under the Jumpstart Our Business Startups Act (the "JOBS Act"), we meet the definition of an emerging growth company. We have irrevocably elected to opt out of the extended transition period for complying with new or revised accounting standards pursuant to Section 107(b) of the JOBS Act.

**Recently Adopted Accounting Standards**

In July 2018, the FASB issued Accounting Standards Update ("ASU") No. 2018-09, *Codification Improvements* ("ASU 2018-09"). The purpose of ASU 2018-09 is to clarify, correct errors in or make minor improvements to the Codification. Among other revisions, the amendments clarify that an entity should recognize excess tax benefits or tax deficiencies for share compensation expense that is taken on an entity's tax return in the period in which the amount of the deduction is determined. The Company has adopted all of the amendments of ASU 2018-09 as of January 1, 2019 on a modified retrospective basis. The adoption of ASU 2018-09 did not have a material impact on the Company's consolidated financial statements.

In February 2018, the FASB issued ASU No. 2018-02, *Income Statement—Reporting Comprehensive Income (Topic 220): Reclassification of Certain Tax Effects from Accumulated Other Comprehensive Income* ("ASU 2018-02"). The purpose of ASU 2018-02 is to allow an entity to elect to reclassify the stranded tax effects related to the Tax Cuts and Jobs Act from Accumulated other comprehensive income into Retained earnings. The amendments in ASU 2018-02 are effective for all entities for fiscal years beginning after December 15, 2018, and for interim periods within those fiscal years. Early adoption is permitted. The Company adopted all amendments of ASU 2018-02 on a prospective basis as of January 1, 2018 and elected to reclassify the stranded tax effects resulting from the Tax Cuts and Jobs Act from Accumulated other comprehensive income to Accumulated deficit. The amount of the reclassification for the year ended December 31, 2018 was $920 thousand.

In August 2017, the FASB issued ASU No. 2017-12, *Derivatives and Hedging (Topic 815)—Targeted Improvements to Accounting for Hedging Activities* ("ASU 2017-12"). The purpose of ASU 2017-12 is to improve the financial reporting of hedging relationships to better portray the economic results of an entity's risk management activities in its financial statements. In addition, ASU 2017-12 makes certain targeted improvements to simplify the application of the hedge accounting guidance. In April 2019, the FASB issued ASU No. 2019-04, *Codification Improvements to Topic 326, Financial Instruments* ("ASU 2019-04"). This amendment clarifies the guidance in ASU 2017-12. ASU 2017-12 is effective for public companies for fiscal years beginning after December 15, 2018, and for interim periods within those fiscal years. Early adoption is permitted. The Company has adopted all of the amendments of ASU 2017-12 on a prospective basis as of January 1, 2018. Since the Company did not have derivatives accounted for as hedges prior to December 31, 2017, there was no cumulative-effect adjustment needed to Accumulated other comprehensive income (loss) and Accumulated deficit. The adoption of ASU 2017-12 did not have a material impact on the Company's consolidated financial statements.

In February 2016, the FASB issued ASU No. 2016-02, *Leases (Topic 842)* ("ASU 2016-02"). ASU 2016-02 is intended to improve the reporting of leasing transactions to provide users of financial statements with more decision-useful information. ASU 2016-02 will require organizations that lease assets to recognize on the balance sheets the assets and liabilities for the rights and obligations created by those leases. In July 2018, the FASB issued ASU No. 2018-10, *Codification Improvements to Topic 842, Leases* ("ASU 2018-10"), which clarifies certain matters in the codification with the intention to correct unintended application of the guidance. Also in July 2018, the FASB issued ASU No. 2018-11, *Leases (Topic 842): Targeted Improvements* ("ASU 2018-11"), which provides entities with an additional (and optional) transition method whereby the entity applies the new lease standard at the adoption date and recognizes a cumulative-effect adjustment to the opening balance of retained earnings in the period of adoption. Additionally, under the new transition method, an entity's reporting for the comparative periods presented in the financial statements in which it adopts the new lease standard will continue to be in accordance with current US GAAP (Topic 840, Leases). ASU 2016-02, as amended, is effective for fiscal years beginning after December 15, 2018, including interim periods within those fiscal years. Early adoption is permitted. The Company elected to adopt the transition method in ASU 2018-11 by applying the practical expedient prospectively at January 1, 2019. The Company also elected to apply the optional practical expedient package to not reassess existing or expired contracts for lease components, lease classification or initial direct costs. The adoption of ASU 2016-02 on January 1, 2019, as amended, resulted in the recognition of approximately $11.5 million and $15.4 million additional right of use assets and liabilities for operating leases, respectively, but did not have a material impact on the Company's Consolidated Statements of Operations. Subsequent to initial adoption, the Company entered into additional leases for a total recognition in 2019 of $13.4 million and $17.6 million right of use assets and liabilities for operating leases, respectively.

In July 2019, the FASB issued Accounting Standards Update ("ASU") No. 2019-07, *Codification Updates to SEC Sections* ("ASU 2019-07"). The purpose of ASU 2019-07 is to amend various SEC paragraphs pursuant to the issuance of SEC Final Rule Releases No. 33-10532, *Disclosure Update and Simplification*, and Nos. 33-10231 and 33-10442, *Investment Company Reporting Modernization*. Among other revisions, the amendments reduce duplication and clarify the inclusion of comprehensive income. The Company has adopted all of the amendments of ASU 2019-07 as of July 2019 with no impact to the Company's consolidated financial statements.

## Accounting Standards to be Adopted in Future Periods

In December 2019, the FASB issued ASU No. 2019-12, *Income Taxes (Topic 740): Simplifying the Accounting for Income Taxes* ("ASU 2019-12"). The purpose of ASU 2019-12 is to reduce complexity in the accounting standards for income taxes by removing certain exceptions as well as clarifying certain allocations. This update also addresses the split recognition of franchise taxes that are partially based on income between income-based tax and non-income-based tax. This guidance is effective for fiscal years beginning after December 15, 2020, and interim periods within those fiscal years. Early adoption is permitted. The Company is still assessing the potential impact of ASU 2019-12 on the Company's consolidated financial statements.

In August 2018, the FASB issued ASU No. 2018-15, *Intangibles—Goodwill and Other—Internal-Use Software (Subtopic 350-40): Customer's Accounting for Implementation Costs Incurred in a Cloud Computing Arrangement That Is a Service Contract* ("ASU 2018-15"). The purpose of ASU 2018-15 is to provide additional guidance on the accounting for costs of implementation activities performed in a cloud computing arrangement that is a service contract. This guidance is effective for fiscal years beginning after December 15, 2019, and interim periods within those fiscal years. Early adoption is permitted. Entities have the option to apply the guidance in ASU 2018-15 prospectively to all implementation costs incurred after the date of adoption or retrospectively. The Company has elected to adopt prospectively as of January 1, 2020 and has implemented a control structure to identify cloud computing arrangements for appropriate accounting treatment similar to its procedures for right of use assets. The Company does not expect ASU 2018-15 to have a material impact on the Company's consolidated financial statements.

In August 2018, the FASB issued ASU No. 2018-13, *Fair Value Measurement (Topic 820): Disclosure Framework—Changes to the Disclosure Requirements for Fair Value Measurement* ("ASU 2018-13"). The purpose of ASU 2018-13 is to modify the disclosure requirements on fair value measurements in Topic 820, *Fair Value Measurement*. This guidance is effective for public companies for fiscal years beginning after December 15, 2019, and interim periods within those fiscal years and requires both a prospective and retrospective approach to adoption based on amendment specifications. Early adoption of any removed or modified disclosures is permitted. Additional disclosures may be delayed until their effective date. The Company does not expect ASU 2018-13 to have a material impact on the Company's consolidated financial statements.

In January 2017, the FASB issued ASU No. 2017-04, *Intangibles—Goodwill and Other (Topic 350): Simplifying the Test for Goodwill Impairment* ("ASU 2017-04"). The purpose of ASU 2017-04 is to simplify the subsequent measurement of goodwill. The amendments modify the concept of impairment from the condition that exists when the carrying amount of goodwill exceeds its implied fair value to the condition that exists when the carrying amount of a reporting unit exceeds its fair value. An entity no longer will determine goodwill impairment by calculating the implied fair value of goodwill by assigning the fair value of a reporting unit to all of its assets and liabilities as if that reporting unit had been acquired in a business combination. This guidance is effective for public companies for goodwill impairment tests in fiscal years beginning after December 15, 2019. The Company does not expect ASU 2017-04 to have a material impact on the Company's consolidated financial statements.

In June 2016, the FASB issued ASU No. 2016-13, *Financial Instruments—Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments* ("ASU 2016-13"). ASU 2016-13 is intended to replace the incurred loss impairment methodology in current US GAAP with a methodology that reflects expected credit losses and requires consideration of a broader range of reasonable and supportable information to inform credit loss estimates to improve the quality of information available to financial statement users about expected credit losses on financial instruments and other commitments to extend credit held by a reporting entity at each reporting date. In April 2019, the FASB issued ASU No. 2019-04, *Codification Improvements to Topic 326, Financial Instruments* ("ASU 2019-04"). This amendment clarifies the guidance in ASU 2016-13. The guidance in ASU 2016-13 was further clarified by ASU No. 2019-11, *Codification Improvements to Topic 326, Financial Instruments* ("ASU 2019-11") issued in November 2019. ASU 2019-11 provides transition relief such as permitting entities an accounting policy election regarding existing Troubled Debt Restructurings ("TDRs") among other things. In May 2019, the FASB issued ASU No. 2019-05, *Financial Instruments-Credit Losses (Topic 326): Targeted Transition Relief* ("ASU 2019-05"). The purpose of this amendment is to provide entities that have certain instruments within the scope of Subtopic 326-20, *Financial Instruments-Credit Losses-Measured at Amortized Cost,* with an option to irrevocably elect the fair value option in Subtopic 825-10, *Financial Instruments-Overall*, on an instrument-by-instrument basis. Election of this option is intended to increase comparability of financial statement information and reduce costs for certain entities to comply with ASU 2016-13. For public entities, ASU 2016-13 is effective for fiscal years beginning after December 15, 2019, including interim periods within those fiscal years. In November 2019, the FASB issued ASU No. 2019-10, *Financial Instruments - Credit Losses (Topic 326), Derivatives and Hedging (Topic 815), and Leases (Topic 842): Effective Dates ("ASU 2019-10")*. The purpose of this amendment is to create a two tier rollout of major updates, staggering the effective dates between larger public companies and all other entities. This granted certain classes of companies, including Smaller Reporting Companies ("SRCs"), additional time to implement major FASB standards, including ASU 2016-13. Larger public companies will still have an effective date for fiscal years beginning after December 15, 2019, including interim periods within those fiscal years. All other entities are permitted to defer adoption of ASU 2016-13, and its related amendments, until the earlier of fiscal periods beginning after December 15, 2022. Under the current SEC definitions, the Company meets the definition of an SRC as of the ASU 2019-10 issuance date and is adopting the deferral period for ASU 2016-13.

### Item 7A. Quantitative and Qualitative Disclosures About Market Risk

Market risk is the risk of loss to future earnings, values or future cash flows that may result from changes in the price of a financial instrument. The value of a financial instrument may change as a result of changes in interest rates, exchange rates, commodity prices, equity prices and other market changes. We are exposed to market risk related to changes in interest rates and foreign currency exchange rates. We do not use derivative financial instruments for speculative or trading purposes, although in the future we may continue to enter into interest rate hedging arrangements or enter into exchange rate hedging arrangements to manage the risks described below.

### Interest rate sensitivity

Our cash and cash equivalents as of December 31, 2019 consisted of demand deposit accounts. Our primary exposure to market risk for our cash and cash equivalents is interest income sensitivity, which is affected by changes in the general level of US interest rates. Given the currently low US interest rates, we generate only a *de minimis* amount of interest income from these deposits.

All of our customer loan portfolios are fixed APR loans and not variable in nature. Additionally, given the high APR's associated with these loans, we do not believe there is any interest rate sensitivity associated with our customer loan portfolio.

Prior to February 1, 2019, our VPC Facility and ESPV Facility were variable rate in nature and tied to the 3-month LIBOR rate. In January 2018, the Company and ESPV each entered into interest rate caps, which cap 3-month LIBOR at 1.75% to mitigate the floating interest rate risk on $240 million of the US Term Notes included in the VPC Facility and on $216 million of the ESPV Facility, respectively. These interest rate caps matured on February 1, 2019. On February 1, 2019, the VPC and ESPV

Facilities were amended and a new EF SPV Facility was added. As part of these amendments, the base interest rate on existing debt outstanding on February 1, 2019 was locked to the 3-month LIBOR as of February 1, 2019 of 2.73% until note maturity. Any additional borrowings on the facilities (excluding the 4th Tranche Term Note) after February 1, 2019 bear a base interest rate (defined as the greater of 3-month LIBOR, the five-year LIBOR swap rate or 1%) plus the applicable spread at the borrowing date.

Any increase in the base interest rate on future borrowings will result in an increase in our net interest expense. The outstanding balance of our VPC Facility at December 31, 2019 was $229.7 million and the balance at December 31, 2018 was $324.2 million. The outstanding balance of our EF SPV Facility was $102.0 million at December 31, 2019 and there was no balance at December 31, 2018. The outstanding balance of our ESPV Facility was $226.0 million and $239.0 million at December 31, 2019 and December 31, 2018, respectively. Based on the average outstanding indebtedness through the year ended December 31, 2019, a 1% (100 basis points) increase in interest rates would have increased our interest expense by approximately $1.6 million.

**Foreign currency exchange risk**

We provide installment loans to customers in the UK. Interest income from our Sunny UK installment loans is earned in British pounds ("GBP"). Fluctuations in exchange rate of the US dollar ("USD") against the GBP and cash held in such foreign currency can result, and have resulted, in fluctuations in our operating income and foreign currency transaction gains and losses. We had a foreign currency transaction gain of approximately $0.3 million during the year ended December 31, 2019 and a $1.4 million loss during the year ended December 31, 2018. We currently do not engage in any foreign exchange hedging activity but may do so in the future.

At December 31, 2019, our net GBP-denominated assets were approximately $59.7 million (which excludes the $16.8 million then drawn under the USD-denominated UK term note under the VPC Facility). A hypothetical 10% strengthening or weakening in the value of the USD compared to the GBP at this date would have resulted in a decrease/increase in net assets of approximately $6.0 million. During the year ended December 31, 2019, the GBP-denominated pre-tax income was approximately $6.1 million. A hypothetical 10% strengthening or weakening in the value of the USD compared to the GBP during this period would have resulted in a decrease/increase in the pre-tax income of approximately $0.6 million.

**Item 8. Financial Statements and Supplementary Data**

**Index to Consolidated Financial Statements**

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm | 112 |
| Consolidated Balance Sheets - December 31, 2019 and 2018 | 113 |
| Consolidated Statements of Operations - Years Ended December 31, 2019, 2018 and 2017 | 114 |
| Consolidated Statements of Comprehensive Income (Loss) - Years Ended December 31, 2019, 2018 and 2017 | 115 |
| Consolidated Statements of Stockholders' Equity - Years Ended December 31, 2019, 2018 and 2017 | 116 |
| Consolidated Statements of Cash Flows - Years Ended December 31, 2019, 2018 and 2017 | 117 |
| Notes to Consolidated Financial Statements | 119 |

# Report of Independent Registered Public Accounting Firm

Board of Directors and Shareholders
Elevate Credit, Inc.

**Opinion on the financial statements**

We have audited the accompanying consolidated balance sheets of Elevate Credit, Inc. (a Delaware corporation) and subsidiaries (the "Company") as of December 31, 2019 and 2018, the related consolidated statements of operations, comprehensive income (loss), stockholders' equity, and cash flows for each of the three years in the period ended December 31, 2019, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2019 and 2018, and the results of its operations and its cash flows for each of the three years in the period ended December 31, 2019, in conformity with accounting principles generally accepted in the United States of America.

**Basis for opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audits included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ GRANT THORNTON LLP

We have served as the Company's auditor since 2014.

Dallas, Texas
February 14, 2020

| (Dollars in thousands except share amounts) | | December 31, 2019 | | December 31, 2018 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Cash and cash equivalents* | $ | 88,913 | $ | 58,313 |
| Restricted cash | | 2,294 | | 2,591 |
| Loans receivable, net of allowance for loan losses of $86,996 and $91,608, respectively* | | 573,677 | | 561,694 |
| Prepaid expenses and other assets* | | 11,608 | | 11,418 |
| Operating lease right of use assets | | 10,191 | | — |
| Receivable from CSO lenders | | 8,696 | | 16,183 |
| Receivable from payment processors* | | 10,651 | | 21,716 |
| Deferred tax assets, net | | 10,139 | | 21,628 |
| Property and equipment, net | | 49,989 | | 41,579 |
| Goodwill | | 16,027 | | 16,027 |
| Intangible assets, net | | 1,402 | | 1,712 |
| Derivative assets at fair value (cost basis of $0 and $109, respectively)* | | — | | 412 |
| Total assets | $ | 783,587 | $ | 753,273 |
| | | | | |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | |
| Accounts payable and accrued liabilities (See Note 16)* | $ | 44,991 | $ | 44,950 |
| Operating lease liabilities | | 14,352 | | — |
| State and other taxes payable | | 605 | | 681 |
| Deferred revenue* | | 12,087 | | 28,261 |
| Notes payable, net (See Note 16)* | | 555,063 | | 562,590 |
| Total liabilities | | 627,098 | | 636,482 |
| COMMITMENTS, CONTINGENCIES AND GUARANTEES (Note 14) | | | | |
| STOCKHOLDERS' EQUITY | | | | |
| Preferred stock; $0.0004 par value; 24,500,000 authorized shares; none issued and outstanding at December 31, 2019 and 2018 | | — | | — |
| Common stock; $0.0004 par value; 300,000,000 authorized shares; 44,445,736 and 43,329,262 issued; 43,676,826 and 43,329,262 outstanding, respectively | | 18 | | 18 |
| Additional paid-in capital | | 193,061 | | 183,244 |
| Treasury stock; at cost; 768,910 and 0 shares of common stock, respectively | | (3,344) | | — |
| Accumulated deficit | | (34,342) | | (66,525) |
| Accumulated other comprehensive income, net of tax benefit of $1,353 and $1,257, respectively | | 1,096 | | 54 |
| Total stockholders' equity | | 156,489 | | 116,791 |
| Total liabilities and stockholders' equity | $ | 783,587 | $ | 753,273 |

\* These balances include certain assets and liabilities of variable interest entities ("VIEs") that can only be used to settle the liabilities of that respective VIE. All assets of the Company are pledged as security for the Company's outstanding debt, including debt held by the VIEs. For further information regarding the assets and liabilities included in the Company's consolidated accounts, see Note 4—Variable Interest Entities.

*The accompanying notes are an integral part of these consolidated financial statements.*

| (Dollars in thousands, except share and per share amounts) | Years Ended December 31, | | |
|---|---|---|---|
| | 2019 | 2018 | 2017 |
| Revenues | $ 746,962 | $ 786,682 | $ 673,132 |
| Cost of sales: | | | |
| Provision for loan losses | 364,241 | 411,979 | 357,574 |
| Direct marketing costs | 51,283 | 77,605 | 72,222 |
| Other cost of sales | 28,846 | 26,359 | 20,536 |
| Total cost of sales | 444,370 | 515,943 | 450,332 |
| Gross profit | 302,592 | 270,739 | 222,800 |
| Operating expenses: | | | |
| Compensation and benefits | 103,070 | 94,382 | 81,969 |
| Professional services | 36,715 | 35,864 | 32,848 |
| Selling and marketing | 7,381 | 9,435 | 8,353 |
| Occupancy and equipment (See Note 16) | 20,712 | 17,547 | 13,895 |
| Depreciation and amortization | 17,380 | 12,988 | 10,272 |
| Other | 5,911 | 5,649 | 4,600 |
| Total operating expenses | 191,169 | 175,865 | 151,937 |
| Operating income | 111,423 | 94,874 | 70,863 |
| Other income (expense): | | | |
| Net interest expense (See Note 16) | (66,646) | (79,198) | (73,043) |
| Foreign currency transaction gain (loss) | 334 | (1,409) | 2,900 |
| Non-operating income (loss) | (681) | (350) | 2,295 |
| Total other expense | (66,993) | (80,957) | (67,848) |
| Income before taxes | 44,430 | 13,917 | 3,015 |
| Income tax expense | 12,247 | 1,408 | 9,931 |
| Net income (loss) | $ 32,183 | $ 12,509 | $ (6,916) |
| | | | |
| Basic income (loss) per share | $ 0.73 | $ 0.29 | $ (0.20) |
| Diluted income (loss) per share | $ 0.73 | $ 0.28 | $ (0.20) |
| Basic weighted-average shares outstanding | 43,805,845 | 42,791,061 | 33,911,520 |
| Diluted weighted-average shares outstanding | 44,338,205 | 44,299,304 | 33,911,520 |

*The accompanying notes are an integral part of these consolidated financial statements.*

**CONSOLIDATED STATEMENTS OF COMPREHENSIVE INCOME (LOSS)**

| (Dollars in thousands) | | Years Ended December 31, | | | | | |
|---|---|---|---|---|---|---|---|
| | | 2019 | | 2018 | | 2017 | |
| Net income (loss) | $ | 32,183 | $ | 12,509 | $ | (6,916) | |
| Other comprehensive income (loss), net of tax: | | | | | | | |
|   Foreign currency translation adjustment, net of tax of ($1), $0 and ($74), respectively | | 1,250 | | (1,237) | | 916 | |
|   Reclassification of certain deferred tax effects | | — | | (920) | | — | |
|   Change in derivative valuation, net of tax of ($95), $95 and $0, respectively | | (208) | | 208 | | — | |
|   Total other comprehensive income (loss), net of tax | | 1,042 | | (1,949) | | 916 | |
|     Total comprehensive income (loss) | $ | 33,225 | $ | 10,560 | $ | (6,000) | |

*The accompanying notes are an integral part of these consolidated financial statements.*

# Elevate Credit, Inc. and Subsidiaries
## CONSOLIDATED STATEMENTS OF STOCKHOLDERS' EQUITY

| (Dollars in thousands except share amounts) | Preferred Stock Shares | Amount | Common Stock Shares | Amount | Series A Convertible Preferred Shares | Amount | Series B Convertible Preferred Shares | Amount | Additional paid-in capital | Treasury Stock Shares | Amount | Accumulated deficit | Accumulated other comprehensive income | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Balances at December 31, 2016 | — | $ — | 13,001,216 | $ 5 | 2,957,059 | $ 3 | 2,682,351 | $ 3 | 88,854 | — | $ — | $ (76,385) | 1,087 | $ 13,567 |
| Share-based compensation | | | | | | | | | 6,318 | | | | | 6,318 |
| Exercise of stock options | | | 486,329 | | | | | | (356) | | | | | (356) |
| Vesting of restricted stock units | | | 214,551 | | | | | | (229) | | | | | (229) |
| ESPP shares granted | | | 79,909 | | | | | | 511 | | | | | 511 |
| Tax expense of equity issuance costs | | | | | | | | | (1,196) | | | | | (1,196) |
| Issuance of common stock net of deferred costs | | | 14,285,000 | 6 | | | | | 80,188 | | | | | 80,194 |
| Conversion of preferred shares | | | 5,639,410 | 6 | (2,957,059) | (3) | (2,682,351) | (3) | | | | | | — |
| 2.5-for-1 common stock split on converted preferred shares | | | 8,459,109 | | | | | | | | | | | — |
| Comprehensive income: | | | | | | | | | | | | | | |
| Foreign currency translation adjustment, net of tax effect of ($74) | | | | | | | | | | | | | 916 | 916 |
| Cumulative effect of change in accounting | | | | | | | | | | | | 3,347 | | 3,347 |
| Net loss | | | | | | | | | | | | (6,916) | | (6,916) |
| Balances at December 31, 2017 | — | $ — | 42,165,524 | $ 17 | — | $ — | — | $ — | 174,090 | — | $ — | $ (79,954) | 2,003 | $ 96,156 |
| Share-based compensation | | | | | | | | | 8,233 | | | | | 8,233 |
| Exercise of stock options | | | 271,891 | | | | | | 997 | | | | | 997 |
| Vesting of restricted stock units | | | 715,492 | 1 | | | | | (246) | | | | | (245) |
| ESPP shares granted | | | 176,355 | | | | | | 844 | | | | | 844 |
| Tax expense of equity issuance costs | | | | | | | | | (674) | | | | | (674) |
| Comprehensive loss: | | | | | | | | | | | | | | |
| Foreign currency translation adjustment, net of tax expense of $0 | | | | | | | | | | | | | (1,237) | (1,237) |
| Change in derivative valuation, net of tax expense of $95 | | | | | | | | | | | | | 208 | 208 |
| Reclassification of certain deferred tax effects | | | | | | | | | | | | 920 | (920) | — |
| Net income | | | | | | | | | | | | 12,509 | | 12,509 |
| Balances at December 31, 2018 | — | $ — | 43,329,262 | $ 18 | — | $ — | — | $ — | 183,244 | — | $ — | $ (66,525) | 54 | $ 116,791 |
| Share-based compensation | | | | | | | | | 9,940 | | | | | 9,940 |
| Exercise of stock options | | | 37,760 | | | | | | 122 | | | | | 122 |
| Vesting of restricted stock units | | | 751,443 | | | | | | (1,392) | | | | | (1,392) |
| ESPP shares granted | | | 327,271 | | | | | | 1,149 | | | | | 1,149 |
| Tax expense of equity issuance costs | | | | | | | | | (2) | | | | | (2) |
| Comprehensive income: | | | | | | | | | | | | | | |
| Foreign currency translation adjustment, net of tax benefit of ($1) | | | | | | | | | | | | | 1,250 | 1,250 |
| Change in derivative valuation, net of tax benefit of ($95) | | | | | | | | | | | | | (208) | (208) |
| Treasury stock acquired | | | (768,910) | | | | | | | 768,910 | (3,344) | | | (3,344) |
| Net income | | | | | | | | | | | | 32,183 | | 32,183 |
| Balances at December 31, 2019 | — | $ — | 43,676,826 | $ 18 | — | $ — | — | $ — | 193,061 | 768,910 | $ (3,344) | $ (34,342) | 1,096 | $ 156,489 |

