EXHIBIT B

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>THE OFFICE OF THE COMPTROLLER OF THE CURRENCY, et al.,<br><br>Defendants. | Case No.  20-cv-05200-JSW<br><br>**ORDER RESOLVING CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 37, 44 |

Plaintiffs, the States of California, Illinois, and New York (collectively "Plaintiffs"), allege that Defendants, the Office of the Comptroller of the Currency and Michael J. Hsu, in his capacity as Acting Comptroller of the Currency (collectively "OCC" or "Defendants"), violated the Administrative Procedure Act ("APA") when the OCC promulgated a final rule entitled *Permissible Interest on Loans That Are Sold, Assigned, or Otherwise Transferred* ("Final Rule" or "Rule")).[1]  *See* 85 Fed. Reg. 33,530 (June 2, 2020).[2]

Currently before the Court are the parties' cross-motions for summary judgment.  The Court has considered the parties' papers, the amicus briefs, the administrative record (Dkt. Nos.

---

[1]     The Rule took effect on August 3, 2020.  It has been codified at 12 C.F.R. section 7.4001(e).  Plaintiffs filed the complaint on July 29, 2020, but they did not move for a preliminary injunction.

[2]     The Federal Deposit Insurance Corporation ("FDIC") issued a similar rule: *Federal Interest Rate Authority Rule*, 85 Fed. Reg. 44,146 (July 22, 2020).  Plaintiffs, the States of Minnesota and New Jersey, the District of Columbia, and the Commonwealth of Massachusetts have challenged that rule in a related case, *California v. FDIC*, No. 20-cv-5860-JSW.  The parties in that case also filed cross-motions for summary judgment, which the Court will address in a separate order.

United States District Court
Northern District of California

35-1 through 35-3), and relevant legal authority.[3]  The Court HEREBY DENIES Plaintiffs' motion and GRANTS the OCC's Cross-Motion.

## BACKGROUND

The OCC has primary regulatory and supervisory responsibility over national banks and federal savings associations (collectively "national banks") pursuant to the National Bank Act of 1864 ("NBA") and the Home Owners' Loan Act of 1933 ("HOLA").  *See* 12 U.S.C. §§ 1, *et seq.*, as amended; 12 U.S.C. §§ 1461, *et seq.,* as amended.  In order to combat predatory lending, Plaintiffs, and at least 43 other states, have placed caps on the interest rates on consumer loans. *See, e.g.,* Cal. Fin. Code §§ 22303-22306; N.Y. Gen. Oblig. Law §§ 5-501, 5-11; N.Y. Banking Law § 14-a.

Under the NBA and HOLA, national banks are not subject to those state interest-rate caps and can "export" their home states' interest rates to states where their borrowers live.  *See* 12 U.S.C. §§ 85, 1463(g); *Marquette Nat. Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299, 301 (1978).  The NBA and HOLA also preempt state law claims of usury against a national bank.  *See, e.g., Beneficial Nat'l Bank. v. Anderson*, 539 U.S. 1, 11 (2003).  Plaintiffs assert that "some non-bank lenders have formed sham 'rent-a-bank' partnerships designed to evade state law" so they can take advantage of NBA and HOLA preemption.  (Mot. at 3:10-11.) In this situation a third-party will partner with a national bank.  The national bank originates the loan in question but subsequently transfers the loan to the third-party.  That third-party will continue to charge the national bank's interest rate, even if that rate exceeds an interest rate cap in the state where the third-party is located.  (*See e.g.,* AR at 69-73, 300, 302, 369-83.)

In 2015, the Second Circuit held that a plaintiff's usury claims against non-bank debt-collectors, which had been assigned a debt originated by a national bank, were not preempted by

---

[3]     The Court received and considered briefs in support of Plaintiffs' motion from the Center for Responsible Lending, the National Consumer Law Center, the East Bay Community Law Center, the National Association for Community Asset Builders, and the National Coalition for Asian Pacific American Community Development (Dkt. No. 38) and from Professor Adam J. Levitin (Dkt. No. 41), as well as briefs in support of Defendants' motion from 47 Economics and Finance Professors (Dkt. No. 59), the Bank Policy Institute and the Structured Finance Association (Dkt. No. 65), and from the Marketplace Lending Association (Dkt. No. 66).

United States District Court
Northern District of California

the NBA. *Madden v. Midland Funding, LLC*, 786 F.3d 246 (2d Cir. 2015). Although the court recognized that in some circumstances, "NBA preemption can be extended to non-national bank entities," it determined the defendants were not acting as the national bank's agent and were not its subsidiaries. The court also determined that the originating bank no longer had any interest in or control over the debt. *Id.* at 249-52. Instead, the debt collectors were acting "solely on their own behalves, as the owners of the debt." *Id.* at 251. On those facts, the court reasoned that applying state usury laws would not significantly interfere with the national bank's activities and "would limit only activities of the third party which are otherwise subject to state control, and which are not protected by federal banking law or subject to OCC oversight." *Id.* (internal quotations, citations, and brackets omitted).