*The accompanying notes are an integral part of these consolidated financial statements.*

| (Dollars in thousands) | | Years Ended December 31, | | |
|---|---|---|---|---|
| | | 2019 | 2018 | 2017 |
| CASH FLOWS FROM OPERATING ACTIVITIES: | | | | |
| Net income (loss) | $ | 32,183 | $ 12,509 | $ (6,916) |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | | | |
| Depreciation and amortization | | 17,380 | 12,988 | 10,272 |
| Provision for loan losses | | 364,241 | 411,979 | 357,574 |
| Share-based compensation | | 9,940 | 8,233 | 6,318 |
| Amortization of debt issuance costs | | 640 | 371 | 525 |
| Amortization of loan premium | | 5,998 | 6,179 | 5,360 |
| Amortization of convertible note discount | | — | 138 | 3,637 |
| Amortization of derivative assets | | 108 | 1,259 | — |
| Amortization of operating leases | | 4 | — | — |
| Deferred income tax expense, net | | 11,583 | 1,148 | 9,729 |
| Unrealized (gain) loss from foreign currency transactions | | (334) | 1,409 | (2,900) |
| Non-operating (income) loss | | 681 | 350 | (2,295) |
| Changes in operating assets and liabilities: | | | | |
| Prepaid expenses and other assets | | (25) | (1,374) | (4,803) |
| Receivables from payment processors | | 11,134 | (735) | (1,708) |
| Receivables from CSO lenders | | 7,487 | 6,896 | 2,987 |
| Interest receivable | | (85,269) | (106,119) | (93,532) |
| State and other taxes payable | | (94) | (160) | 58 |
| Deferred revenue | | (11,434) | 5,819 | 15,116 |
| Accounts payable and accrued liabilities | | 6,121 | 1,386 | 9,266 |
| Net cash provided by operating activities | | 370,344 | 362,276 | 308,688 |
| CASH FLOWS FROM INVESTING ACTIVITIES: | | | | |
| Loans receivable originated or participations purchased | | (1,276,484) | (1,357,866) | (1,196,723) |
| Principal collections and recoveries on loans receivable | | 979,514 | 999,931 | 794,717 |
| Participation premium paid | | (5,861) | (6,393) | (5,680) |
| Purchases of property and equipment | | (24,690) | (27,490) | (16,755) |
| Net cash used in investing activities | | (327,521) | (391,818) | (424,441) |

*The accompanying notes are an integral part of these consolidated financial statements.*

**CONSOLIDATED STATEMENTS OF CASH FLOWS - (Continued)**

| (Dollars in thousands) | | Years Ended December 31, | | | | |
|---|---|---|---|---|---|---|
| | | 2019 | | 2018 | | 2017 |
| CASH FLOWS FROM FINANCING ACTIVITIES: | | | | | | |
| Proceeds from notes payable | $ | 64,000 | $ | 49,824 | $ | 103,560 |
| Payments of notes payable | | (70,000) | | — | | (84,950) |
| Cash paid for interest rate caps | | — | | (1,367) | | — |
| Settlement of derivative liability | | — | | (2,010) | | — |
| Payment of capital lease obligation | | — | | — | | (21) |
| Debt issuance costs paid | | (2,606) | | (200) | | (788) |
| Debt prepayment penalties paid | | (850) | | — | | — |
| Equity issuance costs paid | | — | | — | | (1,731) |
| ESPP shares issued | | 1,149 | | 844 | | 511 |
| Common stock repurchased | | (3,344) | | — | | — |
| Proceeds from issuance of stock | | — | | — | | 86,699 |
| Proceeds from stock award exercises | | 122 | | 997 | | 593 |
| Taxes paid related to net share settlement of equity awards | | (1,391) | | (246) | | (1,178) |
| Net cash provided by (used in) financing activities | | (12,920) | | 47,842 | | 102,695 |
| Effect of exchange rates on cash | | 400 | | (133) | | 436 |
| Net increase (decrease) in cash and cash equivalents | | 30,303 | | 18,167 | | (12,622) |
| Cash and cash equivalents, beginning of period | | 58,313 | | 41,142 | | 53,574 |
| Restricted cash, beginning of period | | 2,591 | | 1,595 | | 1,785 |
| Total Cash and cash equivalents and restricted cash, beginning of period | | 60,904 | | 42,737 | | 55,359 |
| Cash and cash equivalents, end of period | | 88,913 | $ | 58,313 | $ | 41,142 |
| Restricted cash, end of period | | 2,294 | | 2,591 | | 1,595 |
| Total Cash and cash equivalents and restricted cash, end of period | $ | 91,207 | $ | 60,904 | $ | 42,737 |
| Supplemental cash flow information: | | | | | | |
| Interest paid | $ | 66,003 | $ | 79,059 | $ | 68,925 |
| Taxes paid | $ | 535 | $ | 359 | $ | 442 |
| Non-cash activities: | | | | | | |
| CSO fees charged-off included in Deferred revenues and Loans receivable | $ | 4,754 | $ | 10,605 | $ | 11,063 |
| CSO fees on loans paid-off prior to maturity included in Receivable from CSO lenders and Deferred revenue | $ | 181 | $ | 268 | $ | 256 |
| Annual membership fee included in Deferred revenues and Loans receivable | $ | 195 | $ | — | $ | — |
| Derivative debt discount on convertible term notes | $ | — | $ | — | $ | 2,517 |
| Property and equipment accrued but not yet paid | $ | 579 | $ | 445 | $ | 1,158 |
| Prepaid expenses accrued but not yet paid | $ | — | $ | — | $ | 832 |
| Impact on deferred tax assets of adoption of ASU 2016-09 | $ | — | $ | — | $ | 3,347 |
| Impact on OCI and retained earnings of adoption of ASU 2018-02 | $ | — | $ | 920 | $ | — |
| Changes in fair value of interest rate caps | $ | 304 | $ | 304 | $ | — |
| Deferred IPO costs included in Additional paid-in capital | $ | — | $ | — | $ | 6,708 |
| Tax benefit of equity issuance costs included in Additional paid-in capital | $ | 2 | $ | 674 | $ | 1,196 |
| Impact of deferred tax asset included in Other comprehensive income (loss) | $ | 95 | $ | — | $ | — |
| Leasehold improvements included in Accounts payable and accrued liabilities | $ | — | $ | 2,717 | $ | — |
| Leasehold improvements allowance included in Property and equipment, net | $ | 439 | $ | — | $ | — |
| Lease incentives allowance included in Accounts payable and accrued expenses | $ | 3,720 | $ | — | $ | — |
| Operating lease right of use assets recognized | $ | 13,399 | $ | — | $ | — |
| Operating lease liabilities recognized | $ | 17,556 | $ | — | $ | — |

*The accompanying notes are an integral part of these consolidated financial statements.*

## NOTE 1—SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

The Company's accounting and reporting policies are in accordance with accounting principles generally accepted in the United States ("US GAAP") and conform, as applicable, to general practices within the finance company industry. The following is a description of the more significant of these policies used in preparing the consolidated financial statements.

### Business Operations

Elevate Credit, Inc. (the "Company") is a Delaware corporation. The Company provides technology-driven, progressive online credit solutions to non-prime consumers. The Company uses advanced technology and proprietary risk analytics to provide more convenient and more responsible financial options to its customers, who are not well-served by either banks or legacy non-prime lenders. The Company currently offers unsecured online installment loans, lines of credit and credit cards in the United States (the "US") and the United Kingdom (the "UK"). The Company's products, Rise, Elastic, Today Card and Sunny, reflect its mission of "Good Today, Better Tomorrow" and provide customers with access to competitively priced credit and services while helping them build a brighter financial future with credit building and financial wellness features. In the UK, the Company directly offers unsecured installment loans via the internet through its wholly owned subsidiary, Elevate Credit International Limited, ("ECI") under the brand name of Sunny.

### Basis of Presentation

The consolidated financial statements include the accounts of the Company, its wholly owned subsidiaries and variable interest entities ("VIEs") where the Company is the primary beneficiary. All significant intercompany transactions and accounts have been eliminated.

### Initial Public Offering

On April 11, 2017, the Company completed its initial public offering ("IPO") in which it issued and sold 12,400,000 shares of common stock at a price of $6.50 per share to the public. In connection with the closing, the underwriters exercised their option to purchase in full for an additional 1,860,000 shares. On April 6, 2017, the Company's stock began trading on the New York Stock Exchange ("NYSE") under the symbol "ELVT." The aggregate net proceeds received by the Company from the IPO, net of underwriting discounts and commissions and estimated offering expenses, were approximately $80.2 million.

Immediately prior to the closing of the IPO, all then outstanding shares of the Company's convertible preferred stock were converted into 5,639,410 shares of common stock (or 14,098,519 shares of common stock after the 2.5-for-1 forward stock split described below). The related carrying value of shares of preferred stock, in the aggregate amount of approximately $6 thousand, was reclassified as common stock. Additionally, the Company amended and restated its certificate of incorporation, effective April 11, 2017 to, among other things, change the authorized number of shares of common stock to 300,000,000 and the authorized number of shares of preferred stock to 24,500,000, each with a par value of $0.0004 per share.

Stock options granted to certain employees vest upon the satisfaction of the earlier of either a service condition or a liquidity condition. The service condition for these awards is generally satisfied over four years. The liquidity condition is satisfied upon the occurrence of a qualifying event, defined as the completion of the IPO, which occurred on April 11, 2017. The satisfaction of this vesting condition accelerated the expense attribution period for those stock options, and the Company recognized a cumulative share-based compensation expense of $0.8 million for the portion of those stock options that met the liquidity condition.

### Stock Split

On December 11, 2015, the Board of Directors approved the ratio to effect a 2.5-for-1 forward stock split of the Company's common stock. The stock split became effective in connection with the completion of the Company's IPO. All numbers of shares and per share data in the accompanying consolidated financial statements and related notes have been retroactively adjusted to reflect this stock split for all periods presented.

The Company's IPO and resulting stock split had the following effect on the Company's equity during the year ended December 31, 2017:

- Convertible Preferred Stock: In April 2017 as a result of the IPO, all then outstanding shares of the Company's convertible preferred stock (5,639,410) were converted on a one-to-one basis without additional consideration into an aggregate of 5,639,410 shares of common stock and, thereafter, into 14,098,519 shares of common stock after the application of the 2.5-for-1 forward stock split.

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** — **(Continued)**

- Common Stock: The IPO and resulting stock split caused an adjustment to the par value for the common stock, from $0.001 per share to $0.0004 per share, and caused a two-and-a-half times increase in the number of authorized and outstanding shares of common stock. The number of shares of common stock and per share common stock data in the accompanying consolidated financial statements and related notes have been retroactively adjusted to reflect a 2.5-for-1 forward stock split for all periods presented.

- Share-Based Compensation: The IPO and resulting stock split decreased the exercise price for stock options by two-and-a-half times per share and reflected a two-and-a-half times increase in the number of stock options and restricted stock units ("RSUs") outstanding. The number of stock options and RSUs and per share common stock data in the accompanying consolidated financial statements and related notes have been adjusted to reflect a 2.5-for-1 forward stock split for all periods presented.

## Use of Estimates

The preparation of the consolidated financial statements in conformity with US GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities at the date of the consolidated financial statements and the reported amounts of revenues and expenses during the reporting period.

Significant items subject to such estimates and assumptions include the valuation of the allowance for loan losses, goodwill, long-lived and intangible assets, deferred revenues, contingencies, the fair value of derivatives, the income tax provision, valuation of share-based compensation, operating lease right of use assets, operating lease liabilities and the valuation allowance against deferred tax assets. The Company bases its estimates on historical experience, current data and assumptions that are believed to be reasonable. Actual results in future periods could differ from those estimates.

## Cash and Cash Equivalents

The Company considers all highly-liquid investments purchased with an original maturity of three months or less to be cash equivalents.

## Restricted Cash

Amounts restricted under lending agreements, third-party processing agreements and state licensing requirements are classified separately as restricted cash.

## Installment Loans, Lines of Credit and Credit Cards

Installment loans, lines of credit and credit cards, including receivables for finance charges, fees and interest, are unsecured and reported as Loans receivable, net of allowance for loan losses on the Consolidated Balance Sheets. Installment loans are multi-payment loans that require the pay-down of portions of the outstanding principal balance in multiple installments through the Rise and Sunny brands. Line of credit accounts include customer cash advances made through the Rise brand in two states and the Elastic brand. Credit cards represent credit card balances, uncollected billed interest and fees through the Today Card brand. All outstanding balances, allowance for loan losses, and revenues for the Today Card were immaterial in 2018 and 2019.

The Company offers Rise installment and line of credit products and Sunny installment products directly to customers. Elastic lines of credit, Rise bank-originated installment loans and Today credit card receivables represent participation interests acquired from third-party lenders through a wholly owned subsidiary or by a VIE. Based on agreements with the third-party lenders, the VIEs pay a loan premium on the participation interests. The loan premium is amortized over the expected life of the outstanding loan amount. At December 31, 2019, 2018 and 2017, the amortization on the loan premiums were $6.0 million, $6.2 million and $5.4 million, respectively, and are included within Revenues in the Consolidated Statements of Operations. See Note 4—Variable Interest Entities for more information regarding these participation interests in Rise and Elastic receivables.

The Company considers impaired loans as accounts over 60 days past due (for installment loans and lines of credit) and 120 days (for credit cards) or loans which become uncollectible based on information that the Company becomes aware of (e.g., receipt of customer bankruptcy notice). The impaired loans are charged-off at the time that they are deemed to be uncollectible.

A modification of finance receivable terms is considered a troubled debt restructuring ("TDR") if the borrower is experiencing financial difficulty and the Company grants a concession it would not otherwise have considered to a borrower. The Company considers TDRs to include all installment and line of credit loans that were modified by granting principal and interest forgiveness or by extension of the maturity date greater than 60 days as a part of a loss mitigation strategy.

**Allowance for Loan Losses**

The Company has adopted Financial Accounting Standards Board ("FASB") guidance for disclosures about the credit quality of financing receivables and the allowance for loan losses ("allowance"). The Company maintains an allowance for loan losses for loans and interest receivable for loans not classified as TDRs at a level estimated to be adequate to absorb credit losses inherent in the outstanding loans receivable. The Company primarily utilizes historical loss rates by product, stratified by delinquency ranges, to determine the allowance, but also considers recent collection and delinquency trends, as well as macro-economic conditions that may affect portfolio losses. Additionally, due to the uncertainty of economic conditions and cash flow resources of the Company's customers, the estimate of the allowance for loan losses is subject to change in the near-term and could significantly impact the consolidated financial statements. If a loan is deemed to be uncollectible before it is fully reserved, it is charged-off at that time. For loans classified as TDRs, impairment is typically measured based on the present value of the expected future cash flows discounted at the original effective interest rate.

The Company classifies its loans as either current or past due. An installment loan or line of credit customer in good standing may request a 16-day grace period when or before a payment becomes due and, if granted, the loan is considered current during the grace period. Credit card customers have a 25-day grace period for each payment. Installment loans and lines of credit are considered past due if a grace period has not been requested and a scheduled payment is not paid on its due date. Credit cards are considered past due if the grace period has passed and the scheduled payment has not been made. Increases in the allowance are created by recording a Provision for loan losses in the Consolidated Statements of Operations. Installment loans and lines of credit are charged off, which reduces the allowance, when they are over 60 days past due or earlier if deemed uncollectible. Credit cards are charged off, which reduces the allowance, when they are over 120 days past due or earlier if deemed uncollectible. Recoveries on losses previously charged to the allowance are credited to the allowance when collected.

**Revenue Recognition**

The Company recognizes consumer loan fees as revenues for each of the loan products it offers. Revenues on the Consolidated Statements of Operations include: finance charges, lines of credit fees, fees for services provided through CSO programs ("CSO fees"), and interest, as well as any other fees or charges permitted by applicable laws and pursuant to the agreement with the borrower. The Company also records revenues related to the sale of customer applications to unrelated third parties. These applications are sold with the customer's consent in the event that the Company or its CSO lenders are unable to offer the customer a loan. Revenue is recognized at the time of the sale. Other revenues also include marketing and licensing fees received from the originating lender related to the Elastic product and Rise bank-originated loans and from CSO fees related to the Rise product. Revenues related to these fees are recognized when the service is performed.

The Company accrues finance charges on installment loans on a constant yield basis over their terms. The Company accrues and defers fixed charges such as CSO fees and lines of credit fees when they are assessed and recognizes them to earnings as they are earned over the life of the loan. The Company accrues interest on credit cards based on the amount of the loan outstanding and their contractual interest rate. Credit card membership fees are amortized to revenue over the card membership period. Other credit card fees, such as late payment fees and returned payment fees, are accrued when assessed. The Company does not accrue finance charges and other fees on installment loans or lines of credit for which payment is greater than 60 days past due. Credit card interest charges are recognized based on the contractual provisions of the underlying arrangements and are not accrued for which payment is greater than 90 days past due. Installment loans and lines of credit are considered past due if a grace period has not been requested and a scheduled payment is not paid on its due date. Credit cards have a grace period of 25 days and are considered delinquent after the grace period. Payments received on past due loans are applied against the loan and accrued interest balance to bring the loan current. Payments are generally first applied to accrued fees and interest and then to the principal loan balance.

The Company's business is affected by seasonality, which can cause significant changes in portfolio size and profit margins from quarter to quarter. Although this seasonality does not impact the Company's policies for revenue recognition, it does generally impact the Company's results of operations by potentially causing an increase in its profit margins in the first quarter of the year and decreased margins in the second through fourth quarters.

### Credit Service Organization

The Company also provides services in connection with installment loans originated by independent third-party lenders ("CSO lenders"), whereby the Company acts as a credit services organization/credit access business on behalf of consumers in accordance with applicable state laws (the "CSO program"). The CSO program includes arranging loans with CSO lenders, assisting in the loan application, documentation and servicing processes.

Under the CSO program, the Company guarantees the repayment of the customer's loan to the CSO lenders as part of the credit services it provides to the customer. A customer who obtains a loan through the CSO program pays the Company a fee for the credit services, including the guaranty, and enters into a contract with the CSO lenders governing the credit services arrangement. The CSO fee received is initially recognized as deferred revenue and subsequently recognized over the life of the loan. The Company estimates a liability for losses associated with the guaranty provided to the CSO lenders using assumptions and methodologies similar to the allowance for loan losses detailed previously. The CSO program required that the Company fund a cash reserve equal to 25% - 45% of the outstanding loan principal within the CSO program portfolio. As of December 31, 2019 and 2018, respectively, estimated losses of approximately $2.1 million and $4.4 million for the CSO owned loans receivable guaranteed by the Company of approximately $19.6 million and $39.8 million, respectively, are initially recorded at fair value and are included in Accounts payable and accrued liabilities in the Consolidated Balance Sheets. See Note 3—Loans Receivable and Revenues for additional information on loans receivable and the provision for loan losses.

The Company also had a Receivable from CSO lenders related primarily to CSO fees received by the CSO lenders from customers. The receivables (payables) related to the CSO lenders as of December 31, 2019 and 2018 are as follows:

| (Dollars in thousands) | | 2019 | | 2018 |
|---|---|---|---|---|
| Receivable related to 25%-45% cash reserve | $ | 8,648 | $ | 15,940 |
| Receivable (payable) related to CSO fees collected by CSO lenders ....................... | | (9) | | (208) |
| Receivable related to licensing and servicing arrangements with CSO lenders ....... | | 57 | | 451 |
| Total receivable from CSO lenders ........................................................... | $ | 8,696 | $ | 16,183 |

The CSO lenders are considered VIEs of the Company; however, the Company does not have any ownership interest in the CSO lenders, does not exercise control over them, and is not the primary beneficiary, and therefore, does not consolidate the CSO lenders' results with its results.

### Receivables from Payment Processors

The Company has entered into agreements with third-party service providers to conduct processing activities, including the funding of new customer loans and the collection of customer payments for those loans. In accordance with contractual agreements, these funds are settled back to the Company within one to three business days after the date of the originating transaction. Accordingly, the Company had approximately $10.7 million and $21.7 million due from processing providers as of December 31, 2019 and 2018, respectively, which is included in Receivable from payment processors in the Consolidated Balance Sheets.

### Direct Marketing Costs

Marketing expenses consist of online marketing costs such as sponsored search and advertising on social networking sites, and other marketing costs such as purchased television and radio air time and direct mail print advertising. In addition, marketing expense includes affiliate costs paid to marketers in exchange for information for applications from potential customers. Online marketing, affiliate costs and other marketing costs are expensed as incurred.

### Selling and Marketing Costs

Selling and marketing costs include costs associated with the use of agencies that perform creative services and monitor and measure the performance of the various marketing channels. Selling and marketing costs also include the production costs associated with media advertisements that are expensed as incurred over the licensing or production period.

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** — **(Continued)**

## Property and Equipment, net

Property and equipment are stated at cost, net of accumulated depreciation and amortization. The Company capitalizes all acquisitions of property and equipment of $500 or greater. The Company capitalizes certain software development costs. Costs incurred in the preliminary stages of development are expensed, but software development costs incurred thereafter, including external direct costs of materials and services as well as payroll and payroll-related costs, are capitalized.

Software development costs, which are included in Property and equipment, net on the Consolidated Balance Sheets, as of December 31, 2019 and 2018, and related amortization expense, which is included in Depreciation and amortization within the Consolidated Statements of Operations for the years ended December 31, 2019 and 2018 were as follows:

| (Dollars in thousands) | 2019 | 2018 |
|---|---|---|
| Software development costs | $ 73,105 | $ 56,379 |
| Less: accumulated amortization | (45,938) | (34,429) |
| Net book value | $ 27,167 | $ 21,950 |
| Amortization expense | $ 11,509 | $ 5,987 |

Maintenance and repairs that do not extend the useful life of the assets are expensed as incurred. Depreciation and amortization are computed using the straight-line method over the estimated useful lives of the depreciable or amortizable assets as follows:

| | |
|---|---|
| Furniture and fixtures | 7 years |
| Equipment | 3-5 years |
| Leasehold improvements | The lesser of the related lease term or useful life of 3-5 years |
| Software and software development | 3 years |

## Equity Issuance Costs

Costs incurred related to the Company's IPO were deferred and included in Prepaid expenses and other assets in the consolidated financial statements and were charged against the gross proceeds of the IPO (i.e., charged against Additional paid-in capital in the accompanying Consolidated Balance Sheets) as of the closing of the IPO on April 11, 2017 in the amount of approximately $6.7 million.

## Income Taxes

Income taxes are accounted for under the asset and liability method. Deferred tax assets and liabilities are recognized for the future tax consequences and benefits attributable to differences between the financial statement carrying amounts of existing assets and liabilities and their respective tax bases and operating loss and tax credit carryforwards. Deferred tax assets and liabilities are measured using enacted tax rates expected to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in tax rates is recognized in income in the period that includes the enactment date. Valuation allowances are established when necessary to reduce deferred tax assets to the amounts that are more likely than not to be realized.

Relative to uncertain tax positions, the Company accrues for losses it believes are probable and can be reasonably estimated. The amount recognized is subject to estimate and management judgment with respect to the likely outcome of each uncertain tax position. The amount that is ultimately sustained for an individual uncertain tax position or for all uncertain tax positions in the aggregate could differ from the amount recognized. If the amounts recorded are not realized or if penalties and interest are incurred, the Company has elected to record all amounts within income tax expense.

The Company has no recorded liabilities for US uncertain tax positions at December 31, 2019 and 2018. Tax periods from fiscal years 2014-2018 remain open and subject to examination for US federal and state tax purposes. As the Company had no operations nor had filed US federal tax returns prior to May 1, 2014, there are no other US federal or state tax years subject to examination.