According to the OCC, the *Madden* decision "created legal uncertainty about the ongoing permissibility of the interest term after a bank transfers a loan[,]" and it began rule-making proceedings to address and clarify that uncertainty.[4] Final Rule, 85 Fed. Reg. at 33,530-31; *see also id.* at 33,534 ("The primary problem the OCC seeks to address is the legal uncertainty resulting from the *Madden* decision[.]"). The Final Rule provides that "[i]nterest on a loan that is permissible under 12 U.S.C. 85 shall not be affected by the sale, assignment, or other transfer of the loan." 12 C.F.R. § 7.4001(e); *see also* 12 C.F.R. § 160.110(d) ("Interest on a loan that is permissible under 12 U.S.C. 1463(g)(1) shall not be affected by the sale, assignment, or other transfer of the loan.").

The Court will address additional facts as necessary in the analysis.

## ANALYSIS

**A.    Request for Judicial Notice.**

On October 30, 2020, the OCC issued a rule entitled *National Banks and Federal Savings Associations as Lenders*, 85 Fed. Reg. 68,742 ("True Lender Rule"), which set forth a test to determine when a national bank that partners with a third-party "makes" a loan. That rule would

---

[4]    Legislative efforts to overturn *Madden* were not fruitful. *See, e.g.*, S. 1642, 115th Cong. (2017-18), https://www.congress.gov/bill/115-congress/senate-bill/1642; H.R. 3299, 115th Cong. (2017-18), https://www.congress.gov/bill/115-congress/house-bill/3299.

have provided that when a national bank "makes a loan pursuant to the test established in th[e] regulation, the bank may subsequently sell, assign, or otherwise transfer the loan without affecting the permissible interest term, which is determined by reference to state law."  *Id.*, at 68,743.

Plaintiffs ask the Court to take judicial notice of: (1) a Senate Resolution invalidating the True Lender Rule; and (2) portions of the Congressional Record that recount arguments presented in connection with the Resolution.  (Request for Judicial Notice, Exs. A-B.)  Although the OCC argues here that the True Lender Rule is not relevant to these proceedings, in the True Lender Rule it stated that "rulemaking operate[d] together with the OCC's recently finalized 'Madden-fix' rulemaking," *i.e.,* the rule at issue here.  85 Fed. Reg. at 68,743.

The Court OVERRULES the OCC's objections, in part.  Because the OCC expressly stated the rulemaking proceedings operated together, the Court GRANTS the request to take judicial notice of the fact that the Senate Resolution was passed and that the True Lender Rule was invalidated.  The Court shall consider those facts solely for the purpose of evaluating Plaintiffs' arguments about why the Final Rule should be invalidated as an unreasonable interpretation of Section 85 and why it is arbitrary and capricious.  Although the arguments presented in support of and in opposition to the Resolution mirror arguments raised here, the Congressional Record was not submitted to and was not considered by the OCC.  Accordingly, the Court DENIES Plaintiffs' request to take judicial notice of the Congressional Record.

**B.      Standard of Review.**

Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be -- (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; … (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law[.]"  5 U.S.C. §§ 706(2)(A), (C) (D).[5]  A court's "review of an agency's procedural compliance is exacting, yet

---

[5]      In the context of the APA, the Court does not follow the traditional summary judgment analysis set forth in Federal Rule of Civil Procedure 56.  That is because "there are no disputed facts that the district court must resolve."  *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985).  Instead, the Court "determines whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did."  *Id.*

United States District Court
Northern District of California

1   limited." *Kern Cty. Farm Bureau v. Allen*, 450 F.3d 1072, 1076 (9th Cir. 2006). In contrast,

2   "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to

3   substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant

4   data and articulate a satisfactory explanation for its action including a rational connection between

5   the facts found and the choice made." *Motor Vehicle Mfr. Ass'n of U.S., Inc. v. State Farm Mut.*

6   *Auto Ins. Co.*, 463 U.S. 29, 43 (1989) (internal quotations omitted) ("*State Farm*"); *see also*

7   *Chevron U.S.A. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984) ("We have long

8   recognized that considerable weight should be accorded to an executive department's construction

9   of a statutory scheme it is entrusted to administer ....").

10  **C.      The Final Rule is Not Invalid Based on a Failure to Follow 12 U.S.C. Section 25b.**

11          In their third claim, Plaintiffs allege the Final Rule was promulgated in violation of

12  procedure required by law because the OCC did not comply with 12 U.S.C. section 25b ("Section

13  25b").[6] That section of the NBA was enacted in 2010, as part of the Dodd-Frank Wall Street

14  Reform and Consumer Protection Act ("Dodd-Frank"). (Compl. ¶¶ 220-223.) Section 25b

15  provides, in relevant part, that:

16          State consumer financial laws[7] are preempted *only if* –

17          …

18          in accordance with the legal standard for preemption in the decision
            of the Supreme Court of the United States in *Barnett Bank of*
19          *Marion County, N. A. v. Nelson, Florida Insurance Commissioner,*
            *et al.*, 517 U.S. 25 (1996), the State consumer financial law prevents
20          or significantly interferes with the exercise by the national bank of
            its powers; and any preemption determination under this
21          subparagraph may be made by a court, or by regulation or order of
            the Comptroller of the Currency on a case-by-case basis, in
22          accordance with applicable law[.]