For UK taxes, tax periods from fiscal years 2010-2019 remain open and subject to examination. The Company had an uncertain tax position at December 31, 2017 that was resolved and released during the year ended December 31, 2018. There are no additional UK uncertain tax positions at December 31, 2019.

On December 22, 2017, the Tax Cuts and Jobs Act (the "Act", or "Tax Reform") was enacted into law. The Act contains several changes to the US federal tax law including a reduction to the US federal corporate tax rate from 35% to 21%, an acceleration of the expensing of certain business assets, a reduction to the amount of executive pay that could qualify as a tax deduction, and the addition of a repatriation tax on any accumulated offshore earnings and profit.

The Company recognized a one-time $12.5 million charge as of December 31, 2017 due to the impact of US tax reform. This one-time charge was primarily the result of US GAAP requiring remeasurement of all US deferred income tax assets and liabilities for temporary differences from the previous tax rate of 35% to the new corporate tax rate of 21%.

Tax reform also included a new "Mandatory Repatriation" that required a one-time tax on shareholders of Specific Foreign Corporations ("SFCs"). The one-time tax was imposed using the Subpart F rules to require US shareholders to include in income the pro rata share of their SFC's previously untaxed accumulated post 1986 deferred foreign income. The Company's SFC, ECI, had an accumulated earnings and profit ("E&P") deficit at December 31, 2017, and therefore, the Company had no US impact from the new mandatory repatriation law.

Additionally, tax reform included a new anti-deferral provision, similar to the subpart F provision, requiring a US Shareholder of Controlled Foreign Corporation's ("CFC") to include in income annually its pro rata share of a CFC's "global intangible low-taxed income" ("GILTI"). The Company's SFC, ECI, qualifies as a CFC, and as such, requires a GILTI inclusion in the applicable tax year. ECI has a US tax year end of November 30 and results in no GILTI inclusion in the tax provision for the year ended December 31, 2018. The CFC's tax year beginning December 1, 2018 through November 30, 2019 will be included in the Company's tax provision and US Federal tax return for the year ended December 31, 2019. The Company has also elected to treat GILTI as a period cost, and therefore, will recognize those taxes as expenses in the period incurred.

### UK Research and Development Expenditure Credit

During 2019, the Company adopted the UK Research and Development Expenditure Credit ("RDEC") for qualifying expenses incurred since January 1, 2017. The credits are grants from the UK government to promote research and development activities in the UK and are recognized against the underlying research and development expenses. An entity that qualifies for RDEC credits must use the credits to offset any outstanding tax liabilities to the UK government. To the extent that the credit is larger than the tax liability, this excess can be paid directly to the Company. The Company's qualifying expenditures mainly consist of employment and contractor costs of certain of the Company's developers. The Company has recorded gross RDEC credits of $935 thousand within the related expense category with an offsetting amount of $178 thousand within Income tax expense in the Consolidated Statement of Operations in 2019.

### Goodwill and Indefinite Lived Intangible Assets

Goodwill represents the excess of the purchase price over the fair value of the net tangible and identifiable intangible assets acquired in each business combination. In accordance with Accounting Standards Codification ("ASC") 350-20-35, *Goodwill—Subsequent Measurement*, the Company performs a quantitative approach method impairment review of goodwill and intangible assets with an indefinite life annually at October 1 and between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount. Prior to 2019, the Company performed this test at October 31. The Company completed its annual test and determined that there was no evidence of impairment of goodwill or indefinite lived intangible assets. No events or circumstances occurred between October 1 and December 31, 2019 that would more likely than not reduce the fair value of the reporting units below the carrying amount.

The Company's impairment evaluation of goodwill is based on comparing the fair value of the Company's reporting units to their carrying value. The fair value of the reporting units was determined based on a weighted average of the income and market approaches. The income approach establishes fair value based on estimated future cash flows of the reporting units, discounted by an estimated weighted-average cost of capital developed using the capital asset pricing model, which reflects the overall level of inherent risk of the reporting units. The income approach uses the Company's projections of financial performance for a six to nine-year period and includes assumptions about future revenues growth rates, operating margins and terminal values. The market approach establishes fair value by applying cash flow multiples to the reporting units' operating performance. The multiples are derived from other publicly traded companies that are similar but not identical from an operational and economic standpoint.

### Intangible Assets Subject to Amortization

Intangible assets primarily include the fair value assigned to non-compete agreements at acquisition less any accumulated amortization. Non-compete agreements are amortized on a straight-line basis over the term of the agreement. An evaluation of the recoverability of intangible assets subject to amortization is performed whenever the facts and circumstances indicate that the carrying value may be impaired. An impairment loss is recognized if the future undiscounted cash flows associated with the asset and the estimated fair value of the asset are less than the asset's corresponding carrying value. The amount of the impairment loss, if any, is the excess of the asset's carrying value over its estimated fair value. No impairment losses related to intangible assets subject to amortization occurred during the years ended December 31, 2019, 2018 and 2017.

### Leases

Prior to the implementation of ASC Topic 842, *Leases*, the Company recognized escalating lease payments on a straight-line basis over the term of each respective lease with the difference between cash payments and rent expense recorded as a deferred rent liability. At December 31, 2018, the Company had a deferred rent liability of $3.7 million that is included in Accounts payable and accrued liabilities in the Consolidated Balance Sheets. The Company adopted the provisions of ASC Topic 842 on a prospective basis at January 1, 2019. The adoption of ASU 2016-02, as amended, resulted in the recognition of approximately $11.5 million and $15.4 million additional right of use assets and liabilities for operating leases, respectively. Subsequent to initial adoption, the Company entered into additional leases for a total recognition in 2019 of $13.4 million and $17.6 million right of use assets and liabilities for operating leases, respectively.

The Company determines if an arrangement is a lease at inception. Operating leases are included in Operating lease right of use ("ROU") assets and Operating lease liabilities on our Consolidated Balance Sheets. Operating lease ROU assets and operating lease liabilities are recognized based on the present value of the future minimum lease payments over the lease term at the commencement date. As most of our leases do not provide an implicit rate, the Company uses its incremental borrowing rate based on the information available at the commencement date in determining the present value of future payments. The operating lease ROU asset may also include initial direct costs incurred and excludes any lease payments made and lease incentives. The Company's lease terms may include options to extend or terminate the lease when it is reasonably certain that the Company will exercise that option. Lease expense for minimum lease payments is recognized on a straight-line basis over the lease term. The Company has lease agreements with lease and non-lease components. The lease and non-lease components are accounted for as a single lease component.

### Debt Discount and Issuance Costs

Costs incurred for issuing the Notes payable are deferred and amortized using the straight-line method over the life of the related debt, which approximates the effective interest method. These costs include any debt discount or premium on the notes in addition to debt issuance costs incurred. The debt discount related to the Convertible Term Notes was fully amortized in 2018. For the years ended December 31, 2019 and 2018, amortization of the debt discount was approximately $0.0 million and $0.1 million, respectively, and is included within Net interest expense in the Consolidated Statements of Operations. See Note 7 —Notes Payable for additional information on the Convertible Term Notes.

The Convertible Term Notes converted into the 4th Tranche Term Notes on January 30, 2018 per the terms of the VPC Facility. At that time, the maturity of the 4th Tranche Term Notes was extended to February 1, 2021, and the debt discount on the Convertible Term Notes was fully amortized. In January 2018, the Company paid $2.0 million to Victory Park Management, LLC ("VPC") to settle the derivative liability associated with the Redemption Premium Feature upon the conversion of the Convertible Term Notes to the existing 4th Tranche Term Note. See Note 7—Notes Payable for additional information.

The unamortized balance of debt issuance costs was approximately $2.6 million and $0.7 million at December 31, 2019 and 2018, respectively, and is included in Notes payable, net in the Consolidated Balance Sheets. Amortization of debt issuance costs of approximately $0.6 million, $0.4 million and $0.5 million was recognized for the years ended December 31, 2019, 2018 and 2017, respectively, and is included within Net interest expense in the Consolidated Statements of Operations.

**Foreign Currency Translations and Transactions**

The functional currency for ECI is the British Pound ("GBP"). The assets and liabilities of ECI are translated into US dollars ("USD") at the exchange rates in effect at each balance sheet date, and the resulting adjustments are recorded in Accumulated other comprehensive income (loss), net as a separate component of equity. Revenues and expenses are translated at the monthly average exchange rates occurring during each period. Equity is translated at the historical rates of the respective transactions.

The Company had designated its intercompany loan with ECI as long-term. The intercompany loan was denominated in GBP. As a result, gains and losses related to the remeasurement of this balance were recognized in Accumulated other comprehensive income (loss), net in the accompanying Consolidated Statements of Stockholders' Equity.

Effective November 30, 2015, the Company converted the intercompany loan principal balance to equity and forgave the interest (which eliminates upon consolidation) that was accrued and unpaid on the loan at that date. The foreign currency remeasurement loss related to intercompany accounts remaining in Accumulated other comprehensive income, net is $1.4 million at December 31, 2019 and 2018. These intercompany loan transactions had no impact on the Company's consolidated results of operations.

As a portion of ECI's term note under the third-party credit facility is denominated in USD, ECI remeasures the portion of its term note denominated in GBP monthly. On August 30, 2017, the UK Term Note commitment amount was amended to approximately $47.9 million (comprised of $35.0 million and £10.0 million). Due to the transfer of $7.0 million of the UK Term Note from USD to GBP and the $25.0 million paydown of the UK Term Note in 2017, the Company realized a previously unrealized foreign currency loss of approximately $6.2 million. Based on the paydown in the fourth quarter of 2019, the Company realized a previously unrealized foreign currency loss of approximately $1.9 million.

The unrealized foreign currency gain / (loss) from foreign currency remeasurement was approximately $2.3 million, $(1.4) million and $9.1 million for the years ended December 31, 2019, 2018 and 2017, respectively, and is included in Foreign currency transaction gain (loss) in the Consolidated Statements of Operations.

**Comprehensive Income**

Accumulated other comprehensive income, net is comprised of the impact of foreign currency translation adjustments in addition to unrealized gains (losses) on interest rate caps. In 2018, certain stranded tax effects of $0.9 million were reclassified from accumulated comprehensive income to Accumulated deficit. For the years ended December 31, 2019, 2018 and 2017, the change in total other comprehensive income, net of tax, was a gain (loss) of approximately $1.0 million, $(1.9) million and $0.9 million, respectively. During the years ended December 31, 2019 and 2018, $0.3 million and $2.4 million, respectively, was reclassified from accumulated other comprehensive income to net income. No amounts have been reclassified from accumulated other comprehensive income to net loss during the year ended December 31, 2017.

**Concentration of Credit Risk**

The Company maintains cash and cash equivalent balances in bank deposit accounts that, at times, may exceed federally insured limits. The Company has not experienced any losses in such accounts. The Company believes it is not exposed to any significant credit risk on cash and cash equivalents.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

**Fair Value Measurements**

The Company applies the provisions of ASC Topic 820, *Fair Value Measurements and Disclosures*, for fair value measurements of financial and non-financial assets and liabilities that are recognized or disclosed at fair value in the financial statements on a recurring or non-recurring basis, as applicable. This guidance defines fair value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date (also referred to as an exit price). This guidance also establishes a framework for measuring fair value and expands disclosures about fair value measurements. See Note 11—Fair Value Measurements for additional information on fair value measurements.

**Derivative Financial Instruments**

The Company applies the provisions of ASC Topic 815, *Derivatives and Hedging*. On January 11, 2018, the Company and ESPV each entered into one interest rate cap transaction with a counterparty to mitigate the floating rate interest risk on a portion of the debt underlying the Rise and Elastic portfolios, respectively. The interest rate caps matured on February 1, 2019. The interest rate caps were designated as cash flow hedges against expected future cash flows attributable to future interest payments on debt facilities held by each entity. The Company initially reported the gains or losses related to the hedges as a component of Accumulated other comprehensive income in the Consolidated Balance Sheets in the period incurred and subsequently reclassified the interest rate caps' gains or losses to interest expense when the hedged expenses were recorded. The Company excluded the change in the time value of the interest rate caps in its assessment of their hedge effectiveness. The Company presented the cash flows from cash flow hedges in the same category in the Consolidated Statements of Cash Flows as the category for the cash flows from the hedged items. The interest rate caps did not contain any credit risk related contingent features. The Company's hedging program is not designed for trading or speculative purposes.

The Company's derivative financial instruments also included bifurcated embedded derivatives that were identified within the Convertible Term Notes recorded as assets or liabilities initially at fair value, and the changes in fair value at the end of each quarterly reporting period are included in earnings. Upon repayment of a portion of the Convertible Term Notes, approximately $2.0 million was released from the debt discount where the derivative was recorded into Interest expense. In January 2018, the Convertible Term Notes matured and became a portion of the 4th Tranche Term Note. Therefore, there is no bifurcated embedded derivatives as of December 31, 2019. See fair value measurements policy above, Note 7—Notes Payable, net, Note 11—Fair Value, and Note 12—Derivatives for additional information.

**Transfers and Servicing of Financial Assets**

The Company applies the provisions of ASC Topic 860, *Transfers and Servicing*, for accounting for transfers and servicing of financial assets, which requires that specific criteria are met in order to record a transfer of financial assets as a sale. To qualify for sale treatment, the guidance requires that the Company does not have continuing involvement with the sold assets and also requires the Company to no longer retain effective control of the assets. During the years ended December 31, 2019, 2018 and 2017, the Company entered into sales agreements with third-party firms whereby the Company sold charged off customer loans to the third party. The agreements meet the sale criteria, and as a result, proceeds of approximately $33.4 million, $34.8 million and $32.2 million for the years ended December 31, 2019, 2018 and 2017, respectively, were recorded as a recovery of charged off loans, inclusive of other recoveries, in the Allowance for loan losses.

Certain VIEs and a wholly owned subsidiary acquired certain loan participations in unsecured lines of credit and installment loans originated by third-party lenders to individual borrowers, which meet the criteria of a participation interest. Per the terms of the participation arrangements with the third-party lenders, loan servicing is retained by the third-party lenders, and the VIEs and a wholly owned subsidiary reimburses the lenders for the proportionate share of the servicing costs. See Note 4—Variable Interest Entities for additional information related to the participation interests purchased.

**Share-Based Compensation**

In accordance with ASC Topic 718, *Compensation-Stock Compensation*, all share-based payments, consisting of stock options, RSUs and ESPP purchase rights, that are issued to employees are measured based on the grant-date fair value of the awards and recognized as compensation expense on a straight-line basis over the period during which the recipient is required to perform services in exchange for the award (the requisite service period). Starting July 2017, the Company also has an employee stock purchase plan ("ESPP"). The determination of fair value of share-based payments on the date of grant using equity-valuation models is affected by the Company's stock price as well as assumptions regarding a number of highly complex and subjective variables. These variables include, but are not limited to, the expected stock price volatility over the term of the awards, actual and projected employee stock option exercise activity, risk-free interest rate, expected dividends and expected term. The Company uses the Black-Scholes-Merton Option Pricing Model to estimate the grant-date fair value of stock options, and the Company uses an equity valuation model to estimate the grant-date fair value of RSUs. Additionally, the recognition of share-based compensation expense requires an estimation of the number of awards that will ultimately vest and the number of awards that will ultimately be forfeited.

**Treasury Stock**

The Company evaluates each stock repurchase transaction in the period in which it is completed. If the repurchase transaction is significantly in excess of the current market price at purchase, the Company will identify whether the price paid included payment for other agreements, rights, and privileges. Repurchase transactions that do not contain these elements or are not significantly in excess of the current market price at purchase are accounted for using the cost method. The Company anticipates using its treasury stock to fulfill certain employee stock compensation grants and settlements. The Company has elected to use a first in, first out ("FIFO") method for assigning share cost at reissuance. Any gain or loss in the stock value will be credited or charged to paid in capital upon subsequent reissuance of the shares, with losses in excess of previously recognized gains charged to retained earnings. The Company is not obligated to purchase or reissue any shares at any time in accordance with its previously disclosed share repurchase plan.

**Recently Adopted Accounting Standards**

In July 2018, the FASB issued Accounting Standards Update ("ASU") No. 2018-09, *Codification Improvements* ("ASU 2018-09"). The purpose of ASU 2018-09 is to clarify, correct errors in or make minor improvements to the Codification. Among other revisions, the amendments clarify that an entity should recognize excess tax benefits or tax deficiencies for share compensation expense that is taken on an entity's tax return in the period in which the amount of the deduction is determined. The Company has adopted all of the amendments of ASU 2018-09 as of January 1, 2019 on a modified retrospective basis. The adoption of ASU 2018-09 did not have a material impact on the Company's consolidated financial statements.

In February 2018, the FASB issued ASU No. 2018-02, *Income Statement—Reporting Comprehensive Income (Topic 220): Reclassification of Certain Tax Effects from Accumulated Other Comprehensive Income* ("ASU 2018-02"). The purpose of ASU 2018-02 is to allow an entity to elect to reclassify the stranded tax effects related to the Tax Cuts and Jobs Act from Accumulated other comprehensive income into Retained earnings. The amendments in ASU 2018-02 are effective for all entities for fiscal years beginning after December 15, 2018, and for interim periods within those fiscal years. Early adoption is permitted. The Company adopted all amendments of ASU 2018-02 on a prospective basis as of January 1, 2018 and elected to reclassify the stranded tax effects resulting from the Tax Cuts and Jobs Act from Accumulated other comprehensive income to Accumulated deficit. The amount of the reclassification for the year ended December 31, 2018 was $920 thousand.

In August 2017, the FASB issued ASU No. 2017-12, *Derivatives and Hedging (Topic 815)—Targeted Improvements to Accounting for Hedging Activities* ("ASU 2017-12"). The purpose of ASU 2017-12 is to improve the financial reporting of hedging relationships to better portray the economic results of an entity's risk management activities in its financial statements. In addition, ASU 2017-12 makes certain targeted improvements to simplify the application of the hedge accounting guidance. In April 2019, the FASB issued ASU No. 2019-04, *Codification Improvements to Topic 326, Financial Instruments* ("ASU 2019-04"). This amendment clarifies the guidance in ASU 2017-12. ASU 2017-12 is effective for public companies for fiscal years beginning after December 15, 2018, and for interim periods within those fiscal years. Early adoption is permitted. The Company has adopted all of the amendments of ASU 2017-12 on a prospective basis as of January 1, 2018. Since the Company did not have derivatives accounted for as hedges prior to December 31, 2017, there was no cumulative-effect adjustment needed to Accumulated other comprehensive income (loss) and Accumulated deficit. The adoption of ASU 2017-12 did not have a material impact on the Company's consolidated financial statements.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

In February 2016, the FASB issued ASU No. 2016-02, *Leases (Topic 842)* ("ASU 2016-02"). ASU 2016-02 is intended to improve the reporting of leasing transactions to provide users of financial statements with more decision-useful information. ASU 2016-02 will require organizations that lease assets to recognize on the balance sheets the assets and liabilities for the rights and obligations created by those leases. In July 2018, the FASB issued ASU No. 2018-10, *Codification Improvements to Topic 842, Leases* ("ASU 2018-10"), which clarifies certain matters in the codification with the intention to correct unintended application of the guidance. Also in July 2018, the FASB issued ASU No. 2018-11, *Leases (Topic 842): Targeted Improvements* ("ASU 2018-11"), which provides entities with an additional (and optional) transition method whereby the entity applies the new lease standard at the adoption date and recognizes a cumulative-effect adjustment to the opening balance of retained earnings in the period of adoption. Additionally, under the new transition method, an entity's reporting for the comparative periods presented in the financial statements in which it adopts the new lease standard will continue to be in accordance with current US GAAP (Topic 840, Leases). ASU 2016-02, as amended, is effective for fiscal years beginning after December 15, 2018, including interim periods within those fiscal years. Early adoption is permitted. The Company elected to adopt the transition method in ASU 2018-11 by applying the practical expedient prospectively at January 1, 2019. The Company also elected to apply the optional practical expedient package to not reassess existing or expired contracts for lease components, lease classification or initial direct costs. The adoption of ASU 2016-02 on January 1, 2019, as amended, resulted in the recognition of approximately $11.5 million and $15.4 million additional right of use assets and liabilities for operating leases, respectively, but did not have a material impact on the Company's Consolidated Statements of Operations.

In July 2019, the FASB issued Accounting Standards Update ("ASU") No. 2019-07, *Codification Updates to SEC Sections* ("ASU 2019-07"). The purpose of ASU 2019-07 is to amend various SEC paragraphs pursuant to the issuance of SEC Final Rule Releases No. 33-10532, *Disclosure Update and Simplification*, and Nos. 33-10231 and 33-10442, *Investment Company Reporting Modernization*. Among other revisions, the amendments reduce duplication and clarify the inclusion of comprehensive income. The Company has adopted all of the amendments of ASU 2019-07 as of July 2019 with no impact to the Company's consolidated financial statements.

**Accounting Standards to be Adopted in Future Periods**

In December 2019, the FASB issued ASU No. 2019-12, *Income Taxes (Topic 740): Simplifying the Accounting for Income Taxes* ("ASU 2019-12"). The purpose of ASU 2019-12 is to reduce complexity in the accounting standards for income taxes by removing certain exceptions as well as clarifying certain allocations. This update also addresses the split recognition of franchise taxes that are partially based on income between income-based tax and non-income-based tax. This guidance is effective for fiscal years beginning after December 15, 2020, and interim periods within those fiscal years. Early adoption is permitted. The Company is still assessing the potential impact of ASU 2019-12 on the Company's consolidated financial statements.

In August 2018, the FASB issued ASU No. 2018-15, *Intangibles—Goodwill and Other—Internal-Use Software (Subtopic 350-40): Customer's Accounting for Implementation Costs Incurred in a Cloud Computing Arrangement That Is a Service Contract* ("ASU 2018-15"). The purpose of ASU 2018-15 is to provide additional guidance on the accounting for costs of implementation activities performed in a cloud computing arrangement that is a service contract. This guidance is effective for fiscal years beginning after December 15, 2019, and interim periods within those fiscal years. Early adoption is permitted. Entities have the option to apply the guidance in ASU 2018-15 prospectively to all implementation costs incurred after the date of adoption or retrospectively. The Company has elected to adopt prospectively as of January 1, 2020 and has implemented a control structure to identify cloud computing arrangements for appropriate accounting treatment similar to its procedures for right of use assets. The Company does not expect ASU 2018-15 to have a material impact on the Company's consolidated financial statements.

In August 2018, the FASB issued ASU No. 2018-13, *Fair Value Measurement (Topic 820): Disclosure Framework—Changes to the Disclosure Requirements for Fair Value Measurement* ("ASU 2018-13"). The purpose of ASU 2018-13 is to modify the disclosure requirements on fair value measurements in Topic 820, *Fair Value Measurement*. This guidance is effective for public companies for fiscal years beginning after December 15, 2019, and interim periods within those fiscal years and requires both a prospective and retrospective approach to adoption based on amendment specifications. Early adoption of any removed or modified disclosures is permitted. Additional disclosures may be delayed until their effective date. The Company does not expect ASU 2018-13 to have a material impact on the Company's consolidated financial statements.

In January 2017, the FASB issued ASU No. 2017-04, *Intangibles—Goodwill and Other (Topic 350): Simplifying the Test for Goodwill Impairment* ("ASU 2017-04"). The purpose of ASU 2017-04 is to simplify the subsequent measurement of goodwill. The amendments modify the concept of impairment from the condition that exists when the carrying amount of goodwill exceeds its implied fair value to the condition that exists when the carrying amount of a reporting unit exceeds its fair value. An entity no longer will determine goodwill impairment by calculating the implied fair value of goodwill by assigning the fair value of a reporting unit to all of its assets and liabilities as if that reporting unit had been acquired in a business combination. This guidance is effective for public companies for goodwill impairment tests in fiscal years beginning after December 15, 2019. The Company does not expect ASU 2017-04 to have a material impact on the Company's consolidated financial statements.