23

24  _____

    [6]     Unless otherwise noted, all statutory references are to Title 12 of the United States Code.

25
    [7]     "The term 'State consumer financial law' means a State law that does not directly or
26  indirectly discriminate against national banks and that directly and specifically regulates the
    manner, content, or terms and conditions of any financial transaction (as may be authorized for
27  national banks to engage in), or any account related thereto, with respect to a consumer." 12
    U.S.C. § 25b(a)(2). The OCC does not argue that state laws governing interest rate caps would
28  fall outside that definition.

                                                    5

Case 4:20-cv-05200-JSW   Document 69-2   Filed 02/08/22   Page 7 of 19

12 U.S.C. § 25b(b)(1)(B); *see also* 12 U.S.C. § 1465; 12 C.F.R. §§ 7.4010(a) and 34.6 (imposing same requirements for rulemaking under HOLA).[8]  Section 25b sets forth other procedures that must be followed, including consultation with the Consumer Financial Protection Bureau ("CFPB").  *See id.* § 25b(b)(3)(B).  Section 25b(f) provides that "[n]o provision of title 62 of the Revised Statutes shall be construed as altering or otherwise affecting the authority conferred by section 85 of this title for the charging of interest by a national bank at the rate allowed by the laws of the State, territory, or district where the bank is located, including with respect to the meaning of 'interest' under such provision."  That is to say, "Dodd-Frank did not upend the authority of national banks to export interest rates under the NBA."  *Cohen v. Capital One Funding, LLC*, 489 F. Supp. 3d 33, 47 (E.D.N.Y. 2020).

It is undisputed that the OCC neither followed the procedures set forth in Section 25b nor determined if the Final Rule would prevent or significantly interfere with a national bank's exercise of its powers.  *See* 85 Fed. Reg. at 33,533.  The OCC stated it was interpreting the substantive scope of Section 85 and was not making a "preemption determination."  *Id.*  Plaintiffs argue, however, that the "sole legal effect" of the Final Rule is to preempt the application of state interest rate caps to non-banks that purchase national bank loans.  The Court concludes the OCC has the better argument.  First, the OCC did not evaluate a particular State consumer financial law.  Although the preamble to Section 25b(b)(1) references State consumer financial *laws*, each of Section 25b(1)'s subsections uses the singular form of that term.  *See also* 12 U.S.C. § 25b(3)(A) (defining "case-by-case basis" to mean "a determination pursuant to this section made by the Comptroller concerning the impact of a *particular* State consumer financial law on any national bank that is subject to that *law*, or the *law* of any other State with substantially equivalent terms") (emphasis added).

Second, "determination" has been defined to mean "the resolving of a question by argument or reasoning."  *See, e.g.,* https://www.merriam-webster.com/dictionary/determination.

---

[8]     Section 25b sets forth two other circumstances in which State consumer financial laws will be preempted, but Plaintiffs do not argue those circumstances are applicable.

United States District Court
Northern District of California

When "determination" is combined with "preemption", the combination implies an affirmative act, *i.e.,* the OCC has considered and resolved whether a *particular* "state consumer financial law" is preempted. *See, e.g.,* 12 U.S.C. § 25b(3)(B) (when making a case-by-case determination "that a State consumer financial law of another State has substantively equivalent terms *as one* that the Comptroller *is preempting*, the Comptroller shall first consult with the [CFPB] …") (emphasis added).

To support their position, Plaintiffs rely, in part, on *Cuomo v. Clearing House Association, L.L.C.*, 557 U.S. 519 (2009). *Cuomo* centered on an OCC regulation that prohibited "states from 'prosecuting enforcement actions' except in 'limited circumstances authorized by federal law.'" *Id.* at 525. Relying on the regulation, the OCC obtained an injunction, which precluded New York's Attorney General from requiring national banks to respond to an information request relating to whether they violated New York's fair lending laws. *Id.* at 523. The Supreme Court, applying the "familiar *Chevron* framework" determined there was "some ambiguity as to the meaning of the statutory term 'visitorial powers'" used in Section 484. The Supreme Court reasoned that the term "visitorial power" had long been construed to encompass the power to supervise or oversee corporate affairs, a power the Court distinguished from the power of law enforcement. *Id.* at 525-29.

The Court also reasoned that adopting the OCC's construction would be "[b]izarre[.] … [I]f a state statute is valid as to national banks, the corollary that it is obligatory *and enforceable* necessarily results." *Id.* at 529 (internal quotations and citation omitted). Therefore, it concluded that neither the regulation nor the OCC's interpretation comported with the NBA. *Id.* at 531. Finally, the Court rejected the dissent's suggestion that the OCC simply interpreted the term visitorial powers, rather than declaring the preemptive scope of the NBA. *Id.* At 535. The Court pointed out that the regulation was contained in a subpart of OCC regulations entitled "Preemption" and reasoned that "[t]he purpose and function of the statutory term 'visitorial powers' is to define *and thereby limit* the category of action reserved to the Federal Government and forbidden to the States." *Id.* Therefore, any interpretation of the term "'visitorial powers' necessarily 'declares the preemptive scope of the NBA[.]'" *Id.* at 535 (emphasis added).