In June 2016, the FASB issued ASU No. 2016-13, *Financial Instruments—Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments* ("ASU 2016-13"). ASU 2016-13 is intended to replace the incurred loss impairment methodology in current US GAAP with a methodology that reflects expected credit losses and requires consideration of a broader range of reasonable and supportable information to inform credit loss estimates to improve the quality of information available to financial statement users about expected credit losses on financial instruments and other commitments to extend credit held by a reporting entity at each reporting date. In April 2019, the FASB issued ASU No. 2019-04, *Codification Improvements to Topic 326, Financial Instruments* ("ASU 2019-04"). This amendment clarifies the guidance in ASU 2016-13. The guidance in ASU 2016-13 was further clarified by ASU No. 2019-11, *Codification Improvements to Topic 326, Financial Instruments* ("ASU 2019-11") issued in November 2019. ASU 2019-11 provides transition relief such as permitting entities an accounting policy election regarding existing Troubled Debt Restructurings ("TDRs") among other things. In May 2019, the FASB issued ASU No. 2019-05, *Financial Instruments-Credit Losses (Topic 326): Targeted Transition Relief* ("ASU 2019-05"). The purpose of this amendment is to provide entities that have certain instruments within the scope of Subtopic 326-20, *Financial Instruments-Credit Losses-Measured at Amortized Cost,* with an option to irrevocably elect the fair value option in Subtopic 825-10, *Financial Instruments-Overall*, on an instrument-by-instrument basis. Election of this option is intended to increase comparability of financial statement information and reduce costs for certain entities to comply with ASU 2016-13. For public entities, ASU 2016-13 is effective for fiscal years beginning after December 15, 2019, including interim periods within those fiscal years. In November 2019, the FASB issued ASU No. 2019-10, *Financial Instruments - Credit Losses (Topic 326), Derivatives and Hedging (Topic 815), and Leases (Topic 842): Effective Dates ("ASU 2019-10")*. The purpose of this amendment is to create a two tier rollout of major updates, staggering the effective dates between larger public companies and all other entities. This granted certain classes of companies, including Smaller Reporting Companies ("SRCs"), additional time to implement major FASB standards, including ASU 2016-13. Larger public companies will still have an effective date for fiscal years beginning after December 15, 2019, including interim periods within those fiscal years. All other entities are permitted to defer adoption of ASU 2016-13, and its related amendments, until the earlier of fiscal periods beginning after December 15, 2022. Under the current SEC definitions, the Company meets the definition of an SRC as of the ASU 2019-10 issuance date and is adopting the deferral period for ASU 2016-13.

## NOTE 2—EARNINGS PER SHARE

In April 2017, the Company effected a 2.5-for-1 forward stock split of its common stock in connection with the completion of the IPO, which has been retroactively applied to previously reported share and earnings per share amounts.

Basic earnings per share ("EPS") is computed by dividing net income (loss) by the weighted-average number of common shares outstanding ("WASO") during each period. Also, basic EPS includes any fully vested stock and unit awards that have not yet been issued as common stock. There are no unissued fully vested stock and unit awards at December 31, 2019 and 2018.

Diluted EPS is computed by dividing net income (loss) by the WASO during each period plus any unvested stock option awards granted, vested unexercised stock options and unvested RSUs using the treasury stock method but only to the extent that these instruments dilute earnings per share.

The computation of earnings (loss) per share was as follows for years ended December 31, 2019, 2018 and 2017:

| | Years Ended December 31, | | |
|---|---|---|---|
| (Dollars in thousands except share and per share amounts) | 2019 | 2018 | 2017 |
| Numerator (basic): | | | |
| Net income (loss) | $ 32,183 | $ 12,509 | $ (6,916) |
| | | | |
| Numerator (diluted): | | | |
| Net income (loss) | $ 32,183 | $ 12,509 | $ (6,916) |
| | | | |
| Denominator (basic): | | | |
| Basic weighted-average number of shares outstanding | 43,805,845 | 42,791,061 | 33,911,520 |
| | | | |
| Denominator (diluted): | | | |
| Basic weighted-average number of shares outstanding | 43,805,845 | 42,791,061 | 33,911,520 |
| Effect of potentially dilutive securities: | | | |
| Convertible Preferred Stock | — | — | |
| Employee stock plans (options, RSUs and ESPP) | 532,360 | 1,508,243 | — |
| Diluted weighted-average number of shares outstanding | 44,338,205 | 44,299,304 | 33,911,520 |
| | | | |
| Basic and diluted earnings (loss) per share: | | | |
| Basic earnings (loss) per share | $ 0.73 | $ 0.29 | $ (0.20) |
| Diluted earnings (loss) per share | $ 0.73 | $ 0.28 | $ (0.20) |

For the years ended December 31, 2019, 2018 and 2017, the Company excluded the following potential common shares from its diluted earnings (loss) per share calculation because including these shares would be anti-dilutive.

- 1,434,882, 249,517 and 1,434,847 common shares issuable upon exercise of the Company's stock options
- 3,552,730, 826,557 and 519,909 common shares issuable upon vesting of the Company's RSUs.

ASC Topic 260, "Earnings Per Share" ("ASC Topic 260") requires companies with participating securities to utilize a two-class method for the computation of net income per share attributable to the Company. The two-class method requires a portion of net income attributable to the Company to be allocated to participating securities. Net losses are not allocated to participating securities unless those securities are obligated to participate in losses. The Company did not have any participating securities for the years ended December 31, 2019, 2018 and 2017.

## NOTE 3—LOANS RECEIVABLE AND REVENUES

### Revenues

Revenues generated from the Company's consumer loans for the years ended December 31, 2019, 2018 and 2017 were as follows:

| (Dollars in thousands) | 2019 | 2018 | 2017 |
|---|---|---|---|
| Finance charges | $ 456,458 | $ 467,691 | $ 412,954 |
| Lines of credit fees | 247,397 | 254,561 | 195,592 |
| CSO fees | 40,835 | 60,221 | 58,008 |
| Other | 2,272 | 4,209 | 6,578 |
| Total revenues | $ 746,962 | $ 786,682 | $ 673,132 |

**Loans receivable, net of allowance for loan losses**

The Company's portfolio consists of both installment loans and lines of credit, which are considered the portfolio segments at December 31, 2019 and 2018. The Rise product is primarily installment loans in the US with lines of credit offered in two states. The Sunny product is an installment loan product offered in the UK. The Elastic product is a line of credit product in the US. In November of 2018, the Company expanded a test launch of the Today Card, a credit card product offered in the US. Balances and activity for the Today Card as of and for the years ended December 31, 2019 and 2018 were not material.

The following reflects the credit quality of the Company's loans receivable as of December 31, 2019 and 2018 as delinquency status has been identified as the primary credit quality indicator. The Company classifies its loans as either current or past due. A customer in good standing may request up to a 16-day grace period when or before a payment becomes due and, if granted, the loan is considered current during the grace period. Installment loans, lines of credit and credit cards are considered past due if a grace period has not been requested and a scheduled payment is not paid on its due date. All impaired loans that were not accounted for as a TDR as of December 31, 2019 and 2018 have been charged off.

| (Dollars in thousands) | December 31, 2019 | | | | | |
|---|---|---|---|---|---|---|
| | Rise and Sunny | | Elastic(1) | | Total | |
| Current loans | $ | 339,816 | $ | 243,380 | $ | 583,196 |
| Past due loans | | 52,664 | | 22,395 | | 75,059 |
| Total loans receivable | | 392,480 | | 265,775 | | 658,255 |
| Net unamortized loan premium | | 290 | | 2,128 | | 2,418 |
| Less: Allowance for loan losses | | (57,103) | | (29,893) | | (86,996) |
| Loans receivable, net | $ | 335,667 | $ | 238,010 | $ | 573,677 |

| (Dollars in thousands) | December 31, 2018 | | | | | |
|---|---|---|---|---|---|---|
| | Rise and Sunny | | Elastic(1) | | Total | |
| Current loans | $ | 296,339 | $ | 273,217 | $ | 569,556 |
| Past due loans | | 53,491 | | 27,778 | | 81,269 |
| Total loans receivable | | 349,830 | | 300,995 | | 650,825 |
| Net unamortized loan premium | | 54 | | 2,423 | | 2,477 |
| Less: Allowance for loan losses | | (55,557) | | (36,051) | | (91,608) |
| Loans receivable, net | $ | 294,327 | $ | 267,367 | $ | 561,694 |

(1) Includes immaterial balances related to the Today Card, which expanded its test launch in November 2018.

Total loans receivable includes approximately $8.9 million and $7.4 million of loans in a non-accrual status at December 31, 2019 and 2018, respectively. The previously reported non-accrual loan balance as of December 31, 2018 excluded certain non-accrual loans that amounted to $2.7 million. The omission of these amounts only impacted the footnote disclosure and not the reported balances on the balance sheets and statements of operations, the Company does not believe this omission has a material impact on the previously reported balances in the consolidated financial statements as of December 31, 2018.

Additionally, total loans receivable includes approximately $38.1 million and $41.6 million of interest receivable at December 31, 2019 and 2018, respectively. The carrying value for Loans receivable, net of the allowance for loan losses approximates the fair value due to the short-term nature of the loans receivable.

The changes in the allowance for loan losses for the years ended December 31, 2019, 2018 and 2017 are as follows:

| (Dollars in thousands) | December 31, 2019 | | |
| --- | --- | --- | --- |
| | Rise and Sunny | Elastic(1) | Total |
| Balance beginning of year | $ 60,002 | $ 36,050 | $ 96,052 |
| Provision for loan losses | 245,658 | 118,583 | 364,241 |
| Charge-offs | (269,731) | (135,484) | (405,215) |
| Recoveries of prior charge-offs | 23,013 | 10,744 | 33,757 |
| Effect of changes in foreign currency rates | 240 | — | 240 |
| Total | 59,182 | 29,893 | 89,075 |
| Accrual for CSO lender owned loans (Note 1) | (2,079) | — | (2,079) |
| Balance end of year | $ 57,103 | $ 29,893 | $ 86,996 |

| (Dollars in thousands) | December 31, 2018 | | |
| --- | --- | --- | --- |
| | Rise and Sunny | Elastic(1) | Total |
| Balance beginning of year | $ 64,919 | $ 28,870 | $ 93,789 |
| Provision for loan losses | 273,080 | 138,899 | 411,979 |
| Charge-offs | (301,111) | (142,863) | (443,974) |
| Recoveries of prior charge-offs | 23,670 | 11,144 | 34,814 |
| Effect of changes in foreign currency rates | (556) | — | (556) |
| Total | 60,002 | 36,050 | 96,052 |
| Accrual for CSO lender owned loans (Note 1) | (4,444) | — | (4,444) |
| Balance end of year | $ 55,558 | $ 36,050 | $ 91,608 |

| (Dollars in thousands) | December 31, 2017 | | |
| --- | --- | --- | --- |
| | Rise and Sunny | Elastic | Total |
| Balance beginning of year | $ 62,987 | $ 19,389 | $ 82,376 |
| Provision for loan losses | 248,810 | 108,764 | 357,574 |
| Charge-offs | (271,746) | (107,417) | (379,163) |
| Recoveries of prior charge-offs | 24,019 | 8,134 | 32,153 |
| Effect of changes in foreign currency rates | 849 | — | 849 |
| Total | 64,919 | 28,870 | 93,789 |
| Accrual for CSO lender owned loans (Note 1) | (5,843) | — | (5,843) |
| Balance end of year | $ 59,076 | $ 28,870 | $ 87,946 |

(1)  Includes immaterial balances related to the Today Card, which expanded its test launch in November 2018.

As of December 31, 2019 and 2018, estimated losses of approximately $2.1 million and $4.4 million, respectively, for the CSO owned loans receivable guaranteed by the Company of approximately $19.6 million and $39.8 million, respectively, are initially recorded at fair value and are included in Accounts payable and accrued liabilities in the Consolidated Balance Sheets.

**Troubled Debt Restructurings**
In certain circumstances, the Company modifies the terms of its finance receivables for borrowers experiencing financial difficulties. Modifications may include principal and interest forgiveness. A modification of finance receivable terms is considered a TDR if the Company grants a concession to a borrower for economic or legal reasons related to the borrower's financial difficulties that would not otherwise have been considered. Management considers TDRs to include all installment and line of credit loans that were granted principal and interest forgiveness or that extended the maturity date by sixty days or more as a part of a loss mitigation strategy for Rise, Elastic and Sunny that began in 2017. Once a loan has been classified as a TDR, it is assessed for impairment based on the present value of expected future cash flows discounted at the loan's original effective interest rate considering all available evidence. There were no loans that were modified as TDRs prior to 2017.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

The following table summarizes the financial effects, excluding impacts related to credit loss allowance and impairment, of TDRs that occurred for the years ended December 31, 2019, 2018, and 2017:

| (Dollars in thousands) | 2019 | 2018 | 2017 |
|---|---|---|---|
| Outstanding recorded investment before TDR | $ 44,546 | $ 26,683 | $ 9,619 |
| Outstanding recorded investment after TDR | 42,195 | 24,421 | 7,726 |
| Total principal and interest forgiveness included in charge-offs within the Allowance for loan loss | $ 2,351 | $ 2,262 | $ 1,893 |

A loan that has been classified as a TDR remains so until the loan is liquidated through payoff or charge-off. The table below presents the Company's average outstanding recorded investment and interest income recognized on TDR for the years ended December 31, 2019, 2018, and 2017:

| (Dollars in thousands) | 2019 | 2018 | 2017 |
|---|---|---|---|
| Average outstanding recorded investment(1) | $ 15,995 | $ 9,132 | $ 6,416 |
| Interest income recognized | $ 11,013 | $ 14,056 | $ 1,162 |

1. Simple average as of December 31, 2019, 2018, and 2017, respectively.

The table below presents the Company's loans modified in TDRs as of December 31, 2019 and 2018:

| (Dollars in thousands) | 2019 | 2018 |
|---|---|---|
| Current outstanding investment | $ 11,559 | $ 7,627 |
| Delinquent outstanding investment | 7,273 | 5,531 |
| Outstanding recorded investment | 18,832 | 13,158 |
| Less: Impairment included in Allowance for loan losses | (5,238) | (969) |
| Outstanding recorded investment, net of impairment | $ 13,594 | $ 12,189 |

A TDR is considered to have defaulted upon charge-off when it is over 60 days past due or earlier if deemed uncollectible. There were approximately $25.0 million and $21.8 million of loan restructurings accounted for as TDRs that subsequently defaulted for the year ended December 31, 2019 and 2018, respectively. The Company had commitments to lend additional funds of approximately $2.3 million to customers with available and unfunded lines of credit at December 31, 2019.

## NOTE 4—VARIABLE INTEREST ENTITIES

The Company is involved with five entities that are deemed to be VIEs: Elastic SPV, Ltd., EF SPV, Ltd., and three Credit Services Organization ("CSO") lenders. Under ASC 810-10-15, *Variable Interest Entities*, a VIE is an entity that: (1) has an insufficient amount of equity investment at risk to permit the entity to finance its activities without additional subordinated financial support by other parties; (2) the equity investors are unable to make significant decisions about the entity's activities through voting rights or similar rights; or (3) the equity investors do not have the obligation to absorb expected losses or the right to receive residual returns of the entity. The Company is required to consolidate a VIE if it is determined to be the primary beneficiary, that is, the enterprise has both (1) the power to direct the activities of a VIE that most significantly impact the entity's economic performance and (2) the obligation to absorb losses of the entity that could potentially be significant to the VIE. The Company evaluates its relationships with VIEs to determine whether it is the primary beneficiary of a VIE at the time it becomes involved with the entity and it re-evaluates that conclusion each reporting period.

**Elastic SPV, Ltd.**

On July 1, 2015, the Company entered into several agreements with a third-party lender and Elastic SPV, Ltd. ("ESPV"), an entity formed by third-party investors for the purpose of purchasing loan participations from the third-party lender. Per the terms of the agreements, the Company provides customer acquisition services to generate loan applications submitted to the third-party lender. In addition, the Company licenses loan underwriting software and provides services to the third-party lender to evaluate the credit quality of those loan applications in accordance with the third-party lender's credit policies. ESPV accounts for the loan participations acquired in accordance with ASC 860-10-40, *Transfers and Services, Derecognition*, as the lines of credit acquired meet the criteria of a participation interest.

Once the third-party lender originates the loan, ESPV has the right, but not the obligation, to purchase a 90% interest in each Elastic line of credit. Victory Park Management, LLC ("VPC") entered into an agreement (the "ESPV Facility") under which it loans ESPV all funds necessary up to a maximum borrowing amount to purchase such participation interests in exchange for a fixed return (see Note 7—Notes Payable—ESPV Facility). The Company entered into a separate credit default protection agreement with ESPV whereby the Company agreed to provide credit protection to the investors in ESPV against Elastic loan losses in return for a credit premium. The Company does not hold a direct ownership interest in ESPV, however, as a result of the credit default protection agreement, ESPV was determined to be a VIE and the Company qualifies as the primary beneficiary. The following table summarizes the assets and liabilities of the VIE that are included within the Company's Consolidated Balance Sheets at December 31, 2019 and 2018:

| (Dollars in thousands) | | 2019 | | 2018 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Cash and cash equivalents | $ | 26,245 | $ | 18,723 |
| Loans receivable, net of allowance for loan losses of $28,852 and $36,019, respectively | | 234,504 | | 266,725 |
| Prepaid expenses and other assets ($0 and $64, respectively, eliminates upon consolidation) | | — | | 251 |
| Derivative asset at fair value (cost basis of $0 and $51, respectively) | | — | | 195 |
| Receivable from payment processors | | 6,363 | | 12,212 |
| Total assets | $ | 267,112 | $ | 298,106 |
| **LIABILITIES AND SHAREHOLDER'S EQUITY** | | | | |
| Accounts payable and accrued liabilities ($7,690 and $9,372, respectively, eliminates upon consolidation) | $ | 15,902 | $ | 17,923 |
| Deferred revenue | | 4,280 | | 5,293 |
| Reserve deposit liability ($23,150 and $35,850, respectively, eliminates upon consolidation) | | 23,150 | | 35,850 |
| Notes payable, net | | 223,780 | | 238,896 |
| Accumulated other comprehensive income | | — | | 144 |
| Total liabilities and shareholder's equity | $ | 267,112 | $ | 298,106 |

**EF SPV, Ltd.**

On October 15, 2018, the Company entered into several agreements with a third-party lender and EF SPV, Ltd. ("EF SPV"), an entity formed by third-party investors for the purpose of purchasing loan participations from the third-party lender. Per the terms of the agreements, the Company provides customer acquisition services to generate loan applications submitted to the third-party lender. In addition, the Company licenses loan underwriting software and provides services to the third-party lender to evaluate the credit quality of those loan applications in accordance with the third-party lender's credit policies. EF SPV accounts for the loan participations acquired in accordance with ASC 860-10-40, *Transfers and Services, Derecognition*, as the installment loans acquired meet the criteria of a participation interest.

Once the third-party lender originates the loan, EF SPV has the right, but not the obligation, to purchase an interest in each Rise bank originated installment loan. Prior to August 1, 2019, the third-party lender retained 5% of the balances and sold a 95% participation to EF SPV. On August 1, 2019, EF SPV purchased an additional 1% participation in the outstanding portfolio with the participation percentage revised going forward to 96%. VPC lends EF SPV all funds necessary up to a maximum borrowing amount to purchase such participation interests in exchange for a fixed return (see Note 7—Notes Payable—EF SPV Facility). The Company entered into a separate credit default protection agreement with EF SPV whereby the Company agreed to provide credit protection to the investors in EF SPV against the third-party lender originated loan losses in return for a credit premium. The Company does not hold a direct ownership interest in EF SPV, however, as a result of the credit default protection agreement, EF SPV was determined to be a VIE and the Company qualifies as the primary beneficiary. The following table summarizes the assets and liabilities of the VIE that are included within the Company's Consolidated Balance Sheets at December 31, 2019:

| (Dollars in thousands) | | 2019 | | 2018 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Cash and cash equivalents | $ | 7,541 | $ | 8,185 |
| Loans receivable, net of allowance for loan losses of $17,436 and $3,388, respectively | | 111,281 | | 25,484 |
| Receivable from payment processors ($0 and $101 eliminates upon consolidation) | | 681 | | 285 |
| Total assets | $ | 119,503 | $ | 33,954 |
| **LIABILITIES AND SHAREHOLDER'S EQUITY** | | | | |
| Accounts payable and accrued liabilities ($7,114 and $905, respectively, eliminates upon consolidation) | $ | 8,576 | $ | 1,332 |
| Reserve deposit liability ($8,950 and $4,650, respectively, eliminates upon consolidation) | | 8,950 | | 4,650 |
| Notes payable, net | | 101,977 | | 27,972 |
| Shareholder's equity | | — | | — |
| Total liabilities and shareholder's equity | $ | 119,503 | $ | 33,954 |

**CSO Lenders**

The three CSO lenders are considered VIE's of the Company; however, the Company does not have any ownership interest in the CSO lenders, does not exercise control over them, and is not the primary beneficiary, and therefore, does not consolidate the CSO lenders' results with its results.

## NOTE 5—PROPERTY AND EQUIPMENT

Property and equipment as of December 31, 2019 and 2018 consists of the following:

| (Dollars in thousands) | | 2019 | | 2018 |
|---|---|---|---|---|
| Furniture and fixtures | $ | 4,725 | $ | 4,383 |
| Equipment | | 16,475 | | 14,943 |
| Leasehold improvements | | 8,510 | | 6,413 |
| Software development cost | | 73,105 | | 56,379 |
| Software-purchased | | 21,333 | | 16,239 |
| | | 124,148 | | 98,357 |
| Less accumulated depreciation | | (74,159) | | (56,778) |
| | $ | 49,989 | $ | 41,579 |

Depreciation expense was approximately $17.1 million, $12.6 million, and $10.1 million for the years ended December 31, 2019, 2018, and 2017, respectively.

For the years ended 2019 and 2018, the Company identified internal-use software projects whose net carrying value was deemed unrecoverable, and therefore, fully impaired. In addition, the Company identified a group of furniture and fixtures that had been abandoned as a result of an update to one of the Company's offices. As a result, the company recognized impairment expenses of $681 thousand and $311 thousand in Non-operating income (loss) within the Consolidated Statements of Operations for the years ended December 31, 2019 and 2018, respectively.

## NOTE 6—ACCOUNTS PAYABLE AND ACCRUED LIABILITIES

Accounts payable and accrued liabilities at December 31, 2019 and 2018 consist of the following:

| (Dollars in thousands) | 2019 | 2018 |
|---|---|---|
| Accounts payable | $ 15,278 | $ 16,356 |
| Accrued compensation | 17,005 | 7,882 |
| Liability for losses on CSO lender-owned consumer loans | 2,080 | 4,444 |
| Interest payable | 4,952 | 7,280 |
| Other accrued liabilities | 5,676 | 8,988 |
| | $ 44,991 | $ 44,950 |

## NOTE 7—NOTES PAYABLE, NET

The Company has three debt facilities with VPC, the Rise SPV, LLC credit facility (the "VPC Facility"), the EF SPV Facility and the ESPV Facility. These facilities were modified effective February 1, 2019 to the following terms.

### VPC Facility

The VPC Facility is primarily used to fund the Rise and Sunny loan portfolio with a subordinated debt component used for general corporate purposes. It provides the following term notes at December 31, 2019:

- A maximum borrowing amount of $350 million used to fund the Rise loan portfolio ("US Term Note"). Prior to the February 1, 2019 amendment, the interest rate paid on this facility was a base rate (defined as the 3-month LIBOR, with a 1% floor) plus 11%. This resulted in a blended interest rate paid of 12.79% on debt outstanding under this facility as of December 31, 2018. The Company entered into an interest rate cap on January 11, 2018 to mitigate the floating interest rate risk on the aggregate $240 million outstanding as of December 31, 2017. This cap matured in February 2019. Upon the February 1, 2019 amendment date, the interest rate of the debt outstanding as of the amendment date was fixed through the January 1, 2024 maturity date at 10.23% (base rate of 2.73% plus 7.5%). All future borrowings under this facility will bear an interest rate at a base rate (defined as the greater of 3-month LIBOR, the five-year LIBOR swap rate or 1%) plus 7.5% at the borrowing date. The weighted-average base rate on the outstanding balance at December 31, 2019 was 2.73% and the overall rate was 10.23%.

- A maximum borrowing amount of $132 million used to fund the UK Sunny loan portfolio ("UK Term Note"). Prior to the February 1, 2019 amendment, the interest rate paid on this facility was a base rate (defined as the 3-month LIBOR rate) plus 14%. This resulted in a blended interest rate paid of 16.74% on debt outstanding under this facility as of December 31, 2018. Upon the February 1, 2019 amendment date, the interest rate on the debt outstanding as of the amendment date was fixed through the January 1, 2024 maturity date at 10.23% (base rate of 2.73% plus 7.5%). All future borrowings under this facility will bear an interest rate at a base rate (defined as the greater of 3-month LIBOR, the five-year LIBOR swap rate or 1%) plus 7.5% at the borrowing date. The weighted-average base rate on the outstanding balance at December 31, 2019 was 2.73% and the overall interest rate was 10.23%.

- A maximum borrowing amount of $18 million used to fund working capital, and prior to February 1, 2019, at a base rate (defined as the 3-month LIBOR, with a 1% floor) plus 13% ("4th Tranche Term Note"). Upon the February 1, 2019 amendment date, the interest rate was fixed through the February 1, 2021 maturity date at a base rate of 2.73% plus 13%. The interest rate at December 31, 2019 and 2018 was 15.73% and 15.74%, respectively. There was no change in the interest rate spread on this facility upon the February 1, 2019 amendment.

- Revolving feature providing the option to pay down up to 20% of the outstanding balance, excluding the 4th Tranche Term note, once per year during the first quarter. Amounts paid down may be drawn again at a later date.

As of December 31, 2019, the VPC Facility had a total borrowing capacity of $500 million.