7

Although the Court concluded the OCC's construction of the term was reasonable to the extent it included examinations and inspections of books and records, the Court held the OCC "erred by extending the definition of 'visitorial powers' to include 'prosecuting enforcement actions' in state courts[.]" *Id.* at 536.[9]

Plaintiffs correctly note that, as in *Cuomo*, 12 C.F.R. section 7.4001 falls within a section entitled "Preemption." *See also* 12 C.F.R. § 160.110 ("Most favored lender usury preemption for all savings associations."). That fact was significant to *Cuomo* court's reasoning not merely because of *where* the regulation was located but also because the regulation expressly stated that "[s]tate officials may not … prosecut[e] enforcement actions." 557 U.S. at 535. It was in that context the Supreme Court concluded "[i]f that is not pre-emption, nothing is." *Id.* In contrast to the regulation at issue in *Cuomo*, the Final Rule does not explicitly define and limit action that is reserved to the Federal Government and that is forbidden to the states. Thus, the Court does not place the same significance on the location of the regulations as Plaintiffs do.

Taken to its logical conclusion, Plaintiffs' argument is akin to the plaintiff's argument in *Smiley v. Citibank (South Dakota), N.A.*, that "*no* Comptroller interpretation of § 85 is entitled to deference, because § 85 is a provision that pre-empts state law." 517 U.S. 735, 733 (1996) (emphasis in original). The Supreme Court rejected that argument on the basis that the plaintiff "confuse[d] the question of the substantive (as opposed to pre-emptive) *meaning* of a statute with the question of *whether* a statue is preemptive." *Id.* at 744 (emphasis in original). Assuming the OCC's interpretation of Section 85 is reasonable, an issue the Court addresses in the following section, the fact that the effect of its interpretation may "impair the ability of States to enact effective usury laws" is an impairment that "has always been implicit in the structure of" the NBA. *Id.* (quoting *Marquette*, 439 U.S. at 318).

Accordingly, the Court concludes that the OCC interpreted the NBA. Therefore, the Final

---

[9]     The Court affirmed the injunction as applied to the threat to issue subpoenas, which it concluded was "not the exercise of the power of law enforcement 'vested in the courts of justice'" but vacated the injunction "insofar as it prohibit[ed] the Attorney General from bringing judicial enforcement actions." *Id.* at 536 (quoting 12 U.S.C. § 484(a)).

United States District Court
Northern District of California

Rule is not invalid because the OCC did not follow the procedures set forth Section 25b.  For that

reason, the Court also concludes it is not required to apply *Skidmore*[10] deference, as set forth in

Section 25b(b)(5)(A) and will apply *Chevron* deference in order to determine if the Final Rule is

valid.  *See* 12 U.S.C. § 25b(b)(5)(B) ("[N]othing in this section shall affect the deference that a

court may afford to the Comptroller in making determinations regarding the meaning or

interpretation" of federal law.).[11]

**D.      The Final Rule Is Not Invalid Pursuant to *Madden* or *Chevron*.**

"[T]he OCC has the primary responsibility for the surveillance of the 'business of banking'

authorized by the" NBA.  *Martinez v. Wells Fargo Home Mortgage, Inc.*, 598 F.3d 549, 555 (9th

Cir. 2010) (quoting *NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 256

(1995)).  As part of that responsibility, Congress granted the OCC "the power to promulgate

regulations and to use its rulemaking authority to define the incidental powers of national banks

beyond those specifically enumerated in the statute." *Id.*; *see also* 12 U.S.C. § 93a (subject to

certain conditions, "Comptroller of the Currency is authorized to prescribe rules and regulations to

carry out the responsibilities of the office").

**1.      *Madden* Does Not Render the Final Rule Invalid.**

Plaintiffs argue that the OCC lacked authority to issue the Rule because "[t]he Second

Circuit implicitly construed the unambiguous terms of § 85 in *Madden*."  They argue, therefore,

that the OCC "unlawfully offers an interpretation contrary to the statute's text and to *Madden*'s

construction of it."  (Mot. at 13 n.7.)  "A court's prior judicial construction of a statute trumps an

agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds

that its construction follows from the unambiguous terms of the statute and thus leaves no room

for agency discretion." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.,* 545 U.S. 967,

982 (2005) ("*Brand X*") (holding "judicial interpretations contained in precedents" should be held

---

[10]      *Skidmore v. Swift & Co.*, 332 U.S. 134 (1944).

[11]      For this reason, the Court does not reach the OCC's alternative argument regarding Section 25b(f).

1    "to the same demanding *Chevron* step one standard that applies if the court is reviewing the

2    agency's construction on a blank slate"); *see also Empire Health Found. for Valley Hosp. Med.*

3    *Ctr. v. Azar*, 958 F.3d 873, 884 (9th Cir. 2020) ("In other words, if the prior court decision was

4    decided at *Chevron* step one, there is no need to proceed to *Chevron* step two.").  Thus, when

5    judicial precedent holds "the statute unambiguously forecloses the agency's interpretation, and

6    therefore contains no gap for the agency to fill," that precedent "displaces a conflicting agency

7    construction[.]"  *Brand X*, 545 U.S. at 983.