The 4th Tranche Term Note matures on February 1, 2021. The US Term Note and the UK Term Note both mature on January 1, 2024. There are no principal payments due or scheduled until the respective maturity dates. All assets of the Company are pledged as collateral to secure the VPC Facility. The VPC Facility contains certain financial covenants for the Company such as minimum cash requirements and a minimum book value of equity. There are also certain covenants for the product portfolio underlying the facility including, among other things, excess spread requirements, maximum roll rate and charge-off rate levels and maximum loan-to-value ratios. The Company was in compliance with all covenants related to the VPC Facility as of December 31, 2019 and 2018.

As of December 31, 2017, the Company had a $10 million note with a blended interest rate of 10.64% ("Convertible Term Notes"). As of December 31, 2017, the interest rate was the greater of 10% or a base rate (defined as the 3-month LIBOR, with a 1% floor) plus 9%. The Convertible Term Notes were convertible, at the lender's option, into common stock upon the completion of specific defined liquidity events, including certain equity financings, certain mergers and acquisitions or the sale of substantially all of the Company's assets, or during the period from the receipt of notice of the anticipated commencement of a roadshow in connection with the Company's IPO until immediately prior to the effectiveness of the Registration Statement in connection with such IPO. The Convertible Term Notes were convertible into common stock at the market value (or a set discount to market value) of the shares on the date of conversion and since the Convertible Term Notes included a conversion option that continuously reset as the underlying stock price increased or decreased and provided a fixed value of common stock to the lender, it was considered share-settled debt. The Company did not elect and was not required to measure the Convertible Term Notes at fair value; as such, the Company measured the Convertible Term Notes at the accreted value, determined using the effective interest method. The conversion rights were not exercised, and the Convertible Term Notes became a part of the 4th Tranche Note on January 30, 2018.

The Convertible Term Notes contained embedded features that were required to be assessed as derivatives. The Company determined that two of the features it assessed were required to be bifurcated and accounted for under derivative accounting as follows: (i) An embedded redemption feature upon conversion into common shares of the Company's stock ("Share-Settlement Feature") that included a provision for the adjustment to the conversion price to a price less than the transaction-date fair value price per share if the Company is a party to certain qualifying liquidity or equity financing transactions. The incremental undiscounted present value of the embedded redemption feature was $6.3 million. (ii) An embedded redemption feature that required the Company to pay an amount up to $5 million ("Redemption Premium Feature") upon a cash redemption at maturity or upon a redemption caused by certain events of default.

These two embedded features were accounted for together as a single compound derivative. The Company estimated the fair value of the compound derivative using a probability-weighted valuation scenario model. The assumptions included in the calculations were highly subjective and subject to interpretation. The fair value of the single compound derivative was recognized as principal draw-downs were made and in proportion to the amount of principal draw-downs to the maximum borrowing amount. The initial fair value of the single compound derivative was recognized and presented as a debt discount and a derivative liability. The debt discount was amortized using the effective interest method from the principal draw-down date(s) through the maturity date. The derivative liability was accounted for in the same manner as a freestanding derivative pursuant to *ASC 815—Derivatives and Hedging* ("ASC 815"), with subsequent changes in fair value recorded in earnings each period.

During the period from the receipt of notice from the Company to VPC of the anticipated commencement of the roadshow in connection with its IPO until immediately prior to the effectiveness of the Registration Statement, VPC had the option to convert the Convertible Term Notes, in whole or in part, into that number of shares of the Company's common stock determined by the outstanding principal balance of and accrued, but unpaid, interest on the Convertible Term Notes divided by the product of (a) 0.8 multiplied by (b) the IPO price per share. VPC did not elect to exercise its right to convert; however, VPC purchased 2.3 million shares in the offering at the IPO price, and the Company used the proceeds from that purchase, approximately $14.95 million, to reduce an equivalent amount of indebtedness under the Convertible Term Notes. Accordingly, the Company released $2.0 million of the debt discount associated with this repayment into Net interest expense on the Consolidated Statements of Operations in the year ended December 31, 2017.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

Additionally, upon the effectiveness of the Registration Statement, VPC's option to convert was terminated, and the Convertible Term Notes were no longer convertible in whole or in part into shares of the Company's common stock. Furthermore, VPC agreed to waive approximately $3 million of the Redemption Premium Feature associated with the $15.0 million of Convertible Term Notes the Company repaid. The remaining fair value of the derivative recognized by the Company at December 31, 2017 related to the Redemption Premium Feature. See Note 11—Fair Value Measurements for additional information.

As discussed above, the Convertible Term Notes were converted into the 4th Tranche Term Notes on January 30, 2018 per the terms of the VPC Facility and the debt discount on the Convertible Term Notes was fully amortized. The exit premium under the Convertible Term Notes of $2.0 million was due and paid on January 30, 2018.

### EF SPV Facility

The EF SPV Facility has a maximum borrowing amount of $150 million used to purchase loan participations from a third-party lender. Prior to execution of the agreement with VPC effective February 1, 2019, EF SPV was a borrower on the US Term Note under the VPC Facility and the interest rate paid on this facility was a base rate (defined as 3-month LIBOR, with a 1% floor) plus 11%. Upon the February 1, 2019 amendment date, $43 million was re-allocated into the EF SPV Facility and the interest rate on the debt outstanding as of the amendment date was fixed through the January 1, 2024 maturity date at 10.23% (base rate of 2.73% plus 7.5%). All future borrowings under this facility will bear an interest rate at a base rate (defined as the greater of 3-month LIBOR, the five-year LIBOR swap rate or 1%) plus 7.5% at the borrowing date. The weighted-average base rate on the outstanding balance at December 31, 2019 was 2.49% and the overall interest rate was 9.99%. The EF SPV Term Note has a revolving feature providing the option to pay down up to 20% of the outstanding balance once per year during the first quarter. Amounts paid down may be drawn again at a later date prior to maturity.

The EF SPV Term Note matures on January 1, 2024. There are no principal payments due or scheduled until the maturity date. All assets of the Company and EF SPV are pledged as collateral to secure the EF SPV Facility. The EF SPV Facility contains certain covenants for the Company such as minimum cash requirements and a minimum book value of equity requirement. There are also certain covenants for the product portfolio underlying the facility including, among other things, excess spread requirements, maximum roll rate and charge-off rate levels, and maximum loan-to-value ratios. The Company was in compliance with all covenants related to the EF SPV Facility as of December 31, 2019.

### ESPV Facility

The ESPV Facility has a maximum borrowing amount of $350 million used to purchase loan participations from a third-party lender. Prior to the February 1, 2019 amendment, the interest rate paid on this facility was a base rate (defined as the greater of the 3-month LIBOR rate or 1% per annum) plus 13% for the outstanding balance up to $50 million, plus 12% for the outstanding balance greater than $50 million up to $100 million, plus 13.5% for any amounts greater than $100 million up to $150 million, and plus 12.75% for borrowing amounts greater than $150 million. This resulted in a blended interest rate paid of 14.65% on the debt outstanding under this facility at December 31, 2018. Upon the February 1, 2019 amendment date, the interest rate on the debt outstanding as of the amendment date was fixed at 15.48% (base rate of 2.73% plus 12.75%). Effective July 1, 2019, the interest rate on the debt outstanding as of the amendment date was set at 10.23% (base rate of 2.73% plus 7.5%). All future borrowings under this facility after July 1, 2019 will bear an interest rate at a base rate (defined as the greater of 3-month LIBOR, the five-year LIBOR swap rate or 1%) plus 7.5% at the borrowing date. The weighted-average base rate on the outstanding balance at December 31, 2019 was 2.72% and the overall interest rate was 10.22%. The Company entered into an interest rate cap on January 11, 2018 to mitigate the floating rate interest risk on an aggregate $216 million outstanding as of December 31, 2019. This cap matured in February 2019. See Note 11—Fair Value Measurements. The ESPV Term Note has a revolving feature providing the option to pay down up to 20% of the outstanding balance once per year during the first quarter. Amounts paid down may be drawn again at a later date prior to maturity.

The ESPV Term Note matures on January 1, 2024. There are no principal payments due or scheduled until the maturity date. All assets of the Company and ESPV are pledged as collateral to secure the ESPV Facility. The ESPV Facility contains certain covenants for the Company such as minimum cash requirements and a minimum book value of equity requirement. There are also certain covenants for the product portfolio underlying the facility including, among other things, excess spread requirements, maximum roll rate and charge-off levels, and maximum loan-to-value ratios. The Company was in compliance with all covenants related to the ESPV Facility as of December 31, 2019 and 2018.

**VPC, EF SPV and ESPV Facilities:**

The outstanding balance of Notes payable, net of debt issuance costs, for the years ended December 31, 2019 and 2018 are as follows:

| (Dollars in thousands) | | 2019 | | 2018 |
|---|---|---|---|---|
| US Term Note bearing interest at the base rate + 7.5% (2019) and + 11% (2018) | $ | 182,000 | $ | 250,000 |
| UK Term Note bearing interest at the base rate + 7.5% (2019) and + 14% (2018) | | 29,635 | | 39,196 |
| 4th Tranche Term Note bearing interest at the base rate + 13% | | 18,050 | | 35,050 |
| EF SPV Term Note bearing interest at the base rate + 7.5% | | 102,000 | | — |
| ESPV Term Note bearing interest at the base rate + 7.5% (2019) and + 12-13.5% (2018) | | 226,000 | | 239,000 |
| Debt issuance costs | | (2,622) | | (656) |
| Total | $ | 555,063 | $ | 562,590 |

The change in the facility balances includes the following:
- US Term Note - $43 million re-allocation to new EF SPV facility and pay down of $25 million in the first quarter of 2019 under the revolver component of the facility;
- UK Term Note - $10 million repayment in the fourth quarter of 2019;
- 4th Tranche Term Note - $17 million early repayment in the second quarter of 2019;
- EF SPV Term note - $43 million re-allocation from US Term Note in the first quarter of 2019 and additional draws of $59 million during the year ended December 31, 2019; and
- ESPV Term Note - Paydown of $18 million in the first quarter of 2019 under the revolver component of the facility and an additional draw of $5 million in the third quarter of 2019.

Per the terms of the February amendments, the Company qualifies for a 25 bps rate reduction on all three facilities effective January 1, 2020. This reduction does not apply to the 4th Tranche Term Note.

The Company paid a $2.4 million amendment fee on the ESPV Facility during the first quarter of 2019 that is included in deferred debt issuance costs and will be amortized into interest expense over the remaining life of the facility (through January 1, 2024). Additionally, the Company incurred an $850 thousand prepayment penalty during the second quarter of 2019 for the early repayment on the 4th Tranche Term Note that is included in interest expense.

The Company has evaluated the interest rates for its debt and believes they represent market rates based on the Company's size, industry, operations and recent amendments. As a result, the carrying value for the debt approximates the fair value.

The following table presents the future debt maturities, including debt issuance costs, as of December 31, 2019:

| Year (dollars in thousands) | | December 31, 2019 |
|---|---|---|
| 2020 | $ | — |
| 2021 | | 18,050 |
| 2022 | | — |
| 2023 | | — |
| 2024 | | 539,635 |
| Thereafter | | — |
| Total | $ | 557,685 |

### NOTE 8—GOODWILL AND INTANGIBLE ASSETS

The carrying value of goodwill at December 31, 2019 and 2018 was approximately $16.0 million. There were no changes to goodwill during the years ended December 31, 2019, 2018 and 2017. Goodwill represents the excess purchase price over the estimated fair market value of the net assets acquired by the predecessor parent company, Think Finance, Inc. ("Think Finance"), related to the Elastic and UK reporting units. Of the total goodwill balance, approximately $0.3 million is deductible for tax purposes.

The carrying value of acquired intangible assets as of December 31, 2019 is presented in the table below:

| (Dollars in thousands) | Cost | | Accumulated Amortization | | Net | |
|---|---|---|---|---|---|---|
| Assets subject to amortization: | | | | | | |
| Acquired technology ......................................................... | $ | 946 | $ | (946) | $ | — |
| Non-compete | | 3,404 | | (2,682) | | 722 |
| Customers.......................................................................... | | 126 | | (126) | | — |
| Assets not subject to amortization: | | | | | | |
| Domain names.................................................................... | | 680 | | — | | 680 |
| | $ | 5,156 | $ | (3,754) | $ | 1,402 |

The carrying value of acquired intangible assets as of December 31, 2018 is presented in the table below:

| (Dollars in thousands) | Cost | | Accumulated Amortization | | Net | |
|---|---|---|---|---|---|---|
| Assets subject to amortization: | | | | | | |
| Acquired technology ......................................................... | $ | 946 | $ | (946) | $ | — |
| Non-compete | | 3,404 | | (2,372) | | 1,032 |
| Customers.......................................................................... | | 126 | | (126) | | — |
| Assets not subject to amortization: | | | | | | |
| Domain names.................................................................... | | 680 | | — | | 680 |
| | $ | 5,156 | $ | (3,444) | $ | 1,712 |

In May 2018, a party to a non-compete agreement terminated employment with the Company. The terms of the non-compete agreement expired one year after termination. The Company determined that the useful life of the non-compete agreement should coincide with its expiration and therefore amortized the remaining carrying value on a straight-line basis through May 2019. As of December 31, 2019, the non-compete agreement was fully amortized.

Total amortization expense recognized for the years ended December 31, 2019, 2018 and 2017 was approximately $0.3 million, $0.4 million, and $0.2 million respectively. The weighted-average remaining amortization period for the intangible assets was 6, 6 and 8 years at December 31, 2019, 2018 and 2017, respectively.

Estimated amortization expense relating to intangible assets subject to amortization for the succeeding five years is as follows:

| Year (dollars in thousands) | Amount |
|---|---|
| 2020........................................................................................................................................................... | 120 |
| 2021........................................................................................................................................................... | 120 |
| 2022........................................................................................................................................................... | 120 |
| 2023........................................................................................................................................................... | 120 |
| 2024........................................................................................................................................................... | 120 |

## NOTE 9—LEASES

The Company has non-cancelable operating leases for facility space and equipment with varying terms. This included subleases with Think Finance (see Note 16—Related Parties) that terminated during the third quarter of 2018. All of the active leases for facility space qualified for capitalization under FASB ASC 842, *Leases*. These leases have remaining lease terms of three to seven years, and some may include options to extend the leases for up to ten years. The extension terms are not recognized as part of the right-of-use assets. The Company has elected not to capitalize leases with terms equal to, or less than, one year. As of December 31, 2019, net assets recorded under operating leases were $10.2 million and net lease liabilities were $14.4 million.

The Company analyzes contracts above certain thresholds to identify leases and lease components. Lease and non-lease components are not separated for facility space leases. The Company uses its contractual borrowing rate to determine lease discount rates when an implicit rate is not available.

Rental expense prior to the Company's adoption of ASC 842 was $4.2 million and $3.7 million for the years ended December 31, 2018 and 2017, respectively, and is reported in Occupancy and equipment in the Consolidated Statements of Operations. Total lease cost recognized after the adoption of ASC 842 for the year ended December 31, 2019, as included in Occupancy and equipment in the Consolidated Statements of Operations, is detailed in the table below.

| | Year ended December 31, 2019 |
|---|---|
| **Lease cost (dollars in thousands)** | |
| Operating lease cost | $ 4,819 |
| Short-term lease cost | 22 |
| Total lease cost | $ 4,841 |

Further information related to leases is as follows:

| | Year ended December 31, 2019 |
|---|---|
| **Supplemental cash flows information (dollars in thousands)** | |
| Cash paid for amounts included in the measurement of lease liabilities | $ 4,815 |
| Right-of-use assets obtained in exchange for lease obligations | $ 1,110 |
| Weighted-average remaining lease term | 4.5 years |
| Weighted-average discount rate | 10.23% |

Future minimum lease payments as of December 31, 2019 are as follows:

| Year (dollars in thousands) | Amount |
|---|---|
| 2020 | $ 3,760 |
| 2021 | 3,876 |
| 2022 | 3,984 |
| 2023 | 3,486 |
| 2024 | 1,438 |
| Thereafter | 1,892 |
| Total future minimum lease payments | $ 18,436 |
| Less: Imputed interest | (4,084) |
| Operating lease liabilities | $ 14,352 |

## NOTE 10—SHARE-BASED COMPENSATION

Share-based compensation expense recognized for the years ended December 31, 2019, 2018 and 2017 totaled approximately $9.9 million, $8.2 million and $6.3 million, respectively.

### 2016 Omnibus Incentive Plan

The 2016 Omnibus Incentive Plan ("2016 Plan") was adopted by the Company's Board of Directors on January 5, 2016 and approved by the Company's stockholders thereafter. The 2016 Plan became effective on June 23, 2016. The 2016 Plan provides for the grant of incentive stock options to the Company's employees, and for the grant of non-qualified stock options, stock appreciation rights, restricted stock, restricted stock units, dividend equivalent rights, cash-based awards (including annual cash incentives and long-term cash incentives), and any combination thereof to the Company's employees, directors and consultants. In connection with the 2016 Plan, the Company has reserved but not issued under the 2016 Plan 7,395,504 shares of common stock, which includes shares that would otherwise return to the 2014 Equity Incentive Plan (the "2014 Plan") as a result of forfeiture, termination, or expiration of awards previously granted under the 2014 Plan and outstanding when the 2016 Plan became effective.

The 2016 Plan will automatically terminate 10 years following the date it became effective, unless the Company terminates it sooner. In addition, the Company's Board of Directors has the authority to amend, suspend or terminate the 2016 Plan provided such action does not impair the rights under any outstanding award.

As of December 31, 2019, the total number of shares available for future grants under the 2016 Plan was 964,461 shares.

The Company has in the past and may in the future make grants of share-based compensation as inducement awards to new employees who are outside the 2016 Plan. The Company's board may rely on the employment inducement exception under NYSE Rule 303A.08 in order to approve the grants.

### 2014 Equity Incentive Plan

The Company adopted the 2014 Plan on May 1, 2014. The 2014 Plan permitted the grant of incentive stock options, non-statutory stock options, and restricted stock. On April 27, 2017 the Company's Board of Directors terminated the 2014 Plan as to future awards and confirmed that underlying shares corresponding to awards under the 2014 Plan that were outstanding at the time the 2016 Plan became effective that are forfeited, terminated or expire will become available for issuance under the 2016 Plan.

In conjunction with the 2016 and 2014 Plans, as of December 31, 2019, the Company had granted stock options and RSUs which are described in more detail below.

### Modification of Stock Awards

During 2017, certain employee stock option awards were converted into RSU equity awards using conversion ratios designed to preserve the value of these awards to the holders. On October 26, 2017, affected employees received 165,524 RSU awards based upon cancellation of 228,780 stock option awards. Adjustments to our outstanding stock-based compensation awards resulted in an additional compensation expense of $0.7 million to be recognized over the remaining vesting life of the underlying awards.

### Stock Options

Stock options are awarded to encourage ownership of the Company's common stock by employees and to provide increased incentive for employees to render services and to exert maximum effort for the success of the Company. The Company's stock options generally permit net-share settlement upon exercise. The option exercise price, vesting schedule and exercise period are determined for each grant by the administrator of the applicable plan. The Company's stock options generally have a 10-year contractual term and vest over a 4-year period from the grant date.

The weighted-average grant-date fair value for options granted in 2019 was $4.00. These options have a contractual term of 10 years and vest 100% on the third anniversary of the effective date. The assumptions used to determine the fair value of options granted in the years ended December 31, 2019 and 2018 using the Black-Scholes-Merton model are as follows:

|  | 2019 | 2018 |
|---|---|---|
| Dividend yield | 0% | 0% |
| Risk-free interest rate | 1.43% to 2.47% | 2.67% to 2.77% |
| Expected volatility (weighted-average and range, if applicable) | 55% (52% to 55%) | 48% (42% to 49%) |
| Expected term | 7 years | 6-7 years |

The expected term of the options granted is the period of time from the grant date to the date of expected exercise estimated using historical data. The expected volatility for any awards issued prior to our IPO was determined based on an average of companies in similar industries and other factors. Subsequent to our IPO, the expected volatility was determined based on our stock price. The risk-free interest rate used is the current yield on US Treasury notes with a term equal to the expected term of the options at the grant date. The expected dividend yield is based on annualized dividends on the underlying share during the expected term of the option.

A summary of stock option activity as of and for the year ended December 31, 2019 is presented below:

| Stock Options | Shares | Weighted-Average Exercise Price | Weighted-Average Remaining Contractual Life (in years) |
|---|---|---|---|
| Outstanding at December 31, 2018 | 2,328,154 | $ 4.63 | |
| Granted | 130,441 | 4.00 | |
| Exercised | (37,760) | 3.22 | |
| Canceled/Forfeited | (151,657) | 5.20 | |
| Outstanding at December 31, 2019 | 2,269,178 | 4.58 | 3.88 |
| Options exercisable at December 31, 2019 | 2,179,200 | $ 4.59 | 3.66 |

At December 31, 2019, the following options were outstanding at their respective exercise price:

| Exercise Price | Options Outstanding |
|---|---|
| $2.13 | 762,500 |
| $3.98 | 75,677 |
| $4.29 - 4.57 | 208,041 |
| $5.15 - 5.84 | 521,733 |
| $6.31 | 507,891 |
| $7.65 | 2,159 |
| $8.08 - 8.32 | 191,177 |
| Total | 2,269,178 |

At December 31, 2019, there was approximately $127 thousand of unrecognized compensation cost related to non-vested stock options which is expected to be recognized over a weighted-average period of 2.2 years. The total intrinsic value of options exercised for the year December 31, 2019 was $46 thousand.

**Restricted Stock Units**

RSUs are awarded to serve as a key retention tool for the Company to retain its executives and key employees. RSUs will transfer value to the holder even if the Company's stock price falls below the price on the date of grant, provided that the recipient provides the requisite service during the period required for the award to "vest."

The weighted-average grant-date fair value for RSUs granted under the 2016 Plan during the year ended December 31, 2019 was $4.66. These RSUs primarily vest 25% on the first anniversary of the effective date, and 25% each year thereafter, until full vesting on the fourth anniversary of the effective date.

A summary of RSU activity as of and for the year ended December 31, 2019 is presented below:

| RSUs | Shares | Weighted-Average Grant-Date Fair Value |
|---|---|---|
| Nonvested at December 31, 2018 | 3,155,041 | $ 7.91 |
| Granted | 2,424,983 | 4.66 |
| Vested[1] | (1,059,830) | 7.87 |
| Canceled/Forfeited | (358,332) | 7.02 |
| Nonvested at December 31, 2019 | 4,161,862 | 6.10 |
| Expected to vest at December 31, 2019 | 3,299,793 | $ 6.22 |

(1) During the year ended December 31, 2019, certain RSUs were net share-settled to cover the required withholding tax and the remaining amounts were converted into an equivalent number of shares of the Company's common stock. The Company withheld 308,387 shares for applicable income and other employment taxes and remitted the cash to the appropriate taxing authorities.

During the year ended December 31, 2019, the aggregate intrinsic value of vested and expected to vest RSUs was $14.7 million. The total intrinsic value of RSUs that vested during the year ended December 31, 2019 was $4.8 million.

At December 31, 2019, there was approximately $14.7 million of unrecognized compensation cost related to non-vested RSUs which is expected to be recognized over a weighted-average period of 2.4 years. The total fair value of RSUs vested for the year ended December 31, 2019 was $8.3 million.

**Employee Stock Purchase Plan**

The Company offers an Employee Stock Purchase Plan ("ESPP") to eligible employees. There are currently 1,379,948 shares authorized for the ESPP and 796,414 shares reserved for the ESPP. There were 327,271 shares purchased under the ESPP for the year ended December 31, 2019. Within share-based compensation expense for the years ended December 31, 2019, 2018 and 2017, $676 thousand, $562 thousand, and $332 thousand, respectively, relates to the ESPP.

## NOTE 11—FAIR VALUE MEASUREMENTS

The accounting guidance on fair value measurements establishes a fair value hierarchy that prioritizes the inputs to valuation techniques used to measure fair value. The hierarchy gives the highest priority to unadjusted quoted prices in active markets for identical assets or liabilities (Level 1 measurements) and the lowest priority to measurements involving significant unobservable inputs (Level 3 measurements).

The Company groups its assets and liabilities measured at fair value in three levels of the fair value hierarchy, based on the fair value measurement technique, as described below:

Level 1—Valuation is based upon quoted prices (unadjusted) for identical assets and liabilities in active exchange markets that the Company has the ability to access at the measurement date.

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** — (Continued)

Level 2—Valuation is based upon quoted prices for similar instruments in active markets, quoted prices for identical or similar instruments in markets that are not active, and model-based valuation techniques with significant assumptions and inputs that are observable in the market or can be derived principally from or corroborated by observable market data.

Level 3—Valuation is derived from model-based techniques that use inputs and significant assumptions that are supported by little or no observable market data. These unobservable assumptions reflect estimates of assumptions that market participants would use in pricing the asset or liability. Valuation techniques include the use of pricing models, discounted cash flow models and similar techniques.

The Company monitors the market conditions and evaluates the fair value hierarchy levels at least quarterly. For any transfers in and out of the levels of the fair value hierarchy, the Company discloses the fair value measurement at the beginning of the reporting period during which the transfer occurred. For the years ended December 31, 2019 and 2018, there were no significant transfers between levels.