8         The dispute in *Madden* was whether the plaintiff's state law claims against non-national

9    banks were preempted by the NBA.  The court held they were because, for NBA preemption to

10   apply, "application of state law to that action must significantly interfere with a national bank's

11   ability to exercise its power under the NBA." 786 F.3d at 247, 250.  The *Madden* court did not

12   engage in a *Chevron* step one analysis to resolve the issue.  The court also noted that preemption

13   might be extended if a non-national bank was "acting as 'the equivalent to [a] national bank[] with

14   respect to powers exercised under federal law.'"  *Id.* (quoting *Watters v. Wachovia Bank*, *N.A.*,

15   550 U.S. 1, 18 (2007)).  In doing so, the court did not clearly hold that the terms of Section 85

16   were unambiguous.  Rather, the court distinguished prior cases, extending preemption to non-

17   national banks on the basis that, in those cases, the national banks did not completely divest their

18   interests in the accounts at issue, which stood in contrast to the national banks in *Madden*, which

19   had not retained an interest in the plaintiff's account.  *Id.* at 251-52; *see also id.* at 252-53 & n.2.

20        Accordingly, the Court concludes that *Madden* does not preclude the OCC's interpretation

21   of Section 85.

22        **2.**      ***Chevron* - Step One.**

23        The first step in the *Chevron* analysis requires the Court to consider whether "Congress has

24   directly spoken to the precise question at issue."  *Chevron*, 467 U.S. at 842.  "If it has, Congress'

25   resolution of the issue controls and the agency is not free to adopt an interpretation at odds with

26   the plain language of the statute."  *Baldwin v. United States*, 921 F.3d 836, 842 (9th Cir. 2019).

27   "[A]n administrative agency's power to promulgate legislative regulations is limited to the

28   authority delegated by Congress."  *Bowen v. Georgetown Univ. Hospital*, 488 U.S. 204, 208

United States District Court
Northern District of California

10

1    (1988); *see also Merck & Co. v. U.S. Dep't of Health & Human Servs.*, 385 F. Supp. 3d 81

2    (D.D.C. 2019) (holding agency exceeded statutory grant of authority when it promulgated a rule

3    regulating marketing of prescription drugs).  "Regardless of how serious the problem an

4    administrative agency seeks to address, ... it may not exercise its authority 'in a manner that is

5    inconsistent with the administrative structure that Congress enacted into law.'" *FDA v. Brown &*

6    *Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000) (quoting *ETSI Pipeline Project v. Missouri*,

7    484 U.S. 495, 517 (1988)).

8         The OCC has been "charged with the enforcement of banking laws to an extent that

9    warrants the invocation of" the principle of deference "with respect to [its] deliberative conclusion

10   as to the meaning of these laws." *NationsBank*, 513 U.S. at 256-57 (internal quotations and

11   citation omitted).  Plaintiffs argue the Final Rule governs the conduct of non-banks and, from that

12   premise, argue the OCC exceeded its statutory authority by attempting to regulate entities that fall

13   outside its jurisdiction.  This argument mirrors Plaintiffs' argument that the OCC failed to comply

14   with Section 25b because the effect of the rule is to preempt state law.  For the reasons set forth

15   above in Section C, the Court does not find Plaintiffs' argument persuasive.  In addition, the Final

16   Rule may allow a non-bank to charge a rate of interest in excess of state-law usury caps at the time

17   a loan is transferred, but the Final Rule does not purport to regulate changes to the interest rate or

18   to regulate the transferee's conduct once that transaction is consummated.

19         The Court uses "traditional tools of statutory construction" to conduct the step one

20   analysis.  *Chevron*, 467 U.S. at 843 n.9.  "These tools of construction require [the Court] first to

21   engage in a textual analysis of the relevant statutory provisions and to read the words of statutes in

22   their context and with a view to their place in the overall statutory scheme." *N. Cal. River Watch*

23   *v. Wilcox*, 633 F.3d 766, 773 (9th Cir. 2011) (internal citations and quotations omitted).  Because

24   the parties disagree on whether the OCC engaged in a preemption determination, they also

25   disagree on how to frame "the precise question at issue" for purposes of the *Chevron* analysis.

26   Plaintiffs frame the question as: "to which entities does [section 85] apply?"  (Mot. at 8:28-9:1.)

27   The OCC frames the question as: "whether interest charged on loans originated pursuant to

28   [section] 85 remains permissible when the national bank exercises its authority to sell, assign, or

United States District Court
Northern District of California

11

transfer these loans to third parties." (Cross-Mot. at 6:17-19.) The Court frames the issue by reference to the issue considered by the OCC: what happens to the interest rate initially set on a loan originated by a national bank if that loan is subsequently transferred?

Section 85 provides, in part, that "[a]ny association may take, receive, reserve, and charge on any loan or discount made, …, interest at the rate allowed by the laws of the State, Territory, or District where the bank is located[.]"[12] 12 U.S.C. § 85.[13] Unlike *Smiley*, on which the OCC relies, the OCC did not interpret a particular term contained within Section 85. It argues, however, that Section 85 is silent on the issue in question and that it acted to fill that statutory gap.