The level of fair value hierarchy within which a fair value measurement in its entirety falls is based on the lowest-level input that is most significant to the fair value measurement in its entirety. In the determination of the classification of assets and liabilities in Level 2 or Level 3 of the fair value hierarchy, the Company considers all available information, including observable market data, indications of market conditions, and its understanding of the valuation techniques and significant inputs used. Based upon the specific facts and circumstances, judgments are made regarding the significance of the Level 3 inputs to the fair value measurements of the respective assets and liabilities in their entirety. If the valuation techniques that are most significant to the fair value measurements are principally derived from assumptions and inputs that are corroborated by little or no observable market data, the asset or liability is classified as Level 3.

*Financial Assets and Liabilities Not Measured at Fair Value*

The Company has evaluated Loans receivable, net of allowance for loan losses, Receivable from CSO lenders, Receivable from payment processors and Accounts payable and accrued expenses, and believes the carrying value approximates the fair value due to the short-term nature of these balances. The Company has also evaluated the interest rates for Notes payable, net and believes they represent market rates based on the Company's size, industry, operations and recent amendments. As a result, the carrying value for Notes payable, net approximates the fair value. The Company classifies its fair value measurement techniques for the fair value disclosures associated with Loans receivable, net of allowance for loan losses, Receivable from CSO lenders, Receivable from payment processors, Accounts payable and accrued liabilities and Notes payable, net as Level 3 in accordance with ASC 820-10, *Fair Value Measurements and Disclosures* ("ASC 820-10").

*Fair Value Measurements on a Recurring Basis*

**Interest Rate Caps**

On January 11, 2018, the Company and ESPV each entered into one interest rate cap transaction with a counterparty to mitigate the floating rate interest risk on a portion of the debt under the VPC Facility and the ESPV Facility, respectively. On January 16, 2018, the Company and ESPV paid fixed premiums of $719 thousand and $648 thousand for the interest rate caps on the US Term Note (under the VPC Facility) and the ESPV Facility, respectively. The interest rate caps matured on February 1, 2019. The interest rate caps qualified for hedge accounting as cash flow hedges. Gains and losses on the interest rate caps were recognized in Accumulated other comprehensive income in the period incurred and subsequently reclassified to Interest expense when the hedged expenses were recorded.

The Company used model-derived valuations that discounted the future expected cash receipts that would occur if variable interest rates rose above the strike price of the caps. The variable interest rates used in the calculation of projected receipts on the caps were based on an expectation of future interest rates derived from observable market interest rate curves and volatilities in active markets (Level 2). The following tables summarize these interest rate caps as of and for the years ended December 31, 2019 and 2018 (dollars in thousands):

| Contract date | Maturity date | Hedged interest rate payments' related note payable | Strike rate | Notional amount | Fair value at December 31, 2019 | Fair value at December 31, 2018 |
|---|---|---|---|---|---|---|
| January 11, 2018 | February 1, 2019 | US Term Note | 1.75% | $ 240,000 | $ — | $ 216 |
| January 11, 2018 | February 1, 2019 | ESPV Facility | 1.75% | 216,000 | — | 196 |
| | | | | $ 456,000 | $ — | $ 412 |

| Unrealized gains recognized in Accumulated other comprehensive income (loss) | As of December 31, 2019 | As of December 31, 2018 |
|---|---|---|
| US Term Note interest rate cap | $ — | $ 159 |
| ESPV Facility interest rate cap | — | 144 |
| | $ — | $ 303 |

| Gains recognized in Interest expense | Year ended December 31, 2019 | Year ended December 31, 2018 |
|---|---|---|
| US Term Note interest rate cap | $ 159 | $ 1,272 |
| ESPV Facility interest rate cap | 144 | 1,145 |
| | $ 303 | $ 2,417 |

**Convertible Term Notes**

Upon the initial $10 million draw on the Convertible Term Notes in October 2016, a derivative liability of approximately $1.7 million was recorded at fair value and was included as debt discount in Notes Payable, net and as a Derivative Liability on the Consolidated Balance Sheets at December 31, 2016. Upon the $15 million draw on the Convertible Term Notes in January 2017, an additional derivative liability of approximately $2.5 million was recorded at fair value and was included as a debt discount in Notes Payable and as a Derivative Liability. This liability was considered to be Level 3 in accordance with ASC 820-10 and was measured at fair value on a recurring basis. See Note 7—Notes Payable for additional information.

During the period from the receipt of notice from the Company to VPC of the anticipated commencement of the roadshow in connection with its IPO until immediately prior to the effectiveness of the Registration Statement, VPC had the option to convert the Convertible Term Notes, in whole or in part, into a number of shares of the Company's common stock determined by the outstanding principal balance of, and accrued, but unpaid interest on, the Convertible Term Notes divided by the product of (a) 0.8 multiplied by (b) the IPO price per share. VPC did not elect to exercise its right to convert, and an unpaid balance on the Convertible Term Notes remained outstanding after the IPO. Upon the effectiveness of the Registration Statement, VPC's option to convert was terminated, and the Convertible Term Notes were no longer convertible in whole or part into shares of the Company's common stock; as a result, the share-settlement ceased to be an embedded derivative feature requiring separate recognition and disclosure. However, a pro-rata portion of the Redemption Premium Feature to be paid upon the cash redemption at maturity, or upon a redemption caused by certain events of default, remained an embedded derivative feature that the Company was required to assess and recognize as a derivative liability. In January 2018, the Company paid $2.0 million to VPC to settle the derivative liability associated with the Redemption Premium Feature upon the conversion of the Convertible Term Notes to the existing 4th Tranche Term Note. See Note 7—Notes Payable for additional information.

The Company has no derivative amounts subject to enforceable master netting arrangements that are offset on the Consolidated Balance Sheets. The Derivative liability related to the Convertible Term Notes is measured at fair value on a recurring basis.

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS** — (Continued)

The changes in the Derivative liability for the years ended December 31, 2019, 2018 and 2017 are shown in the following table. The Convertible Term Notes converted to the 4th Tranche Term Note upon maturity at January 30, 2018 and the Derivative liability was settled with no value remaining outstanding at December 31, 2018 and December 31, 2019.

| (Dollars in thousands) | Embedded Derivative Liability in Convertible Term Notes |
|---|---|
| Balance at December 31, 2017 | $ 1,972 |
| Settlement of derivative due to conversion of the underlying Convertible Term Note to 4th Tranche Term Note | (2,010) |
| Fair value adjustment (Non-operating income (loss) in the Consolidated Statements of Operations) | 38 |
| Balance at December 31, 2018 (1) | $ — |

(1)  No activity since December 31, 2018.

## NOTE 12—DERIVATIVES

The Company and ESPV use hedging programs to manage interest rate risk associated with future interest payments. The Company and ESPV entered into two interest rate cap instruments on January 11, 2018, which matured on February 1, 2019.

**Cash Flow Hedges**

The Company and ESPV utilize interest rate caps to offset interest rate fluctuations in the Company's and ESPV's future interest payments on certain of their Notes payable. The financial instruments are designated and accounted for as cash flow hedges, and the Company and ESPV measure the effectiveness of the hedges at least quarterly. Effective gains or losses related to these cash flow hedges are reported in Accumulated other comprehensive income (loss) and reclassified into earnings, through interest expense, in the period or periods in which the hedged transactions affect earnings. See Note 11—Fair Value for additional information on these cash flow hedges. The following table summarizes the activity that was recorded in Accumulated other comprehensive income (loss) in addition to reclassifications from Accumulated other comprehensive income (loss) into earnings related to each of the Company's and ESPV's interest rate caps during the years ended December 31, 2019 and 2018.

| (Dollars in thousands) | Year ended December 31, 2019 | | Year ended December 31, 2018 | |
|---|---|---|---|---|
| | US Term Note | ESPV Facility | US Term Note | ESPV Facility |
| Beginning unrealized gains in Accumulated other comprehensive income | $ 159 | $ 144 | $ — | $ — |
| Gross gains recognized in Accumulated other comprehensive income | — | — | 1,431 | 1,289 |
| Gains reclassified to income through Interest expense | (159) | (144) | (1,272) | (1,145) |
| Ending unrealized gains in Accumulated other comprehensive income | $ — | $ — | $ 159 | $ 144 |

There were no interest rate caps during the year ended December 31, 2017.

**Embedded Derivative**

During the year ended December 31, 2016, the Company identified a bifurcated embedded derivative in its Convertible Notes related to its conversion feature in addition to the obligation to pay a redemption premium upon cash redemption of the notes. This derivative matured in 2018 and is no longer on the balance sheets as of December 31, 2019 and 2018. See Note 7—Notes Payable and Note 11—Fair Value for additional information about the bifurcated embedded derivative.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

## NOTE 13—INCOME TAXES

Income tax expense for the years ended December 31, 2019, 2018 and 2017 consists of the following:

| (Dollars in thousands) | 2019 | 2018 | 2017 |
|---|---|---|---|
| Current income tax expense (benefit): | | | |
| Federal | $ — | $ (5) | $ — |
| State | 576 | 150 | 202 |
| Foreign | 88 | 115 | — |
| Total current income tax expense | 664 | 260 | 202 |
| | | | |
| Deferred income tax expense (benefit): | | | |
| Federal | 9,643 | 1,245 | 9,973 |
| State | 1,940 | (97) | (244) |
| Total deferred income tax expense | 11,583 | 1,148 | 9,729 |
| | | | |
| Total income tax expense | $ 12,247 | $ 1,408 | $ 9,931 |

No material penalties or interest related to taxes were recognized for the years ended December 31, 2019, 2018 and 2017.

The Company's consolidated effective tax rates were 28%, 10% and 329%, while the Company's US effective tax rates were 32%, 9% and 219% for the years ended December 31, 2019, 2018 and 2017, respectively. The consolidated and US effective tax rates were significantly higher in 2017 as a result of the Act, which reduced the US federal corporate tax rate from 35% to 21% in 2018, and for which the Company recognized a one-time $12.5 million charge in 2017. The Company's US cash effective tax rate for 2019 was approximately 2%.

The differences between the provision for income tax and the amount that would result if the federal statutory rate were applied to the pre-tax financial income for the years ended December 31, 2019, 2018 and 2017 were as follows:

| (Dollars in thousands) | 2019 | 2018 | 2017 |
|---|---|---|---|
| Federal statutory rate of 21%, 21% and 35%, respectively | $ 9,330 | $ 2,923 | $ 1,055 |
| State income tax provision | 1,611 | 579 | (537) |
| Permanent differences | 2,495 | 259 | 161 |
| Change in valuation allowance | (682) | 5,428 | (1,198) |
| Rate differential | (38) | 154 | (1,616) |
| Change in federal statutory rate - US tax reform | — | (50) | 12,462 |
| Change in foreign statutory tax rate | (33) | (158) | 399 |
| Change in reserve for uncertain tax positions | 0 | (5,926) | 190 |
| Research and development credit | (1,013) | (2,493) | — |
| Other | 577 | 692 | (985) |
| Total | $ 12,247 | $ 1,408 | $ 9,931 |

On December 22, 2017, the SEC issued SAB 118, which provides guidance on accounting for tax effects of the Act. SAB 118 provides a measurement period of up to one year from the enactment date to complete the accounting. The Company has completed its accounting of the impact of the reduction in the corporate tax rate and remeasurement of certain deferred tax assets and liabilities based on the rate at which they are expected to reverse in the future, generally 21%, in 2018. During the year ended December 31, 2018, the Company recorded benefits of $245 thousand to its provisional amounts related to the Act, which had a 2 % impact for the year ended December 31, 2018.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

With respect to the new GILTI provision, the Company's SFC, ECI, qualifies as a CFC, and as such, requires a GILTI inclusion in the applicable tax year. The Company has elected to treat GILTI as a period cost, and therefore, will recognize those taxes as expenses in the period incurred. For the year ended December 31, 2019, the Company recognized $1.0 million related to GILTI, which is treated as a permanent difference. ECI has a US tax year end of November 30th and was not subject to a GILTI inclusion in the tax provision for the year ended December 31, 2018.

The tax effects of temporary differences that give rise to significant portions of deferred tax assets and deferred tax liabilities at December 31, 2019 and 2018 are presented below:

| (Dollars in thousands) | | 2019 | | 2018 |
|---|---|---:|---|---:|
| Deferred Tax Assets: | | | | |
| Allowance for losses on loans receivable............................................ | $ | 8,450 | $ | 13,337 |
| Net operating loss carryforward – foreign.......................................... | | 9,717 | | 9,642 |
| Net operating loss carryforward – domestic........................................ | | 196 | | 9,001 |
| Cumulative translation adjustment – domestic.................................... | | 1,355 | | 2,178 |
| Research and development credit......................................................... | | 3,139 | | 2,037 |
| Deferred equity compensation costs................................................... | | 2,130 | | 1,972 |
| Accrued expenses................................................................................ | | 3,426 | | 1,392 |
| Deferred equity issuance costs ........................................................... | | 23 | | 25 |
| Other.................................................................................................... | | 841 | | 654 |
| Total deferred tax assets ..................................................................... | | 29,277 | | 40,238 |
| Deferred Tax Liabilities: | | | | |
| Property and equipment, principally due to differences in depreciation............ | | (1,205) | | (678) |
| Amortization of intangible assets ....................................................... | | (7,416) | | (6,522) |
| Prepaid expenses ................................................................................ | | (1,226) | | (1,437) |
| Net deferred tax assets before valuation allowance ........................... | | 19,430 | | 31,601 |
| Valuation allowance ............................................................................ | | (9,291) | | (9,973) |
| Deferred tax assets, net....................................................................... | $ | 10,139 | $ | 21,628 |

## Uncertain tax positions

The following table sets forth the changes in the Company's unrecognized tax benefits related to the UK tax provision for the years ended December 31, 2019, 2018 and 2017:

| (Dollars in thousands) | | 2019 | | 2018 | | 2017 |
|---|---|---:|---|---:|---|---:|
| Balance at beginning of the year | $ | — | $ | 5,926 | $ | 5,736 |
| Reductions for tax positions related to the prior year ............. | | — | | (5,926) | | (166) |
| Additions (reductions) for tax positions related to the current year | | — | | — | | 356 |
| Balance at the end of the period ................................... | $ | — | $ | — | $ | 5,926 |

A thin-capitalization assessment was completed during 2018 that concluded a more likely than not position that interest expense incurred by the UK would not be limited by the UK taxing authorities. Based on the findings of this assessment, the Company no longer has an uncertain tax position related to the UK tax provision.

For purposes of evaluating the need for a deferred tax valuation allowance, significant weight is given to evidence that can be objectively verified. The following provides an overview of the assessment that was performed for both the domestic and foreign deferred tax assets, net.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

### US deferred tax assets, net

At December 31, 2019 and 2018, the Company did not establish a valuation allowance for its US deferred tax assets ("DTA") based on management's expectation of generating sufficient taxable income in a look forward period over the next one to three years. The Federal NOL carryforward from US operations at December 31, 2018 was approximately $42.0 million and we expect that our results from operations in 2019 will fully utilize this NOL carryforward. The remaining NOL carryforward relates to certain states and is immaterial at December 31, 2019. The research and development credit expires beginning in 2036. The ultimate realization of the resulting deferred tax asset is dependent upon generating sufficient taxable income prior to the expiration of this carryforward. The Company considered the following factors when making their assessment regarding the ultimate realizability of the deferred tax assets.

Significant factors include the following:

- In 2019, the Company continued to grow its operating income (from $71 million in 2017 to $95 million in 2018 and to $111 million in 2019). The US-only pre-tax earnings improved from US-only pre-tax income of $14.1 million in 2018 to US-only pre-tax income of $38.4 million in 2019, a 172% improvement from the prior year. The primary driver for the increase in operating income is related to our continued margin expansion provided by improved credit quality and lower direct marketing expense.

- The Company is in a three-year cumulative pre-tax income position in 2019. Additionally, we expect full utilization of our NOL carryforward in 2019 as well as utilization of approximately 20% of our research and development credits. For 2020, the Company is forecasting further earnings growth as we continue to scale our business while focusing on continued improvement in the credit quality and profitability from the loan portfolios.

- Due to the short-term nature of the loan portfolio and the other material items that comprise the US deferred tax assets, net, the Company estimates that these deferred tax items will reverse within one to three years.

The Company has given due consideration to all the factors and has concluded that the US deferred tax asset is expected to be realized based on management's expectation of generating sufficient taxable income and the reversal of tax timing differences in a look-forward period over the next one to three years. Although realization is not assured, management believes it is more likely than not that all of the recorded deferred tax assets will be realized. The amount of the deferred tax assets considered realizable, however, could be adjusted in the future if estimates of future taxable income change. As a result, at December 31, 2019 and 2018, the Company did not establish a valuation allowance for the US DTA.

### UK deferred tax assets, net

At December 31, 2019 and 2018, the Company recognized a full valuation allowance for its foreign deferred tax assets due to the lack of sufficient objective evidence regarding the realization of these assets in the foreseeable future due to the regulatory uncertainty in the UK. For the years ended December 31, 2019 and 2018, the valuation allowance decreased by approximately $0.7 million and increased by approximately $5.4 million, respectively.

The Company continues to retain NOL carryforwards for foreign income tax purposes of approximately $57.2 million and $56.7 million as of December 31, 2019 and 2018, respectively, available to offset future foreign taxable income. To the extent that the Company generates taxable income in the future to utilize the tax benefits of the related deferred tax assets, subject to certain potential limitations, it may be able to reduce its effective tax rate by reducing the valuation allowance. The Company's foreign NOL carryforward can be carried forward indefinitely.

### NOTE 14—COMMITMENTS, CONTINGENCIES AND GUARANTEES

### Contingencies

Currently and from time to time, the Company may become a defendant in various legal and regulatory actions that arise in the ordinary course of business. The Company generally cannot predict the eventual outcome, the timing of the resolution or the potential losses, fines or penalties of such legal and regulatory actions. Actual outcomes or losses may differ materially from the Company's current assessments and estimates, which could have a material adverse effect on the Company's business, prospects, results of operations, financial condition or cash flows.

In accordance with applicable accounting guidance, the Company establishes an accrued liability for litigation, regulatory matters and other legal proceedings when those matters present material loss contingencies that are both probable and reasonably estimable. Even when an accrual is recorded, the Company may be exposed to loss in excess of any amounts accrued.

*UK Claims Accrual:*

During the second half of 2018, the Company's UK business began to receive an increased number of customer complaints initiated by claims management companies ("CMCs") related to the affordability assessment of certain loans. If the Company's evidence supports the affordability assessment and the Company rejects the claim, the customer has the right to take the complaint to the Financial Ombudsman Service for further adjudication. The CMCs' campaign against the high cost lending industry increased significantly during the second half of 2018 resulting in a significant increase in affordability claims against all companies in the industry during this period. The Company believes that many of the increased claims against it are without merit and reflect the use of abusive and deceptive tactics by the CMCs. The Financial Conduct Authority, a regulator in the UK financial services industry, began regulating the CMCs in April 2019 in order to ensure that the methods used by the CMCs are in the best interests of the consumer and the industry.

As of December 31, 2019 and 2018, the Company accrued approximately $2.3 million and $0.9 million, respectively, for the claims that were determined to be probable and reasonably estimable based on the Company's historical loss rates related to these claims. This accrual is recognized as Other cost of sales in the Consolidated Statements of Operations and as Accounts payable and accrued liabilities on the Consolidated Balance Sheets. The outcomes of the adjudication of these claims may differ from the Company's estimates, and as a result, the Company's estimates may change in the near term and the effect of any such change could be material to the financial statements. The Company continues to monitor the matters for further developments that could affect the amount of the loss contingency recognized. The following table presents a rollforward of the amount accrued for the years ended December 31, 2019 and 2018.

| (Dollars in thousands) | December 31, 2019 | December 31, 2018 |
|---|---|---|
| Beginning balance | $ 925 | $ — |
| Accruals | 9,029 | 2,855 |
| Payments | (7,377) | (1,975) |
| Effects of changes in foreign currency rates | (243) | 45 |
| Ending balance | $ 2,334 | $ 925 |

On October 25, 2019, the Company's UK subsidiary, ECI, entered into an agreement with the Financial Conduct Authority ("FCA") (the "Agreement") to not make any payments greater than £1 million outside of the normal course of business without obtaining prior approval from the FCA. The Company believes this Agreement will not have a material impact on ECI's ability to continue to serve its customers and meet its obligations.

*Other Matters:*

The Company is cooperating with the Consumer Financial Protection Bureau (the "CFPB") related to a civil investigative demand ("CID") received by Think Finance requesting information about the operations of Think Finance prior to the spin-off. In November 2017, the CFPB sued Think Finance in Montana District Court. Elevate is not a party to this lawsuit. The CFPB and Think Finance have settled all claims and have received final court approval in the United States Bankruptcy Court for the Northern District of Texas.

While no Think Finance, Inc. ("TFI") related litigation has been filed directly against Elevate, and we can provide no assurance that there will not be any future Think Finance related litigation filed against the Company, in October 2019, Elevate entered into tolling agreements with the Think Finance Creditors' Committee and class claimants in regard to any potential future claims against Elevate. These tolling agreements have been extended. In December 2019, the TFI bankruptcy plan was confirmed, and any claims from the TFI Creditors' Committee were assigned to the Think Finance Litigation Trust ("TFLT"). On February 20, 2020, Elevate and the TFLT in the TFI bankruptcy will be commencing mediation proceedings to determine, among other things, whether or not the spin-off of Elevate from TFI was a fraudulent conveyance. Although we do not anticipate liability for any obligations not expressly assumed by us pursuant to the separation and distribution agreement, it is possible that we could be required to assume responsibility for certain obligations retained by TFI should TFI fail to pay or perform its retained obligations. If it were determined that the spin-off constituted a fraudulent conveyance, then the spin-off could be deemed void and there could be a number of different remedies imposed against Elevate, including without limitation, the requirement that Elevate has to pay money damages in an amount equal to the difference between the consideration received by TFI in the spin-off and the fair market value of Elevate at the time of the spin-off. We can provide no assurances as to how long the mediation proceedings may take, or the outcome of such proceedings. Because no claims have been filed against Elevate, no reasonable estimate of possible loss, if any, can be made at this time. We believe any future claims are without merit, and we intend to defend ourselves vigorously.

In addition, on January 9, 2020, the District of Columbia's Attorney General, Karl A. Racine, issued a subpoena to Elevate alleging that Elevate may have violated the District of Columbia's Consumer Protection Procedures Act in connection with loans issued by banks in the District of Columbia.  The documents requested are related to the Rise and Elastic bank-originated loans in the District of Columbia.  Elevate has engaged counsel and initiated discussions with the Attorney General's office and is working to address any potential issues and provide certain documents as requested.  Elevate disagrees that it has violated the above referenced law and it intends to vigorously defend its position.

In addition, on January 27, 2020, an Elevate wholly-owned subsidiary and other non-affiliated service providers to banks were sued in a class action lawsuit in Washington state.  The Plaintiff in the case claims that Elevate and the other non-affiliated service providers to banks are engaged in "predatory lending practices that target financially vulnerable consumers" and have violated Washington's Consumer Protection Act by engaging in unfair or deceptive practices. Elevate disagrees that it has violated the above referenced law and it intends to vigorously defend its position.

## Commitments

The Elastic product, which offers lines of credit to consumers, had approximately $251.2 million and $250.1 million in available and unfunded credit lines at December 31, 2019 and 2018, respectively. In May 2017, the Rise product began offering lines of credit to consumers in certain states and had approximately $8.3 million and $9.3 million at December 31, 2019 and 2018, respectively, in available and unfunded credit lines. The Today Card, which expanded its test launch in November 2018, had approximately $0.6 million and $0.4 million in available and unfunded credit lines at December 31, 2019 and 2018, respectively. While these amounts represented the total available unused credit lines, the Company has not experienced and does not anticipate that all line of credit customers and credit card customers will access their entire available credit lines at any given point in time. The Company has not recorded a loan loss reserve for unfunded credit lines as the Company has the ability to cancel commitments within a relatively short timeframe.

Effective June 2017, the Company entered into a seven-year lease agreement for office space in San Diego, California. Upon the commencement of the lease, the Company was required to provide the lessor with an irrevocable and unconditional $500 thousand letter of credit. Provided the Company is not in default of any terms of the lease agreement, the outstanding required balance of the letter of credit will be reduced by $100 thousand per year beginning on the second anniversary of the lease commencement and ending on the fifth anniversary of the lease agreement. The minimum balance of the letter of credit will be at least $100 thousand throughout the duration of the lease. At December 31, 2019 and 2018, the Company had $400 thousand and $500 thousand, respectively, of cash balances securing the letter of credit which is included in Restricted cash within the Consolidated Balance Sheets.

## Guarantees

In connection with its CSO programs, the Company guarantees consumer loan payment obligations to CSO lenders and is required to purchase any defaulted loans it has guaranteed. The guarantee represents an obligation to purchase specific loans that go into default.