Plaintiffs contend the OCC's position that Section 85 is silent is not tenable. They argue Section 85 unambiguously governs entities. Plaintiffs cite portions of Section 25b, which exclude a national bank's subsidiaries, agents, or affiliates from the preemption standard set forth in Section 25b(b)(1). *See* 12 U.S.C. §§ 25b(b)(2), 25b(e), 25b(h)(2). They also argue that Section 86 limits remedies for alleged violations of Section 85 only to national banks. *See also* 12 U.S.C. §§ 1463(g)(1)-(2). Further, Plaintiffs contrast the text of Section 85 with the text of Section 1735f-7a, which provides that interest rate caps "shall not apply to any *loan*, mortgage, credit sale, or advance" or "*depository account* held by, or other obligation of a depository institution." 12 U.S.C. § 1735f-7a(a)(1)-(2) (emphasis added). *See, e.g., Russello v. United States,* 464 U.S. 16, 23 (2002) ("'[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'") (quoting *United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir. 1972)).

However, the Court does not agree with Plaintiffs' position that the "interpretive question" before the OCC was: to which entities does Section 85 apply? Looking at Section 85 as the Court

---

[12] The details of other interest rates provided for by Sections 85 and 1463(g) are not relevant to the dispute.

[13] *See also* 12 U.S.C. § 1463(g)(1) (setting forth interest rates savings associations may charge). The parties' arguments focus on Section 85, but they agree those arguments are equally applicable to Section 1463. The Court's analysis and conclusions relating to Section 85 apply equally to Section 1463 and dictate the same outcome.

has framed the issue, Section 85 does not address what happens to an interest rate set by a national bank once it has been incorporated into a contract, let alone a contract that is subsequently transferred. Moreover, Section 1735f-7a also does not expressly address the transfer of loans. Assuming for the sake of argument that Section 1735f-7a speaks to loan transfers, it does not necessary follow that Plaintiffs' principle of statutory construction is applicable. In some instances, silence "may signal permission rather than proscription. For that reason, that Congress spoke in one place but remained silent in another, … rarely if ever suffices for the direct answer that *Chevron* step one requires." *Catawba Cty., N.C. v. Envtl. Prot. Agency*, 571 F.3d 20, 26 (D.C. Cir. 2009).

The Court concludes that Section 85 does not speak directly to the issue at hand.

### 3.    *Chevron* – Step 2.

Under the second step of the *Chevron* analysis, the Court defers to the OCC's interpretation of Section 85 "so long as it 'is based on a permissible construction of the statute.' … A permissible construction is one that is not 'arbitrary, capricious, or manifestly contrary to the statute.'" *Altera Corp. & Subs. v. Comm'r of Internal Revenue*, 926 F.3d 1061, 1075 (9th Cir. 2019) (quoting *Chevron*, 467 U.S. at 843-44).

> This is a generous standard, requiring deference "even if the agency's reading differs from what the court believes is the best statutory interpretation." *Brand X*, 545 U.S. at 980. To determine whether [an agency's] interpretation is reasonable, "[a court looks] to the plain and sensible meaning of the statute, the statutory provision in the context of the whole statute and case law, and to the legislative purpose and intent." *Nat. Res. Def. Council v. U.S. Envtl. Prot. Agency*, 526 F.3d 591, 605 (9th Cir. 2008) (citation omitted).

*Or. Rest. and Lodging Ass'n v. Perez*, 816 F.3d 1080, 1089 (9th Cir. 2016).

For reasons set forth above, the Court concludes the OCC's interpretation is not manifestly contrary to Section 85. Looking at Section 85 within the context of the NBA, Congress granted national banks enumerated powers in addition to the power to lend money. Those powers include the power "to make contracts," "all such incidental powers as shall be necessary to carry on the business of banking," and the power to sell or otherwise transfer loans. *See* 12 U.S.C. §§ 24(Third), 24(Seventh); 12 C.F.R. §§ 7.4008(a), 34.3(a). The Supreme Court also recognized a

United States District Court
Northern District of California

1   bank's power to transfer loans as early as 1848.  *See Planters' Bank of Miss. v. Sharp*, 47 U.S.

2   301, 323 (1848).  The OCC explained that *Planters' Bank* and the cited provisions of the NBA

3   informed its interpretation of Section 85.  85 Fed. Reg. at 33,531-32.

4          Plaintiffs argue that the OCC's interpretation is not reasonable because the privilege of

5   preemption cannot be transferred or assigned.  The Court is not persuaded by this argument,

6   because the Final Rule does not grant a non-bank party the same most favored status a national

7   bank holds with respect to the power to set interest rates.  Instead, commensurate with a national

8   bank's power to transfer or assign loans, the Final Rule states the national bank has the power to

9   do so without altering the interest rate upon which it and the borrower initially agreed.