**Indemnification**

In the ordinary course of business, the Company may indemnify customers, vendors, lessors, investors, and other parties for certain matters subject to various terms and scopes. For example, the Company may indemnify certain parties for losses due to the Company's breach of certain agreements or due to the services it provides. The Company has not incurred material costs to settle claims related to such indemnification provisions at December 31, 2019 and 2018. The fair value of these liabilities is immaterial; accordingly, the Company has no liabilities recorded for these agreements at December 31, 2019 and 2018.

## NOTE 15—OPERATING SEGMENT INFORMATION

The Company determines operating segments based on how its chief operating decision-maker manages the business, including making operating decisions, deciding how to allocate resources and evaluating operating performance. The Company's chief operating decision-maker is its Chief Executive Officer, who reviews the Company's operating results monthly on a consolidated basis.

The Company has one reportable segment, which provides online financial services for sub-prime credit consumers, which is composed of the Company's operations in the United States and the United Kingdom. The Company has aggregated all components of its business into a single reportable segment based on the similarities of the economic characteristics, the nature of the products and services, the distribution methods, the type of customers and the nature of the regulatory environments.

Information related to each reportable segment is outlined below. Segment revenue is used to measure performance because management believes that this information is the most relevant in evaluating the results of the respective segments relative to other entities that operate in the same industry.

The following tables summarize the allocation of net revenues and long-lived assets based on geography. The geographic presentation of the Company's segment assets was based on the geographic location of the asset and revenue by the Company's country of domicile.

| (Dollars in thousands) | Years ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | **2019** | | **2018** | | **2017** | |
| Revenues | | | | | | |
| United States .............................................. | $ | 638,873 | $ | 663,717 | $ | 570,316 |
| United Kingdom | | 108,089 | | 122,965 | | 102,816 |
| Total............................................................ | $ | 746,962 | $ | 786,682 | $ | 673,132 |
| | | | | | | |
| Long-lived assets | | | | | | |
| United States | $ | 54,313 | $ | 41,933 | $ | 29,317 |
| United Kingdom.......................................... | | 23,296 | | 17,385 | | 13,082 |
| Total | $ | 77,609 | $ | 59,318 | $ | 42,399 |

## NOTE 16—RELATED PARTIES

The Company entered into sublease agreements with Think Finance for office space that expired in 2018. Total rent and utility payments made to Think Finance for office space were approximately $0.0 million, $0.8 million and $0.9 million for the years ended December 31, 2019, 2018 and 2017, respectively. Rent and utility expense is included in Occupancy and equipment within the Consolidated Statements of Operations.

Expenses related to our board of directors, including board fees, travel reimbursements, share-based compensation and a consulting arrangement with a related party are included in Professional services within the Consolidated Statements of Operations. These expenses for the years ended December 31, 2019, 2018 and 2017 were as follows:

| | Years Ended December 31, | | |
|---|---|---|---|
| (Dollars in thousands) | 2019 | 2018 | 2017 |
| Fees and travel expenses | $ 729 | $ 543 | $ 590 |
| Stock compensation | 2,441 | 1,311 | 728 |
| Consulting | 374 | 300 | 300 |
| Total board related expenses | $ 3,544 | $ 2,154 | $ 1,618 |

At December 31, 2019 and 2018, the Company owed approximately $123 thousand and $119 thousand, respectively, to board members related to the above expenses, which is included in Accounts payable and accrued liabilities within the Consolidated Balance Sheets.

During the year ended December 31, 2017, a member of the board entered into a direct investment in the VPC Facility of $800 thousand. The interest payments on this loan were $85 thousand, $107 thousand and $76 thousand for the years ended December 31, 2019, 2018 and 2017, respectively.

## NOTE 17—401(k) PLAN

The Company adopted a 401(k) Plan (the "Plan") on June 1, 2014. All employees are eligible to participate in the Plan upon reaching the age of 21 years and completing one month of service with the Company. The Plan is a "safe harbor 401k plan" and the Company matches 100% of each participant's first 5% of compensation that is contributed to the Plan each year. Participants may contribute up to 70% of their eligible earnings to the applicable Plan, subject to regulatory and other plan restrictions. Company and employee contributions are fully vested at the time of contribution. The Company's consolidated matching contributions in the years ended December 31, 2019, 2018 and 2017 totaled approximately $2.8 million, $2.5 million and $1.8 million, respectively.

In addition, the Company operates a defined contribution pension scheme for its employees in the United Kingdom. The assets of the scheme are held separately to those of the Company in an independently administered fund. The pension cost charge represents approximately $0.4 million in contributions paid by the Company to the fund during both the years ended December 31, 2019 and 2018 and $0.3 million during the year ended December 31, 2017.

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS — (Continued)

## NOTE 18—QUARTERLY FINANCIAL DATA (UNAUDITED)

The Company's operations are subject to seasonal fluctuations. Demand in the US has historically been highest in the third and fourth quarters of each year, corresponding to the holiday season, and lowest in the first quarter of each year, corresponding to our customers' receipt of income tax refunds in the US. Typically, the Company's loan loss provision, a significant portion of cost of sales, in addition to direct marketing and other cost of sales, is lowest as a percentage of revenue in the first half of each year. The following is a summary of the quarterly results of operations for the years ended December 31, 2019 and 2018 (in thousands, except share and per share data):

| (Dollars in thousands, except share and per share amounts) | First Quarter | Second Quarter | Third Quarter | Fourth Quarter |
|---|---|---|---|---|
| **2019** | | | | |
| Total revenue | $ 189,504 | $ 177,760 | $ 192,778 | $ 186,920 |
| Total cost of sales | 103,645 | 102,781 | 122,327 | 115,617 |
| Gross profit | $ 85,859 | $ 74,979 | $ 70,451 | $ 71,303 |
| Net income | $ 13,358 | $ 5,772 | $ 4,764 | $ 8,289 |
| Basic earnings per share | $ 0.31 | $ 0.13 | $ 0.11 | $ 0.19 |
| Diluted earnings per share | $ 0.30 | $ 0.13 | $ 0.11 | $ 0.19 |
| Basic weighted-average shares outstanding | 43,348,249 | 43,681,159 | 44,169,964 | 44,009,459 |
| Diluted weighted-average shares outstanding | 43,875,410 | 44,291,816 | 44,743,944 | 44,587,331 |
| | | | | |
| **2018** | | | | |
| Total revenue | $ 193,537 | $ 184,377 | $ 201,480 | $ 207,288 |
| Total cost of sales | 119,166 | 117,344 | 143,173 | 136,260 |
| Gross profit | $ 74,371 | $ 67,033 | $ 58,307 | $ 71,028 |
| Net income (loss) | $ 9,483 | $ 3,128 | $ (4,234) | $ 4,132 |
| Basic earnings (loss) per share | $ 0.22 | $ 0.07 | $ (0.10) | $ 0.10 |
| Diluted earnings (loss) per share | $ 0.22 | $ 0.07 | $ (0.10) | $ 0.09 |
| Basic weighted-average shares outstanding | 42,211,714 | 42,561,403 | 43,182,208 | 43,197,914 |
| Diluted weighted-average shares outstanding | 43,680,603 | 44,239,007 | 43,182,208 | 43,838,128 |

## NOTE 19—SUBSEQUENT EVENTS

The Company evaluated subsequent events and determined there have been no material subsequent events that required recognition or additional disclosure in these financial statements, except as follows:

The Company made a draw on the EF SPV Facility of $6.5 million and a paydown on the UK Term Note of $6.5 million subsequent to December 31, 2019.

For the period from January 1, 2020 to February 14, 2020, the Company repurchased 706,463 shares of its common stock on the open market for a total purchase price of $3.4 million, including any fees or commissions.

**Item 9. Changes in and Disagreements with Accountants**

None.

**Item 9A. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

Under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, our management has evaluated the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934) as of December 31, 2019 (the "Evaluation Date"). Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer concluded that, as of the Evaluation Date, our disclosure controls and procedures are effective and provide reasonable assurance (i) that information required to be disclosed in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Securities and Exchange Commission rules and forms; and (ii) that information required to be disclosed in the reports that we file or submit under the Exchange Act is accumulated and communicated to management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosures.

**Limitations on the Effectiveness of Controls**

Our management, including our Chief Executive Officer and Chief Financial Officer, does not expect that our disclosure controls and procedures or internal control over financial reporting will prevent or detect all possible misstatements due to error and fraud. Our disclosure controls and procedures and internal control over financial reporting are, however, designed to provide reasonable assurance of achieving their objectives.

**Report of Management on Internal Control over Financial Reporting**

Management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rule 13a-15(f) of the Exchange Act. Management has assessed the effectiveness of our internal control over financial reporting as of December 31, 2019 based on the criteria established in Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. As a result of this assessment, management concluded that, as of December 31, 2019, our internal control over financial reporting was effective in providing reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.

This Annual Report on Form 10-K does not include an attestation report from our independent registered public accounting firm. Because we are an "emerging growth company" under the JOBS Act, our independent registered public accounting firm is not required to attest to the effectiveness of our internal control over financial reporting.

**Changes in Internal Control over Financial Reporting**

There has been no change in our internal control over financial reporting that occurred during our most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

**Item 9B. Other Information**

None.

**PART III**

**Item 10. Directors, Executive Officers and Corporate Governance**

The Company plans to file its Proxy Statement for the 2020 Annual Meeting of Stockholders (the "Proxy Statement") within 120 days after December 31, 2019. Information required by this Item 10 is included in our Proxy Statement under the caption "Corporate Governance" and is incorporated herein by reference.

The Company has adopted a Code of Business Conduct and Ethics Policy that applies to all of its directors, officers (including all of its executive officers) and employees. This Code of Business Conduct and Ethics Policy is publicly available on the Company's website at www.elevate.com in the Investor Relations section under "Corporate Governance—Governance Documents—Code of Business Conduct and Ethics Policy." We intend to satisfy the disclosure requirement under Item 5.05 of Form 8-K regarding amendment to, or waiver from, a provision of our Code of Business Conduct and Ethics Policy by posting such information on our investor relations website under the heading "Corporate Governance—Governance Documents" at http://investors.elevate.com.

**Item 11. Executive Compensation**

The information required by this item will be included under the headings "Executive Compensation" and "Corporate Governance" in the Proxy Statement and is incorporated herein by reference.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters**

The information required by this item will be included under the captions "Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters" and "Executive Compensation" in the Proxy Statement and is incorporated herein by reference.

**Item 13. Certain Relationships and Related Transactions**

The information required by this item will be included under the captions "Certain Relationships and Related Transactions" and "Corporate Governance" in the Proxy Statement and is incorporated herein by reference.

**Item 14. Principal Accounting Fees and Services**

The information required by this item will be included under the caption "Independent Registered Public Accounting Firm Fees and Services" in the Proxy Statement and is incorporated herein by reference.

**PART IV**

**Item 15. Exhibits, Financial Statement Schedules**

**Item 15(a)(1) and (2) and 15(c) Financial Statements and Schedules**

See "Index to Consolidated Financial Statements" in Item 8 of this Annual Report on Form 10-K. Other financial statement schedules have not been included because they are not applicable, or the information is included in the financial statements or notes thereto.

**Item 15(a)(3) and Item 15(b) Exhibits**

The exhibits identified below are filed or incorporated by reference as part of this Annual Report on Form 10-K, in each case as indicated therein (numbered in accordance with Item 601 of Regulation S-K). We have identified below each management contract and compensation plan filed as an exhibit to this Annual Report on Form 10-K in response to Item 15(a)(3) of Form 10-K.

**Item 16. 10-K Summary**

None.

# Exhibit index

| Exhibit number | Description | Filed / Incorporated by Reference from Form | Incorporated by Reference from Exhibit Number | Date Filed |
|---|---|---|---|---|
| 3.1 | Second Amended and Restated Certificate of Incorporation | 8-K | 3.1 | April 14, 2017 |
| 3.2 | State of Delaware Certificate of Change of Registered Agent and Registered Office | 8-K | 3.1 | September 20, 2017 |
| 3.3 | Amended and Restated Bylaws | 8-K | 3.1 | February 11, 2019 |
| 4.1 | Form of common stock certificate | S-1 | 4.1 | January 11, 2016 |
| 4.2 | Form of Amended and Restated Investors' Rights Agreement by and among the Registrant and certain of its stockholders | S-1 | 4.2 | January 11, 2016 |
| 4.3 | Description of Securities of the Registrant | Filed herewith. | | |
| 10.1∞ | Amended and Restated Joint Marketing Agreement, dated July 1, 2015, by and between Republic Bank & Trust Company and Elevate@Work, LLC | S-1 | 10.5 | November 9, 2015 |
| 10.2 | First Amendment to Amended and Restated Joint Marketing Agreement, dated June 18, 2018, by and among Elastic Marketing, LLC and Republic Bank & Trust Company. | 10-Q | 10.1 | August 10, 2018 |
| 10.3∞ | Written Consent to the Amended and Restated Joint Marketing Agreement, dated September 1, 2016, by and between Republic Bank & Trust Company and Elevate@Work, LLC | S-1 | 10.76 | January 30, 2017 |
| 10.4∞ | Amended and Restated License and Support Agreement, dated July 1, 2015, by and between Republic Bank & Trust Company and Elevate Decision Sciences, LLC | S-1 | 10.6 | November 9, 2015 |
| 10.5 | First Amendment to Amended and Restated License and Support Agreement, dated June 18, 2018, by and among Elevate Decision Sciences, LLC and Republic Bank & Trust Company. | 10-Q | 10.2 | August 10, 2018 |
| 10.6∞ | Administrative Services Agreement, dated July 1, 2015, by and between Elastic SPV, Ltd. and Elevate@Work Admin, LLC | S-1 | 10.7 | November 9, 2015 |
| 10.7∞ | Credit Default Protection Agreement, dated July 1, 2015, by and between Elastic@Work, LLC and Elastic SPV, Ltd | S-1 | 10.8 | November 9, 2015 |
| 10.8∞ | First Amendment to Credit Default Protection Agreement, dated April 24, 2019, by and between Elastic SPV, Ltd. and Elastic Louisville, LLC. | 10-Q | 10.6 | May 10, 2019 |
| 10.9∞ | Participation Interest Purchase and Sale Agreement, dated July 1, 2015, by and between Elastic SPV, Ltd. and Elastic@Work, LLC | S-1 | 10.11 | November 9, 2015 |
| 10.10∞ | Financing Agreement, dated July 1, 2015, by and among Elastic SPV, Ltd., the guarantors party thereto, the lenders party thereto, and Victory Park Management, LLC, as agent | S-1 | 10.9 | November 9, 2015 |
| 10.11 | First Amendment to Financing Agreement, dated October 21, 2015, by and among Elastic SPV, Ltd., the guarantors party thereto, the lenders party thereto, and Victory Park Management, LLC, as agent | S-1 | 10.36 | November 9, 2015 |
| 10.12∞ | Second Amendment to Financing Agreement, dated July 14, 2016, by and among Elastic SPV, Ltd., the guarantors party thereto, the lenders party thereto, and Victory Park Management, LLC, as agent | S-1 | 10.53 | January 30, 2017 |
| 10.13∞ | Third Amendment to Financing Agreement, dated April 27, 2017, by and among Elastic SPV, Ltd., the guarantors party thereto, the lenders party thereto, and Victory Park Management, LLC, as agent | 8-K | 10.1 | May 2, 2017 |

| Exhibit number | Description | Filed / Incorporated by Reference from Form | Incorporated by Reference from Exhibit Number | Date Filed |
|---|---|---|---|---|
| 10.14 | Fourth Amendment to Financing Agreement, dated October 15, 2018, by and among Elastic SPV, Ltd. and Today Card LLC, as borrowers; the guarantors party thereto, the lenders party thereto, and Victory Park Management, LLC, as the agent. | 10-Q | 10.5 | November 9, 2018 |
| 10.15 | Amended and Restated Financing Agreement dated February 7, 2019 by and among Elastic SPV, Ltd. as borrower, the guarantors party thereto, the lenders party thereto and Victory Park Management, LLC as administrative agent and collateral agent | 8-K | 10.2 | February 11, 2019 |
| 10.16∞ | Fourth Amended and Restated Financing Agreement, dated October 15, 2018, by and among Rise SPV, LLC, EF SPV, Ltd., Elevate Credit International Ltd. and Elevate Credit Service, LLC as borrowers, the guarantors party thereto, the lenders party thereto, and Victory Park Management, LLC as the agent. | 10-Q | 10.4 | November 9, 2018 |
| 10.17∞ | Fifth Amended and Restated Financing Agreement dated February 7, 2019 by and among Rise SPV, LLC, Today Card LLC, Elevate Credit International Ltd., and Elevate Credit Service, LLC as borrowers, the guarantors party thereto, the lenders party thereto and Victory Park Management, LLC as administrative agent and collateral agent. | 8-K | 10.1 | February 11, 2019 |
| 10.18 | Form of Assignment and Assumption Agreement between VPC Onshore Specialty Finance Fund II, L.P. and various assignees | S-1 | 10.80 | March 27, 2017 |
| 10.19 | Financing Agreement dated February 7, 2019 by and among EF SPV, Ltd. as borrower, the guarantors party thereto, the lenders party thereto and Victory Park Management, LLC as administrative agent and collateral agent. | 8-K | 10.3 | February 11, 2019 |
| 10.20 | First Amendment to Financing Agreement, dated August 1, 2019 by and among EF SPV, Ltd. as borrower, the guarantors party thereto, the lenders party thereto and Victory Park Management, LLC as administrative agent and collateral agent. | 10-Q | 10.1 | August 9, 2019 |
| 10.21 | Intercreditor Agreement, dated July 1, 2015, by and among the Registrant, Rise SPV, LLC, Elevate Credit International Ltd., Elevate Credit Service, LLC, Elastic SPV, Ltd., the guarantors party thereto, and Victory Park Management, LLC, as collateral agent | S-1 | 10.10 | November 9, 2015 |
| 10.22∞ | Program Agreement Between Credit Services Organization and Third-Party Lender dated September 29, 2017 by and between Integrity Funding Ohio LLC and Rise Credit Service of Ohio, LLC | 8-K | 10.1 | October 5, 2017 |
| 10.23 | Guaranty dated September 29, 2017 by Rise Credit Service of Ohio, LLC to and for the benefit of Integrity Funding Ohio LLC | 8-K | 10.2 | October 5, 2017 |
| 10.24 | Parent Guaranty Agreement dated September 29, 2017 by Elevate Credit, Inc. to and for the benefit of Integrity Funding Ohio LLC | 8-K | 10.3 | October 5, 2017 |
| 10.25 | Credit Services Agreement dated September 29, 2017 by and between Redpoint Asset Funding Ohio, LLC and Rise Credit Service of Ohio, LLC | 8-K | 10.4 | October 5, 2017 |
| 10.26 | Credit Services Organization Guaranty by Rise Credit Service of Ohio, LLC dated September 29, 2017 to and for the benefit of Redpoint Asset Funding Ohio, LLC | 8-K | 10.5 | October 5, 2017 |

| Exhibit number | Description | Filed / Incorporated by Reference from Form | Incorporated by Reference from Exhibit Number | Date Filed |
|---|---|---|---|---|
| 10.27 | Parent Guaranty dated September 29, 2017 by Rise Credit, LLC and Elevate Credit, Inc. to and for the benefit of Redpoint Asset Funding Ohio, LLC | 8-K | 10.6 | October 5, 2017 |
| 10.28 | Credit Services Agreement dated September 29, 2017 by and between Redpoint Capital Asset Funding, LLC and Rise Credit Service of Texas, LLC | 8-K | 10.7 | October 5, 2017 |
| 10.29 | Credit Access Business Guaranty by Rise Credit Service of Texas, LLC dated September 29, 2017 to and for the benefit of Redpoint Capital Asset Funding, LLC | 8-K | 10.8 | October 5, 2017 |
| 10.30 | Parent Guaranty dated September 29, 2017 by Rise Credit, LLC and Elevate Credit, Inc. to and for the benefit of Redpoint Capital Asset Funding, LLC | 8-K | 10.9 | October 5, 2017 |
| 10.31∞ | Amended and Restated Special Limited Agency Agreement dated September 29, 2017 by and between First Financial Loan Company LLC and Rise Credit Service of Texas, LLC | 8-K | 10.10 | October 5, 2017 |
| 10.32∞ | Amendment to Amended and Restated Special Limited Agency Agreement, dated April 1, 2019, between First Financial Loan Company, LLC as lender and Rise Credit Service of Texas, LLC as CSO. | 10-Q | 10.5 | May 10, 2019 |
| 10.33 | Credit Services Agreement, dated July 15, 2015, by and between NCP Finance Ohio, LLC and Rise Credit Service of Ohio, LLC | S-1 | 10.68 | January 30, 2017 |
| 10.34∞ | Amendment to Services Agreement, dated November 22, 2016, by and between NCP Finance Ohio, LLC and Elevate Credit Service, LLC | 10-Q | 10.12 | November 9, 2017 |
| 10.35∞ | Second Amendment to Services Agreement, dated October 9, 2017 and effective as of October 1, 2017, by and between NCP Finance Ohio, LLC and Elevate Credit Service, LLC | 10-Q | 10.13 | November 9, 2017 |
| 10.36∞ | Third Amendment to Services Agreement, dated May 8, 2019, by and between NCP Finance Ohio, LLC and Elevate Credit Service, LLC. | 10-Q | 10.3 | August 10, 2018 |
| 10.37∞ | Fourth Amendment to Services Agreement, dated January 25, 2019, by and between NCP Finance Ohio, LLC and Elevate Credit Service, LLC | 10-K | 10.34 | March 8, 2019 |
| 10.38 | Guaranty, dated July 15, 2015, by and between NCP Finance Ohio, LLC and Rise Credit Service of Ohio, LLC | S-1 | 10.69 | January 30, 2017 |
| 10.39 | Amendment to Guaranty, dated October 15, 2015, by and between NCP Finance Ohio, LLC and Rise Credit Service of Ohio, LLC | S-1 | 10.71 | January 30, 2017 |
| 10.40 | Parent Guaranty, dated July 15, 2015, by and among NCP Finance Ohio, LLC, Rise Credit, LLC and the Registrant | S-1 | 10.70 | January 30, 2017 |
| 10.41 | Credit Services Agreement, dated January 18, 2016, by and between NCP Finance Limited Partnership and Rise Credit Service of Texas, LLC | S-1 | 10.65 | January 30, 2017 |
| 10.42 | Guaranty, dated January 18, 2016, by and between NCP Finance Limited Partnership and Rise Credit Service of Texas, LLC | S-1 | 10.66 | January 30, 2017 |
| 10.43 | Parent Guaranty, dated January 18, 2016, by and among NCP Finance Limited Partnership, Rise Credit, LLC and the Registrant | S-1 | 10.67 | January 30, 2017 |
| 10.44∞ | Program Agreement between Credit Services Organization and Third-Party Lender, dated June 26, 2015, by and between Sentral Financial LLC and RISE Credit Service of Ohio, LLC | S-1 | 10.28 | November 9, 2015 |