10         The OCC's interpretation also is consistent with Section 1, which charges the OCC "with

11  assuring the safety and soundness of" national banks.  "[I]n discounting notes and managing its

12  property in legitimate banking business, [a bank] must be able to assign or sell those notes when

13  necessary and proper, as, for instance, to procure more specie in an emergency, or return an

14  unusual amount of deposits withdrawn, or pay large debts for a banking-house, and for any 'goods

15  and effects' connected with banking which it may properly own."  *Planters' Bank*, 47 U.S. at 323;

16  *cf. Tiffany v. Nat'l Bank of Mo.*, 85 U.S. 409, 413 (1873) (noting national banks were created "in

17  part to create a market for the loans of the General government").  The OCC stated that the

18  uncertainty associated with the *Madden* decision "impair[ed] many national banks' ability to rely

19  on" loan transfers as a "risk management tool, which [was] particularly worrisome in times of

20  economic stress when funding and liquidity challenges may be acute."  Final Rule at 33,533 &

21  n.39 (citing cases).

22         In comments to the OCC, Professor Levitin questioned the proposition that the Final Rule

23  was "necessary to protect bank liquidity" and argued to the OCC that there were "over 5200

24  federally insured depositories" providing a "robust market" among national banks for the sale or

25  transfer or loans.  (AR at 130.)  As in his comments to the OCC, before this Court, Professor

26  Levitin argues that the OCC's argument demonstrates that the Final Rule is arbitrary and

27  capricious because it simply impacts the size of the secondary market and avoids reduced sale

28  prices.  (*Id.*; Levitin Amicus Brief at 24:15-24.)

United States District Court
Northern District of California

1  The Court concludes it was not unreasonable for the OCC to determine greater certainty

2  regarding the transfer of interest rates, and a larger market for transfers, would serve to promote

3  the safety and soundness of the national banking system. *Cf. Cohen, LLC*, 489 F. Supp. 3d at 49

4  (concluding usury claim against non-bank entities was preempted and noting that "application of

5  state usury laws to securitized credit card receivables would compel Capital One [a non-party

6  national bank] to either forego securitization, *or else modify interest rates on a state-by-state*

7  basis") (emphasis added).

8  The OCC also argued that its interpretation of Section 85 comports with the "valid when

9  made" principle. 85 Fed. Reg., at 33,532 (citing *Nichols v. Fearson*, 32 U.S. (7 Pet.) 103, 109

10  (1833); *Gaither v. Farmers' & Mechs.' Bank of Georgetown*, 26 U.S. (1 Pet.) 37, 43 (1828); *see*

11  *also In re Rent-Rite Superkegs W., Ltd.*, 603 B.R. 41, 66 (Bankr. D. Colo. 2019), *reversed in part*

12  *on other grounds and remanded by In re Rent-Rite Superkegs W., Ltd.*, 623 B.R. 335 (D. Colo.

13  2020). Plaintiffs, supported by Professor Levitin, argue that this principle of common law could

14  not have informed Congress when it drafted the NBA because it is a modern invention. (*See, e.g.,*

15  Mot. at 15:6-12; Levitin Amicus Brief at 6:3-15.)[14]  They also argue the cases cited by the OCC

16  arose in different factual circumstances. Plaintiffs contend modern cases ignore portions of

17  *Nichols* and *Gaither*, which state that a transaction that is non-usurious at its inception cannot be

18  affected by a subsequent *usurious* transaction. *See Nichols*, 32 U.S. at 109; *Gaither*, 26 U.S. at 43.

19  Although Plaintiffs' argument regarding of the history of the "valid-when-made" principle

20  is persuasive, as is Professor Levitin's analysis of it, the Court concludes the OCC's reliance on

21  that principle does not render its interpretation of Section 85 unreasonable. That is because the

22  OCC also relied on the principle that an assignee steps into the shoes of an assignor. *See* 85 Fed.

23  Reg. at 33,532 ("Upon assignment, the third-party assignee steps into the shoes of the national

24  bank and may enforce the rights the bank assigned to it under the contract."). Plaintiffs do not

25

26  _____

[14]  Plaintiffs also argue that the OCC has taken inconsistent positions about the incorporation
of common law because, when it promulgated the True Lender Rule, it "disagreed" with

27  commenters who believed "that Section 85 incorporates the common law of usury as of 1864[.]"
85 Fed. Reg. at 68,743. However, the OCC did not clearly take a position about whether Section

28  85 incorporated common law. Rather, it responded to the comment by explaining that the True
Lender Rule interpreted other portions of the NBA. *Id.*

United States District Court
Northern District of California

1    dispute that general principle of law.  Instead, they argue a national bank cannot assign the

2    statutory right of preemption.  That argument, however, is based on the Plaintiffs' position that the

3    Final Rule preempts state law, a position that the Court finds unpersuasive.

4          Accordingly, the Court concludes that the OCC's interpretation of Section 85 is not

5    unreasonable.

6    **E.      The Final Rule Is Neither Arbitrary Nor Capricious.**

7          In addition to their arguments about why the OCC's promulgation of the Rule is an

8    unreasonable interpretation of Section 85, Plaintiffs argue the Final Rule is arbitrary and

9    capricious under *State Farm*.[15]  *See Altera*, 926 F.3d at 1075 (noting that *Chevron* and *State Farm*

10   "provide for related but distinct standards for reviewing rules promulgated by administrative

11   agencies").  "[T]he touchstone of 'arbitrary and capricious' review under the APA is 'reasoned

12   decisionmaking.'"  *Id.* at 1080 (quoting *State Farm*, 463 U.S. at 52).