| Exhibit number | Description | Filed / Incorporated by Reference from Form | Incorporated by Reference from Exhibit Number | Date Filed |
|---|---|---|---|---|
| 10.45 | Parent Guaranty Agreement, dated June 26, 2015, by the Registrant to and for the benefit of Sentral Financial LLC | S-1 | 10.29 | November 9, 2015 |
| 10.46 | Guaranty, dated June 26, 2015, by RISE Credit Service of Ohio, LLC to and for the benefit of Sentral Financial LLC | S-1 | 10.30 | November 9, 2015 |
| 10.47 | Amendment to Guaranty, dated October 5, 2015, between Sentral Financial LLC and Rise Credit Services of Ohio, LLC | S-1 | 10.31 | November 9, 2015 |
| 10.48 | License Agreement for Nortridge Loan System dated May 9, 2013, by and between Nortridge Software, LLC and Elevate Credit Service, LLC (as successor in interest to TC Loan Service, LLC) | S-1 | 10.72 | January 30, 2017 |
| 10.49∞ | Support Agreement for Nortridge Loan System dated May 9, 2013, by and between Nortridge Software, LLC and Elevate Credit Service, LLC (as successor in interest to TC Loan Service, LLC) | S-1 | 10.73 | January 30, 2017 |
| 10.50∞ | TransUnion Master Agreement for Consumer Reporting and Ancillary Services, dated April 3, 2014, by and between Trans Union LLC and the Registrant | S-1 | 10.34 | November 9, 2015 |
| 10.51 | Fort Worth Sublease Agreement, dated May 1, 2014, by and between TC Loan Service, LLC and Elevate Credit Service, LLC | 10-K | 10.41 | March 9, 2018 |
| 10.52 | Amendment to Fort Worth Sublease Agreement, dated December 1, 2014, by and between TC Loan Service, LLC and Elevate Credit Service, LLC | 10-K | 10.42 | March 9, 2018 |
| 10.53 | Second Amendment to the Fort Worth Sublease Agreement, dated May 22, 2015, by and between TC Loan Service, LLC and Elevate Credit Service, LLC | S-1 | 10.12 | November 9, 2015 |
| 10.54 | Third Amendment to the Fort Worth Sublease Agreement, dated October 12, 2015, by and between TC Loan Service, LLC and Elevate Credit Service, LLC | S-1 | 10.54 | January 30, 2017 |
| 10.55 | Fourth Amendment to Fort Worth Sublease Agreement, dated July 31, 2016, by and between TC Loan Service, LLC and Elevate Credit Service, LLC | S-1 | 10.55 | January 30, 2017 |
| 10.56∞ | Lease Agreement (Fort Worth Property), dated July 13, 2016, by and between FLDR/TLC Overton Centre, L.P. and Elevate Credit Service, LLC | S-1 | 10.56 | January 30, 2017 |
| 10.57∞ | First Amendment to Lease Agreement, dated August 31, 2018, by and between FLDR/TLC Overton Centre, L.P. and Elevate Credit Service, LLC. | 10-Q | 10.3 | November 9, 2018 |
| 10.58∞ | Second Amendment to Lease Agreement, dated December 3, 2018, by and between FLDR/TLC Overton Centre, L.P. and Elevate Credit Service, LLC | 10-K | 10.55 | March 8, 2019 |
| 10.59 | Addison Sublease Agreement, dated May 1, 2014, by and between TC Loan Service, LLC and Elevate Credit Service, LLC | S-1 | 10.17 | November 9, 2015 |
| 10.60 | Amendment to Addison Sublease Agreement, dated December 1, 2014, by and between TC Loan Service, LLC | S-1 | 10.16 | November 9, 2015 |
| 10.61 | Second Amendment to the Addison Sublease Agreement, dated May 22, 2015, by and between TC Loan Service, LLC | S-1 | 10.15 | November 9, 2015 |
| 10.62∞ | Office Lease Agreement, dated January 24, 2018, by and between the Registrant and COP-Spectrum Center, LLC | 10-K | 10.50 | March 9, 2018 |
| 10.63∞ | First Amendment to Office Lease dated March 25, 2019 by and between COP-Spectrum Center, LLC as landlord and Elevate Credit, Inc. as tenant. | 10-Q | 10.4 | May 10, 2019 |

| Exhibit number | Description | Filed / Incorporated by Reference from Form | Incorporated by Reference from Exhibit Number | Date Filed |
|---|---|---|---|---|
| 10.64+ | Forms of Indemnification Agreements between the Registrant and each of its directors and its officers | S-1 | 10.18 | March 10, 2017 |
| 10.65+ | Elevate 2014 Equity Incentive Plan, as amended | 8-K | 10.5 | January 30, 2019 |
| 10.66+ | Elevate Form Stock Option Agreement | S-1 | 10.20 | November 9, 2015 |
| 10.67+ | Elevate Form Stock Option Agreement with vesting acceleration for Kenneth E. Rees and Jason Harvison | S-1 | 10.21 | November 9, 2015 |
| 10.68+ | Employment Option Agreement, dated as of May 1, 2014, by and between the Registrant and Kenneth E. Rees | S-1 | 10.22 | November 9, 2015 |
| 10.69+ | Elevate 2016 Omnibus Incentive Plan, as amended | 8-K | 10.4 | January 30, 2019 |
| 10.70+ | Form of Elevate 2016 Omnibus Incentive Plan Notice of Restricted Stock Bonus Award (Prior Form) | S-1 | 10.43 | December 31, 2015 |
| 10.71+ | Form of Elevate 2016 Omnibus Incentive Plan, Notice of Restricted Stock Bonus Award. (Prior Form) | 10-Q | 10.8 | August 9, 2019 |
| 10.72+ | Form of Elevate 2016 Omnibus Incentive Plan, Notice of Restricted Stock Bonus Award. | Filed herewith. | | |
| 10.73+ | Form of Elevate 2016 Omnibus Incentive Plan Notice of Restricted Stock Bonus Award (Section 16 Grantees) (Prior Form) | S-1 | 10.47 | December 31, 2015 |
| 10.74+ | Form of Elevate 2016 Omnibus Incentive Plan, Notice of Restricted Stock Bonus Award (Section 16 Grantees). (Prior Form) | 10-Q | 10.11 | August 9, 2019 |
| 10.75+ | Form of Elevate 2016 Omnibus Incentive Plan, Notice of Restricted Stock Bonus Award (Section 16 Grantees). | Filed herewith. | | |
| 10.76+ | Form of Elevate 2016 Omnibus Incentive Plan Notice of Restricted Stock Unit Award (Prior Form) | S-1 | 10.44 | December 31, 2015 |
| 10.77+ | Form of Elevate 2016 Omnibus Incentive Plan Notice of Restricted Stock Unit Award (Prior Form) | 10-Q | 10.3 | May 11, 2018 |
| 10.78+ | Form of Elevate 2016 Omnibus Incentive Plan, Notice of Restricted Stock Unit Award. (Prior Form) | 10-Q | 10.7 | August 9, 2019 |
| 10.79+ | Form of Elevate 2016 Omnibus Incentive Plan, Notice of Restricted Stock Unit Award. | Filed herewith. | | |
| 10.80+ | Form of Elevate 2016 Omnibus Incentive Plan Notice of Restricted Stock Unit Award (Section 16 Grantees) (Prior Form) | S-1 | 10.48 | December 31, 2015 |
| 10.81+ | Form of Elevate 2016 Omnibus Incentive Plan 2016 Notice of Restricted Stock Unit Award (Section 16 Grantees) (Prior Form) | S-1 | 10.74 | January 30, 2017 |
| 10.82+ | Form of Elevate 2016 Omnibus Incentive Plan Notice of Restricted Stock Unit Award (Section 16 Grantees) (Prior Form) | 10-Q | 10.4 | May 11, 2018 |
| 10.83+ | Form of Elevate 2016 Omnibus Incentive Plan, Notice of Restricted Stock Unit Award (Section 16 Grantees). (Prior Form) | 10-Q | 10.10 | August 9, 2019 |
| 10.84+ | Form of Elevate 2016 Omnibus Incentive Plan, Notice of Restricted Stock Unit Award (Section 16 Grantees). | Filed herewith. | | |
| 10.85+ | Form of Elevate 2016 Omnibus Incentive Plan Notice of Stock Option Award (Prior Form) | S-1 | 10.45 | December 31, 2015 |
| 10.86+ | Form of Elevate 2016 Omnibus Incentive Plan, Notice of Stock Option Award. (Prior Form) | 10-Q | 10.9 | August 9, 2019 |

| Exhibit number | Description | Filed / Incorporated by Reference from Form | Incorporated by Reference from Exhibit Number | Date Filed |
|---|---|---|---|---|
| 10.87+ | Form of Elevate 2016 Omnibus Incentive Plan, Notice of Stock Option Award. | Filed herewith. | | |
| 10.88+ | Form of Elevate 2016 Omnibus Incentive Plan Notice of Stock Option Award (Section 16 Grantees) (Prior Form) | S-1 | 10.46 | December 31, 2015 |
| 10.89+ | Form of Elevate 2016 Omnibus Incentive Plan, Notice Stock Option Award (Section 16 Grantees). (Prior Form) | 10-Q | 10.12 | August 9, 2019 |
| 10.90+ | Form of Elevate 2016 Omnibus Incentive Plan, Notice Stock Option Award (Section 16 Grantees). | Filed herewith. | | |
| 10.91+ | Elevate 2016 Employee Stock Purchase Plan, as amended | 8-K | 10.6 | January 30, 2019 |
| 10.92+ | Notice of Restricted Stock Unit Award and Restricted Stock Unit Agreement with Brian Biglin | S-8 | 10.10 | March 12, 2018 |
| 10.93+ | Employment, Confidentiality and Non-Compete Agreement, dated May 1, 2014, by and between Kenneth E. Rees and Elevate Credit Service, LLC | S-1 | 10.24 | November 9, 2015 |
| 10.94+ | First Amendment to Employment, Confidentiality and Non-Compete Agreement, dated December 11, 2015, by and between Kenneth E. Rees and Elevate Credit Service, LLC | S-1 | 10.39 | December 31, 2015 |
| 10.95+ | Second Amendment to Employment, Confidentiality and Non-Compete Agreement, dated March 1, 2017, by and between Kenneth E. Rees and Elevate Credit Service, LLC | S-1 | 10.81 | March 10, 2017 |
| 10.96+ | Third Amendment to Employment, Confidentiality and Non-Compete Agreement, dated January 24, 2019, by and between Kenneth E. Rees and Elevate Credit Service, LLC. | 8-K | 10.1 | January 30, 2019 |
| 10.97+ | Resignation and Release of Claims Agreement, dated July 25, 2019, between Elevate Credit Service, LLC and Kenneth E. Rees | 10-Q | 10.4 | August 9, 2019 |
| 10.98+ | Employment, Confidentiality and Non-Compete Agreement, dated May 1, 2014, by and between Jason Harvison and Elevate Credit Service, LLC | S-1 | 10.25 | November 9, 2015 |
| 10.99+ | First Amendment to Employment, Confidentiality and Non-Compete Agreement, dated December 11, 2015, by and between Jason Harvison and Elevate Credit Service, LLC | S-1 | 10.40 | December 31, 2015 |
| 10.100+ | Second Amendment to Employment, Confidentiality and Non-Compete Agreement, dated March 1, 2017, by and between Jason Harvison and Elevate Credit Service, LLC | S-1 | 10.82 | March 10, 2017 |
| 10.101+ | Third Amendment to Employment, Confidentiality and Non-Compete Agreement, dated January 24, 2019, by and between Jason Harvison and Elevate Credit Service, LLC. | 8-K | 10.2 | January 30, 2019 |
| 10.102+ | Fourth Amendment to Employment, Confidentiality and Non-Compete Agreement, dated August 1, 2019, by and between Jason Harvison and Elevate Credit Service, LLC. | 10-Q | 10.5 | August 9, 2019 |
| 10.103+ | Amended and Restated Employment Agreement, dated November 21, 2019, by and between Jason Harvison and Elevate Credit Services, LLC. | 8-K | 10.1 | November 22, 2019 |
| 10.104+ | Employment, Confidentiality and Non-Compete Agreement, dated January 5, 2015, by and between Christopher Lutes and Elevate Credit Service, LLC | S-1 | 10.26 | November 9, 2015 |
| 10.105+ | First Amendment to Employment, Confidentiality and Non-Compete Agreement, dated December 11, 2015, by and between Christopher Lutes and Elevate Credit Service, LLC | S-1 | 10.41 | December 31, 2015 |
| 10.106+ | Second Amendment to Employment, Confidentiality and Non-Compete Agreement, dated March 1, 2017, by and between Christopher Lutes and Elevate Credit Service, LLC | S-1 | 10.83 | March 10, 2017 |

| Exhibit number | Description | Filed / Incorporated by Reference from Form | Incorporated by Reference from Exhibit Number | Date Filed |
|---|---|---|---|---|
| 10.107+ | Third Amendment to Employment, Confidentiality and Non-Compete Agreement, dated January 24, 2019, by and between Christopher Lutes and Elevate Credit Service, LLC. | 8-K | 10.3 | January 30, 2019 |
| 10.108+ | Fourth Amendment to Employment, Confidentiality and Non-Compete Agreement, dated August 1, 2019, by and between Christopher Lutes and Elevate Credit Service, LLC. | 10-Q | 10.6 | August 9, 2019 |
| 10.109β | Joint Marketing Agreement, dated October 15, 2018, by and between FinWise Bank and EF Marketing, LLC | Filed herewith. | | |
| 10.110β | First Amendment to Joint Marketing Agreement, dated August 1, 2019, by and between FinWise Bank and EF Marketing, LLC | Filed herewith. | | |
| 10.111β | Technology and Support Agreement, dated October 15, 2018, by and between FinWise Bank and Elevate Decision Sciences, LLC | Filed herewith. | | |
| 10.112 | First Amendment to Technology and Support Agreement, dated August 1, 2019, by and between FinWise Bank and Elevate Decision Sciences, LLC | Filed herewith. | | |
| 10.113β | Administrative Services Agreement, dated October 15, 2018, by and between EF SPV, Ltd. and EF Financial, LLC | Filed herewith. | | |
| 10.114 | Credit Default Protection Agreement, dated October 15, 2018, by and between EF Financial, LLC and EF SPV, Ltd. | Filed herewith. | | |
| 10.115 | First Amendment to Credit Default Protection Agreement, dated April 24, 2019, by and between EF Financial, LLC and EF SPV, Ltd. | Filed herewith. | | |
| 10.116 | Participation Interest Purchase and Sale Agreement, dated August 1, 2019, by and between EF SPV, LTD and FinWise Bank | Filed herewith. | | |
| 10.117β | First Amendment to Participation Agreement, dated August 1, 2019, by and between EF SPV, LTD and FinWise Bank | Filed herewith. | | |
| 21.1 | Subsidiaries of Elevate Credit, Inc. | Filed herewith. | | |
| 23.1 | Consent of Grant Thornton, LLP | Filed herewith. | | |
| 31.1 | Certification pursuant to Rule 13a-14a and Rule 15d-14(a) of the Securities and Exchange Act, as amended | Filed herewith. | | |
| 31.2 | Certification pursuant to Rule 13a-14a and Rule 15d-14(a) of the Securities and Exchange Act, as amended | Filed herewith. | | |
| 32.1& | Certification pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | Filed herewith. | | |
| 32.2& | Certification pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 | Filed herewith. | | |
| 99.1∞ | Participation Agreement, dated July 1, 2015, by and between Elastic SPV, Ltd. and Republic Bank & Trust Company | S-1 | 99.1 | November 9, 2015 |
| 101.INS* | XBRL Instance Document. | Filed herewith. | | |
| 101.SCH* | XBRL Taxonomy Extension Schema Document. | Filed herewith. | | |
| 101.CAL* | XBRL Taxonomy Extension Calculation Linkbase Document. | Filed herewith. | | |
| 101.DEF* | XBRL Taxonomy Extension Definition Linkbase Document. | Filed herewith. | | |
| 101.LAB* | XBRL Taxonomy Extension Labels Linkbase Document. | Filed herewith. | | |
| 101.PRE* | XBRL Taxonomy Extension Presentation Linkbase Document. | Filed herewith. | | |

+      Indicates a management contract or compensatory plan.

∞     Confidential treatment has been requested or granted as to certain portions of this exhibit, which portions have been omitted and submitted separately to the Securities and Exchange Commission.

β     Confidential portions of this exhibit have been omitted as permitted by applicable regulations.

&     This certification is deemed not filed for purposes of section 18 of the Securities Exchange Act of 1934, as amended (Exchange Act), or otherwise subject to the liability of that section, nor shall it be deemed incorporated by reference into any filing under the Securities Act or the Exchange Act.

*     Pursuant to applicable securities laws and regulations, these interactive data files are deemed not filed or part of a registration statement or prospectus for purposes of sections 11 or 12 of the Securities Act, are deemed not filed for purposes of section 18 of the Exchange Act and otherwise are not subject to liability under these sections.

223 of 231

**Signatures**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, Elevate Credit, Inc. has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized in the City of Fort Worth, State of Texas, on February 14, 2020.

**Elevate Credit, Inc.**

By:   /s/ Jason Harvison
_____
Jason Harvison

Chief Executive Officer and Director
(Principal Executive Officer)

**POWER OF ATTORNEY**

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below constitutes and appoints Jason Harvison, Christopher Lutes and Sarah Fagin Cutrona, jointly and severally, as his or her true and lawful attorneys-in-fact and agents, with full power of substitution and resubstitution, for him or her and in his or her name, place and stead, in any and all capacities, to sign any and all amendments to this Annual Report on Form 10-K, and to file the same, with all exhibits thereto, and other documents in connection therewith, with the Securities and Exchange Commission, granting unto said attorneys-in-fact and agents full power and authority to do and perform each and every act and thing requisite or necessary to be done in and about the premises hereby ratifying and confirming all that said attorneys-in-fact and agents, or his, or their substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons in the capacities and on the date indicated.

| Signature | Title | Date |
|---|---|---|
| /s/ Jason Harvison<br>Jason Harvison | Chief Executive Officer and Director<br>(Principal Executive Officer) | February 14, 2020 |
| /s/ Christopher T. Lutes<br>Christopher Lutes | Chief Financial Officer<br>(Principal Financial Officer) | February 14, 2020 |
| /s/ Chad Bradford<br>Chad Bradford | Chief Accounting Officer<br>(Principal Accounting Officer) | February 14, 2020 |
| /s/ Saundra D. Schrock<br>Saundra D. Schrock | Chairman | February 14, 2020 |
| /s/ John C. Dean<br>John C. Dean | Director | February 14, 2020 |
| /s/ Stephen B. Galasso<br>Stephen B. Galasso | Director | February 14, 2020 |
| /s/ Tyler W. K. Head<br>Tyler W. K. Head | Director | February 14, 2020 |
| /s/ Robert L. Johnson<br>Robert L. Johnson | Director | February 14, 2020 |
| /s/ Kenneth E. Rees<br>Kenneth E. Rees | Director | February 14, 2020 |
| /s/ Stephen J. Shaper<br>Stephen J. Shaper | Director | February 14, 2020 |
| /s/ Bradley R. Strock<br>Bradley Strock | Director | February 14, 2020 |

(This page intentionally left blank)

## SHAREHOLDER INFORMATION

### Registered Public Accountants

Grant Thornton LLP

1717 Main St., Suite 1800

Dallas, TX 75201-4667

**Phone:** (214) 561-2300

### Transfer Agent

Computershare Investor Services

462 South 4th Street, Suite 1600

Louisville, KY 40202

**Phone:**

Shareholder Services Local:

(800) 368-5948

Shareholder Services International:

+1 (781) 575-4223

### Contact Information

For more information please contact

Investor Relations at Elevate

**Solebury Trout**

Sloan Bohlen

**Phone:** (817) 928-1646

investors@elevate.com

**Footnotes**

1   For the period from 2013 to December 31, 2019. Based on the average effective APR of 122% for the twelve months ended December 31, 2019. This estimate, which has not been independently confirmed, is based on our internal comparison of revenues from our combined loan portfolio and the same portfolio with an APR of 400%, which is the approximate average APR for a payday loan according to the Consumer Financial Protection Bureau, or the "CFPB."

2   Originations and customers from 2002-December 31, 2019, attributable to the combined current and predecessor direct and branded products.

3   Adjusted EBITDA is not a financial measure prepared in accordance with GAAP. Adjusted EBITDA represents our net income (loss), adjusted to exclude: net interest expense primarily associated with notes payable under the VPC Facility, EF SPV Facility, and ESPV Facility used to fund or purchase loans; foreign currency gains and losses associated with our UK operations; depreciation and amortization expense on fixed assets and intangible assets; non-operating income (loss); share-based compensation expense and income tax expense (benefit). See our most recent 10-K for a reconciliation to GAAP net income.

## EXECUTIVE OFFICERS

**Jason Harvison**
President and Chief Executive Officer

**Scott Greever**
EVP, Products

**Chris Lutes**
Chief Financial Officer

**Joan Kuehl**
Chief Information Officer

**Sharon Clarey**
Chief Human Resources Officer

**David Peterson**
Chief Credit Officer

**Sarah Fagin Cutrona**
Chief Counsel

**Kathleen Vanderkolk**
Chief Risk Officer

## BOARD OF DIRECTORS

**Jason Harvison**
Chief Executive Officer
Elevate Credit

**Robert L. Johnson**
Chairman
The RLJ Companies

**Kenneth E. Rees**
Former Chief Executive Officer
Elevate Credit

**Saundra D. Schrock**
Chief Executive Officer
Mindful Planet, LLC

**John C. Dean**
Chairman Emeritus and Director
Central Pacific Bank

**Stephen J. Shaper**
Chief Executive Officer
Middlemarch Capital Corporation

**Stephen B. Galasso**
President
SBG Resources, LLC

**Bradley R. Strock**
Former Chief Information Officer
PayPal

**Tyler W. K. Head**
President
Corbett Capital, LLC

This Annual Report is delivered with, and accompanies, the Company's Annual Report on Form 10-K for the period ended December 31, 2019. This Annual Report contains forward-looking statements within the meaning of  Section 27A of the Securities Act of 1933, as amended, and Section 21E of the Securities Exchange Act of 1934, as amended. Forward-looking statements are estimates and projections reflecting management's judgment based on currently available information and involve a number of risks and uncertainties that could cause actual results to differ materially from those suggested by the forward-looking statements. You should not place undue reliance on forward-looking statements, which are based on current expectations and speak only as of the date when made. Forward-looking statements include all statements that are not historical facts and can be identified by terms such as "anticipate," "believe," "could," "seek," "estimate," "expect," "intend," "may," "plan," "potential," "predict," "project," "should," "will," "would" or similar expressions and the negatives of those terms. Factors that might cause such differences include, but are not limited to: the Company's plans to adopt new credit models in the digital and partner channels; the Company's potential for long-term growth; the Company's expectations of future financial performance; as well as those discussed in the Company's Annual Report on Form 10-K. Consequently, you should not consider any such list to be a complete set of all potential risks or uncertainties. This Annual Report includes non-GAAP financial measures, including adjusted EBITDA. The customer testimonial included herein are provided from actual Elevate customers or customers of banks we support that have agreed to the use of their testimonials and likeness for marketing, advertising and other purposes. Experiences of these customers may not be indicative of those of other customers. We generally refer to loans, customers and other information and data associated with each of Rise, Elastic, Sunny and Today Card as Elevate's loans, customers, information and data, irrespective of whether Elevate originates the credit to the customer or whether such credit is originated by a third-party, or originated loans by FinWise Bank, Republic Bank or Capital Community Bank, where Elevate provides support.

# Better borrowing, by the numbers.



**157%**

**NET INCOME**
(MILLIONS)

$13
$32

2018  2019

**20%**

**ADJUSTED EBITDA³**
(MILLIONS)

$116
$139

2018  2019

**50%**

Since 2013, our brands dropped our average APR by more than 50 percent

## 4 BRANDS



## 3 BANK RELATIONSHIPS

## 2 COUNTRIES





4150 International Plaza
Suite 300
Fort Worth, Texas 76109

elevate.com

ELVT
LISTED
NYSE

EXHIBIT D

**Elevate Credit, Inc. and Subsidiaries**

**NOTES TO THE CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (UNAUDITED) — (Continued)**

For the three and nine months ended September 30, 2020 and 2019

The following table summarizes the assets and liabilities of the VIE that are included within the Company's Condensed Consolidated Balance Sheets at September 30, 2020 and December 31, 2019:

| (Dollars in thousands) | | September 30, 2020 | | December 31, 2019 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Cash and cash equivalents | $ | 107,602 | $ | 26,245 |
| Loans receivable, net of allowance for loan losses of $15,415 and $28,852, respectively | | 143,102 | | 234,504 |
| Prepaid expenses and other assets | | 52 | | — |
| Receivable from payment processors | | 3,253 | | 6,363 |
|     Total assets | $ | 254,009 | $ | 267,112 |
| **LIABILITIES AND SHAREHOLDER'S EQUITY** | | | | |
| Accounts payable and accrued liabilities ($26,194 and $7,690, respectively, eliminates upon consolidation) | $ | 30,912 | $ | 15,902 |
| Deferred revenue | | 2,251 | | 4,280 |
| Reserve deposit liability ($23,150 and $23,150, respectively, eliminates upon consolidation) | | 23,150 | | 23,150 |
| Notes payable, net | | 197,696 | | 223,780 |
|     Total liabilities and shareholder's equity | $ | 254,009 | $ | 267,112 |

**EF SPV, Ltd.**

On October 15, 2018, the Company entered into several agreements with a third-party lender and EF SPV, Ltd. ("EF SPV"), an entity formed by third-party investors for the purpose of purchasing loan participations from the third-party lender. Per the terms of the agreements, the Company provides customer acquisition services to generate loan applications submitted to the third-party lender. In addition, the Company licenses loan underwriting software and provides services to the third-party lender to evaluate the credit quality of those loan applications in accordance with the third-party lender's credit policies. EF SPV accounts for the loan participations acquired in accordance with ASC 860-10-40, *Transfers and Services, Derecognition*, as the installment loans acquired meet the criteria of a participation interest.

Once the third-party lender originates the loan, EF SPV has the right, but not the obligation, to purchase an interest in each Rise bank originated installment loan. Prior to August 1, 2019, FinWise Bank retained 5% of the balances and sold a 95% participation to EF SPV. On August 1, 2019, EF SPV purchased an additional 1% participation in the outstanding portfolio with the participation percentage revised going forward to 96%. VPC lends EF SPV all funds necessary up to a maximum borrowing amount to purchase such participation interests in exchange for a fixed return (see Note 5—Notes Payable—EF SPV Facility). The Company entered into a separate credit default protection agreement with EF SPV whereby the Company agreed to provide credit protection to the investors in EF SPV against Rise bank originated loan losses in return for a credit premium. The Company does not hold a direct ownership interest in EF SPV, however, as a result of the credit default protection agreement, EF SPV was determined to be a VIE and the Company qualifies as the primary beneficiary.

25