13         A rule would be arbitrary and capricious if an agency "entirely failed to consider an

14   important aspect of the problem[.]"  *State Farm*, 463 U.S. at 43; *see also Or. Nat. Res. Council v.*

15   *Thomas*, 92 F.3d 792, 798 (9th Cir. 1996) ("[w]hether an agency has overlooked 'an important

16   aspect of the problem' ... turns on what a relevant substantive statute makes 'important'").

17   Plaintiffs argue the OCC failed to consider the impact of the Final Rule on "rent-a-bank schemes"

18   and the related question of how the "true lender" doctrine will apply to the Final Rule, a point that

19   Plaintiffs – and others – raised through comments.  (*See, e.g.,* AR at 313-14, 331-32, 348-49, 373-

20   402.)  For example, one commenter argued that when interest rates are challenged, the *Madden*

21   rule was easy to enforce, in contrast to challenges based on a true-lender theory.  (*Id.* at 385.)

22         The OCC acknowledged those comments in the Final Rule and stated that it "takes the

23   risks created by predatory lending, including through third-party relationships, very seriously[.]"

24   85 Fed. Reg. at 33,534.  It then set forth reasons why it believed the Final Rule would not facilitate

25   predatory lending.  For example, it noted that the Final Rule did not "alter[] the OCC's strong

26

27   _____

     [15]     To the extent these arguments are more properly considered in Step 2 of the *Chevron*
28   analysis, the Court incorporates its analysis here into the analysis above as further support for its
     conclusion that the OCC's interpretation of Section 85 is not unreasonable.

position on this issue, *nor does it rescind or amend any related OCC issuances.*"  *Id.* (emphasis added).  The OCC highlighted that it has "issued guidance on how banks can appropriately manage … risks associated" with third-party relationships.  (*Id.* & n.58 (citing OCC Bulletins).)  The OCC also noted that the Final Rule would not permit a national bank to charge interest rates that exceed the rates required in Section 85.

Plaintiffs argue that with respect to comments regarding the true-lender doctrine, the OCC simply stated that doctrine "raise[d] issues distinct from, and outside the scope of, this narrowly tailored rulemaking."  85 Fed. Reg. at 33,535.  However, in that statement, the OCC addressed comments requesting that it "establish a test for determining whether a bank is the true lender."  *Id.*  The portion of the Final Rule that immediately precedes that statement sets for the OCC's rationale as to why it concluded caveats relating to the true lender doctrine were not needed in the text of the rule.  Although the OCC later stated in the True Lender Rule that these two rules "operated together," that statement does not directly contradict its position that the true-lender doctrine raised distinct issues.

Plaintiffs also argue the OCC failed to consider that the Final Rule creates a regulatory vacuum because it will permit non-banks to "ignore" state rate caps.  Again, the Court does not find Plaintiffs' argument on that point persuasive.  Accordingly, the Court concludes that the record does not demonstrate that the OCC "entirely failed to consider" an important aspect of the problem.

Agency action also will be considered arbitrary and capricious if the "explanation for its decision runs counter to the evidence before the agency."  *State Farm*, 463 U.S. at 43.  Plaintiffs argue that during the rulemaking proceedings commenters alerted the OCC to the FDIC's statement that it "was not aware of any widespread of significant negative effects on credit availability or securitization markets having occurred to this point as a result of the *Madden* decision."  (*See, e.g.,* AR at 336-37 (quoting FDIC Proposed Rule, 84 Fed. Reg. at 66,850 (emphasis omitted).)  Plaintiffs also note that the OCC referenced empirical studies about *Madden*'s impact, but the OCC did not state it relied on those studies to make its decision.  It simply stated commenters brought the studies to its attention.  85 Fed. Reg. at 33,531.  The OCC

states throughout the Final Rule that the rule was intended to resolve uncertainty following the *Madden* decision and cited to the fact that commenters raised the issue of uncertainty during the rule making proceedings. *See, e.g., id.*, 33,534 n.54. In addition to comments criticizing the proposed rule, the AR provides support for the OCC's view that *Madden* did create uncertainty for those within the industry and those commenters stated the proposed rule would alleviate that uncertainty. (*See, e.g.,* AR at 263 (Comment of Consumer Bankers Association, Utah Bankers Association, and National Association of Industrial Bankers), 292 (Comment of U.S. Chamber of Commerce, Center for Capital Markets Competitiveness), 594 (Comment of Online Lenders Alliance).) Based on those comments, the Court cannot say the OCC's decision ran counter to the evidence before it.

Accordingly, the Court concludes that the Final Rule is not arbitrary and capricious based on the standards set forth in *State Farm.*

## CONCLUSION

For the reasons set forth in this Order, the Court DENIES Plaintiffs' motion for summary judgment and GRANTS Defendants' cross-motion. The Court will enter a separate judgment, and the Clerk shall close the file.

**IT IS SO ORDERED**.

Dated: February 8, 2022

_____
JEFFREY S. WHITE
United States District Judge